FILED

2015 Aug-28  PM 04:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

|  |  |  |
|---|---|---|
| MARK DUKE; JAMES EDWARDS; DALE GILLEY; FRANKIE JOHNSON; MICHAEL MAYS; MICHAEL MCGREGOR; JOHN MILLER; ALLAN WILLIAMS; and ROBERT WOODS, on behalf of themselves and all others similarly situated, | * * * * * * * * * | |
| PLAINTIFFS, | * | Civil Action No. 4:14-CV-1952-VEH |
| vs. | * | |
| COMMISSIONER JEFFERSON S. DUNN; ASSOCIATE COMMISSIONER TERRANCE MCDONNELL; DEPUTY COMMISSIONER GREG LOVELACE; INSTITUTIONAL COORDINATOR GRANTT CULLIVER; WARDEN DEWAYNE ESTES; ASSISTANT WARDEN ERIC EVANS; ASSISTANT WARDEN KAREN CARTER; CAPTAIN CARL SANDERS; CAPTAIN GARY MALONE, in their official capacities, | * * * * * * * * * * * * * * * * | |
| DEFENDANTS. | * | |

---

## SECOND AMENDED COMPLAINT

---

## PRELIMINARY STATEMENT

Plaintiffs are men presently confined in the custody of the Alabama Department of Corrections ("ADOC") at St. Clair Correctional Facility ("St. Clair" or "the Facility"), where mismanagement, poor leadership, overcrowding, inadequate security, and unsafe conditions, including broken and nonfunctioning locks on the majority of cell doors, have led to an extraordinarily high homicide rate, weekly stabbings and assaults, and a culture where violence is tolerated, creating conditions of confinement that violate the Eighth and Fourteenth Amendments to the United States Constitution. Because of poor management, drugs and other contraband – in many cases contraband that is brought into the Facility and sold to prisoners by officers or DOC staff – are prevalent. Furthermore, correctional staff fail to follow policies and procedures and sometimes ignore urgent pleas for assistance that then results in serious violence. The potential for violence is exacerbated by policies eliminating or severely cutting back mental health and drug treatment services, rehabilitative programming, and removing books and other constructive activities from the housing units. The lack of opportunities to engage in constructive activities and rehabilitative programming, including reading, creates an oppressive and monotonous environment that accommodates abuse and violence, as well as drug abuse in a population with a high rate of mental illness and prior addiction.

2

Defendants have failed to reasonably and adequately respond to this extremely high rate of prisoner-on-prisoner assaults and homicides and the dangerous conditions that facilitate the incidents and culture of violence. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 for injunctive and declaratory relief to redress Defendants' violations of their rights under the Eighth and Fourteenth Amendments to the United States Constitution.

Each paragraph in this complaint incorporates, repeats, and realleges every other paragraph in this complaint.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). Plaintiffs seek declaratory relief pursuant to 28 U.S.C. § 2201. Venue is proper pursuant to § 1391(b).

## PARTIES

PLAINTIFFS:

2. Plaintiffs Mark Duke, James Edwards, Dale Gilley, Frankie Johnson, Michael Mays, Michael McGregor, John Miller, Allan Williams, and Robert Woods are prisoners at St. Clair Correctional Facility.[1] Each named Plaintiff has suffered physical

---

[1]Antonio Cheatham and Derrick White have been transferred to different facilities.

harm or is in immediate danger of future harm. They seek to represent themselves and all other current and future prisoners at St. Clair.

DEFENDANTS:

3.     Defendant Jefferson S. Dunn is the Commissioner of the Alabama Department of Corrections. As Commissioner, Defendant Dunn is responsible for the direction, supervision, and control of the Department of Corrections. He is the highest ranking official in the Alabama Department of Corrections. Defendant Dunn is sued in his official capacity as Commissioner of the Alabama Department of Corrections.

4.     Defendant Terrance G. McDonnell is the Associate Commissioner for Plans and Programs for the Alabama Department of Corrections. As Associate Commissioner, Defendant McDonnell is responsible for the Central Records Division, Research and Planning Division, Supervised Reentry Program, Religious Programs, Educational and Vocational Education Programs, and Victim-Constituent Services. Defendant McDonnell is sued in his official capacity.

5.     Defendant Greg Lovelace is the Deputy Commissioner for Maintenance for the Alabama Department of Corrections. As Deputy Commissioner, Defendant Lovelace is responsible for the maintenance and construction of correctional facilities. Defendant Lovelace is sued in his official capacity.

6.     Defendant Grantt Culliver is the Institutional Coordinator for the Northern

4

Region of the Alabama Department of Corrections.  Defendant Culliver is responsible for planning, monitoring, and reviewing day-to-day operations of correctional institutions in his assigned area, including St. Clair Correctional Facility.  Defendant Culliver is sued in his official capacity. Defendant Culliver is also serving as the Associate Commissioner for Operations for the Alabama Department of Corrections. As Associate Commissioner, Defendant Culliver is responsible for ensuring the effective daily operations of prison facilities. He supervises the Classification Review Board, the Training Division, the Transfer Division, and the Institutional Coordinators. Defendant Culliver is sued in his official capacity.

7.     Defendant Dewayne Estes is the Warden of St. Clair Correctional Facility in Springville, Alabama.  As warden, Defendant Estes is responsible for the day-to-day operations of the prison, as well as the safety of all inmates at the Facility and the supervision of all subordinate employees.  Defendant Estes is sued in his official capacity.

8.     Defendant Karen Carter is an Assistant Warden of St. Clair Correctional Facility in Springville, Alabama.  As assistant warden, Defendant Carter is responsible for the day-to-day operations of the prison, as well as the safety of all inmates at the Facility and the supervision of all subordinate employees.  Defendant Carter is sued in her official capacity.

9.      Defendant Eric Evans is an Assistant Warden of St. Clair Correctional Facility in Springville, Alabama.  As assistant warden, Defendant Evans is responsible for the day-to-day operations of the prison, as well as the safety of all inmates at the Facility and the supervision of all subordinate employees.  Defendant Evans is sued in his official capacity.

10.     Defendant Carl Sanders is a Captain at St. Clair Correctional Facility in Springville, Alabama.  As a Captain, Defendant Sanders is responsible for safety of all inmates at the Facility, for supervising the security activities of St. Clair, and the supervision of all subordinate employees.  Defendant Sanders is sued in his official capacity.

11.     Defendant Gary Malone is a Captain at St. Clair Correctional Facility in Springville, Alabama.  As a Captain, Defendant Malone is responsible for the safety of all inmates at the Facility, for supervising the security activities of St. Clair, and the supervision of all subordinate employees.  Defendant Malone  is sued in his official capacity.

## FACTUAL ALLEGATIONS

12.     Defendants are aware of the extremely high rate of violence at St. Clair. There have been six homicides at the Facility in the 36 months prior to the filing of the original complaint, three of which occurred in 2014.  This constitutes a rate of

prisoner-on-prisoner homicides at St. Clair that is drastically higher than the national average in state prisons.  Based on the  Bureau of Justice Statistics' most recent available annual data from 2011, the national homicide rate in state prisons was approximately 5.4 homicides per 100,000 prisoners.  The homicide rate at St. Clair during the same time period was approximately 75.4 homicides per 100,000 prisoners. The homicide rate at St. Clair in 2012 was 75.6 per 100,000 prisoners, 77.7 per 100,000 prisoners in 2013, and the homicide rate to date **for 2014 is approximately 232.4 per 100,000 prisoners**.

13.     There is also a high rate of stabbings and serious assaults.  Based on the most recent Alabama Department of Corrections data available at the time the complaint was filed, the rate of serious assaults at St. Clair from January to May 2014 was 848.8 serious assaults per 100,000 prisoners and the rate of fights and assaults combined was 4,321 per 100,000 prisoners. Since the complaint was filed, subsequently released data indicates that the rate of serious violence is increasing. The rate of serious assaults at St. Clair from June 2014 to March 2015 climbed to 1,086 serious assaults per 100,000 prisoners, while the rate of total fights and assaults nearly doubled, rising to 7,680 per 100,000 prisoners.

14.     Defendants are aware of this extreme level of serious, life-endangering

violence at St. Clair.   In a news article from March 16, 2012, former Warden Davenport referred to the overcrowding, contraband, and violence at St. Clair as a "security nightmare."   There has been media coverage of each of the prisoner-on-prisoner homicides, which has included official statements from ADOC.

15.     Furthermore, undersigned counsel sent a letter to former Commissioner Thomas on April 22, 2014, regarding the alarming rise in violence and unprecedented homicide rate at St. Clair under former Warden Davenport's leadership and met with the Commissioner to emphasize these concerns.

16.     Less than two months after this meeting regarding the alarming rise in fatalities at St. Clair, another homicide occurred.  Jodey Waldrop was killed inside his cell on June 3, 2014.

17.     On June 9, 2014, following the murder of Mr. Waldrop, undersigned counsel sent a second letter to former Commissioner Thomas which documented the high rate of violence and the number of homicides at St. Clair in the preceding 30 months.   In this letter, and in meetings with the Commissioner and his staff, undersigned counsel detailed the mismanagement and violent conditions at St. Clair and called for immediate reform and change in leadership.

18.     No changes were made following these communications and the violence

at St. Clair continued.  On September 16, 2014, another prisoner, Tim Duncan, was killed in his block at St. Clair.

19.     Defendants' knowledge of the violent and dangerous conditions is also established by institutional reports prepared by Defendants' employees describing violent incidents and lawsuits filed by prisoners challenging the abuse of authority and conditions of confinement.

20.     Defendants are responsible for the care, custody and control of prisoners in their custody, and, through their acts and omissions, Defendants have allowed a dangerous and violent environment to flourish.  Upon information and belief, Defendants have not made significant efforts, and have not implemented adequate changes in policy or practice to address, or to improve, the conditions at St. Clair that allow violence to proliferate.  Despite the extraordinary rate of violence and homicides at St. Clair, Defendants have failed to take reasonable, necessary and appropriate steps to prevent and remedy these dangerous conditions.

21.     Where Defendants have responded, their response has been unreasonable. Verbally abusive and physically aggressive intervention by staff heightens the tension and makes the prison more dangerous.  This behavior has been modeled by the highest ranking staff in the prison including former Warden Davenport, Captain Sanders, and

Captain Malone.

22.     It was widely publicized that in 2012, former Warden Davenport reportedly punched a handcuffed prisoner in the face.  Former Warden Davenport was not demoted or removed from his command.

23.     Upon information and belief, Defendant Captain Sanders engages in arbitrary and unpredictable bullying tactics that keep the prison on edge including an incident in 2011 when Captain Sanders snatched a food tray from a prisoner's hands causing a dangerous and volatile situation to erupt leading to serious injuries to officers and prisoners.  Upon information and belief, Captain Sanders has taunted prisoners and responded to their safety concerns by telling them to "get a knife," "kill him or kill yourself," and "if you really don't like him, stab him."

24.     A group of high ranking officers have used excessive force and promulgated the culture of violence through their own actions.  This, combined with Defendants' failure to appropriately supervise staff with patterns of incidents involving excessive force or abusive interactions, has created an environment where the risk of physical harm is high.  This is reflected in the numerous assaults on prisoners by a group of correctional staff who have been the subject of repeated complaints of abuse, including but not limited the following assaults, all of which exceeded the authorization

of both the ADOC and St. Clair use of force policies:

a.      In July 2015, Dillon Cole was assaulted by Sergeant Hamilton and Officer McQueen in the C2 block of segregation.  He was handcuffed behind his back, thrown to the ground, and kicked by the officers.  Mr. Cole did not receive medical treatment and was held in a temporary holding cage outside the segregation unit for approximately eight hours.

b.      In May 2015, Brandon Ladd was assaulted by Officer Fife and Officer Burns in A block of segregation during a cell extraction. While laying on his stomach in handcuffs and shackles, Officer Burns kicked Mr. Ladd and Officer Fife hit Mr. Ladd repeatedly in the head with handcuffs wrapped around his fist. Mr. Ladd received stitches in the infirmary and was sent to UAB for treatment the next morning after having several seizures. This incident occurred the same afternoon that Counsel visited Brandon Ladd.

c.      In May 2015, Terrance Seay was assaulted by Officer Jones and Captain Malone in A block of segregation during a cell extraction when they hit him with the shield and stood on top of him. Once in the infirmary, Officer Jones and Captain Malone punched Mr. Seay while he was still handcuffed. This incident occurred the same afternoon that counsel visited Terrance Seay. Mr. Seay was

brought back to segregation and kept in the outside holding cages in the yard, handcuffed and shackled, for approximately three days.

d.      On or about April 17, 2015, Gerald Vann was assaulted by multiple officers when he attempted to comply with orders to return to his cell. Officers beat him with batons, then picked him up and rammed him head-first into a brick wall. Mr. Vann suffered large gashes on his head and required treatment at an outside hospital including dozens of staples to close and.

e.      On or about April 17, 2015, Darius Mines was assaulted by multiple officers who beat him with batons as he tried to comply with orders to return to his cell. The officers continued to assault Mr. Mines after he was handcuffed, and he received multiple staples to his head as a result of these injuries.

f.      On or about April 17, 2015, Bernard Abney was attempting to return to his cell in P-Block when officers struck him in the head with a baton, threw him to the ground, and struck him multiple times. Mr. Abney suffered a broken bone in his back and required hospitalization following the assault.

g.      On or about April 17, 2015, Maurice Green was attempting to return to his cell when he was assaulted by officers who threw him to the ground and kicked him, resulting in several of his teeth being chipped.

h.      On or about April 17, 2015, Unteyus Stephens was assaulted by officers when he attempted to comply with orders to return to his cell.  Officers  struck him with a television stand and struck him in the chin and ribs with batons. After he was handcuffed and taken out of the cell block, Defendant Malone slammed him into a wall.  Mr. Stephens required numerous stitches as a result of his injuries.

i.      In April 2015, Xabrian Austin was assaulted by Officers Tolliver and Burns following a strip search in his cell.  Mr. Austin consented to the search. After the guards searched his cell, Mr. Austin was sprayed with a chemical spray, handcuffed him and took him to the shift office.  Inside the shift office, while Mr. Austin remained in restraints, the guards punched him in the face and jaw in the presence of Lt. Carter.

j.      In April 2015, Gerald Ingram was assaulted by officers who struck him in the rib cage with a baton.

k.      On or about February 3, 2015, Demetric Pritchett was assaulted by two officers while handcuffed.  Mr. Pritchett had requested to see a supervisor regarding threats he was receiving from other men in the segregation cell block.[2]

_____

[2]Men in segregation are confined to an isolation cell for more than 23 hours per day, with only five hours of recreation per week, one five-minute shower every other

Officers Jason Schmid and Patton escorted him outside his cell and took him into a hallway where they repeatedly punched him in the face.

l.      In January 2015, Justin Jackson was assaulted by multiple officers who punched him, slammed him to the ground, kicked him, and struck him with their batons, all while he was handcuffed.  The officers dragged Mr. Jackson to the infirmary, where the assault continued until Mr. Jackson was locked in a temporary holding cage.  Sergeant Cook approached him in the cage, then called Officer Howard who began to beat Mr. Jackson again, all while Mr. Jackson remained handcuffed.  Howard and Cook also struck him with their batons.

m.     On January 3, 2015, Shakil Gamble was beaten by multiple officers and was ordered to the shift office where he was directed to stand facing the wall. While Mr. Gamble was standing with his hands against the wall, Officer Tolliver repeatedly slammed his head into the wall.  Additional officers entered the shift office, including Lt. Carter.  Officers began to beat Mr. Gamble and strike him with their batons. Mr. Gamble's head was also slammed against the floor.

n.      Upon information and belief, in January 2015, Zendarius White was assaulted by officers in L-Block. Mr. White asked officers why they were

_____

day, and restrictions on visitation, phone calls, and other privileges.

14

harassing other inmates and the officers responded by body-slamming Mr. White.

o.      In December 2014, Larry Nesbitt was assaulted by four officers in the infirmary, where he was being evaluated for a toothache and high blood pressure. Officers Howard Jr., Williams, Suggs, and Howard Sr. ordered nurses to leave the room, then slapped and punched Mr. Nesbitt, who was handcuffed throughout the assault.

p.      On or about December 7, 2014, Antonio Johnson was assaulted by two officers when he attempted to eat in the chow hall without his identification. Mr. Johnson tried to explain his lack of identification but was ordered to go to the shift office. As he was complying with the order, Officer Burke punched him multiple times in the face. A second officer, Officer Bowman, approached and the two officers forced Mr. Johnson to the ground and kicked him in the head.

q.      On or about December 3, 2014, Marcus Webb was assaulted by Captain Gary Malone while handcuffed in the infirmary. Mr. Webb suffered head and arm injuries as a result of this assault.

r.      In November 2014, Tommy Demming was shoved into a wall and punched in the face while handcuffed in his segregation cell by Officer Padgett.

15

s.      On or about November 3, 2014, James Howard was assaulted by Officer Lauolefiso Jones while walking to the chow hall.  Officer Jones grabbed the front of Mr. Howard's shirt, picked him up and slammed him into the ground. Officer Jones then rolled him over, handcuffed him, and kicked him while he was handcuffed.  Officer Jones shouted homosexual slurs during the assault.

t.      In October 2014, Jamie Abrams, at the time a resident of the honor dorm, was beaten and cursed by Officer Lauolefiso Jones, who grabbed Mr. Abrams by the neck and slammed his head against a wall.  The assault was the result of Mr. Abrams' mistakenly sitting at the wrong table during a Kairos religious program at the prison.

u.      In October 2014, Officer Lauolefiso Jones entered Matthew Owens' cell after the Kairos program, grabbed Mr. Owens by the neck and slammed his head into his bunk several times.  Mr. Owens nearly passed out while being choked. Officer Jones also threatened to kill him and shouted numerous profanities at him.

v.      In October 2014, Joseph Royal was beaten while restrained by several officers in the segregation unit after the officers had been instructed by Captain Gary Malone to beat him.

16

w.     On or about October 6, 2014, Terrence Seay was assaulted by Officer
Lauolefiso Jones while handcuffed and in leg shackles in the barbershop.
Officer Jones punched Mr. Seay, throwing him to the ground, then stomped on
him and struck him with a broom handle.  Mr. Seay was handcuffed during the
assault.

x.     In September 2014, Arlo Townsend was beaten by Officer Burns while
handcuffed and subsequently sprayed with a chemical agent.  Lieutenant Ronald
Carter accompanied Mr. Townsend to the infirmary, where Lt. Carter inflicted
a second beating on the handcuffed Mr. Townsend, which resulted in severe
injuries to his jaw, mouth, and teeth.

y.     On or about September 3, 2014, Michael Nelson, a partially-paralyzed
stroke victim who relies on a wheelchair, was beaten by Officer Daniel Turner
following a disagreement over a clothesline that Mr. Nelson used near his bunk
in the G dorm, which is a medical dorm. Officer Turner cursed at Mr. Nelson,
threatened to kill him, then repeatedly punched him in the face and chest.
Officer Turner pushed Mr. Nelson in his wheelchair into a bathroom area, where
he threw Mr. Nelson and the wheelchair into a wall, forced Mr. Nelson onto the
floor, destroying his wheelchair.

17

z.      On or about August 4, 2014, Charlie Bennett was sprayed with chemical spray, paraded through the prison naked, and not provided with proper medical treatment to remove the chemical from his body. Officer Chad Cleveland entered Mr. Bennett's cell and ordered him to strip, squat and cough.  Mr. Bennett complied.  No contraband was found, yet Officer Cleveland ordered him to squat and cough again.  Mr. Bennett again complied and again no contraband was found. The third time Officer Cleveland ordered him to squat and cough, Mr. Bennett refused, believing another search was excessive. Officer Cleveland and Sergeant Truitt then sprayed him with chemical spray and walked him naked through the camp.

aa.     In June 2014, inmate Demetric Pritchett was assaulted multiple times while restrained in segregation. The final assault occurred at the orders of Captain Malone. While Mr. Pritchett was restrained, an officer beat Mr. Pritchett's head and face.

ab.     In March 2014, inmate Tommy Demming observed Officer Bryan Chapman beating a handcuffed inmate. When Mr. Demming verbally intervened, Officer Chapman opened the door to his cage and punched him three times in the head. Mr. Demming was handcuffed while he was assaulted.

ac.     In 2014, Captain Malone punched a prisoner, who was handcuffed, in the head, chipping the prisoner's tooth.

ad.     In July 2014, Correctional Officers Donald Lukima and Christopher Smith, officers on Lt. Carter's shift, beat a prisoner.  Officers Lukima and Smith ordered the prisoner out of his cell in the middle of the night, took him into the hallway outside his block, handcuffed him, and then hit him in the back of the head with handcuffs wrapped around their knuckles, causing injuries requiring staples.

ae.     In May 2014, Lt. Carter put his hands around an inmate's neck and applied pressure until he lost consciousness.  The inmate had to be taken to UAB hospital due to his injuries.

af.     In May 2014, Lt. Carter forced Dale Gilley to stand outside the shift office facing the wall for fourteen hours and, at one point during that period of time, slammed his head against the wall and punched him in the face.

ag.     Jermaine Tillman was assaulted in February 2013 by Officers Chad Cleveland, M. Desnides, and W. Howard.  The officers assaulted Mr. Tillman when he was returning to his cell from the showers and was restrained in handcuffs behind his back.   The officers hit Mr. Tillman in the face, slammed

his head into a window, and continued to punch, kick, and beat him when he fell to the floor.

ah.     Upon information and belief, inmate Richardo Eason was beaten by multiple St. Clair officers while handcuffed in February 2013.   While assigned to the segregation unit, Mr. Eason was placed in handcuffs before being allowed to leave his cell for a shower. Officer JaMichael Howard left his post and approached Mr. Eason, asked him a question, then punched Mr. Eason several times in the face. Officers Taylor Knight and Chad Cleveland then assisted Howard in slamming Mr. Eason onto the floor.

ai.     Upon information and belief, inmate Darrious Mabry was beaten by Officer Matthew Moore in October 2012.  In a dispute over Mr. Mabry leaving the dining hall with extra cake, Officer Moore left his post and attacked Mr. Mabry, who suffered a broken nose, split lip, broken tooth, injured eye, and head contusions.

aj.     Upon information and belief, in Janury 2012, inmate Joseph Shack was beaten by Sgt. John Mason and suffered hearing loss as a result.  Mr. Shack was handcuffed and shackled during the beating.  Sgt. Mason punched him in the head, face, and ear, stomped on his back, kicked him and yelled racial epithets

at him.  Mr. Shack had requested the presence of a witness at a disciplinary hearing, and Sgt. Mason responded: "This is what I do to a [n . . . ] that tries to tell me how to do my job." Mr. Shack was treated for a ruptured ear, fractured thumb, and internal bleeding.  He was fitted for a hearing aid following the rupture.

ak.    Upon information and belief, James Bonds was beaten by officers and suffered a severe eye injury in September 2011.  Three correctional officers shook down his cell, forced him to remove clothes and to squat and cough. After they found a cell phone in his cell, the officers sprayed Mr. Bonds with a chemical agent and struck him with batons, then handcuffed him.  After Mr. Bonds was handcuffed, Officer Donald Lukima arrived at the scene and struck Mr. Bonds in the eye while Mr. Bonds was handcuffed.  Mr. Bonds suffered a serious eye injury, including an orbital wall fracture to his left eye and massive bleeding. His injuries required multiple treatments and surgeries at outside hospitals.

25.    In addition, subsequent to meeting with undersigned counsel, a number of the plaintiffs have experienced mistreatment by correctional officers. Such incidents of mistreatment include, but are not limited to:

a.      For three days and two nights in October 2014, Antonio Cheatham was forced to stand outside the shift office because the prison staff refused to place him in safe housing.  The situation began on or around October 3, when Captain Carl Sanders ordered Mr. Cheatham to move to L-Block.  Mr. Cheatham, who had recently had part of his ear bitten off by another inmate, told Captain Sanders that he had documented enemies in L-Block and could not live there. Captain Sanders responded by telling Mr. Cheatham he could either move to L-Block or stand outside the shift office all night.  Mr. Cheatham remained there for most of two nights before being sent to an isolation cell in segregation.

b.      In early October 2014, Robert Woods, who is 57 years old and disabled, complained to Captain Carl Sanders that another inmate was hiding contraband under his bed, and requested a move to a safe block.  Captain Sanders responded by threatening to assign Mr. Woods, who is missing one leg, to a top bunk. Captain Sanders then assigned Mr. Woods to Q-Block, a notoriously violent housing unit.  When he arrived, Mr. Woods was instructed by the inmates who controlled the block where he could live within the block.  Soon after arriving on Q-Block, Mr. Woods witnessed an inmate being beaten by 10-15 other inmates.

26.     Defendants have also failed to promulgate, implement and enforce adequate policies, procedures, and practices necessary to adequately supervise and monitor the housing units and common areas in the Facility and to maintain the safety and security of prisoners at St. Clair.   Defendants are aware that the inadequate supervision by correctional staff has created a dangerous environment, has contributed to numerous homicides and assaults in the Facility, and creates a substantial risk of serious harm.  As stated by former Warden Davenport, the conditions at St. Clair make it a "security nightmare."  They have failed to take reasonable measures to change their practices, policies, and procedures to improve safety and security of the prisoners in the general population housing units.

27.     Defendants fail to adequately supervise and monitor the housing blocks in general population.  Upon information and belief, St. Clair has eight cellblocks, J, K, L, M, N, O, P, and Q, that house prisoners in general population.  Each cellblock is divided into two separate sides, so that they are designated as J1, J2, K1, K2, etc.  Blocks J and K are paired blocks that are connected by a hallway, as are L and M, N and O, and P and Q.   Each side of a cellblock is comprised of 24 two-man cells, so that 48 prisoners live on each side of a block and 96 prisoners live in each block as a whole.   Each cell has a steel door through which prisoners enter and exit their cell.

23

The locking mechanisms on the majority of cell doors are broken or ineffectual and provide no protection.  (See ¶¶ 40-44 below.)

28.     A single officer is assigned to supervise and monitor each of the housing blocks and the 96 prisoners housed there.  The officer is stationed in a "cube," which has windows that allow the officer to see into both sides of the block.  Upon information and belief, the cube officer is not permitted to leave their post during their shift.  Random patrols of the housing blocks by additional officers occur extremely infrequently.  Upon information and belief, most days, officers only walk through the blocks during scheduled count times that occur three to five times in a 24 hour period. Therefore, the cube officer is the only officer monitoring both sides of each block the vast majority of the time.  Upon information and belief, the officers in the cube are, at times, asleep, on the telephone, or otherwise not paying attention to the prisoners they are supervising.

29.     Upon information and belief, there are blind spots in all of the blocks that cannot be seen by the cube officer, including the shower area, the TV/day room, and inside all of the cells.  There are few, if any, functioning cameras in the housing blocks. Consequently, large sections of the housing blocks in general population are not within the view of any officer the majority of the day.

24

30.     The only means for prisoners to communicate with the officer in the cube is by banging on the glass windows.  If a prisoner is in a locked cell, there is no way for a prisoner in his cell to contact the officer in the cube except by banging on his cell door.

31.     Each of the cellblocks open onto a common yard, referred to as the "G-Yard" and doors leading to the G-Yard from the blocks are located in the hallways that connect the paired blocks together.  The gymnasium used by all of the prisoners in general population is located on the G-Yard.  The prisoners who live in H dorm and G dorm also use the G-Yard and the gymnasium.

32.     There are generally between 200 and 400 prisoners on the yard or in the gym during yard call and gym call.  Upon information and belief, there is one officer assigned to supervise the yard and the gym during yard and gym call and between two and four roving officers.  However, there are often less officers present than are assigned to the gym and yard.

33.     There are also two open bay dorms at St. Clair.  The first is known as "H dorm," where prisoners enrolled in the Therapeutic Communities program ("TC"), a substance abuse treatment program, reside.  Upon information and belief, there are approximately 260 prisoners who currently reside in H dorm.  The other dorm is known

25

as G dorm.  It is a part of the infirmary and typically, prisoners requiring medical care live there.  Upon information and belief, there are approximately 58 prisoners who live in G dorm.

34.     Upon information and belief, there is one officer who is assigned to sit at a desk at the entrance of H dorm and who is responsible for supervising the prisoners who reside in the dorm.  That officer is not permitted to leave his assigned post during his shift and is unable to see inside the bathrooms, as well as the back of the dorm where some prisoners' beds are located, from the desk where he sits.  Upon information and belief, random patrols of the dorms by additional officers occur extremely infrequently.  Most days, officers only walk through the blocks during scheduled count times that occur three to five times in a 24 hour period.  Therefore, the officer assigned to the desk is the only officer monitoring H dorm the vast majority of the time and the officers at the desk are, at times, asleep, on the telephone, or otherwise not paying attention to the prisoners they are supervising.

35.     Upon information and belief, there are blind spots in the open bay dorms. The officer assigned to monitor the dorm from the desk near the entrance is not able to see a portion of the back of the dorm where some prisoners' beds are located. Additionally, the officer is not able to see into the bathrooms from his or her post.

26

There are few, if any, functioning cameras in the open bay dorms. Consequently, portions of the open bay dorms are not within the view of any officer for large parts of the day.

36.     Defendants are aware that the inadequate supervision in general population contributes to the high rate of prisoner-on-prisoner violence. Inattentive officers, the inability to contact officers in an emergency, and blind spots in the units have contributed to numerous violent incidents, many of which have been stabbings, that have resulted in serious injury or death. Since the filing of this lawsuit, Defendants have failed to fix the broken locks on cell doors and take appropriate measures to reduce the large number of knives and other weapons at the prison. These continuing failures, along with poor supervision of inmates at the facility, have resulted in additional inmate-on-inmate stabbings and assaults causing serious injuries. The incidents of prisoner on prisoner assaults include but are not limited to:

a.     In July 2015, Omar and Jamal Denson were attacked by multiple inmates. Jamal Denson was stabbed, receiving serious wounds in his head, kidneys, and lungs that required treatment and surgery at UAB hospital. Omar Denson was stabbed multiple times.

b.     In July 2015, Micah Mays was assaulted by another inmate in his cell in

27

Q block.  He suffered several stab wounds and a broken arm.

c.      In May or June 2015, Janarious Smith was stabbed by another inmate during yard time in the segregation unit.  While walking in the yard area, another inmate was able to remove his handcuffs and stab Mr. Smith, who was handcuffed behind his back, several times with a knife in the back and arm.

d.      In May 2015, Victor Russo was robbed and assaulted shortly after returning from the prison store to his cell.  Multiple prisoners were able to open his cell door and enter his cell because the door had a broken locking mechanism.  They attacked Mr. Russo, who is 52, and stole all of his store items.  He suffered facial injuries requiring treatment at UAB Hospital.

e.      In April 2015, A.Z. was raped in H dorm, the Therapeutic Community, a week after being transferred to St. Clair.  A.Z. was asleep in his bunk when his assailant put a knife to his throat and raped him.  After reporting the rape, A.Z. was placed in an isolation cell in segregation and was unable to participate in the Therapeutic Community.  A.Z. was not provided with continuing medical or mental health treatment.  When placed in an isolation cell in segregation, A.Z. reported to officers that he felt suicidal and in response he was told to kill himself.  A.Z. never heard the outcome of the I&I investigation.  A.Z.'s

28

assailant, a general population prisoner living in H dorm who was not a participant in Therapeutic Community and had a history of violence and sexual assault.

f.      In April 2015, Michael McGregor was repeatedly stabbed two days after arriving at St. Clair.  Mr. McGregor was asleep in his cell, with the door locked. His assailant was able to enter his locked cell and stabbed him in his arms, chest, back, head, and neck, using two ice picks.  Mr. McGregor suffered extensive injuries to his back and neck, including chipped vertebrae, requiring treatment at UAB hospital. Hours before this assault, Mr. McGregor reported to his classification officer that he needed to be moved because he was being threatened by this assailant.

g.      In April 2015, W.C. was raped twice at knifepoint in the middle of the night by his cell partner in P-Block.  He had been required to sign a living agreement as the only means of avoiding placement in isolation.  W.C. continued to face retaliation from friends of his assailant.  He did not receive continuing mental health care and never heard the outcome of the I&I investigation.

h.      In March 2015, Jamal Woods was stabbed by three inmates in L-Block. Mr. Woods was stabbed in his head, face, shoulder, and leg, receiving serious

injuries that required two trips to UAB hospital.  The assault was in plain sight of the cube officer, the lone officer in the block overseeing 96 inmates.

i.      In March 2015, James Dorriety was stabbed multiple times in his head and back, suffering a punctured lung. Mr. Dorriety, an honor dorm resident, was returning to his cell block from the prison canteen when three men armed with knives robbed him of his canteen goods and assaulted him.  His injuries required treatment at UAB hospital, where he received numerous staples in his head and surgery to treat his lung injury.

j.      In March 2015, Nakia Echols suffered multiple stab wounds from another inmate.  The inmate entered his cell in P-Block armed with a knife and ice pick in the early morning hours as Mr. Echols slept and assaulted him.  Following the assault, Mr. Echols was too frightened to return to his cell and slept for a week on a bench in Q-Block, undetected by prison staff.

k.      In March 2015, David Beech, who is 58 years old, was stabbed and seriously injured by another inmate while both were waiting in the noon pill call line.  The inmate stabbed Mr. Beech multiple times with a box cutter.  Mr. Beech was treated at UAB hospital and received numerous staples on his wrist and several each on his head and back.

l.      In March 2015, Jeffrey Peoples was assaulted by multiple assailants while

he was sleeping in his cell.

m.      Around February 2015, Dillon Cole was stabbed multiple times in L block.

n.      In February 2015, Brandon Ladd was stabbed during an attempted robbery in his cell in L-Block by an inmate assigned to a different block, who was able to enter his block.  Mr. Ladd suffered stab wounds to his forearm and chest, resulting in a collapsed lung, which required extensive treatment, including surgery, at UAB hospital.

o.      In February 2015, Larry Hill was assaulted in his cell block by multiple inmates who were allowed entry into the cell block by the cube officer.  Mr. Hill was beaten with knife handles and fists and knocked unconscious.

p.      On or around February 1, 2015, J.M. was raped by another inmate, who approached J.M. as he was reading on his bunk and placed a knife to his throat. Both men were assigned to the Therapeutic Community or H dorm, which is where the rape occurred.  J.M. remains in an isolation cell in segregation. J.M. did not have sight and sound separation from his assailant even while in segregation.  J.M. does not use the shower in segregation because he continues to fear retaliation.  He has not received mental health counseling and has not heard the outcome of the I&I investigation.

q.      In January 2015, Bradley Gant was attacked as he was leaving his block during a meal time.  He suffered head and facial injuries after being struck with a metal lock by an inmate who had previously harassed him.  Mr. Gant required staples in the back of his head and stitches on his chin as a result of the assault. When Mr. Gant reported the earlier harassment, Captain Sanders responded that the other inmate "isn't here to take care of you," and advised Mr. Gant to "get a knife and do something about it."

r.      In January 2015, Micah Mays was stabbed and cut multiple times, suffering injuries to his face, wrists, neck, and shoulders during a robbery attempt in N-Block.  His assailants had entered N-Block from a different block. His injuries were so severe he required treatment at UAB hospital.

s.      In January 2015, Justen Stinson was stabbed and punched in his cell in P-Block.  After being assaulted, Mr. Stinson moved undetected through several other blocks seeking help for his injuries from other inmates.

t.      In January 2015, Elliott Blount was robbed and stabbed in his cell in N-Block.  Mr. Blount's assailant was assigned to P/Q and was allowed to enter an unassigned living area.  Mr. Blount suffered severe head injuries that required extensive surgery at UAB hospital.

u.      In January 2015, Derrick LaKeith Brown, an inmate who suffers from

32

hemophilia, was stabbed and seriously injured by another inmate. His wounds included a punctured liver and internal bleeding that required treatment at UAB hospital.

v.      In January 2015, D.C., a nonviolent offender, was raped at knifepoint in L-Block.  His assailant told him that he would kill him if he reported the rape. D.C. was placed in an isolation cell in segregation after reporting the rape, but he still did not have sight and sound separation from his assailant.  D.C. did not receive continuing mental health counseling.

w.      In December 2014, J.H. was sexually assaulted at knife point in his cell by a prisoner, the same man who later raped J.M.  J.H. reported the assault and was placed in an isolation cell in segregation.  J.H. never heard the results of the I&I investigation.  Two months later, the same assailant sexually assaulted J.M. The assailant was then moved to segregation and placed in the same block as J.H.

x.      On or about December 3, 2014, Michael Stamper, who is 53 years old, was stabbed approximately eight times, including twice in his forehead and in his lung.  The incident occurred in O-Block, which is typically reserved for older inmates with good disciplinary records.  Mr. Stamper received over 40 stitches and required treatment at UAB hospital.

y.     In November 2014, Frankie Johnson, a plaintiff in this lawsuit, was stabbed in the back of his head, the backs of both arms, his left side, and on one of his fingers while in the chow hall and in full view of several correctional officers.  Mr. Johnson required staples to the back of his head and stitches to his finger.

z.     In November 2014, Mark Archer, an older inmate who has undergone surgery for severe back problems, had all of his personal property stolen from his cell while he was in the shift office.  The stolen items included a special, egg-crate mattress Mr. Archer needs for his back.  Neither Mr. Archer nor St. Clair staff have been able to locate the mattress, and it remains missing months later.

aa.     In October 2014, Dale Gilley, a plaintiff in this lawsuit, was assaulted in the dimly-lit tunnel leading to H dorm following his visit with undersigned counsel. As Mr. Gilley entered the tunnel he heard another prisoner say, "Hey, holler at me about that program," and looked up, but did not see the man clearly. The man then punched him in the face.  Mr. Gilley reported the incident and, because he was unable to identify his assailant, was given the choice of signing a liability release form or going to an isolation cell in segregation.

ab.     In September or October 2014, Christopher Chapple was beaten over the course of several hours by multiple assailants in Q-Block. There was only a

34

single cube officer in the block, a cadet, who never came out of the cube during Mr. Chapple's assault, nor called for roving officers to assist as the beating continued.

ac.     In September 2014, Joseph Royal was attacked by his cell mate soon after being transferred to P-Block. Mr. Royal was assaulted while sleeping and woke up covered in blood. He was taken to Brookwood Hospital, where he received staples in his head.

ad.     In August 2014, Victor Russo, who is 52 years old, was moved out of the honor dorm for an alleged shaving infraction.  He moved into his new block and soon after was accosted by three younger inmates armed with knives who robbed him.  When Mr. Russo reported the robbery to correctional staff, Captain Sanders suggested he get a knife to protect himself.

ae.     In September 2014, Tim Duncan was murdered by another prisoner or prisoners in N-Block. Mr. Duncan had previously had conflict with individuals in N-Block and had made numerous requests to Captain Sanders to be transferred to another block. These requests were repeatedly denied.

af.     On or about June 3, 2014, Jodey Waldrop was murdered in his cell by another prisoner, who was able to enter Mr. Waldrop's cell in the middle of the night when the block was on lockdown, due to the cell door not locking.

35

ag.     In June 2014, Derrick White, who lived in P-Block, was assaulted in the hallway between P and Q blocks during a movement time by a prisoner who, upon information and belief, was not assigned to either block.  There were no officers present when Mr. White was assaulted.  He was strangled and then dragged while unconscious into the showers in Q.  He was in the showers from approximately 7:30 a.m. until 1:00 p.m. and was never found by staff, despite the fact that, upon information and belief, a count was conducted during the time he was missing.

ah.     In May 2014, Derrick White was stabbed in the gym by another prisoner. Mr. White's assailant also stabbed another prisoner during this incident.  There were approximately 20 prisoners present in the gym and 200 prisoners in the yard at the time of the stabbing.  Upon information and belief, there was one officer supervising the yard and no officers present in the gym.

ai.     In May 2014, Antonio Cheatham was assaulted by another prisoner in the bathroom of the H dorm, a known blind spot, while no correctional officers were in view.  Part of his ear was bitten off and flushed down a toilet before any officers responded to the struggle.

aj.     In February 2014, a prisoner was stabbed inside his cell, a blind spot to the cube officer.

ak.     In January 2014, Marquette Cummings was stabbed and killed in the TV room, a blind spot to the cube officer.

al.     In December 2013, Michael Mays was stabbed by another prisoner on the way to the chow hall. Mr. Mays was stabbed in the neck, in the back, and in the elbow. Mr. Mays had to be taken to an outside hospital for treatment.

am.    In September 2013, Frankie Johnson was burned in his cell in the middle of the night by a prisoner who was able to exit his own cell and enter Mr. Johnson's cell.   That prisoner threw a chemical substance that had been heated in a microwave on Mr. Johnson while he was sleeping, resulting in severe chemical burns.

an.     In July 2013, Mark Duke was stabbed several times by another prisoner in the G-Yard and suffered a punctured lung.

ao.     In 2013, a prisoner was stabbed multiple times with an ice pick outside the gym by another prisoner.  At the time there were approximately 200 inmates in the area, but no officers were present to intervene in the conflict.  The prisoner made it to the infirmary unassisted and was eventually transported by ambulance to an outside hospital because of the seriousness of his wounds.

ap.     In May 2012, John Rutledge was strangled to death inside his cell in the middle of the night when the cells should have been locked down.  Multiple

aspsailants were able to enter Mr. Rutledge's cell and hog-tie and strangle him without being observed by officers.  His cell mate discovered him and reported his condition to the cube officer.  By the time officers reached the cell, Mr. Rutledge was dead from strangulation.

aq.      Upon information and belief, Muhammad Al-Ameen, also known as Terry Rivers, was repeatedly stabbed on the yard by another inmate in May 2012. There were numerous inmates on the yard, but no officers were present when Mr. Al-Ameen was stabbed.  Mr. Al-Ameen's injuries required surgery.

ar.      In October 2011, Jabari Bascomb was stabbed to death in his cell, a blind spot to the cube officer, after another prisoner broke into his cell.

as.      Upon information and belief, in January 2011, Anthony Moss was assaulted in his cell, a blind spot to the cube officer, and suffered an injury which caused him to lose the use of his left eye.

37.      Defendants have also failed to promulgate and enforce adequate and effective policies, procedures and practices in the segregation housing units meant to keep prisoners isolated from one another for their protection.  Upon information and belief, policy requires that prisoners in segregation be placed in handcuffs before their cell door is opened, and that only one door be open at a time so that prisoners in segregation do not come in contact with each other.

38

38.     DOC staff also fail to adequately conduct searches for contraband and knives in segregation. The failure to follow the policies of permitting only one prisoner out of his cell at a time and searching for contraband creates a significant risk of serious harm because these conditions have been the cause of multiple violent assaults, including but not limited to:

a.     In May or June 2015, Janarious Smith was stabbed by another inmate during yard time in the segregation unit. While walking in the yard area, another inmate was able to remove his handcuffs and stab Mr. Smith, who was handcuffed behind his back, several times with a knife in the back and arm.

b.     In August 2014, a prisoner was stabbed by the same prisoner that fatally stabbed Jammy Bell in 2013, after the prisoner was assigned to clean the halls in the segregation unit. The officers failed to secure the food-tray slots on the cell doors prior to sending the prisoner into the unit and the other man was able to stab the prisoner in his leg by sticking a knife attached to a broom handle through his open tray slot.

c.     In August 2013, Jammy Bell was fatally stabbed by another prisoner in the segregation unit after an officer failed to follow proper protocol for opening the cell doors.

d.     Upon information and belief, Jovar Gamble was stabbed multiple times

39

in August 2012, while housed in the segregation unit.  Mr. Gamble was in handcuffs on the walk when another segregation inmate stabbed him.

e.      Upon information and belief, Orlando Porch was assaulted by another inmate while both men were housed in segregation in January 2012.

39.     Defendants are aware of the locations and circumstances in which these homicides and assaults have occurred and that inadequate supervision was one of the dangerous conditions that made it possible for these incidents to occur.  However, they have failed to adequately increase patrols and supervision of the units, have not installed cameras or provided means for prisoners to call for help in an emergency, nor taken any other reasonable action to increase and improve the quality of supervision in general population, leaving the plaintiff class exposed to the continuing real and imminent substantial risk of serious harm.

### DEFENDANTS' FAILURE TO PROVIDE SECURE LOCKING MECHANISMS ON INDIVIDUAL CELL DOORS PLACES INMATES AT RISK OF VIOLENT ASSAULT.

40.     The locking mechanism on the majority of cells are broken and have not been repaired.  Defendants rely on a system of locked, secure cells to house inmates safely, rather than visual monitoring, yet Defendants are aware that the locks in the majority of doors at the Facility can be easily tampered with so that they do not lock. Without locking cell doors, prisoners in the cell blocks have no means of protecting

40

themselves inside their cells.  Defendants have refused requests to fix cell doors and have failed to take adequate measures to repair the broken cell locks.

41.     The locks on the cell doors in general population can be easily tampered with by using items such as a piece of plastic, a razor blade, or paper clips to jam the locking mechanism.  Once the locking mechanism is jammed, it does not engage and the door can be "tricked," meaning it can be opened from the inside or from the outside with a plastic ID card which all prisoners carry.  The locks on some of the doors in general population are broken and do not work, even if nothing is jamming the mechanism.  In some doors, the entire mechanism is missing.  Cell doors in general population remain open all day, making it possible for prisoners to jam the locks in other prisoners' doors.  The locks on the doors in segregation can also be easily tampered with by jamming an object, such as a toothpaste cap, in the mechanism that rolls the door, which prevents the lock from engaging.

42.     Consequently, Plaintiffs cannot keep other prisoners from entering their cells and prisoners are able to enter or exit their own and other prisoners' cells at any time, even during lockdown. This creates a particularly dangerous environment because cells are "blind zones" in the blocks, meaning that officers in the cube cannot see inside the cells and there is no way for a prisoner to call an officer for help in the event of an emergency, other than banging on the cell to try to get the attention of the cube officer.

41

(See ¶¶ 28-30 above.)  Because cube officers are frequently asleep or are otherwise inattentive, this is not an effective means for a prisoner being assaulted to get help.

43.     Defendants know that the locks on most cells do not work.  St. Clair staff have made comments demonstrating their knowledge, have used their own ID cards to open cell doors, and have seen prisoners come out of their cells when the unit is supposed to be on lockdown.  Upon information and belief, there is an indicator light panel in the cube that indicates to the cube officer when cell doors are not locked. Furthermore, Defendants are aware that the lack of functioning locks creates dangerous conditions because prisoners have been assaulted in their cells during times when the unit was on lockdown.  These incidents include, but are not limited to:

a.     On or about June 3 2014, Jodey Waldrop was murdered in his cell by another prisoner, who was able to enter Mr. Waldrop's cell in the middle of the night when the block was on lockdown, due to the cell door not locking.

b.     In August 2013, Jammy Bell was stabbed by another prisoner in segregation after his cell door was tampered with.

c.     In May 2012, John Rutledge was strangled to death by other prisoners who entered his cell in the middle of the night, when the cells should have been on lockdown.

d.     Upon information and belief, in May 2011, Derrick Averhart was stabbed

42

in the arm, head, and face by another inmate while handcuffed in his cell in segregation.

44.     Defendants have failed to respond in a reasonable manner to the continuing real and imminent substantial risk of serious harm posed to the plaintiff class by the broken locks on the general population cell doors.  Defendants do not adequately train younger staff how to determine if a door is tricked, do not regularly check cell doors to make sure the lock is functioning properly or repair locks they know are broken, have refused Plaintiffs' requests to repair broken locks, and have taken no other reasonable or adequate action to ameliorate the risk of harm created by cell doors that do not lock.

**VULNERABLE INMATES, INCLUDING THE DISABLED AND ELDERLY, ARE HOUSED IN VIOLENT UNITS WHERE THEIR RISK OF VIOLENT ATTACK IS INCREASED.**

45.     Defendants' lack of risk assessment and classification system puts prisoners at risk of violence.  Defendants fail to effectively separate prisoners who are at risk for a violent conflict.  Defendants fail to adequately screen incoming prisoners to determine if they have enemies in the Facility, based either on personal conflicts, prior conflicts at other facilities in ADOC, or gang-based conflicts, and do not adequately take such considerations into account when making housing assignments. Without the ability to identify enemies and vulnerable inmates, St. Clair cannot

43

appropriately manage risks of violence, thus exposing prisoners to harm.

46.    Upon information and belief, Defendants do not adequately factor in a prisoner's security level, including his offense of conviction, sentence, and disciplinary record, in making housing assignments.  Minimum, medium, and maximum custody prisoners can be, and are, assigned to the same units and cells as each other. Therefore, prisoners with short term of years sentences, convictions for relatively minor offenses and clean or only minor disciplinary histories can be assigned to the same unit, and assigned to share a cell with, prisoners who have life sentences, were convicted of more serious offenses, or with a violent institutional history. Furthermore, prisoners transferred out of the honor dorm and the Therapeutic Communities dorm, housing units where there are more privileges, are particularly vulnerable to assault when they are moved into the blocks in general population.  It is unreasonable of Defendants to fail to make housing assignments based on security classification status or other vulnerabilities.

47.    Upon information and belief, Defendant Sanders, the captain of general population, is responsible for authorizing all housing movement and has repeatedly assigned older, physically disabled, or otherwise vulnerable prisoners to units and cells with young prisoners with a history of violent conduct.  He has also failed to authorize a change in housing assignment when such prisoners request a bed change based on

fear for their safety.  (See ¶¶ 51-53 below.)

a.      In September 2014, Tim Duncan was murdered by another prisoner or prisoners in N-Block. Mr. Duncan had previously had conflict with individuals in N-Block and had made numerous requested to Captain Sanders to be transferred. These requests were repeatedly denied.

b.      In August 2014, Victor Russo, who is 52 years old, was moved out of the honor dorm for an alleged shaving infraction.  He moved into his new block and soon after was accosted by three younger inmates armed with knives who robbed him.  When Mr. Russo reported the robbery to correctional staff, Captain Sanders suggested he get a knife to protect himself.

c.      James Edwards, who is 54 years old, has recently been assigned to cells with much younger prisoners who engage in risky activities that put him at risk and who steal his property. In 2012, while living in a prior block, Mr. Edwards' cell mate would leave the cell door unlocked at night in order to obtain drugs and engage in other prohibited behavior. Mr. Edwards complained to Captain Sanders and requested a bed transfer because his cell mate was using drugs and taking his property. Captain Sanders refused to move him and told him, "When I see one of y'all on a stretcher, I know it's a problem."

d.      Robert Woods was recently reassigned by Defendant Sanders from a

block where many older prisoners live, to a violent block where he is vulnerable because he is 57 years old and physically disabled. When he expressed fear for his safety to Defendant Sanders, Sanders responded "If you ain't got a knife, I'll give you one." When Mr. Woods' property box was broken into in his cell and he reported the theft to Defendant Sanders, Sanders responded that he had moved Mr. Woods so that something like that would happen to him. When Mr. Woods spoke to former Warden Davenport about Defendant Sanders' response to his fears, former Warden Davenport responded by asking Mr. Woods if he had a knife yet. When Mr. Woods responded that he did not, former Warden Davenport told Mr. Woods to do what he needed to do to survive on his new block. Mr. Woods made one final request to Defendant Sanders to move him from his new block and Defendant Sanders responded by placing several box cutters on a table and told Mr. Woods to make a knife to protect himself.

48. Upon information and belief, Defendants fail to adequately and effectively separate prisoners who have had violent confrontations at St. Clair. Defendants do not have reasonable policies and procedures in place that would enable re-classification of prisoners who may be identified as violent as a result of actions in the Facility.

49. In response to violence between prisoners, Defendants place the victim and the aggressor in punitive isolation for an indefinite period. The victim is then

placed in a catch-22 position of remaining indefinitely in punitive isolation or signing a "living agreement" with the other inmate(s) involved in the altercation in order to be released from segregation back into general population. Upon information and belief, once a living agreement has been signed, Defendants can and do assign prisoners who have engaged in violence or threatened each other to the same unit. Defendants' requirement that victims of violent assaults must either remain in an isolation cell in segregation or sign a "living agreement," and then be placed back in contact with the prisoner(s) who assaulted them, is not a reasonable response to violent incidents between prisoners.

50.    Defendants do not adequately consider an inmate's mental health status or history of violent conflict with other prisoners in making housing assignments. Upon information and belief, inmates with serious mental health problems or histories of repeated violent conflict live in general population and do not get adequate treatment or supervision. Defendants also fail to provide adequate training or supervision to staff on how to respond to prisoners who report threats of violence made by prisoners with known histories of mental instability or violent conflict. Defendants' failure to adequately classify and treat prisoners with mental illness or histories of repeated violent assaults, as well as their failure to provide adequate training or supervision of staff on how to respond to mentally ill or violent prisoners has resulted in substantial

47

harm to Plaintiffs.

51.     Defendants have failed to create and enforce adequate procedures, practices, and policies for investigating and responding to inmate requests to be moved to a new cell assignment based on threats or fear for their safety in their current housing assignment.  Defendants have rejected inmate requests for movement with little or no effort made to determine the veracity and seriousness of the threat.

52.     Upon information and belief, all bed change requests must be approved by Defendant Sanders.  Former Warden Davenport, as well as Captain Sanders, Lieutenant Carter, and Lieutenant Scott have responded to Plaintiffs' requests to move based on threats to their safety by telling them to arm themselves with knives, by making comments to the effect that they are tough enough to handle the potential violence, by telling the threatened prisoners that Defendants do not care what happens to them, or by telling them that the only option for transfer is to be moved into an isolation cell in segregation.  If a threatened prisoner agrees to move to an isolation cell in segregation for his safety, Defendants have also denied that request.

53.     Defendants are aware that their refusal to classify prisoners and refusal to investigate and grant movement requests based on a prisoner's safety concerns creates a substantial risk of serious harm because prisoners have been assaulted after their requests to move housing assignments were denied.  These incidents include, but are

not limited to:

    a.     In May 2015, Victor Russo was robbed and assaulted shortly after returning from the prison store to his cell.  Multiple prisoners were able to open his cell door and enter his cell because the door had a broken locking mechanism.  They attacked Mr. Russo, who is 52, and stole all of his store items.  He suffered facial injuries requiring treatment at UAB Hospital.

    b.     In April 2015, A.Z. was raped in H dorm, the Therapeutic Community, a week after being transferred to St. Clair.  A.Z. was asleep in his bunk when his assailant put a knife to his throat and raped him.  After reporting the rape, A.Z. was placed in an isolation cell in segregation and was unable to participate in the Therapeutic Community.  A.Z. was not provided with continuing medical or mental health treatment.  When placed in an isolation cell in segregation, A.Z. reported to officers that he felt suicidal and in response he was told to kill himself. A.Z. never heard the outcome of the I&I investigation.  A.Z.'s assailant was a general population prisoner living in H dorm who was not a participant in Therapeutic Community and had a history of violence and sexual assault.

    c.     In April 2015, W.C. was raped twice at knifepoint in the middle of the night by his cell partner in P-Block.  He had been required to sign a living agreement as the only means of avoiding placement in isolation.  W.C. continued

49

to face retaliation from friends of his assailant.  He did not receive continuing mental health care and never heard the outcome of the I&I investigation.

d.      For three days in October 2014, inmate Raymond Roberts was forced to sleep outside of the shift office for days because he feared the assigned bed placement in P-Block of general population and Capt. Sanders refused to place him in an isolation cell in segregation.

e.      In November 2014, Mark Archer, an older inmate who has undergone surgery for severe back problems, had all of his personal property stolen from his cell while he was in the shift office.  The stolen items included a special, egg-crate mattress Mr. Archer needs for his back.  Neither Mr. Archer nor St. Clair staff have been able to locate the mattress, and it remained missing months later.

f.      In June 2014, prior to being assaulted, Derrick White requested to be moved back to an isolation cell in segregation because he believed his life was in danger.  His request was refused and he was strangled and beaten soon after.

g.      In June 2014, a 60 year old, physically disabled prisoner, was robbed at knife point by another prisoner, who, upon information and belief, is a 23 year-old mentally ill prisoner. The prisoner was robbed less than 24 hours after being transferred from the honor dorm to L-Block, a much more violent block, housing younger inmates.

h.      In February 2014, a prisoner requested to be moved out of his unit after his cell mate tried to stab him and threatened to kill him.   His request was denied without adequate investigation and he was later stabbed by his cell mate inside his cell.

i.      In September 2013, Allan Williams was stabbed by a prisoner, who, upon information and belief, is a mentally ill prisoner.  Mr. Williams was stabbed while he was walking back from his shower.  Upon information and belief, the man who stabbed Mr. Williams had a violent history and had stabbed another prisoner a few years before he stabbed Mr. Williams.

j.      Upon information and belief, Freddie James Stallworth was stabbed multiple times by another prisoner who was his cell mate.  The stabbing caused serious injuries including a punctured lung, and required surgery at a free world hospital.  Prior to the attack, Mr. Stallworth notified Lt. Carla Graham in November 2013, that he was in danger from his cell mate, and requested a move. His request was denied without adequate investigation.  He was stabbed soon thereafter.

k.      In November 2013, an older prisoner named Carlos Subel was assigned to L-Block and he requested to be moved to an isolation cell in segregation instead because he was worried about his safety.  His request to move to

segregation was denied and he continued to refuse to sleep in L-Block.  He was then forced to sleep outside the shift office without a mattress for about a week where he was denied his property and access to showers.  He was also forced to stand for numerous hours at a time by Lt. Carter and by Lt. Scott.  Mr. Subel has several medical conditions and standing for several hours caused him several complications, including bleeding from his rectum.

l.      In 2011, a prisoner was stabbed by another prisoner, who had requested to go to an isolation cell in segregation for his own protection but his requests were denied.  Upon information and belief, the assailant feared for his safety due to outstanding debts he owed other prisoners for drugs and attacked the prisoner in order to get moved into an isolation cell in segregation where he felt he would be safer.

54.      These incidents of violence demonstrate Defendants' awareness that the failure to classify prisoners based on security status, a history of conflict, and mental health status and to investigate housing movement requests based on fear or threats of violence creates a substantial risk of serious harm.  Even though Defendants know that their current policies and practices contribute to serious incidents of violence, they have failed to take adequate action to address the problems in classification.  Upon information and belief, there have not been significant or effective changes to the

52

classification system or to how Defendants respond to movement requests in response to these violent incidents, leaving the plaintiff class exposed to the continuing real and imminent substantial risk of serious harm.

### DEFENDANTS' FAILURE TO ADEQUATELY ENFORCE HOUSING ASSIGNMENTS AND MONITOR MOVEMENT TIMES PUTS PRISONERS AT RISK OF VIOLENCE.

55.     Defendants do not take reasonable measures to ensure prisoners only have access to the housing unit where they are assigned. Defendants fail to regularly enforce dorm assignments and officers in the cube will frequently let prisoners into a unit where they are not assigned without verifying they reside in the unit.   In the absence of officer enforcement, prisoners are forced to forge associations with other prisoners for their protection in the blocks.   In the absence of officer supervision and enforcement, movement between blocks and block occupancy is enforced through physical threats and violence.

56.     Upon information and belief, despite regulations that require that only one unit at a time to move to meal, work, shower, and mail call, the doors to the housing units regularly remain unlocked during movement times and all units on G-Yard have yard call at the same time. Upon information and belief, during movement times, regulations require that an officer be posted to the door or hallways in and out of the unit to ensure only prisoners assigned to the unit are allowed to enter but officers are

53

very rarely or never posted to these locations during movement times.  Therefore, it is easy for prisoners to enter a unit they are not assigned to.

57.    Upon information and belief, staff conduct a bed roster count twice a week, making it possible for prisoners to stay overnight in a unit or cell to which they are not assigned.

58.    Defendants are aware that the failure to enforce housing assignments contributes to the high rate of violence and creates a significant risk of serious harm. While conducting count at the facility, officers fail to enforce housing assignment locations and focus only on ensuring the prison has an accurate number of prisoners. Prisoners are frequently present in unauthorized areas or other cell blocks at count time with no repercussions. Upon information and belief, Defendants' method of conducting count in general population is to have three officers enter each housing block. Two officers physically count the prisoners inside a housing area, while a third officer watches the procedure from a central viewing area. The standard procedure requires the officers physically count each inmate, but does not require the officers verify that a prisoner is in his assigned housing area. The standard count procedure does not require officers to use a bed assignment roster when counting the inmates, does not require the officers to determine the prisoner's housing assignment or determine whether the prisoner is authorized to be present in that housing block. Upon

54

information and belief, defendants conduct count at five scheduled times throughout the day: 6:00 a.m., 2:00 p.m., 6:00 p.m., 9:00 - 10:30 p.m., and between 1:30 a.m. and 3:30 a.m. The predictability of the prison count allows prisoners to be absent from their assigned areas with an awareness of when they should be back in their assigned area. There have been numerous incidents of violence where the failure to enforce housing unit assignments has contributed to the circumstances that made the assault possible and where a prisoner was assaulted in their unit by another prisoner who was not assigned to that unit, including but not limited to:

a.      In July 2015, multiple inmates from dorms on the G Yard traveled to the H Dorm and stole cell phones from several inmates.  Up to 15 inmates from the G Yard later returned to H Dorm with knives.

b.      In February 2015, Brandon Ladd was stabbed during an attempted robbery in his cell in L-Block by an inmate assigned to a different block, who was able to enter his block.  Mr. Ladd suffered stab wounds to his forearm and chest, resulting in a collapsed lung, which required extensive treatment, including surgery, at UAB hospital.

c.      In February 2015, Larry Hill was assaulted in his cell block by multiple inmates who were allowed entry into the cell block by the cube officer.  Mr. Hill was beaten with knife handles and fists and knocked unconscious.

55

d.      In January 2015, Micah Mays was stabbed and cut multiple times, suffering injuries to his face, wrists, neck, and shoulders during a robbery attempt in N-Block.  His assailants had entered N-Block from a different block. His injuries were so severe he required treatment at UAB hospital.

e.      In January 2015, Elliott Blount was robbed and stabbed in his cell in N-Block.  Mr. Blount's assailant was assigned to P/Q and was allowed to enter an unassigned living area.  Mr. Blount suffered severe head injuries that required extensive surgery at UAB hospital.

f.      In January 2015, Justen Stinson was stabbed and punched in his cell in P-Block.  After being assaulted, Mr. Stinson moved undetected through several other blocks seeking help for his injuries from other inmates.

g.      In June 2014, Derrick White was attacked when another prisoner strangled him in the hallway between P and Q and was able to drag Mr. White into Q-2, which required him to go through the main unit doors.   Upon information and belief, Mr. White's assailant was not assigned to either P or Q.

h.      In July 2013, Mark Duke was threatened at knife point in an attempted robbery in his cell by a prisoner who was not assigned to his block.

i.      Upon information and belief, Stanley Joe Flambo was assaulted in July 2013, by another prisoner, who was armed with a knife and punched him and

56

attempted to force him over the top tier railing of the cell block. His assailant was not assigned to his cell block.

j.      Upon information and belief, Benjamin Howlet was stabbed in his cell in November 2011, when correctional officers permitted two unauthorized inmates to enter Mr. Howlet's cell. Mr. Howlet suffered numerous injuries to his face, rib area, and stomach requiring surgery at an outside hospital.

59.     In addition, Defendants fail to adequately monitor movement by inmates throughout the Facility during designated movement times, such as yard call, meal times, and inmate visits to the canteen. In particular, Defendants fail to keep inmates who are designated enemies separate during movement times and fail to supervise movement as inmates return from the canteen. Such incidents include, but are not limited to:

a.      In May 2015, Victor Russo was robbed and assaulted shortly after returning from the prison store to his cell. Multiple prisoners were able to open his cell door and enter his cell because the door had a broken locking mechanism. They attacked Mr. Russo, who is 52, and stole all of his store items. He suffered facial injuries requiring treatment at UAB Hospital.

b.      In March 2015, James Dorriety was stabbed multiple times in his head and back, suffering a punctured lung. Mr. Dorriety, an honor dorm resident, was

returning to his cell block from the prison canteen when three men armed with knives robbed him of his canteen goods and assaulted him. His injuries required treatment at UAB hospital, where he received numerous staples in his head and surgery to treat his lung injury.

c.    In January 2015, Bradley Gant was attacked as he was leaving his block during a meal time. He suffered head and facial injuries after being struck with a metal lock by another inmate who had previously harassed him. Mr. Gant required staples in the back of his head and stitches on his chin as a result of the assault. When Mr. Gant reported the earlier harassment, Captain Sanders responded that the other inmate "isn't here to take care of you," and advised Mr. Gant to "get a knife and do something about it."

d.    In February 2014, Tehron Young was stabbed by his former cell partner in the chow hall area. While they were cell mates, the two inmates had a series of confrontations culminating in a fight, as a result of which Mr. Young and his assailant signed a living agreement and the assailant was moved to another living area. Two days later Mr. Young was stabbed while walking into the chow hall area, receiving serious injuries, including a punctured lung, that required two weeks of treatment at UAB Hospital.

60.    Despite Defendants' knowledge that the failure to enforce block and cell

58

assignments or monitor movement times contributes to serious violent incidents, Defendants have failed to implement adequate changes in procedure and practice to address the substantial risk of serious harm.  Upon information and belief, there has been no meaningful increase in enforcement of housing assignments following the incidents of violence, leaving the plaintiff class exposed to the continuing real and imminent substantial risk of serious harm.

### DEFENDANTS FAIL TO PROVIDE ADEQUATE REHABILITATIVE, EDUCATIONAL, AND VOCATIONAL PROGRAMMING AND THERAPEUTIC SERVICES.

61.    In addition to creating an environment where abuse and violence are the norm, Defendants have failed to provide adequate positive, rehabilitative, recreational, or religious programming, as well as treatment and services for drug addiction and mental illness.  Upon information and belief, Defendants provide inadequate counseling services to address mental illness, disability and drug addiction, despite data that show that the vast majority of prisoners suffer from one or both of these afflictions.  The failure to provide adequate treatment for these conditions contributes to the high level of violence.  Furthermore, rather than providing services, Defendants respond to prisoners suffering from mental illness, disability and drug addiction by placing them in punitive segregation, which isolates them and can exacerbate their symptoms.  These prisoners are then released back into general population more impaired and more

traumatized.

62.    Upon information and belief, Defendants have severely restricted programs that are aimed at reducing violence, giving prisoners a forum to voice concerns and resolve issues, incentivizing good behavior, and providing prisoners an opportunity to educate themselves.  Upon information and belief, Defendants have drastically limited access to outside religious organizations that minister to prisoners. The unavailability of positive and constructive programming contributes to conflicts and tensions among prisoners and to the high rate of violence.

63.    Upon information and belief, former Warden Davenport has eliminated or drastically limited prisoners' access to books.  Upon information and belief, former Warden Davenport removed most or all of the books from the housing units that were previously available to prisoners, including religious books, self-help books, educational books for men trying to earn their GEDs, and novels.

64.    Upon information and belief, in January 2015 there were significant cuts to a number of education and vocational programs. Total enrollment in these programs has been drastically reduced for all subjects including masonry, welding, electrical, and heating and air.  These classes are among the very few activities available for the people incarcerated at St. Clair and reductions of this magnitude create conditions where even more inmates remain idle and without positive, rehabilitative activities of

any sort.

## DEFENDANTS' FAILURE TO MONITOR AND POLICE THE ROLE OF DOC STAFF IN PROFITING FROM THE CIRCULATION OF CONTRABAND PUTS PRISONERS AT RISK OF VIOLENCE.

65.     Because of poor management, drugs, including methamphetamine, methadone, heroin, suboxone, and marijuana, are prevalent at St. Clair and drug abuse and addiction among prisoners is widespread.  Upon information and belief, many of the drugs are brought into the Facility by DOC staff.  Over the past two years, there have been dozens of reports of staff willfully violating DOC policy, including smuggling in contraband.  This has enabled widespread corruption among officers and officers are able to extort money and favors from prisoners in exchange for drugs.

66.     Drugs create a substantial risk of serious harm and are a major source of conflict at St. Clair, both because of behavior stemming from addiction, for which Defendants have failed to provide adequate services and treatment, and because of the dynamics of debt created by officers' and prisoners' participation in drug sales. Over the course of the past year, over twenty prisoners have come forward and requested protective custody because they are at risk of physical violence as a result of debt or extortion. In nearly every such incident, the individual was put into an isolation cell in segregation and was given a disciplinary infraction. The behavior of certain officers in response to some protective custody requests was particularly egregious, in particular

Capt. Sanders who in May 2014 responded to an inmate's request for protective custody over a contraband-related debt by attempting to orchestrate a payment plan between the inmate and the men extorting him.

67.     Defendants are indifferent to the circulation of drugs in the Facility and have failed to adequately prevent officers bringing in and participating in the sale of drugs to prisoners in the Facility.  Upon information and belief, Defendants do not employ effective search protocols and procedures when officers enter the Facility. Furthermore, Defendants' failure to provide meaningful incentives, programming, and treatment, contributes to prisoners engaging in risky behavior, such as gambling and drug use.  (See ¶¶ 61-64 above.)  Defendants' failure to reasonably and adequately respond to the prevalence of drugs in the Facility leaves the plaintiff class exposed to the continuing real and imminent substantial risk of serious harm.

## DEFENDANTS FAIL TO PROVIDE ADEQUATE AND SECURE HOUSING AND THERAPEUTIC SERVICES TO INMATES ASSIGNED TO SEGREGATION

68.     Defendants continue to provide unsafe and non-secure housing conditions in the facility's Segregation Unit.  These problems have been exacerbated in recent months by overcrowding in this unit, created as a result of the ongoing security failures and ensuing violence at St. Clair.  The violations in and around the Segregation Unit include, but are not limited to, the following incidents:

a.      In May and June 2015, inmate Jonathan Bishop along with another inmate were held overnight in cages outside the facility's segregation unit because there were no cells available for them indoors. These outdoor cells, meant to temporarily house inmates who are awaiting a permanent cell assignment, are not equipped with water or protection from the elements. The men slept exposed in the outdoor cage for multiple days.

b.      In February 2015, Michael Stewart, an inmate who requested to be placed in an isolation cell in segregation because of threats by enemies in population, cut his wrists multiple times in his segregation cell and bled for ten hours before staff noticed his condition and provided medical intervention.  Additionally, Mr. Stewart was housed in a cell with a broken window during several of the coldest winter weeks, and the prison staff failed to provide him with a jacket.

c.      Inmates Xavier Smith and Cordarious White were held overnight in cages outside the facility's segregation unit because there were no cells available for them indoors.  Both Mr. Smith and Mr. White were forced to stay overnight in these cages during freezing January weather with no protection aside from their DOC uniforms.

d.      Inmate Larry Nesbitt, who is currently incarcerated for drug possession following probation revocation based on a technical violation, should not be

housed at St. Clair, a maximum security prison.  Mr. Nesbitt is eligible for housing at a lower-security facility and the fact that he remains in the segregation unit at St. Clair demonstrates the failure to properly classify inmates based on security status.

e.      In July 2014, an assailant entered A.H.'s cell in the M-Block with a knife and sexually assaulted him.   A.H. escaped his cell and sought help.   At the infirmary, nurses and officers laughed at A.H. while the nurses conducted an examination.  A.H. reported that he was suicidal and was kept in a crisis cell for five days.  He was then sent to an isolation cell in segregation in the same unit as his assailant.  A.H. did not receive continuing mental health care and he did not receive the outcome of the I&I investigation.

**DEFENDANTS' POLICIES AND PRACTICES WITH REGARD TO THE PREVENTION, DETECTION, AND RESPONSE TO SEXUAL ABUSE PLACE PRISONERS AT RISK OF SEXUAL ABUSE.**

69.    Defendants have failed to take reasonable steps to protect prisoners from a known risk of sexual assault.  Defendants' policies and practices with regard to incidents of sexual violence place prisoners at increased and unnecessary risk of sexual misconduct and abuse.

70.    Defendants are aware of a history of widespread sexual abuse throughout DOC facilities including St. Clair and that DOC policies and practices unnecessarily

increase the risk of abuse. In 2012, the Equal Justice Initiative issued a report detailing the Department's practices and policies that contributed to a culture of sexual violence at Tutwiler Prison including placing inmates who report sexual abuse in isolation, failure to provide continued mental health counseling, failure to provide minimally adequate classification and housing assignment to identify and protect vulnerable prisoners, failure to provide adequate staffing and monitoring, failure to investigate allegations of sexual assault, and failure to inform victims of sexual assault about the results of the investigation. In November 2012, the National Institute of Corrections issued a report identifying many of the same policies and practices as contributing to the sexualized environment and harm to prisoners at Tutwiler. In 2013, the Equal Justice Initiative issued a report about sexual violence at the men's prisons and met with Commissioner Thomas to discuss the lack of PREA compliance and the policies and practices that contribute to sexual violence at the men's prisons. In January 2014, the Department of Justice found that the Alabama Department of Corrections' policies and practices at Tutwiler Prison for Women with regard to sexual misconduct and abuse placed prisoners at higher risk of sexual abuse. These reports put Defendants on notice that sexual violence is widespread at both the men's and women's facilities and that it must take steps throughout its facilities to ensure compliance with PREA and protect its prisoners from the substantial risk of harm due to sexual abuse. Defendants

65

are aware that these policies and practices heighten the risk of sexual assault, but continue to employ these same policies and practices at St. Clair.

71.    Defendants' policy of placing prisoners who report sexual abuse in isolation cells in segregation heightens the risk of sexual assault by discouraging prisoner reporting of sexual abuse.  Policies and practices that discourage and deter prisoner reporting  seriously undermine the ability to detect and prevent sexual abuse and exhibit deliberate indifference to constitutional rights of prisoners.

72.    Furthermore, when prisoners report abuse, Defendants fail to adequately respond or investigate.  Defendants' policies and practices do not ensure that prisoners who report abuse are provided sight and sound separation from their assailants; protected from the assailants known associates;  provided adequate counseling services; or informed of the outcome of the DOC investigation when such investigation occurs.  Defendants have prevented victims of sexual abuse at St. Clair from accessing outside support and have not provided sufficient mental health care within the facility.

73.    Defendants are aware that dangerously low staffing levels combined with known architectural and structural conditions significantly increase the risk of sexual abuse, yet Defendants have not taken necessary measures to address these deficiencies. Defendants do not maintain adequate staffing levels nor do they take into consideration

such factors as components of the physical plant (including blind spots), the composition of the population, and the number and placement of supervisory staff.

74.     Defendants' classification system does not adequately identify potential predators and victims.  Without an adequate classification system, Defendants cannot appropriately manage behavior and thereby subject prisoners to an increased risk of harm.

75.     Defendants fail to conduct adequate initial assessment during intake screening to assess the risk of being sexually abused or risk of being sexually abusive towards other people.   Defendants' housing and classification policies and practices do not adequately separate people at high risk of being sexually victimized from those at high risk of being sexually abusive.  Defendants' failure to conduct an adequate initial assessment has contributed to the high rate of sexual assaults occurring where vulnerable prisoners are  housed in the same dorm as prisoners with a high risk of being sexually abusive. Sexual assaults have occurred within the Therapuetic Community in H dorm, where victims often had lower custody levels and were transferred to St. Clair in order to participate in the treatment program.

76.     Defendants fail to protect victims of sexual abuse from further retaliation.  Victims at St. Clair have faced retaliation from their abusers as they do not have sight and sound separation, even when placed in segregation.  Defendants expose victims of

sexual abuse to continued abuse by failing to prevent retaliation.

77.     Defendants' policies and practices have led to a high rate of sexual violence at St. Clair, including:

a.     In April 2015, A.Z. was raped in H dorm, the Therapeutic Community, a week after being transferred to St. Clair. A.Z. was asleep in his bunk when his assailant put a knife to his throat and raped him. After reporting the rape, A.Z. was placed in an isolation cell in segregation and was unable to participate in the Therapeutic Community. A.Z. was not provided with continuing medical or mental health treatment. When placed in an isolation cell in segregation, A.Z. reported to officers that he felt suicidal and in response he was told to kill himself. A.Z. never heard the outcome of the I&I investigation. A.Z.'s assailant, a general population prisoner living in H dorm who was not a participant in Therapeutic Community, had a history of violence and sexual assault.

b.     In April 2015, W.C. was raped twice at knifepoint in the middle of the night by his cell partner in P-Block. He had been required to sign a living agreement as the only means of avoiding placement in isolation. W.C. continued to face retaliation from friends of his assailant. He did not receive continuing mental health care and never heard the outcome of the I&I investigation.

c.     On or around February 1, 2015, J.M. was raped by another inmate, who approached J.M. as he was reading on his bunk and placed a knife to his throat. Both men were assigned to the Therapeutic Community or H dorm, which is where the rape occurred.  J.M. remains in an isolation cell in segregation. J.M. did not have sight and sound separation from his assailant even while in segregation.  J.M. does not use the shower in segregation because he continues to fear retaliation.  He has not received mental health counseling and has not heard the outcome of the I&I investigation.

d.     In January 2015, D.C., a nonviolent offender, was raped at knifepoint in L-Block.  His assailant told him that he would kill him if he reported the rape. D.C. was placed in an isolation cell in segregation after reporting the rape, but he still did not have sight and sound separation from his assailant.  D.C. did not receive continuing mental health counseling.

e.     In December 2014, J.H. was sexually assaulted at knife point in his cell by a prisoner, the same man who later raped J.M.  J.H. reported the assault and was placed in an isolation cell in segregation.  J.H. never heard the results of the I&I investigation.  Two months later, the same assailant sexually assaulted J.M. The assailant was then moved to segregation and placed in the same block as J.H.

f.      In July 2014, an assailant entered A.H.'s cell in the M-Block with a knife and sexually assaulted him.   A.H. escaped his cell and sought help.   At the infirmary, nurses and officers laughed at A.H. while the nurses conducted an examination.  A.H. reported that he was suicidal and was kept in a crisis cell for five days.  He was then sent to an isolation cell in segregation in the same unit as his assailant.  A.H. did not receive continuing mental health care and he did not receive the outcome of the I&I investigation.

## CLASS ACTION ALLEGATIONS

78.     Plaintiffs bring this action on behalf of all present and future prisoners at St. Clair Correctional Facility.  This action is brought pursuant to the Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(2).  The class meets the requirements of Rule 23 as follows:

a.      There are approximately 1,300 prisoners confined at any one time to St. Clair Correctional Facility, who are subject to a substantial risk of a violent assault.  The membership of this class continually changes, rendering joinder of all members impracticable.  Upon information and belief, dozens of incidents of violent assaults are filed each year.  Many more incidents go unreported.

b.      The questions of law and fact presented by the named Plaintiffs are common to all members of the class, and include whether Defendants' policies

and practices subject prisoners to a substantial and unreasonable risk of significant harm. The policies and practices include whether Defendants have failed to adequately monitor and supervise prisoners at St. Clair; whether Defendants have failed to adequately assess prisoners for risk of violence and failed to implement an adequate classification system; whether Defendants have failed to adequately enforce housing block, dorm, and cell assignments; whether Defendants have failed to monitor movement times; whether Defendants have failed to adequately investigate housing movement requests based on fear of harm; whether Defendants have failed to provide secure locking mechanisms on individual cell doors; whether Defendants have failed to adequately monitor and police the role of ADOC staff in the availability of contraband items; whether Defendants have failed to adequately train, supervise, and discipline staff with a history of harassing and abusing prisoners, whether supervisory Defendants have failed to adequately screen, assign, train and supervise staff, whether Defendants have failed to provide safe and adequate housing in segregation and whether Defendants' policies and practices has led to deliberate indifference to the risk of sexual assault. As a result, every prisoner confined to St. Clair risks being subjected to these unlawful practices. The claims and practices alleged in this complaint are common to all members of the class.

c.      The violations suffered by the named Plaintiffs are typical of those suffered by the class.  The entire plaintiff class will benefit from the injunctive and declaratory relief sought.

d.      Plaintiffs Antonio Cheatham, Mark Duke, James Edwards, Dale Gilley, Frankie Johnson, Michael Mays, Michael McGregor, John Miller, Allan Williams, and Robert Woods are presently incarcerated at St. Clair Correctional Facility.  These named Plaintiffs will fairly and adequately protect the interests of the class.

e.      The named plaintiffs are represented by The Equal Justice Initiative, a non-profit legal services organization with decades of experience challenging unconstitutional conditions of confinement.

f.      The Defendants have acted or failed to act, on grounds generally applicable to the class, thereby making injunctive relief appropriate with respect to the class as a whole.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

79.     There are no administrative remedies within the Alabama Department of Corrections for named Plaintiffs or other members of the plaintiff class to exhaust.

## CLAIMS FOR RELIEF

## CAUSE OF ACTION

72

## Cruel and Unusual Punishment

80.     Defendants, through their policies, practices, acts and omissions, exhibit deliberate indifference to the continuing real and imminent  substantial risk of serious physical harm, in violation of the right of plaintiff class of prisoners to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

81.     Defendants, through their policies, practices, acts and omissions, subject the plaintiff class of prisoners to unnecessary and wanton infliction of pain, and emotional and physical injury in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

82.     With deliberate indifference to the substantial risk of serious harm to the plaintiff class, Defendants failed to appropriately train, assign, and supervise staff, subjecting the plaintiff class to substantial risk of serious bodily harm in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

1.     Assume jurisdiction over this action;

2.     Personally conduct an unannounced inspection of St. Clair Correctional Facility and all relevant institutional records and files;

73

3.      Grant Plaintiffs a full trial and discovery in this matter;

4.      Adjudge and declare that the acts and omissions of the Defendants with regard to the classmembers violate the Eighth and Fourteenth Amendments to the United States Constitution;

5.      Order Defendants to comply with the Constitution and enjoin Defendants from subjecting Plaintiffs to cruel and unusual punishment;

6.      Award Plaintiffs appropriate costs for expert fees and collateral litigation expenses; and

7.      Order such additional relief as the Court may deem just and proper.

Respectfully submitted this August 28, 2015,

/s/ Bryan A. Stevenson
Bryan A. Stevenson (ASB-3184--N75B)
Charlotte R. Morrison (ASB-5897-T80M)
Jennae R. Swiergula (ASB-8265-A35S)
Carla C. Crowder (ASB-8573-L74C)
Ryan C. Becker (ASB-7228-R48B)
Equal Justice Initiative
122 Commerce Street
Montgomery, AL 36104
PH: (334) 269-1803
FX: (334) 269-1806
email: bstevenson@eji.org
        cmorrison@eji.org
        jswiergula@eji.org
        ccrowder@eji.org
        rbecker@eji.org

*Counsel for Plaintiffs*

74

## <u>Certificate of Service</u>

I hereby certify that on August 28, 2015, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such

filing to the following:

      Albert S. Butler
      Alabama Department of Corrections
      Legal Division
      301 Ripley Street
      P.O. Box 301501
      Montgomery, AL 36130

      Larry B. Childs
      Michael A. Fant
      William C. Athanas
      Waller Lansden Dortch & Davis LLP
      AmSouth Harbert Plaza
      1901 Sixth Avenue North, Suite 1400
      Birmingham, AL 35203

                 /s/ Charlotte Morrison
                 Charlotte Morrison