FILED
2016 Mar-03  PM 06:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

|  |  |  |
|---|---|---|
| | * | |
| MARK DUKE, et al., | * | |
| | * | |
| Plaintiffs, | * | Civil Action No: 4:14-cv-01952-VEH |
| | * | |
| vs. | * | |
| | * | |
| JEFFERSON DUNN, Commissioner, | * | |
| Alabama Department of | * | |
| Corrections, et al., | * | |
| | * | |
| Defendants. | * | |

_____

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
# FOR CLASS CERTIFICATION
# REDACTED

_____

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.         THE PRISON IS SEVERELY OVERCROWDED . . . . . . . . 2

II.       THE PRISON IS SEVERELY UNDERSTAFFED . . . . . . . . 3

III.      THE MAJORITY OF CELL DOOR LOCKS AND CONTROL PANELS IN THE PRISON ARE BROKEN. . . . . 7

IV.     SIGNIFICANT PORTIONS OF EACH OF THE HOUSING UNITS GO UNOBSERVED BY A CORRECTIONAL OFFICER FOR PROLONGED PERIODS OF TIME. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.    "Blind Spots" Are Prevalent Throughout the Prison . . . . . . . 10

        B.    Despite the Known Risk of Blind Spots, Defendants Have Failed to Take Reasonable Steps to Address these Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V.      THE FAILURE TO MONITOR AND CONTROL MOVEMENT PUTS ALL INMATES AT SERIOUS RISK OF VIOLENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

VI.     WEAPONS CONTRABAND IS PERVASIVE, EASILY ACQUIRED, AND TOLERATED. . . . . . . . . . . . . . . . . . . . . 21

VII.    DEFENDANTS HAVE ALLOWED A CULTURE TO DEVELOP WHERE SEXUAL VIOLENCE IS COMMONPLACE AND PERCEIVED AS AN INEVITABLE PART OF PRISON LIFE . . . . . . . . . . . . . . 28

        A.    Bed Space - Not Classification and Risk Assessment - Determines Housing Assignments . . . . . . . . . . . . . . . 33

B.      Victims Lack Adequate, Safe Ways to Report Sexual Violence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

C.      Victims of Sexual Violence Face Punitive Conditions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

D.      Victims of Sexual Violence Are Not Monitored or Protected From Retaliation . . . . . . . . . . . . . . . . . . . . . . 39

E.      Sexual Violence Investigations Are Haphazard and Incomplete  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

F.      St. Clair Has No Coordinated or Consistent Response Plan For Sexual Violence, and Corrective Action Is Non-Existent . . . . . . . . . . . . . . . . . . . . . . . . . 42

G.      Defendants Fail to Respond to Evidence that a Rape Culture Exists at St. Clair . . . . . . . . . . . . . . . . . . . . . . 43

VIII.   DEFENDANTS' POLICIES AND PRACTICES WITH REGARD TO HOUSING CREATE A SUBSTANTIAL RISK OF HARM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

IX.     FREQUENT USE OF FORCE CONTRIBUTES TO A CULTURE OF VIOLENCE . . . . . . . . . . . . . . . . . . . . . . . . 47

A.      Officers' Use of Force Results in Serious Head Injuries to Inmates, Which are Chronically Under-reported By ADOC . . . . . . . . . . . . . . . . . . . . . . . . . 47

B.      Defendants Have Failed to Take Necessary and Reasonable Steps to Address This Pattern of Use of Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

X.      THE FAILURE TO PROVIDE ADEQUATE PROGRAMMING CONTRIBUTES TO THE DANGEROUS CONDITIONS AT ST. CLAIR  . . . . . . . . . 53

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

I.         PLAINTIFFS SATISFY THE NUMEROSITY, COMMONALITY, TYPICALITY, AND ADEQUACY REQUIREMENTS OF FED. R. CIV. P. 23(A) . . . . . . . . . . 57

    A.    The Numerosity Requirement is Satisfied Because the Plaintiff Class Includes Approximately 1,270 Present Members, is Fluid and Includes Future Members, and the Harm is Class-Wide . . . . . . . . . . . . . . . . 57

    B.    Plaintiffs' Claim Challenging the Dangerous Conditions at St. Clair Presents Common Issues of Law and Fact Satisfying Commonality Under Rule 23(a)(2) Because Every Class Member is at Risk of Harm . . . . . . . . . . . . . . . . 60

    C.    The Typicality Requirement of Rule 23(a)(3) s Satisfied Because the Named Plaintiffs' Claims Represent Those of the Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

    D.    The Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Class as Required by Rule 23(a)(4) and this Court should Designate Plaintiffs' Counsel as Class Counsel Pursuant to Rule 23(g) . . . . . . . . . . . . . . . . . . . . . . 73

II.       THE REQUIREMENTS OF FED. R. CIV. P. 23(B)(1) ARE SATISFIED BECAUSE PROSECUTING ACTIONS BY INDIVIDUAL CLASS MEMBERS WOULD BE DISPOSITIVE OF THE INTERESTS OF OTHER MEMBERS AND COULD CREATE A RISK OF INCOMPATIBLE STANDARDS FOR DEFENDANTS . . . 77

III.      THE REQUIREMENTS OF FED. R. CIV. P. 23(B)(2) ARE SATISFIED BECAUSE DEFENDANTS HAVE ACTED AND REFUSED TO ACT ON GROUNDS GENERALLY APPLICABLE TO THE CLASS . . . . . . . . 79

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

CERTIFICATE OF SERVICE

## INTRODUCTION

Pursuant to Fed. R. Civ. P. 23, Plaintiffs respectfully request an order certifying a class consisting of all persons who are now, or will be at any time in the future, incarcerated at St. Clair Correctional Facility ("St. Clair"). For the reasons set forth below, plaintiffs respectfully submit that the requirements of Rule 23 are met in this case and class certification should be ordered.

## STATEMENT OF FACTS

## I.     THE PRISON IS SEVERELY OVERCROWDED.

St. Clair is dangerously overcrowded. Ex. 1, Report of Plaintiffs' Expert James Austin (Feb. 19, 2016) (hereinafter "Austin Report"), 8. The prison is operating beyond its designed capacity even assuming the facility is able to use all of its bed space. The overcrowding, however, has been seriously exacerbated by the closure of several housing blocks. According to Warden Dewayne Estes, two blocks housing 96 men were closed during the first half of 2015 and men from that block were transferred to the H dorm. Ex. 2, Warden Estes Dep. 202-03 (Dec. 16, 2015). This effectively reduced St. Clair's designed capacity from 984 to 888 beds. Ex. 3, Report of Plaintiffs' Expert Steve J. Martin (Feb. 18, 2016) (hereinafter "Martin Report"), 7. As such, St. Clair is operating at 134 percent capacity.

2

## II.    THE PRISON IS SEVERELY UNDERSTAFFED.

St. Clair is chronically understaffed and posts in need of security are regularly unattended.  The lack of adequate staffing compromises the performance of routine security functions, leads to unattended posts,  and contributes to dangerous situations for staff and inmates.

St. Clair's staff to inmate ratio is "among the highest ratios in U. S. prisons." Ex. 3, Martin Report, 7.[1]   The lack of security personnel is directly reflected in the daily staffing of the facility.   On a regular day, a number of assigned posts go unmanned, ████████████████████████████████████████████

████ . Ex. 3, ████████████████ ; Ex. 4. Report of Plaintiffs' Expert Martin F. Horn (Feb. 18, 2016) (hereinafter "Horn Report"), 9-10.

Further, the posts are not sufficiently manned at levels necessary to provide security. ████████████████████████████████████████████

████████████████████ Ex. 5, ████████████████ 25 (Dec. 18, 2015).  At all times, there should be one officer on patrol for every housing unit, with one rover responsible for only 50 inmates. Ex. 4. Horn Report, 11.  ████████████████████

████████████████████████████████████████████████████

---

[1]Commissioner Dunn has stated that St. Clair is staffed with "only 57 percent of the security staff it is authorized for," a number confirmed by Warden Estes in his review of the staffing levels at the facility. Ex. 1, Estes Dep. 38-40; Ex. 6. , Lauren Walsh, *ADOC Commissioner: Overcrowding, understaffing breeding violence at St. Clair Prison*, WBMA,(Dec. 10, 2015).



███████████████████████████████████████████ Ex. 5.

██████████████.[2]  Given blind spots in the facility (see infra Part IV), █████

████████████████████████████████████ (Ex. 1, █████████████), and

the virtually free range of movement of inmates at the facility (see infra V), the lack

of sufficient security rovers directly contributes to higher levels of violence and

misconduct. Ex. 3, Martin Report, 8.

---

[2]The staff shortage creates dangerous conditions for prisoners, but also for officers and staff. ██████████████ a kitchen steward at St. Clair since July 2008, stated that for approximately the first year of her employment at St. Clair, there were two officers assigned to the kitchen at all times. Ex. 7, ██████████████ SCP_02967-69.  One officer stayed with Ms. ████ and the other officer provided security throughout the rest of the kitchen area.  Id.  Beginning in 2009, however, the number of officers assigned to the kitchen was reduced to one.  Id.  With only one officer assigned to the kitchen, there were long stretches during Ms. ████ shift where she did not see an officer.  Id.  On May 15, 2015, an inmate started arguing with Ms. ████ and there was no officer present.  Id.  The inmate proceeded to throw a tray, striking Ms. ████ in the face, and punched her three times in the mouth.  Id.  Ms. ████ had to have five teeth pulled and is still in the process of undergoing extensive dental work.  Id. Despite the serious nature of the incident, Warden Estes classified this as a non-serious assault on staff.  Ex. 2, Estes Dep.  344.
    The risk of violence faced by staff at St. Clair is underscored by the risk to officers of all levels, including shift supervisors.  On April 17, 2015, Lieutenant Carter was assaulted by a group of inmates while he was on duty as the shift commander.  Ex.5,  Malone Dep. 105, 115. ████████████████████████████████████████ Id.; Ex. 8, ██████████████ 52-54 (Dec. 17, 2015).  As of December 2015, eight months after the assault, Lt. Carter still had not returned to duty.  Ex. 5, Malone Dep. 105.  As with Ms. ████ assault, the facility's ability to prevent and respond to Lt. Carter's assault appears to have been inhibited by the lack of available staff. Ex. 9, ██████████████, *Guards "outnumbered" at St. Clair Correctional Facility*, FACEBOOK, Oct. 17, 2015 (Officer ██████████ commented that the facility was short-staffed during the assault and only two officers were available to respond to the incident).  In reviewing the incident, Warden Estes exhibited a lack of knowledge concerning the assault and indicated he had no information concerning the staffing levels at the time of the assault.  Ex. 2, Estes Dep. 313-17. ████████████████████████████████████████████ Ex. 8, ██████████. 61-62, 296-97.

4

More critically, officers assigned to the security rover position are also responsible for a number of other duties at the facility, including escorting inmates to the chow hall, gym call, pill call, or the infirmary further stretching security staff available for patrolling the housing areas and leaving the housing units without roving staff for long periods of time. Ex. 5, Malone Dep. ███, 333-42.  Because an officer assigned to a specific post can be pulled off for any number of reasons, staff supervisors have a limited understanding of the security staff at their disposal within the facility. Ex. 3, ██████████ ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████ )

Moreover, when officers are required to leave their security posts, there are no officers available to fill that post.  For example, if an inmate is assaulted and has to go to the hospital, a roving officer is required to accompany the inmate, leaving the security patrol post unmanned.  Ex. 2, Estes Dep. 59-62.  Depending on the inmate's custody level, up to three officers might be assigned to accompany the inmate to the hospital.  Id.[3]  This "thinning out" of the officers appears to happen on a near daily basis, exacerbating the risks connected to the lack of adequate staff and contributing

---

███████████████████████████████████████████████████ ████████████████████████████████████████████. Ex. 10, ████████████████████████████████████████

to the officers' feelings of exposure and fear.  Ex. 4, Horn Report, 10-11.

Understaffing creates a dangerous environment, not only because these staffing levels make it impossible to complete critical security functions including regular, systematic facility-wide searches,[4] but also because the staff that are at the prison work in fear.  When available staff is stretched thin, officers "become loathe to intervene and a 'devils bargain' is struck wherein the officer effectively says to the inmate, 'don't hurt me and I will not intervene in your activities.'" Ex. 4, Horn Report, 11.  Officers at the facility are acutely aware of the risk of violence created by a lack of adequate staffing.   Ex. 11, ███████, *The Truth about St. Clair Prison*, FACEBOOK, Apr. 19, 2015 (Officer ███████ commented that "The thing that worries me the most is not the inmates. I have never been scared to go to work because of the inmates. The worst fear I have is that something could happen to me and I honestly don't know which officers would respond to help."); Ex. 9, ███████, *Guards "outnumbered" at St. Clair Correctional Facility* (Officer ███████ commented that "The Lt. Gets stabbed and no help comes except for ███████ and ███ we had only a few officers on the yard and one officer in pill call and yeah cert came in but when they left did anyone say what can we do to prevent something like this

---

[4]See infra Part VI.  See also Ex. 4. Horn Report, 4-5, 10-11; Ex. 5, Malone Dep. 284-92;  Ex. 2, Estes Dep. 206-09.

from occurring again in the future? No because I remember we were short and I was on the yard by myself with one officer in pill call and maybe two in the chow hall.").

### III.   THE MAJORITY OF CELL DOOR LOCKS AND CONTROL PANELS IN THE PRISON ARE BROKEN.

Many if not most of the locks at St. Clair are either broken or can be 'tricked' into not locking securely.  As a result of the broken locks, numerous robberies, sexual assaults, stabbings, and murders have occurred after inmates gained access to cells through broken or tricked locks.  See Ex. 12, David Wise Decl. SCP_02963-66. Defendants are aware of the broken locks but have failed to take reasonable steps to protect inmates from this risk.

Defendants concede that many locks are broken and that the facility does not know which locks are broken or how many are malfunctioned.  See  Answer to Second Amended Complaint (hereinafter "Answer"), Doc. 62 at ¶¶ 27, 43; see also Ex. 2, Estes Dep. 28-29.[5]  Defendants have been aware of this problem for years, if not decades.  According to David Wise, warden of St. Clair from 2009 to 2010, "one of the most severe problems" at St. Clair "is the prevalence of broken locks throughout the cell blocks, where the majority of inmates are housed in two-man

[5]

cells." Ex. 12, David Wise Decl. SCP_02963-66.  During his tenure as warden, Wise "repeatedly conveyed to executive leadership the impossibility of safely operating a maximum security prison where the majority of locks are broken" and that this contributed to high levels of violence.  Ex. 12, David Wise Decl. SCP_02963-66.

Broken locks have created a dangerous environment.  Because the majority of cell doors do not have secure locking mechanisms, it is impossible for men housed in these cells to keep other prisoners from entering their cells. Second Amended Complaint (hereinafter "Compl."), Doc. 53, at ¶ 43.  Inmates are able to enter or exit their own and other prisoners' cells at any time, even during lockdown. This creates a particularly dangerous environment because cells are "blind zones" in the blocks, meaning that officers in the cube cannot see inside the cells and there is no way for a prisoner to call an officer for help in the event of an emergency, other than banging on the cell to try to get the attention of the cube officer. See infra, Part IV.  As one corrections expert noted when reviewing the conditions at the facility, █████████ and inmate declarations are "replete with instances in which inmates are subjected to serious and fatal injuries from assailants who have defeated their locking mechanisms in order to carry out their attacks."  Ex. 3, Martin Report, 10.

Defendants are aware that the lack of functioning locks creates dangerous conditions because numerous prisoners have been assaulted in their cells during times

when the unit was on lockdown.[6]  Despite the known risk of broken or compromised

_____

[6]These incidents include, but are not limited to the following:

Michael McGregor was stabbed and suffered nearly fatal wounds while he slept in his cell in April 2015.  Compl. ¶ 36(f); Ex. 14,  Michael McGregor Decl. SCP_02955-58.

Justen Stinson was stabbed on March 17, 2015 after two men came into his cell and attacked him on March 17, 2015.  Compl. ¶ 36(s).  ████████████████████████████

Nakia Echols was stabbed when another inmate entered his cell while he slept. Compl. ¶ 36(j); ██ ██████████████████████████

On May 29, 2015,  Victor Russo was robbed and assaulted by several men in his cell, a blind spot. See ████████████████████████████

In March 2015, multiple inmates broke into  Jeffrey People's cell and assaulted him while he slept. Compl. ¶ 36(l), ████████████████████████ .

On or around February 23, 2015, an inmate broke into Brandon Ladd's cell and stabbed him. Compl. ¶ 36(n); ████████████████████████ .

In January 2015,  Elliott Blount was robbed and stabbed when an inmate broke into his cell. Compl. ¶ 36(t).

On June 3rd, 2014, Jodey Waldrop was killed after another inmate broke into his cell and stabbed him. Compl. ¶ 43(a).

On July 19th, 2014, an inmate broke into A.H.'s cell while the facility was on lockdown and sexually assaulted him at knife point.  Compl. ¶ 43(a); Ex. 20, ██████████ SCP_02951-54.

In September 2013, Frankie Johnson was burned in his cell in the middle of the night by a prisoner who was able to exit his own cell and enter Mr. Johnson's cell. Compl. ¶ 36(am).  Ex. 21, Johnson v. Mangoine, No 113-cv-01928-RPB-SGC (N.D. Ala. 2013), SCP_0231-44.

In August of 2013, Jammy Bell was murdered after he and another inmate in segregation cells were able to trick their doors and leave their cells.  See Compl. ¶ 38; Ex. 22 , Allan Williams Dep. 222-23 (Sep. 24, 2015) (locks in segregation can be tricked); Ex. 23,Carol Robinson, State inmate stabbed to death in Sunday night fight at St. Clair prison, AL.com, Aug. 12, 2013.

In May 2012, John Rutledge was strangled to death inside his cell in the middle of the night when the cells should have been locked down.  Compl. ¶ 43(c).  Ex. 24,Jeremy Gray, Slaying of St. Clair County prison inmate under investigation, AL.com, May 9, 2012.

locks, Defendants have failed to take necessary steps to address this risk of harm.

Defendants failure to repair or even document broken or faulty locking mechanisms,

continued use of cells with broken locks, and failure to implement security measures

that would compensate for or respond to the increased risk posed by these problems,

demonstrates deliberate indifference. Ex. 4 Horn report, 7-8; Ex. 3 Martin Report, 10-

12.

## IV. SIGNIFICANT PORTIONS OF EACH OF THE HOUSING UNITS GO UNOBSERVED BY A CORRECTIONAL OFFICER FOR PROLONGED PERIODS OF TIME.

### A. "Blind Spots" Are Prevalent Throughout the Prison.

St. Clair has eight cellblocks: J, K, L, M, N, O, P, and Q. Each block houses

prisoners in general population and is divided into two separate sides.  Answer, ¶ 27.

They are designated as J1, J2, K1, K2, etc. Blocks J and K are paired blocks that are

connected by a hallway, as are L and M, N and O, and P and Q.  Each side of a

cellblock is comprised of 24 two-man cells, such that 48 prisoners live on each side

---

In November of 2011, two inmates with a knife broke into Mr. Howlet's cell and beat and stabbed Mr. Howlet repeatedly. ███████████████████████; Ex. 25, <u>Howlet v. Davenport,</u> No. 4:09-cv-00732-RDP-HGD (N.D. Al.  June 6, 2014), SCP_0215-223.

In October 2011, Jabari Bascomb was stabbed to death in a cell where the lock was tricked.  Compl. ¶ 36(ar); Ex. 26, Robin Demonia, *Alabama prison violence rising in overcrowded system*, AL.Com at 3, June 3, 2012.

In January 2011, Anthony Moss was assaulted in his cell. Compl. ¶ 36(as); Ex. 27, Compl. <u>Moss v. Davenport</u>, No. 4:11-cv-01397-KOB-RRA at3, SCP_0266 (N.D. Al. Apr. 26, 2011)

of a block and 96 prisoners live in each block as a whole.  Defendants acknowledged that, in each of the general population cell blocks,  "portions of the shower areas and the day rooms are not visible to the cube officers and that portions of the interiors of the cells generally are not visible to the cube officers."  Answer,  ¶ 29. Because blind spots exist in common areas and because every prisoner in general population is assigned to live in a cell, which is also a blind spot, every prisoner in general population is at risk of harm due to blind spots.

There are also two open bay dorms at St. Clair, the infirmary and  H Dorm.  H Dorm is where prisoners who are enrolled in the Therapeutic Communities program reside, along with some general population prisoners.   See Compl.¶  33.  Approximately 250 men reside in H Dorm.  See Ex. 28, Bed Roster SCP_03119.  Defendants admit that an officer cannot see inside the bathroom or all of the beds in H dorm when sitting at the desk at the front of H Dorm.  See Answer,  ¶ 34.  Because the unobserved areas in H Dorm are areas which every prisoner has access to, every prisoner is at risk of harm due to blind spots.

The existence of these  blind spots both in general population and in H Dorm puts the men incarcerated at St. Clair at grave risk.  Furthermore, because inmates in segregation are frequently moved back to general population, blind spots pose a risk of harm to every prisoner at St. Clair.  These unobserved areas create an environment

11

where murders,[7] sexual assaults,[8] and stabbings and assaults[9] occur frequently.

## B.   Despite the Known Risk of Blind Spots, Defendants Have Failed to Take Reasonable Steps to Address these Conditions.

_____

[7]Since 2011, four men have been murdered at St. Clair in blind spots, out of sight of officers. Timothy Latham was stabbed to death on November 9, 2015 in the dayroom in P-Block. See Ex. 2, Estes Dep. 328; Ex. 29, *Inmate stabbed to death at St. Clair Correctional Facility; second stabbing in week*, Al.com; Nov. 9, 2015; see also supra n. 6 (describing murders of Mr. Bascomb, Mr. Rutledge, and Mr. Waldrop in unsupervised areas).

[8]Over the last 18 months, at least seven prisoners have been held at knifepoint and sexually assaulted at St. Clair in blind spots. W.C., M.T., D.C., J.H., and A.H. were all sexually assaulted at knifepoint inside of cells and out of the view of officers. A.Z. and J.M. were sexually assaulted at knifepoint in H Dorm, in areas where officers could not see. See infra Part VII.

[9]In August of 2015, Mr. Janarious Smith was beaten and stabbed in a blind spot in the day room. ███████████████████████.

On March 16, 2015, Dillon Cole was grabbed from behind while walking up the stairs in L-Block and pulled into the dayroom, a blind spot, where he was stabbed three times in his lower back. Mr. Cole had to run to the cube and beat on the window to get the officer's attention. See ██ ███████████████████████.

On January 11, 2015, Elliot Blount was stabbed in the head and chest in his cell in N-Block, a blind spot. See ███████████████████████.

On March 3, 2015, Jeffery Peoples was assaulted in his cell. See Compl. ¶ 36(l); ███████ ███████████████████. Mr. Peoples was previously stabbed outside Q-Block when no officers were present. Id.

On September 16, 2014, Joseph Royal was assaulted in cell 25 in P-Block by his cellmate, a spot that is not visible to officers. See Compl. ¶ 36(ac)███████████████████████.

On April 15, 2015, an inmate broke into Michael McGregor's cell with a knife in both hands, said "you know what time it is," and began stabbing him. Mr. McGregor suffered near-fatal injuries. Ex. 14, Michael McGregor Decl. SCP_02955-58.

On May 29, 2015, Victor Russo was robbed and assaulted by several men in his cell, a blind spot. See Compl. ¶ 36(ad); ██████████████████. The only way for Mr. Russo to get assistance from prison staff was escaping his cell and getting the attention of the cube officer. Id. Mr. Russo was sent to the hospital for medical treatment. Id.

While Defendants are aware that the large number of blind spots create a dangerous environment placing inmates at risk of injury or death, they have failed to take reasonable, necessary and appropriate steps to prevent and remedy these dangerous conditions.   Defendants do not track the number of unobserved violent incidents or incidents that take place in blind spots and therefore have no system for identifying high risk areas.  See Ex. 5, Malone Dep. 363-66; Ex. 2, Estes Dep. 367.[10]

Steve Martin in his expert report concludes, "the number and frequency of unobserved assaults in the housing units is a clear indicator that staff are not able to prevent, detect or intervene in assaults as they occur in areas subject to direct observation if staff was in place to do so." Ex. 3, Martin Report, 8.  The cube officer has limited sight lines and ███████████████████████████████████



█████████████████████████████ See Ex. 3, Martin Report, 8.

██████████████████████████████████████████

██████████████████████████████████████████

████████████████. See Ex. 5, ████████████. Because rovers  also fulfill other duties, such as escorting prisoners to pill call, gym call, chow, the  infirmary, or outside hospitalizations, these posts are frequently left unmanned.  Id. at 31-45;  Ex.

_____

[10]When asked about the unobserved incidents of violence, Warden Estes responded, "How would I know that there was an incident of violence that occurred if it wasn't observed?"  Ex. 2, Estes Dep. 367.

2, Estes Dep. 58-61.[11]

The prevalence of blind spots at St. Clair creates the conditions where violence flourishes and prisoners are at substantial risk of harm.  The staff shortages at St. Clair exacerbate these conditions.  Defendants are aware that these conditions present a substantial risk of harm to prisoners in the facility yet have failed to take reasonable and necessary steps to address this harm.

## V.    THE FAILURE TO MONITOR AND CONTROL MOVEMENT PUTS ALL INMATES AT SERIOUS RISK OF VIOLENCE.

Defendants' failure to monitor  and enforce housing and dorm assignments places all inmates at substantial risk of harm.  There is a well-established pattern of virtually free range movement among all housing units.   Prisoners frequently and easily[12] enter units where they are not assigned.  ███████████████

---

[11] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

[12]See Ex. 34, ███████████ 269 (Dec. 15, 2015);  Ex. 35, ██████████.
SCP_02692-94, Ex. 36, ██████████. SCP_02707-09; Ex. 37, ██████████.
SCP_02714-16; Ex. 38, ██████████. SCP_02731-33; Ex. 39, ██████████.
SCP_02749-51; Ex. 40, ██████████ SCP_02771-72; Ex. 16, ██████████.
SCP_02779; Ex. 41, ██████████. SCP_02788-90; Ex. 42, ██████████
SCP_02796-98, Ex. 43, ██████████. SCP_02800-02; Ex. 44, ██████████
SCP_02828-30; Ex. 18, ██████████. SCP_02832-33; Ex. 45, ██████████l.
SCP_02835-37; Ex. 30, ██████████. SCP_02859-61; Ex. 46, ██████████.
SCP_02876-78; Ex. 47, ██████████. SCP_02886-87.



See Ex. 50,

Three homicides and multiple other violent attacks at St. Clair further demonstrate Defendants' failure to monitor movement and the resulting serious risk of violence that all prisoners face at St. Clair.[13]  See also Ex. 2 Martin Report, at 8-9, 13 ("[T]he number and frequency of assaults that occur involving inmates who are out-of-place is alarming . . . . It is clear that inmates at the facility can, and often do, move from one supposedly secure housing unit to another in order to carry out assaults."); Ex. 2, Estes Dep. 99, 331-32 (acknowledging generally that problems occur when inmates are in unauthorized areas and specifically that suspect in homicide of Timothy Latham was in unauthorized place).

---

[13]See supra n. 7 (Timothy Latham stabbed to death by an inmate who was assigned to a different block); Ex. 2, Estes Dep. 331-32.

Larry Hill was attacked in Q-Block by approximately twenty other inmates in February 2015. Many of the inmates who assaulted Mr. Hill were not assigned to live in Q-Block, but were let in by the cube officer.  Mr. Hill was knocked unconscious after the inmates punched, kicked, and hit him with the butt ends of knives.  See ; Compl. ¶ 58(c).

J.H. was threatened with sexual assault at knife point in his cell in M-Block in December 2014 by an inmate who was assigned to H Dorm.  See Ex. 49, SCP_02938-40; Compl. ¶ 77(e). See also supra n. 6 (Victor Russo, Justen Stinson, Brandon Ladd, Elliot Blount, Benjamin Howlett all assaulted by men who were in unauthorized areas) supra n. 9 (Janarious Smith and Derrick White assaulted by inmates who were in unauthorized areas); ; Compl. ¶ 58(g)

15

Despite being aware of this dangerous pattern, Defendants have failed to take necessary and adequate steps to control movement.  It is the responsibility of the cube officer to monitor inmate movement in and out of cell blocks, but the cube officer has no duty to document inmate entry into the housing blocks.[14]  The cube officer also regularly leaves the doors to the cellblocks open during movement times – for example, during yard call or when work crews are coming and going from the blocks – and it is effortless for inmates to enter blocks and dorms where they are not assigned. [15]

Even when the doors to the cellblocks and dorms are closed, officers fail to verify that inmates are assigned to a block before rolling the door open for them.[16] The same is true for open bay dorms, like H Dorm, where "[n]ine times out of ten"

---

[14]See Ex. 5, Malone Dep. 355-57 (when asked about whether the cube officer logs inmate movement, particularly when inmates not assigned to the block enter, Malone responded, "[n]ot that I'm aware of.").

[15]See e.g. Ex. 44, ███████████████. SCP_02828-30 ("During movement times, the cube officers would leave the doors open and wouldn't make sure that prisoners entering a block were assigned to live there."); Ex. 51, Dale Gilley Decl. SCP_02944-47 ("There are gates that are supposed to separate H Dorm from the main camp, which are supposed to be locked but are often left open.").

[16]See Ex. 35, ██████████████. SCP_02692-94; Ex. 37, █████████████. SCP_02714-16; Ex. 32, ████████████. SCP_02722-24; Ex. 38, ████████████. SCP_02731-33 ; Ex. 39, ████████████. SCP_02749-51; Ex. 40, ████████████. SCP_02771-72; Ex. 41, ████████████. SCP_02788-90; Ex. 48, ████████████. SCP_02792-94; Ex. 42, ████████████. SCP_02796-98; Ex. 43, ████████████ SCP_02800-02; Ex. 19, ████████████. SCP_02804-06; Ex. 18, ████████████. SCP_02832-33; Ex. 45, SCP_02835-37; Ex. 30, ████████████. SCP_02859-61; Ex. 46, ████████████. SCP_02876-78; Ex. 47, ████████████. SCP_02886-87; Ex. 53, ████████. SCP_02906-09.

16

officers do not prevent non-residents from entering.  <u>See</u> Ex. 52, Dale Gilley Dep.76

(Sep. 25, 2015).



Prison staff at St. Clair also do not ensure that inmates sleep in cells and

housing units where they are assigned.  Michael McGregor described the process of

reassignment that occurred on his arrival at St. Clair:

> Q:   Was L-28 the first cell that you were assigned to in
>      that block, the only cell?
>
> A:   I think I was assigned to another cell but when I
>      come in there, they wouldn't let you move in there,
>      the right cell.  Everybody in there is in the wrong
>      cell and stuff.
>
> Q:   So when you say "they", you mean the inmates who
>      were living there wouldn't let you put your stuff in
>      there?
>
> A:   (Nodded affirmatively.)
>
> Q:   So how did that work, you say I'm here and they say

17

no, you're not; how does that work?

A:      Just this is full, this is where an empty bed is right
        now, and, you know, we got that took care of, you
        have to move over here.

Ex. 54, Michael McGregor Dep. 76-77.[17]

The dangers inherent in these institutional practices are exacerbated by staff

inattention.  Inmates are permitted to move freely around St. Clair because Defendants

perpetuate a culture of inattention among security staff.  ██████████████████

████████████████████████████████████████████████████████

███████    █████████████████████████████████████████████ ,

---

[17] See also, Ex. 55,  Frankie Johnson Dep. 106 (Sep. 21, 2015) ("[Y]ou got people right now
sleeping out of their block in the dorm right now"); Ex. 16, ███████████. SCP_02778-80 ("I
never went back to P[-Block] after I was attacked and slept on a bench in the TV room in Q-2 for
about a week after my assault."  "Officers don't pay attention to where prisoners are assigned when
they do count.  During count, they only make sure the numbers are right.  When I was assigned to
P-Block but was staying in Q-Block, I would go into an empty cell and close the door during a
"lockdown" count.  After count was over, I would pop the lock open again and leave."); Ex. 51, Dale
Gilley Decl. SCP_02944-47  ("It is easy to get into and stay in a housing unit where you don't live.
When officers do count at night, they only count the number of people in each block and don't make
sure that prisoners are in their assigned cells."); Ex. 43, █████████████ SCP_02800-02 ("As long
as everyone is in their assigned cell when bed roster is called, approximately twice a week, there is
no other monitoring of movement between cells.  There is usually ample warning time for us to
return to our assigned cells before these bed roster calls."); Ex. 17, █████████████. SCP_02843-
46 ("When officers do bed checks approximately twice a week, they rarely ask for ID cards and
typically only ask for a person's AIS number.  As a result, if you can memorize another prisoner's
identifying information, you can get away with sleeping in their cell."); Ex. 30, █████████████
█████ SCP_02859-61 ("It is also possible to live in a block that you are not assigned to and prisoners
will trade housing assignments.  Bed checks only occur about twice a week and it is rare for a
prisoner to get in trouble for staying in a cell that isn't assigned to him.  I believe that officers are
only concerned with the count numbers adding up.").

18



██████████████████.[18]   Furthermore, the public Facebook pages of St. Clair security staff indicate that staff post on social media while on duty and, because these posts are public, they do so with little fear of being held accountable.  See, e.g., Ex. 57, ██████

██████ FACEBOOK, Dec. 20, 2013 ("My shift ended almost 6 and a half hours ago and I'm still here.   Thank you ██████ may I have another."); Ex. 58, ██████,

FACEBOOK, Sep. 22, 2015 ("We are still at the hospital.  They transported the inmate from UAB to UAB Highlands on southside.  ██████ and I have still not been relieved and I have to freaking work tomorrow.")

While security staff at St. Clair are posting on social media, sleeping, and being otherwise inattentive, all inmates are at a serious risk of violence.[19]  Despite the serious and frequent level of violence, Defendants have not taken steps to protect men housed at the facility.  Defendants' indifference to this risk is demonstrated by the lack of any meaningful investigation, monitoring, or reporting relating to unauthorized movement in the facility.  ████████████████████  ████████████████████

---

[18] See also Ex. 3, Martin Report, 9 ("Inmates also consistently reported observing officers in the "cubes" (fixed control station) sleeping. ████████████████████ ██████████████████████████████████████ .

[19] For example, in September 2015, Douglas Simon was stabbed by his cellmate in L-Block in the face, arm, and neck.  Mr. Simon ran out of his cell, but his cellmate chased him through the block with his knife.  Other inmates tried to get the attention of the cube officer for help, but he was asleep.  Mr. Simon's injuries were so severe that they required treatment at an outside hospital. ████ ████████████████████████████

██████████████████████████████████████

█████████████████  Ex. 5, Malone Dep. 357-58 (denying responsibility for investigating how prisoners get into unauthorized dorms.)

In the homicides, sexual assaults and stabbings described above, see supra n.14, there was no systematic investigation, documentation or reporting identifying how the inmate gained access to the unauthorized area or which officer was responsible for letting the inmate into an unauthorized area. Indeed, it appears no policy or practice exists to investigate these questions. Warden Estes acknowledged that such an investigation would not be helpful because the facility has no procedure for documenting this kind of information. See Ex. 2, Estes Dep. 109. Estes could not recall a time when an officer received corrective action for allowing an inmate into an unauthorized area. Ex. 2 Estes Dep. 133. When asked about finding a prisoner in an unauthorized area, Estes said, "it's kind of hard to determine when he got there or how he got there" and if they cannot determine how "then it will just be that," demonstrating a callous indifference to the safety of the prisoners in his custody. Id. at 133-34.

Defendants are aware of frequent uncontrolled movement throughout general population. Defendants are aware that these conditions present a substantial risk of harm to prisoners in the facility yet have failed to take reasonable and necessary steps

20

to address this harm.

## VI.  WEAPONS   CONTRABAND   IS   PERVASIVE,   EASILY ACQUIRED, AND TOLERATED.

Weapons contraband is pervasive throughout St. Clair.  Ex. 3, Martin Report ("the population is heavily armed.") ███████████ stated that while he worked at St. Clair's infirmary, he saw "stab wounds almost every day." See Ex. 42, ████████████  SCP_02796-98. ████████████, another inmate at St. Clair, stated:

> [M]ost prisoners at St. Clair have knives. For instance, two knives were found in my old cell after I switched cells with another inmate. Prisoners make knives from pieces of the building, such as air vents or from furniture, such as metal parts of the bed frames.

Ex. 45, ████████████., SCP_02836.[20]

---

[20]See also Ex. 30, ████████████., SCP_02860 (he sees "at least one knife everyday and they are very easy to obtain"); Ex. 35, ████████████. SCP_02693 ("knives are present throughout St. Clair. I would estimate there are approximately two knives for every inmate."); Ex. 60, ████████████. SCP_02762 ("I almost never see prison staff confiscate knives. When I reported the difficulties with my cell-mate, I was told by Officer Turner that I should not make him get his knife."); Ex. 36, ████████████l. SCP_02708 ("Most prisoners had knives at St. Clair. Knives could be made or sharpened from anything metal. I would estimate about 90% of inmates at St. Clair have knives."); Ex. 37, ████████████. SCP_02715 ("I see knives everyday at St. Clair."); Ex. 32, ████████████. SCP_02723 ("Almost all of my cell mates at St. Clair had knives. I believe that the majority of knives are made from iron at the trade school but some are made from sharpening materials from the building or furniture."); Ex. 38, ████████████. SCP_02732 ("knives are all over the place at St. Clair. I have seen other prisoners cut bed rails to make knives."); Ex. 39, ████████████. SCP_02750 ("[T]here are a large number of knives at St. Clair."); Ex. 40, ████████████. SCP_02772 ("many prisoners at St. Clair are armed with knives. Prisoners make knives from parts of the building and furniture, like metal bed railings and fencing."); Ex. 16, ████████████. SCP_02779 ("I see a lot of prisoners with knives."); Ex. 41, ████████████. SCP_02789 ("Knives were prevalent at St. Clair, including in segregation. Knives can be made out of anything metal and I saw several stabbings while I was at St. Clair."); Ex. 43, ████████████. SCP_02801 ("I see many prisoners with knives.

The testimony of present and former staff members also illustrates the high level of weapons contraband in St. Clair. Current St. Clair employee ████████ stated that she observed inmates hiding contraband in areas around the kitchen. Ex. ████████. SCP_02968.   She reported what she witnessed to correctional officers, but they did not take her concerns seriously.  Id.[21]

The high level of contraband creates a known risk of harm.  The risk of violence is universally perceived by staff and prisoners.  See supra VII A.  Former Warden Davenport described the access to weapons as a "security nightmare." Ex. 62, Dixon Hayes, *Sen. Ward, state commissioner tour St. Clair prison*, MyFoxAl.Com Mar. 16, 2012. St. Clair operates in an environment where the majority of people feel the need to have a knife for self-protection.  This need for self-protection creates a cycle where nearly every prisoner at St. Clair is armed, turning potentially small disputes into deadly assaults.  Five men have been stabbed to death at St. Clair since

---

Prisoners make knives from pieces of buildings, such as air vents or from furniture. I have seen prisoners super-gluing their injuries after being involved In knife fights."); Ex. 14, Michael McGregor Decl. SCP_02956 ("Knives are everywhere and many people told me that I should get a knife. A knife can be purchased for one package of TOPS cigarettes."); Ex. 18, ████ SCP_02833("75% approximate inmates have knives.");   Ex. 61, ████████ SCP_02884 ("there are significantly more stabbings and more knives at St. Clair.").

[21]Another staff member, Officer ████████, recently expressed concern with the number of knives and stabbings at St. Clair on Facebook. "I have almost 14 (years working) and ████ ████████ With all the fights and stabbings and knives we take that don't even get reported or no one gets locked up because of." Ex. 19, ████, *Guards "outnumbered" at St. Clair Correctional Facility*, FACEBOOK, Oct. 17, 2015.

2011.[22]  In the past eighteen months, at least seven men have been raped at knifepoint.

See infra VII.  And assaults with knives occur frequently.  Ex. 3, Martin Report 13-14

("[T]he frequency of assaults resulting in life-threatening injuries is quite simply

among the highest I have observed in my 43 year career in corrections.").[23]

---

[22]On January 6, 2014, Marquette Cummings was stabbed to death.  Ex. 23, Carol Robinson, *Convicted killer fighting for life after stabbed in Alabama prison*, Al.com, Jan. 6, 2014 (describing stabbing homicide of Marquette Cummings); see also supra n. 7 (describing stabbing deaths of Jodey Waldrop, Jammy Bell, and Jabari Bascomb); ███████████████████████████; supra n. 8 (describing stabbing death of Mr. Waldrop); See Ex. 1, Estes Dep. 328-29; Ex. 64, Adam Ganucheau, *Inmate stabbed to death at St. Clair Correctional Facility; second stabbing in week*, Al.com, Nov. 9, 2015 (describing stabbing death of Timothy Latham).

[23]For example, on March 30, 2015, Jamal Woods was stabbed seventeen times on the top tier of L-Block. ███████████████████████████. On March 29, 2015, James Dorriety was stabbed in the head and back. ███████████████████. On December 3, 2015, Michael Stamper was stabbed in the head, back, chest, left shoulder, and left arm. ███████████████████████. On August 18, 2014, Victor Russo was assaulted by three men armed with knives in the M-Block hallway. ██████████████████. ████████████ In August 2014, while working as a cell cleaner and runner in segregation, Willie Brantley was stabbed by another prisoner who had attached a knife to a broomstick and stuck it through his open tray hole. ███████████████████████ The prisoner who stabbed Mr. Brantley also killed Jammy Bell. ███████████████████████. On February 26, 2014, Tehron Young was stabbed in the back, side, and arm. ████████ On February 25, 2014, Alister Cook was stabbed in the back. ███████████████ When he had previously reported difficulties with his cell-mate prior, Officer Turner told Mr. Cook that he should "not make him get his knife." ███████████ ███████████ On December 20, 2013, Michael Mays, a plaintiff in this lawsuit, was stabbed multiple times in the neck near the G-Yard entry gate. ███████████████████████.

On July 20, 2013, Mark Duke, a named plaintiffs in this lawsuit, was stabbed five times in the left shoulder blade and twice in the chest area, and had abrasions to the right temple, left forehead and left cheek. ███████████████████. In March or April 2012, Christopher Ledbetter was stabbed in the abdomen, back, and face outside of the Chow Hall. ████ ███████████████████████; see also supra n. 7 (stabbing assaults of Nakia Echols, Victor Russo, Michael McGregor, Nakia Echols, Brandon Ladd, Justen Stinson, Elliot Blount, Benjamin Howlet, Derrick Averhart); ██████████████████████████████ ██████████████████████████████████████████

The extreme level of violence at St. Clair stems from the proliferation of knives and Defendants' failure to take reduce the level of contraband.  Defendants are aware of the prevalence of contraband and its direct link to violence at St. Clair, but have failed to take reasonable steps to prevent and remedy the problem.   St. Clair policy does not provide for regular systemic facility-wide searches. Instead, policy provides that each part of the facility be searched only once every sixty days. Ex. 2, Estes Dep. 209. Thus, each area is to be searched six times a year. <u>Id.</u>  Defendants' policy and practice of conducting sixty day spot searches is unreasonable.  █████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████ ; supra n. 10 (stabbing assaults of Bo Taylor, Janaraious Smith, Dillon Cole, Derrick White); ████████ . ██████████ supra n. 11 (stabbing assault of Micah Mays); supra n. 21 (stabbing assault of Douglas Simon by assailant who warned officers he would stab someone if released to general population); ███████████████ ; ██████████



■.[24]

Only one systematic-facility wide search of the type called for by recognized standards for correctional practices has been conducted at St. Clair in 2015.  See Ex. 4, Horn report at 4-5. This search occurred when Warden Estes called in the CERT team following an attempt to smuggle firearms into the facility.  Ex. 2, Estes Dep. 206.

---

[24]Men incarcerated at St. Clair have described the weapons searches as half-hearted at best. For example, Plaintiff Michael McGregor described one "shakedown" as follows:

> Some officer brought a little trash can and put it in the middle of the dorm, told them he was going to shake the whole dorm down, tear it a part, or he was going to leave and come back and there was going to be a lot of stuff in that trash can, enough to make him happy, and they piled enough knives and different stuff in that trash can and everything to make him happy. When he come back, he could just take that and go on.

Ex. 54, Michael McGregor, Dep. 47.  A.Z. likewise described how the CERT team "came to H dorm and announced that they were too tired to conduct a shakedown, so they put a trash can down and simply asked men to turn in their knives."  See Ex. 53, ■ SCP_02906-09.

The CERT team conducted a systematic search of the facility over the course of three days and found ███████████████████████████████████████ ███████████████████████████████. See Ex. 2, Estes Dep. 208; Ex. 5, ███████ ████ 268-71.



███████████████ Ex. 18, ███████████████████████████, ADOC_0008179. The lack of thorough cell searches in segregation is dramatically represented by a recent incident where a segregation inmate had to be hospitalized after overdosing on multiple narcotics, including "cocaine, THC, and benzodiazapenes." Ex. 78, ███████ ███████████████████ SCP_03001.

Further, St. Clair fails to discipline prisoners found with knives, creating a culture where inmates possess weapons with impunity. For instance, though a six-inch long knife was found by Lieutenant Northcutt in ██████████ segregation cell, he did not receive a disciplinary for possession of a weapon. See Ex. 2, Warden Estes Dep., 268-69. After 50-60 knives were found in the CERT shakedown, not all of those found with contraband were disciplined. Id. at 305. Even sending 20 prisoners to segregation "would be difficult," and would likely involve transferring prisoners

26

to accommodate them. Id. at 305. Warden Estes, █████████, and Capt. Malone

acknowledged that prisoners found with knives may not be sent to segregation, due

in part to lack of space. Id. at 306; Ex. 5, Malone Dep., 294; Ex. 8, ███████████-

█. ████████████████████████████████████████████

████████████████████████████–█.[25]

Defendants are aware that weapons contraband is pervasive and easily acquired

and presents a substantial risk of harm to all prisoners housed at St. Clair, as well as

staff assigned there. Defendants' policies and practices with regard to the detection

and elimination of weapons contraband are inadequate and unreasonable and

demonstrate a deliberate indifference to this risk of harm.

## VII.   DEFENDANTS HAVE ALLOWED A CULTURE TO DEVELOP WHERE SEXUAL VIOLENCE IS COMMONPLACE AND PERCEIVED AS AN INEVITABLE PART OF PRISON LIFE.

Over the last 18 months, at least seven prisoners have been held at knifepoint

and sexually assaulted at St. Clair.[26]

---

[25]St. Clair Officer █████████ wrote, in a public post on social media, "[w]ith all the fights and stabbings and knives we take that don't even get reported or no one gets locked up because of . . . it's the worst it has ever been!" Id. at 311; Ex. 9, ███████, *Guards "outnumbered" at St. Clair Correctional Facility*, FACEBOOK, Oct. 17, 2015, ██████████████████████ Officer ███r publically posted that the officers will confiscate knives without reporting or disciplining any parties involved, sharing this as part of the explanation for why St. Clair is "the worst it has ever been." Id.

[26]In discovery, Plaintiffs requested all reports of sexual violence at St. Clair in the last 18 months. See Ex. 79, Plaintiffs' Second RFP, request number 16. Defendants have not provided this information and St. Clair does not publicly report on the incidence of sexual violence. Although

On April 24, 2015, A.Z. was raped at knifepoint in his bed in H dorm, the Therapeutic Community, less than two weeks after being transferred to St. Clair. Compl. ¶¶ 36 (e), 53(b), 77(a).  A.Z. was serving a 15-year sentence for a Class-B felony.  A.Z.'s assailant was a general population inmate, serving a life-sentence for murder, rape, and robbery, who was assigned to H dorm but was not a participant in the Therapeutic Community.  Ex. 53, ███████ SCP_02906-09; Ex. 80, ADOC Inmate Search Result.  A.Z. was unable to safely report the rape for three days and remained housed with his assailant during that time.  Ex. 53, ██████. SCP_02906-09.  He was taken to a rape crisis center the day after he reported being sexually assaulted and was offered continuing support and counseling by victim advocates there. Ex. 53, ██████ SCP_02906-09. However, St. Clair's PREA representative, Lieutenant Angelia Gordy, took a black marker and crossed out the victim advocates' contact information.  Ex. 53, ███████. SCP_02906-09; Ex. 81, ████████ ██████████ SCP_02925-37.  Upon returning to St. Clair, A.Z. was placed in an isolation cell in segregation and was given no further medical or mental health treatment.  Ex. 53, ████████ SCP_02906-09.  He reported to officers that he felt suicidal and was told in response, "I don't give a shit, do it."  Ex. 53, ███████.

---

Plaintiffs detail seven incidents of sexual violence in the last 18 months in this Memorandum, it is likely that this incident number under-represents the actual frequency of sexual violence at St. Clair.

SCP_02906-09.  A.Z.'s assailant was placed in close proximity to him in segregation. Ex. 53, ███████. SCP_02906-09.  His assailant was later released to general population while A.Z. remained in isolation until his transfer to another facility.  Ex. 53, ███████ SCP_02906-09.  A.Z. has never heard the outcome of the I&I investigation.  Ex. 53, ███████. SCP_02906-09.

On April 10, 2015, W.C. was raped twice at knifepoint in the middle of the night by his cell partner in P-Block.   Compl. ¶¶ 36(g), 53(c), 77(b); Ex. 82, ████ ███. SCP_02735-37.  After reporting the rape and visiting a rape crisis center, W.C. returned to St. Clair and was required to sign a living agreement as the only means of avoiding placement in isolation; however, after signing the living agreement, W. C. was reassigned to the other side of P-Block, where several of W.C.'s assailant's friends lived.  Ex. 82, ███████ SCP_02735-37.  The friends of W.C.'s assailant refused to allow W.C. to enter the block and he was forced to spend several hours in the hallway outside the shift office.  Ex. 82, ███████ SCP_02735-37.  In the weeks that followed, W.C. continued to face retaliation and was threatened by friends of his assailant.  Ex. 82, ███████ SCP_02735-37.  He did not receive continuing mental health counseling and never heard the outcome of I&I's investigation.  Ex. 83,  Report of Plaintiffs' Expert Michelle Bonner (Feb. 22, 2016).

On April 2, 2015, around 12:00 p.m., M.T. was raped in a cell at knifepoint by

an unidentified inmate who snuck up behind him.  See Ex. 84, ███████████
SCP_02970-84.

On February 1, 2015, J.M. was raped at knifepoint in his bed in H dorm by an inmate who was in the Therapeutic Community with him.  Compl. ¶¶ 36(p), 77; Ex. 85, ██████. SCP02959-62.  The next day, Monday, February 2, J.M. called the PREA hotline to report the rape.  Ex. 85, ██████. SCP02959-62.  J.M. remained housed with his assailant for two days before St. Clair's PREA representative, Lieutenant Angelia Gordy, came to speak with him on Wednesday, February 4.  Ex. 85, ██████ SCP02959-62.  J.M. was not taken to a rape crisis center for a sexual assault test kit; instead, J.M. had a brief medical evaluation in the prison infirmary and was immediately taken to an isolation cell in segregation.  J.M. did not have sight and sound separation from his assailant, who repeatedly went to J.M.'s cell door in segregation and threatened him.  Ex. 85, ██████.117-21.  As a result, J.M. stopped using the shower because he feared being exposed to his assailant.  Ex. 85, ██████ SCP02959-62.  J.M's assailant had threatened to rape J.H. at knifepoint two months before sexually assaulting J.M.  Ex. 49, ██████. SCP_02938-40.  J.M. did not receive mental health counseling and never heard the outcome of the I&I investigation.  Ex. 85, ██████. SCP02959-62.

On January 14, 2015, D.C., a nonviolent offender, was raped at knifepoint in

L-Block. Ex. 86, ███████. SCP02753-55; Compl. ¶¶ 36 (v), 77(b). D.C. was scared to report the rape because his assailant threatened to kill him, but he decided to take action when friends of his assailant continued to harass him. Ex. 86, ███████. SCP02753-55. ████████████████████████████████████ ████████████████████████████████████ Ex. 87, ██████████████████████████ However, D.C. was called a "liar" and chided when he reported the rape to St. Clair prison staff on April 1, 2015. Ex. 86, ██████. SCP02753-55. D.C. was placed in an isolation cell in segregation, but did not have sight and sound separation from his assailant. Ex. 86, ██████. SCP02753-55. He did not receive continuing mental health counseling. Compl. ¶¶ 36 (v), 77(b).

In December 2014, J.H. was sexually threatened at knifepoint in his cell in M-Block by an inmate from the Therapeutic Community in H dorm. Ex. 49, ██████. SCP_02938-40; Compl. ¶¶ 36 (w), 77(e). J.H. immediately reported the incident and gave a statement to St. Clair's PREA representative, Lieutenant Angelia Gordy. Ex. 49, ██████. SCP_02938-40. He was told there would be an investigation and was then placed in an isolation cell in segregation. Ex. 49, ██████. SCP_02938-40. No one followed up with J.H. about an investigation. Ex. 49, ██████. SCP_02938-40. Two months later, J.H.'s assailant was placed in a cell directly across from him in

segregation after he raped J.M.  Ex. 49, ███████.  SCP_02938-40.

On or around July 24, 2014, A.H. was sexually assaulted at knifepoint in his cell in M-Block by an inmate who was not assigned to his cell.  Compl. ¶¶ 68(e), 77(f).  He immediately reported the assault to prison staff.  At the infirmary, nurses and officers laughed at A.H. while he was medically examined.  Ex. 20, ███████.  SCP_02951-54.  After reporting that he was suicidal and spending five days in a crisis cell, A.H. was put in an isolation cell in segregation. Ex. 20, ███████. SCP_02951-54. A.H.'s assailant was housed in a cell across the hall, in the same segregation block.  Ex. 20, ███████.  SCP_02951-54.  A.H. never received continuing mental health counseling.  Ex. 20, ███████. SCP_02951-54.  A.H. has never been informed of the outcome of the I&I investigation. Ex. 20, ███████.  SCP_02951-54.

Defendants are aware of widespread sexual violence at St. Clair,[27] but have not

---

[27]All seven of the 2015 sexual assaults identified above were reported to Defendants. Moreover, Defendants have been on notice for years about the steps necessary to address sexual violence in its correctional facilities.  In 2012, the Equal Justice Initiative (EJI) issued a report detailing the ADOC's practices and policies that placed incarcerated men and women at risk of sexual violence.  The Department's deficient policies and practices included placing inmates who reported sexual abuse in solitary confinement, failing to provide continued mental health counseling, failing to use classification to identify and protect vulnerable prisons, failing to provide adequate staffing and monitoring, failing to investigate allegations of sexual assault, and failing to inform victims of sexual assault about the results of the investigation.  Ex. 88,  2012 EJI Report On Tutwiler, SCP_03257-59.  In November 2012, the National Institute of Corrections (NIC) issued a report identifying many of the same policies and practices as contributing to the sexualized environment and harm to prisoners at Tutwiler.  Ex. 89, NIC Report, SCP_03221-56.  In January 2014, the Department of Justice (DOJ) found that the ADOC's policies and practices at Tutwiler with regard to sexual misconduct and abuse placed prisoners at a higher risk of sexual abuse.  Ex. 90,  DOJ Report, SCP_03273-3308.

taken reasonable steps to address this. Ex. 83, Bonner Report, 20-22.

The following illustrates the multiple failings of Defendants to address the problem of sexual violence, at every possible step:

### 1. Bed Space - Not Classification and Risk Assessment - Determines Housing Assignments.

Housing and bed assignments at St. Clair are based primarily, if not exclusively, on open bed space rather than inmate classification or assessment based on risk of sexual victimization or sexual abusiveness. Ex. 92, Evans Interrogatory Answers, at 9 ("Housing is separate from classification"); Ex. 93, Estes Interrogatory Answers, at 8 ("Classification is not used to make housing decisions"); Ex. 2, Estes Dep. 183-84, 187; Ex. 5, Malone Dep. 192-93; █████████████████████████████████ ████████████████████ Ex. 83, Bonner Report, 9.

St. Clair is a maximum security prison but inmates with lower security levels are regularly transferred to the prison to participate in the ADOC's Therapeutic Community ("TC") for drug treatment. Ex. 83, Bonner Report, 9. ████████████

---

The ADOC was on notice that sexual violence was widespread not only at Tutwiler but at the men's facilities as well. In 2013, EJI issued a report about sexual violence at the men's prisons and met with then-Commissioner Kim Thomas to discuss the lack of PREA compliance, and the policies and practices that contribute to sexual violence at the men's prisons. Ex. 91, 2013 EJI Report on Men's Facilities SCP_03266-68. These reports, describing widespread sexual violence throughout ADOC's facilities, necessitated that ADOC take steps to protect its prisoners from a substantial risk of sexual violence. Years later, Defendants have done nothing. Defendants' inaction constitutes deliberate indifference and places prisoners, particularly those at St. Clair, at a substantial risk of sexual violence.

█████████████████████████████████████████████████████████████

████████████████████████████████████████████ Ex. 83, Bonner

Report, 9; Ex. 94, Bed Movement Charts SCP_03124-28; Ex. 2, ████████████████

███████████████████████████████. When inmates with lower security levels do

not complete the TC program, they are regularly moved to the general population

blocks at St. Clair, rather than being transferred back to a facility that matches their

security level, thus placing them at substantial risk of sexual assault. Ex. 83, Bonner

Report, 9-11.[28]

Even when inmates have requested a housing move based on specific threats

of sexual violence, prison staff at St. Clair have turned a blind eye. For example, in

April 2015, after just arriving at St. Clair from a lower-level prison, Michael

McGregor reported to his classification officer that an inmate was sexually threatening

him in L-Block and requested a different housing assignment. Ex. 54, McGregor

Dep.103-16. Mr. McGregor told his classification officer who was threatening him.

Id. ███████████████████████████████████████████████████

████████████████████████████████████████████ See Ex. 95,

_____

[28]For example, even though W.C. signed a contract stating he would return to a Level 4
prison if he left the TC program, he was instead moved to P-Block, where he was later raped. Ex.
82, ██████. SCP_02735-37. D.C., a nonviolent offender, was also transferred from a Level 4
prison to St. Clair to participate in the TC program. Ex. 86, ████████. SCP02753-55. However,
D.C. was later housed at St. Clair in the general population cell blocks, where he was raped, with
inmates with violent criminal and disciplinary records. Ex. 86, ██████. SCP02753-55.

███████████████████████████████████████; <u>see also</u> Ex. 54, McGregor Dep. 154 ("[T]hen for an I&I man to say, hey, this ain't the first he's done it; he's been in lock-up, or whatever and got out, done it before.  And then I think on his record, he's got, what 34 to 36 assault and sodomy cases").  Mr. McGregor's classification officer told him that he would come up for a review in August 2015 and that he should "[s]tay out of trouble" until then. Ex. 54,  McGregor Dep. 115-16. Hours later, Mr. McGregor was stabbed in L-Block by the man who he had reported to his classification officer.  Ex. 54, McGregor Dep., at 80-82; Compl. ¶ 36(f) .  Mr. McGregor suffered extensive injuries to his back and neck that required treatment at UAB Hospital.  Compl. ¶ 36(f): ███████████████████, ███████████.

As was concluded in Ms. Bonner's report, these incidents demonstrate that Defendants' policies and practices with regard to housing put all inmates at St. Clair at an "incredibly high risk of being abused" and sexually victimized. Ex. 83,  Bonner Report.

### 2.    Victims Lack Adequate, Safe Ways to Report Sexual Violence.

Victims lack adequate and safe ways to report incidents of sexual violence.  Ex. 228, Bonner Report.  Months passed before D.C. was able to safely report that he was raped. Ex. 86, ██████. SCP02753-55.  A.Z. wanted to immediately report being

raped, but his assailant stayed close to the phones. Ex. 53, ███████. SCP_02906-09. W.C.'s assailant said that he would kill him if he reported the rape and it took hours for W.C. to find a safe way to report what happened. Ex. 82, ██████. SCP_02735-37. A St. Clair lieutenant said, "fuck you," to A.H. when he reported being sexually victimized. Ex. 20, ████ SCP_02951-54.

When victims can reach a phone to report sexual abuse to the ADOC I&I division "hotline," they do not speak to a person, but instead are prompted to leave a voice message. Ex. 83, Bonner Report, 11. "By their very nature, hotlines are implemented to elicit immediate response and assistance to the callers who are in distress or in danger." Ex. 83, Bonner Report, 11. ADOC's method for reporting sexual abuse is a messaging device with inconsistent and lengthy response times. Ex. 83, Bonner Report. J.M.'s experience demonstrates the inadequacies of the ADOC's "hotline" reporting mechanism. Ex. 83, Bonner Report; Ex. 85, ██████. SCP_02952-62. The day after he was raped, J.M. left a voice message on the ADOC's "hotline" machine. Ex. 83, Bonner Report, 11; Ex. 85, ██████. SCP_02952-62. For the next two days, J.M. remained housed in the immediate vicinity of his knife-wielding assailant before St. Clair's PREA representative, Lieutenant Angelia Gordy, responded to J.M.'s report. Ex. 83, Bonner Report; Ex. 85, ██████ SCP_02952-62.

Defendants' failure to provide victims with adequate and safe ways to report

sexual violence, and to implement policies and procedures to ensure that prison staff promptly respond to reports "is not by accident, ignorance, or inability"; Defendants' failure is "willful neglect."  Ex. 83, Bonner Report, 13.

### 3.    Victims of Sexual Violence Face Punitive Conditions.

"The consensus in corrections is that administrative segregation is not supposed to be akin to punitive segregation."  Ex. 83, Bonner Report, 18.  However, victims who report sexual violence at St. Clair face punitive and harsh conditions, because the conditions of administrative segregation at St. Clair are indistinguishable from those in disciplinary segregation.  Ex. 83, Bonner Report, 15-18.  Inmates in administrative segregation face solitary confinement, are shackled at their hands and feet prior to leaving their cells, do not receive any programming or books, and are severely restricted from communication with the free world.  Ex. 83, Bonner Report, 16; Ex. 34, ████████████████████████████████████ Ex. 5, Malone Dep. 262-66 (describes distinctions for segregation; "Any inmate out of segregation will remain in their restraints." ).

███████████████████████████████████████

████████████████████████████████████████

███████████    These examples illustrate their experiences of spending months in administrative segregation:

I was denied access to mental health services and medical

care while I was in segregation.  I requested to go to sick call because I was still in pain from the sexual assault and had terrible headaches, but my requests were denied.  The only person who checked on me in segregation was a psychologist, who spent two minutes taking to me and never followed up or returned.

There were no books in segregation and the only thing I could do was listen to the radio.  I was only allowed to use the phone once to contact my mother, after she called repeatedly.

Ex. 53, ███████. SCP_02906-09.

For several months, I declined to use the showers in segregation because I would be exposed to my assailant.

Ex. 85, ███████. SCP_02959-62.

The living conditions in segregation were horrible and there were spiders all over my cell.  The lights in my cell did not work for over a month.  My sink also did not work.

Ex. 49, ███████. SCP_02938-40. ███████████



For these reasons, Ms. Bonner concluded in her report that, Defendants' "policies and practices further unduly punish victims of sexual abuse."  Ex. 83, Bonner Report, 18.

### 4.    Victims of Sexual Violence Are Not Monitored or Protected From Retaliation.

Every victim of sexual violence identified above faced retaliation at St. Clair

and was forced "to monitor their own safety, without the assistance of security or other staff." Ex. 83, Bonner Report, 17. For example, A.H. repeatedly asked to be transferred to another prison instead of returning to general population to no avail and faced immediate, violent retaliation as a result:

> When I was released from segregation and returned to general population in March 2015, some friends of the inmate . . . started giving me trouble. They told me that I was going to drop the charges, and rewrite my statement to say that I was lying and under the influence of drugs at the time. I refused to do that and they beat me up. I was then put back in segregation. When I returned to segregation, I was put back in the same block as the [assailant]. . . He threatened me in segregation, saying things like, it's only a matter of time.

Ex. 53, ███████. SCP_02951-54. The prisoner who raped A.Z. was held in close proximity to A.Z. in segregation and sent him a letter demanding that he lie about the sexual assault. Ex. 53, ███████. SCP_02906-09. When D.C. had yard time in segregation, the prisoner who raped him could see D.C. and would yell threats at him from his cell. Ex. 86, ███████. SCP02753-55. For months, and even though J.M. reported the threats to St. Clair prison staff on multiple occasions, the prisoner who raped J.M. came to his cell door in segregation to threaten him. Ex. 85, ███████. 116-21. J.H. informed a lieutenant that it was unsafe for him to leave segregation because his assailant put "a hit out" for him. Ex. 49, ███. SCP_02938-40. In response, J.H. received a disciplinary for refusing to return to general population and was penalized

39

with 30 days of restrictions.  <u>Id.</u>  J.M. also received a disciplinary for refusing to

return to general population because he felt unsafe.  Ex. 85, ███████.  SCP_02959-

62. ███████ ████████████, ( ██████████████████████████

████████████████████████████████████████████████

██████████████████ ).

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████

### 5.    Sexual Violence Investigations Are Haphazard and Incomplete.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██

Additionally, as these investigations are pending, victims consistently go

without any updates on their status.  Ex. 49, ███████.  SCP_02938-40; Ex. 53, ███

███ SCP_02906-09.  As of January 26, 2016, J.M. had received no updates on the

status of the investigation into his February 1, 2015 rape.  Ex. 83, Bonner Report, 15.

As of January 27, 2016, W.C. had received no updates on the status of the investigation into his April 10, 2015 rape.  Ex. 83, Bonner Report, 15.



Ex. 83, ▮▮▮▮▮▮, 14.  As Ms. Bonner concluded in her expert report, ADOC's investigations into incidents of sexual violence at St. Clair show "blatant disregard to the victims and the violent criminal acts committed against them."  Ex. 83, Bonner Report, 15.  The investigations also demonstrate deliberate indifference.  Ex. 83,

Bonner Report, 22.

### 6. St. Clair Has No Coordinated or Consistent Response Plan For Sexual Violence, and Corrective Action Is Non-Existent.

Defendants have not implemented a correction action plan to reduce further harm to victims or the risk of future harm to other inmates at St. Clair. Ex. 83, Bonner Report, 19. This is demonstrated most starkly by the fact that none of the highest level administrators at the facility – Warden Estes, ███████████, ███████ ████ – is aware of how many sexual assaults have been documented at the facility in 2015, nor are reports generated for them to review that track sexual assaults. Ex. 83, Bonner Report, 19; see, e.g., Ex. 2, Estes Dep. 243-47; Ex. 8, ██████████████; Ex. 34, ████████████████.

### 7. Defendants Fail to Respond to Evidence that a Rape Culture Exists at St. Clair.

Defendants have failed to respond to evidence that a "rape culture" exists at the prison where prison rape is treated as a joke rather than a serious problem. Ex. 83, Bonner Report, 8. During depositions, Defendants were shown public Facebook posts from St. Clair staff, including staff with supervision duties, that made light of sexual violence in prison. Ex. 2, Estes Dep. Ex. 17, 18, and 19; Ex. 8, ██████████████ For example, Defendants were shown a St. Clair sergeant's post from his public Facebook account, which read, "Surprise sex is the best thing to wake up to. Unless you're in prison." Ex. 2, Estes Dep. Ex. 19. The same sergeant then commented on the image,

"Yeah, I had to share it.  Funny shit."  Ex. 2, Estes Dep. Ex. 19.  In response to the St.

Clair sergeant's post, Warden DeWayne Estes stated,

> I've heard several prosecutors in high profile cases say,
> yeah, wait till you -- wait till to [sic] get to prison.  Right?
> Does that mean that that [sic] prosecutor's going to have
> that attitude that he wants that convict to go to prison and
> to -- to be involved in this?  Or is it just him blowing off
> steam?

Ex. 2, Estes Dep. 291.  "These posts and tolerance of these attitudes towards prison

rape further amplify the rape culture and callous disregard for sexual violence

throughout the facility."  Ex. 83, Bonner Report, 8.

Defendants are aware that the risk of sexual violence is pervasive and presents

a substantial risk of harm to all prisoners housed at St. Clair.  Defendants' policies and

practices with regard to the detection and elimination of sexual violence are

inadequate and unreasonable and demonstrate a deliberate indifference to this risk of

harm.

## VIII. DEFENDANTS' POLICIES AND PRACTICES WITH REGARD TO HOUSING CREATE A SUBSTANTIAL RISK OF HARM.

"Classification is not used to make housing decisions" at St. Clair.  Ex. 93,

Estes Interrogatory Answers, at 8; see also Ex. 92, Evans Interrogatory Answers, at

8 ("Housing is separate from classification"); Ex. 1, Austin Report, 3 ("ADOC does

not have an internal classification system at its facilities"); Ex. 2, Estes Dep. 183-84,

187; Ex. 5, Malone Dep. 192-93; Ex. 8, ███████████████████; Ex. 34, ██████

███████████.  Instead of relying on inmate classification, housing and bed assignments at St. Clair are based primarily, if not exclusively, on open bed space. See id.; see also Ex. 4, Horn Report, 12-13.  As a result, prisoners with disparate backgrounds and classification histories are regularly housed together at St. Clair, producing serious violence.  See Ex. 1, Austin Report, 3 ("the absence of a well-structured internal classification system is a direct contributor to the large number of assaults, fights, intimidations, and the flow of contraband.")

Primarily using open bed space to dictate housing and bed assignments rather than inmate classification puts prisoners at serious risk of harm.  Housing non-violent offenders with known risk factors in violent dorms and/or cells with inmates with higher classification levels or known histories of violence creates a substantial risk of harm.

Multiple violent incidents involving prisoners with disparate backgrounds and classification histories who were housed together, including sexual assaults[29] and near

---

[29]W.C. was a level 4 custody prisoner and had been housed at a lower-level prison before he was transferred to St. Clair to participate in the Therapeutic Community in H dorm.  Ex. 82, ███. ███.  SCP_02735-37.  W.C. signed a contract stating he would return to a Level 4 prison if he left the TC Program.  Id.  However, when W.C. left the TC Program, he was moved into P-Block, a violent housing unit in general population.  Id.; see also Ex. 2, ███████████████████████

███████████████████████████████████

Similarly, D.C., a nonviolent, lower custody inmate who was transferred to St. Clair from a Level 4 prison, was raped at knifepoint on January 14, 2015, in L-Block after being moved from the Therapeutic Community in H dorm.  See Compl. ¶¶ 36(v), 77(b); Ex. 86, ███████████-

fatal assaults[30] on men with known risk factors shortly after their arrival at St. Clair

by men with known histories of violence, put Defendants on notice of this risk of

harm. Michelle Bonner, <u>see</u> Ex. 83, Bonner Report, 6-7.  Defendants should have

taken reasonable, necessary, and appropriate steps to prevent and remedy these

dangerous conditions with inmate classification processes, but have failed to do so.

Effective classification processes are crucial to well-run prisons, particularly

---

[30]Douglas Simon was serving a sentence for marijuana possession on when he arrived at St. Clair in August 2015.  <u>See</u> ███████████████████████ ███████████ There was no screening or intake process before Mr. Simon was assigned to cell L-35. ████████████████████████. Mr. Simon's cell-mate in L-35 had a reputation for violence and, in his most recent stay in segregation, told officers that he would stab someone if he returned to general population. See id. Ex. 34, ██████████████████ ███████████████████████████████████████████ Ex. 38, ████ On or about September 12, 2015, less than six weeks before his sentence ended, Mr. Simon was stabbed by his cell-mate resulting in serious wounds that required treatment at UAB Hospital.  <u>See</u> ██████████████████████; ████████████ ████████████████████████.

When Michael McGregor, who is 50 years old and serving a sentence for a non-violent offense, arrived at St. Clair in April 2015, he was immediately assigned to L2-Block, a particularly violent housing unit.  Ex. 14, Michael McGregor Declaration, SCP_02955-58; <u>see also</u> Ex. 2, █████ ████████ Hours after arriving in L-block, Mr. McGregor was approached by a prisoner who asked him sexually threatening questions and if he had ever been at a Level 5 prison before.  <u>See</u> Ex. 54, McGregor Dep. 103.  ██████████████████████ ███████████████████████ ). Mr. McGregor reported the threats to his classification officer and asked to be moved.  Ex. 54, McGregor Dep. 103-16.  Mr. McGregor's classification officer told him he would come up for a review in four months and sent him back to L-Block.  Ex. 54, McGregor Dep. 115-16. Hours later, while he was laying in his cell in L-Block, Mr. McGregor was nearly fatally stabbed by this prisoner.  See Compl. ¶ 36(f); Ex. 20, McGregor Dep. 80-82; ███████████ ██████████████████.

"[i]n a situation such as we find at St. Clair where basic practices and procedures and the physical plant are so deficient that prisoners are placed in jeopardy, the proper classification of prisoners is imperative . . . and its absence a serious deficiency." Ex. 4, Horn Report, 12-14.   Mr. Horn found though that "regular and ongoing classification of prisoners is not occurring at St. Clair," nor is it used to separate predatory and vulnerable prisoners. Id.; see also Ex. 1, ███████████████

████████████████████████████████████

████████████████████████ These groups should be kept separated and Defendants should have implemented an objective behaviorally-based classification system to separate predatory and vulnerable inmates.  Ex. 4, Horn Report, 12-14; ████ ███████████. Defendants' failure to implement and use such a system is unreasonable and places all prisoners at St. Clair at a substantial risk of harm.

## IX.   FREQUENT USE OF FORCE CONTRIBUTES TO A CULTURE OF VIOLENCE.

The culture of violence at St. Clair extends to the actions, responses, and attitudes of multiple correctional officers and supervisors, and is a direct result of the environment created by Defendants.  Officers are routinely confronted with situations in which force – chemical spray, baton strikes, slapping and slamming handcuffed inmates – is used in order to maintain control.  Security staff rely heavily on force

because of inadequate options to otherwise maintain safety at the facility: the locks do not work, the housing areas are understaffed, isolation and segregation space is insufficient and unsafe, weapons are readily available, and drug use is rampant.

### A.   Officers' Use of Force Results in Serious Head Injuries to Inmates, Which are Chronically Under-reported By ADOC.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████         ████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

---

[31]Numerous inmates at St. Clair have suffered serious head injuries as a result of use of force by officers. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Compl. ¶ 24 (x), (ad), (ae), (af).

Defendants maintain a culture at St. Clair where baton blows to the head are viewed as the least restrictive use of force, even when the inmate is shackled and handcuffed.[32]  For example, on September 17, 2015, Captain Gary Malone used an object to strike multiple inmates in the face who were handcuffed behind their back while wearing leg irons in the segregation yard.[33]  Ex. 2, ███████████████ Ex. 5, Malone Dep. 459-60; see also Ex. 4, Horn Report, 15 ("use of force against inmates in restraints is always of concern and rarely appropriate.")  In response to questioning about when it is appropriate to deploy his baton, Captain Malone repeatedly maintained that he would employ the "minimum amount of force necessary," but refused to further define the standards under which he employed his baton.  Ex. 5, Malone Dep. 453.  Captain Malone equated baton strikes to an inmate's knee, body, and overhand strikes to an inmate's head with the "minimum amount of force necessary to regain control." Ex. 5, Malone Dep. 454-55. ███████████████

███████████████████████████████████

███████████████████████████████████

---

[32]A high level of force committed on restrained inmates is modeled even at the highest levels of the administration.  For example, then-St. Clair warden, Carter Davenport, punched a shackled prisoner in 2012, but was not demoted or removed from his post. See Ex. 98, Casey Toner,  *Prison Secrets: AL.com Investigation Finds Prison Bosses Have Little to Fear From Breaking the Rules*, The Birmingham News, (June 21, 2014); Answer, ¶ 22.

[33]Plaintiffs have requested but have not received any documents indicating investigation into Captain Malone's use of force and Defendants were unaware any use of force investigation during depositions.  See Ex. 2, Estes Dep.121; Ex. 5, Malone Dep. 463.

48

██████████████████████████████████████ Ex. 8, ██████

██ . ██[34]

**B.      Defendants Have Failed to Take Necessary and Reasonable Steps to Address This Pattern of Use of Force.**

████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████ Nevertheless, Defendants

have failed to implement policies and practices that would help verify the level of

force used when there is conflicting information and determine the severity of injuries

to inmates, such as obtaining and reviewing medical records from outside providers.

███████████████████████████████████

███████████████████████████████████

██████████████████████████████ <u>See</u>

Ex. 2, Estes Dep. 357(aware that incidents of force have required treatment at outside

_____

[34] ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████

hospitals, but not aware of any use of force incident where medical records from an outside provider were reviewed during investigation); ███████████████

███████████████████████.

███████████████████████████

███████████████████████████

███████████████████. ████████ ██████████████████

██████████████████████ Although captains at the facility conduct use of force investigations, Captain Gary Malone, who has been assigned both to the Segregation Unit and to General Population during the pendency of this litigation, has failed to obtain basic information concerning use of force incidents over the last six months.  See Ex. 5, Malone Dep. 442-43 (does not know number or details of use of force incidents, estimates that batons have been used "once or twice"); ████████████████████████

████████████████████████████

████████████ Ex. 3, Martin Report, 7 ("Facility and departmental officials have not implemented an adequate system of administrative reviews and investigations to minimize unnecessary and excessive incidents of force.")

███████████████████████████

███████████████████████████

███████████████████████████

50



[35]

The administration has exhibited a failure to adequately investigate even in the most major incidents.  For example, on September 17, 2015, Captain Malone reported striking three inmates who were handcuffed and shackled with a baton in the segregation unit yard.[36] See Ex. 2, ███████████████, see also Ex. 99, ██████ ███████ SCP_02682-84.  Although Captain Malone admitted that he, along with additional officers, struck multiple inmates in the head with hard impact objects, he was never interviewed by I&I regarding the incident.  Ex. 5, Malone Dep. 463.

███████████████████████ Finally, Warden Evans, second in

[35]See supra Part IX.A. ████████████████

[36] There is also evidence that inmates were struck with a flashlight, as well as a baton.  One of the injured inmates required 10 staples to the head following this use of force.  See Ex.2, Estes Dep. Ex. 6(Roberts v. Malone, No. 4:15-cv-01852-LSC-JEO (N.D. Ala. 2015)(compl.)).

command at the facility and the warden assigned to oversee the segregation captains and segregation review board, has no knowledge of this incident.  See Ex. 34, Evans Dep. 292-93 (Responds, "I can't recall it," when provided the date and location of incident and names of three injured inmates.)

This lack of review and investigation of a major incident which occurred during the pendency of this litigation is exemplary of the flawed and incomplete review process around use of force incidents, even where inmates sustain serious injuries to the head, face, and neck. ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

## X.     THE FAILURE TO PROVIDE ADEQUATE PROGRAMMING CONTRIBUTES TO THE DANGEROUS CONDITIONS AT ST. CLAIR.

Defendants fail to provide adequate rehabilitative, educational, vocational and religious programming, as well as treatment for serious drug addiction and mental illness. ██████████████████████████████████████████

███████████████████████████████████████████

██████████████ . ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

    █████████████████████████████████████████

███████████████████████████████  ████████████

███████████████████████████████████████████

███████████████████████████████████[37]   Even for

the ████████ of inmates who have jobs, many of the available jobs  do not permit

inmates to leave the cell blocks in order to work, thus they remain closely confined

with the hundreds of other inmates with no jobs. [38] ██████████████████████

---

[37]See ███████████████████████████████████████
███████████████████████████████████████████ Ex.
16,Wise Decl. SCP_02963-66 ("Although St. Clair houses a division of Alabama Correctional
Industries (ACI), there are only enough available jobs to occupy a fraction of the inmate population;
therefore most of the inmates remain idle in the cell blocks."); ████████████████████
██████████████████████████████████

[38]See ██████████████████████████████████████████
███████████████ see also Ex.  286, █████████████████████ .
SCP_02718-20 ("There is very little programming at St. Clair and virtually no opportunities for
people like me who have life without parole sentences to productively do their time."); Ex. 43, ████
███████  SCP_02800-02 ("We often spend all day in our blocks with nothing to do."); Ex. 102,
James Edwards Dep. 93 (Sep. 23, 2015) (Discussed need for incentive programs "because, right
now, you have guys walking around who they don't have any money and they don't do any visiting.
. . what's their incentive for staying out of trouble.")

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

Additionally, the facility eliminated rehabilitative and religious programming, such as Convicts Against Violence and removed books from the cell blocks, including religious and self-help books, educational books for men trying to earn GEDs, and novels.  See Ex. 12, Wise Decl. SCP_02963-66 (positive programs, classes, and religious programs that he implemented to reduce conflict were eliminated by new Administration; books in the cell blocks also removed); Exhibit 43, ██████████ SCP_02800-02; Ex. 51, Dale Gilley Decl. SCP_02944-47.

### Argument

Plaintiffs seek to certify a class of all current and future prisoners at St. Clair who are exposed to the constant threat of violence and a substantial risk of serious bodily harm because Defendants have failed to adequately address the dangerous conditions that exist at the facility.  Class certification is "peculiarly appropriate" here because the issues involved–that prisoners are exposed to an unconstitutional risk of violence–are "common to the class as a whole" and "they turn on questions of law applicable in the same manner to each member of the class."  General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 155 (1982) (quoting  Califano v. Yamasaki,

54

442 U.S. 682, 700-701 (1979)).

Indeed, class actions are a superior method of litigating actions seeking to remedy unconstitutional prison conditions because they allow for the ability to implement a remedy efficiently and consistently and prevent potential difficulties, such as inconsistent judgments from multiple proceedings. See Coley v. Clinton, 635 F.2d 1364, 1378 (8th Cir. 1980) (class actions are an "especially appropriate vehicle for civil rights actions seeking" prison reform (citing 3B J. Moore & J. Kennedy, Moore's Federal Practice P 23.40(1) (1980))); see also LaMarca v. Turner, 995 F.2d 1526 (11th Cir. 1993) (finding injunctive relief appropriate in unconstitutional conditions of confinement class action based on prison officials' failure to protect prisoners from assaults by other prisoners, brought on behalf of all present and future prisoners at Glades Correctional Institution).

Furthermore, cases like this one where there is a "substantial risk of mootness," because of the inherently transitory nature of the members of the class, creates "a need for certification." Johnson v. City of Opelousas, 658 F.2d 1065, 1069-70 (5th Cir. 1981) (class certified in constitutional challenge to juvenile curfew brought by 16 year old who turned 17 and was no longer subject to the curfew during pendency of litigation). St. Clair's population is inherently transitory as prisoners are often moved throughout the ADOC system due to transfers. Thus, class certification is wholly appropriate here.

55

For a district court to certify a class action, the named plaintiffs must satisfy all four threshold requirements of Rule 23(a) and at least one of the requirements of Rule 23(b).  See Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2548-49 (2011), Busby v. JRHBW Realty, 513 F.3d 1314, 1321 (11th Cir. 2008); Klay v. Humana, Inc., 382 F. 3d 1241, 1250 (11th Cir. 2004) abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008).   Rule 23(a) of the Federal Rules of Civil Procedure permits class certification if:  (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Dukes, 131 S. Ct. at 2548-49.  Because Plaintiffs meet all four of these requirements and the requirements of Rule 23(b)(1) and (2), this Court should grant Plaintiffs' motion for class certification.

## I.   PLAINTIFFS SATISFY THE NUMEROSITY, COMMONALITY, TYPICALITY, AND ADEQUACY REQUIREMENTS OF FED. R. CIV. P. 23(A).

For the reasons set forth below, Plaintiffs satisfy each of the four threshold requirements of Rule 23(a).

### a.   The Numerosity Requirement is Satisfied Because the Plaintiff Class Includes Approximately 1,270 Present Members, is Fluid and Includes Future Members, and the Harm is Class-Wide.

There are nearly 1,300 men incarcerated at St. Clair Correctional Facility,[39] all of whom, along with future prisoners at St. Clair, would be members of the proposed class.  The numerosity requirement of Rule 23(a) is satisfied when the class is so numerous that joinder of all members is impracticable.  Practicability of joinder "depends on many factors, including . . . size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined, and their geographic dispersion."  Kilgo v. Bowman Transp., Inc., 789 F.2d 859, 878 (11th Cir. 1986) (upholding district court's determination that numerosity requirement was met where there were thirty-one individual class members, in addition to "future and deterred job applicants, which of necessity cannot be identified").

Although numbers alone do not satisfy this requirement, the Eleventh Circuit has recognized that classes consisting of more than forty members are generally considered to satisfy Rule 23(a)(1). Cox v. American Cast Iron Pipe Co., 784 F. 2d 1546, 1553 (11th Cir. 1986) (citing 3B Moore's Federal Practice ¶ 23.05[1] at n. 7 (1978)).  Furthermore, plaintiffs need not establish the precise number of members of the class.  Evans v. U.S. Pipe & Foundry Co., 696 F.2d 925, 930 (11th Cir. 1983). Plaintiffs easily satisfy the numerosity requirement because St. Clair now houses nearly 1,300 men.  Moreover, the proposed class includes future inmates as well.  See

---

[39]See Ex. 103,  RESEARCH AND PLANNING DIV., ADOC, MONTHLY STATISTICAL REPORT FOR OCT. 2015 3 (2015).

<u>Kilgo</u>, 789 F.2d at 878 (factoring future class members into numerosity analysis and determining numerosity requirement met).

As is common in prison and jail cases, joinder is impracticable because of the continuous transfer of prisoners in and out of the facility. Additionally, the class includes numerous future class members who cannot be joined.   Federal courts have routinely found that, in conditions cases, the large and fluid nature of prison and jail populations supports class certification of all inmates who have or will be subjected to the challenged conditions.   See <u>Stewart v. Winter</u>, 669 F. 2d 328, 334 (5th Cir. 1982) (finding fluidity of prison population supports class certification by ensuring "presence of a continuing class of plaintiffs with a live dispute against prison authorities"); <u>Henderson v. Thomas</u>, 289 F.R.D. 506, 510 (M.D. Ala. 2012) ("[T]he fluid nature of a plaintiff class—as in the prison-litigation context—counsels in favor of certification of all present and future members."); <u>Brown v. Sec'y, Dep't of Corr.</u>, No. 203CV526FTM29DNF, 2005 WL 1473817, at *7 (M.D. Fla. June 21, 2005) (finding numerosity satisfied where only eight prisoners suffered injuries because hundreds more prisoners could be affected by pepper-spray abuses).

Like these prisons and jails, St. Clair's population is in constant flux, with newly processed prisoners, transfers, and releases such that prisoners enter and exit the prison routinely and this weighs strongly in favor of finding joinder impracticable. Additionally, the nearly 1,300 proposed class members who are currently incarcerated

at St. Clair easily surpasses the often cited threshold of forty.  See Cox, 784 F. 2d at

1553.  For all of these reasons, the proposed class of all current prisoners, as well as

an unknown number of future prisoners, satisfies the numerosity requirement.

> **b.  Plaintiffs' Claim Challenging the Dangerous Conditions at St. Clair Presents Common Issues of Law and Fact Satisfying Commonality Under Rule 23(a)(2) Because Every Class Member is at Risk of Harm.**

Commonality, under Rule 23(a)(2) requires there must be "questions of law or

fact common to the class."  Fed. R. Civ. P. 23(a)(2).  In other words, plaintiffs

demonstrate that "class members 'have suffered the same injury.'"  Wal-Mart Stores,

Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (quoting General Tel. Co. of Sw. v.

Falcon, 457 U.S. 147, 157 (1982)).  Therefore, a court deciding class certification

must determine whether the class claims depend on a common contention that is

capable of class-wide resolution, id., and whether the action involves issues "that are

susceptible to class-wide proof."  Murray v. Auslander, 244 F.3d 807, 811 (11th Cir.

2001); see also  Bussey v. Macon City Greyhound Park, Inc., 562 F. App'x 782, 788

(11th Cir. 2014) ("Commonality requires that there be at least one issue whose

resolution will affect all or a significant number of the putative class members."

(internal citations and quotation marks omitted)).  Furthermore, the commonality

requirement is more qualitative than quantitative and for purposes of Rule 23(a)

"[e]ven a single [common] question will do."  Dukes, 131 S. Ct.  at 2562.  Vega v.

T-Mobile USA, Inc., 564 F.3d 1256, 1268 (11th Cir. 2009) (commonality does not require that all questions of law or fact be common, nor even that they predominate over individual issues).

Plaintiffs here allege that they suffer from the same injury: that their right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendment rights is being violated due to the dangerous conditions, the constant threat of violence, and a culture of violence at St. Clair Correctional Facility, which exposes the men incarcerated there to a constitutionally unacceptable level of risk of physical harm and that Defendants have failed to reasonably and adequately respond to this risk. The conditions at St. Clair that contribute to the high rate of violence and unsafe environment include: severe overcrowding, with the prison now operating at 57 percent capacity, (see Ex. 6, Lauren Walsh, *ADOC Commissioner: Overcrowding, understaffing breeding violence at St. Clair Prison*, WBMA, Dec. 10, 2015), serious understaffing, with a staff to inmate ratio of 1:8, which is among the highest in the country (see Ex. 3, Martin Report, 7, supra Part II), non-functioning, broken locks on the majority of cell doors, (see supra Part III; Compl. ¶¶ 40-44), blind spots in the housing units that cannot be seen by the officer stationed in the cubicle, who is frequently the only officer in the housing blocks, (see supra Part IV; Compl. ¶ 29;¶ 35-36;), widespread access to weapons contraband, (see supra Part VI;Compl. ¶¶ 63-65), failure to take reasonable steps to create and implement a sound classification and

housing system that adequately separates and protects vulnerable inmates  (see supra VIII); failure to adequately monitor, detect and prevent sexual violence (see supra VII); punitive treatment of inmates who report threats or abuse (see supra Part VII); an environment where staff feel outnumbered and vulnerable and react to conflict with high levels of force resulting in significant injuries to prisoners (see supra Part IX); inadequate treatment for prisoners suffering from mental illness and addiction (Compl. ¶ 50); and the failure to provide adequate rehabilitative, vocational, and rehabilitative programming (see supra X;  Compl. ¶¶ 61-64).

Defendants' management of St. Clair is passive, ineffective and an unreasonable response to the level of violence.  Defendants fail to conduct adequate investigations and fail to review investigations conducted by the Investigations and Intelligence Division; misreport incidents of violence; fail to adequately investigate, report or respond to incidents of sexual violence, fail  to implement adequate polices and practices necessary to prevent, detect and respond to prisoner on prisoner sexual abuse and assault (see supra Part VII; Compl. ¶¶ 69-77), or address the rape culture at St. Clair; fail to take action to repair and address structural problems with the physical plant (e.g. broken locks, blind spots) that contribute to dangerous conditions; fail to address security breakdowns, such as the broken locks, unregulated inmate movement, and prevalence of contraband, with corrective action; fail to adequately train staff, fail to adequately supervise staff and ensure that they remain at their

61

assigned posts and are performing their duties;  fail to adequately address staffing shortages; fail to adequately investigate use of force incidents (see supra Part IX; Compl. ¶¶ 21-26); fail to control movement and enforce housing assignments (see supra V; Compl. ¶¶ 27-39; ¶¶ 55-59); fail to create and implement a housing plan that adequately accounts for vulnerability and risk factors, (see supra Part VIII; Compl. ¶¶ 45-54); and fail to provide secure housing and therapeutic services to inmates assigned to segregation.  (Compl. ¶ 68.)

Plaintiffs' Eighth Amendment claim requires this Court to answer the question of whether, due to the conditions described above, Plaintiffs are subjected to a substantial risk of serious harm to which Defendants are deliberately indifferent.  See Farmer v. Brennan, 511 U.S. 825, 828 (1994); Marsh v. Butler County, Ala., 268 F.3d 1014 (11th Cir. 2001) (en banc),  abrogated on other grounds by Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) (conditions "taken as a whole" including dilapidated physical plant, lack of adequate monitoring by staff, cell doors that did not lock, failure to screen inmates for mental health issues, lack of classification system, failure to discipline prisoners who committed assaults, and failure to adequately train staff presented "an objectively substantial risk of serious harm"); Hale v. Tallapoossa County, 50 F.3d 1579 (11th Cir. 1995) (conditions including overcrowding, history of high rate of violence at jail, inadequate supervision by jail staff sufficient to establish that substantial risk of serious harm existed); see also Gates v. Cook, 376

F.3d 323, 333 (5th Cir. 2004) (conditions of confinement may establish Eighth Amendment violation "in combination" when they have a mutually reinforcing effect). This question, common to all members of the plaintiff class, meets the requirement for commonality under Fed. R. Civ. P. 23(a)(2).  See Dukes, 131 S. Ct. at 2551; Hurt v. Shelby Cty. Bd. of Educ., No. 2:13-CV-230-VEH, 2014 WL 4269113, at *11 (N.D. Ala. Aug. 21, 2014) ("[W]hat is paramount is whether the class plaintiffs suffered the same injuries and whether those injuries permit common answers." ).

Indeed, challenges to systemic, facility-wide conditions and practices have routinely been found to satisfy the commonality requirement of Rule 23(a)(2).  See, e.g., Hassine v. Jeffes, 846 F.2d 169 (3rd Cir. 1988) (finding commonality where prisoners claimed to be subjected to unconstitutional conditions of confinement including overcrowding, double-bunking, lack of diversity in prison staff, dilapidated condition of facility, and lack of adequate mental health care); Henderson v. Thomas, 289 F.R.D. 506, 511 (M.D. Ala. 2012) (finding commonality where, despite factual differences in the claims, DOC's policy applied to plaintiffs in the same way and plaintiffs' legal claim was "identical to the class's claim); Jones v. Gusman, 296 F.R.D. 416, 466 (E.D. La. 2013) (finding commonality because  "claims, defenses, relevant facts, and applicable substantive law demonstrate that certification is warranted" and "whether certain conditions at [the jail] . . . put inmates at a substantial risk of harm is amenable to a common answer").

In <u>Hughes v. Judd</u>, the legal guardians of juvenile detainees brought a class action alleging unconstitutionally violent conditions at the county jail. No. 8:12-CV-68-T-23MAP, 2013 WL 1821077 (M.D. Fla. Mar. 27, 2013), report and recommendation adopted as modified, No. 8:12-CV-568-T-23MAP, 2013 WL 1810806 (M.D. Fla. Apr. 30, 2013). Plaintiffs allegations included that there were blind spots in the dorms that guards could not see from their post, that fights between detainees occurred frequently, and that there was inadequate supervision in the dorms. <u>Id.</u> at *5-7, 10. The court found that plaintiffs had established commonality because "the questions of law are applicable in the same manner to each potential class member . . . , [e]ach class member, if proceeding separately against Defendants, would need to meet the same test under the Eighth and Fourteenth Amendments to prevail." <u>Id.</u> at *23. Furthermore, "[p]laintiffs seek permanent injunctive and declaratory relief that would enjoin allegedly unconstitutional behavior as applied to the entire class." <u>Id.</u> Likewise here, each plaintiff proceeding on his own would have to meet the same Eighth Amendment standard and Plaintiffs are seeking only injunctive and declaratory relief.

The claims of all the class members assert the same injury–violation of their Eighth and Fourteenth Amendment rights due to a substantial risk of serious harm, created by systemic failures by Defendants. They seek injunctive and declaratory relief to enjoin the unconstitutional actions of Defendants in order to remedy the

Eighth Amendment violations suffered by the entire class.  Class-wide injunctive and declaratory relief is the most effective and efficient way of remedying the unconstitutionally dangerous conditions at St. Clair.

> ### c. The Typicality Requirement of Rule 23(a)(3) s Satisfied Because the Named Plaintiffs' Claims Represent Those of the Class.

To meet the typicality requirement, the claims of the named plaintiffs must be "typical of the claims or defenses of the class."  Fed. R. Civ. P. 23 (a)(3).  In other words, typicality requires that "[a] class representative must possess the same interest and suffer the same injury as the class."  <u>Vega</u>, 564 F.3d at 1275.  A sufficient nexus between the representatives' claims and the class claims is established when the claims "arise from the same event or pattern or practice and are based on the same legal theory."  <u>Kornberg v. Carnival Cruise Lines, Inc.</u>, 741 F.2d 1332, 1337 (11th Cir. 1984); <u>Ault v. Walt Disney World Co.</u>, 692 F.3d 1212 (11th Cir. 2012) (finding typicality where claims all arose from same policy, even where factual differences meant that some class members had stronger individual claims than others).

Courts have routinely found the typicality requirement of Rule 23(a) satisfied in cases challenging unconstitutional conditions of confinement.  <u>See</u> <u>Hassine</u>, 846 F.2d at 177-78 (finding named representatives' claims typical, even when they "had not at the time of assertion themselves been injured by those conditions" because named representatives were still "*subject* to them"); <u>Henderson</u>, 289 F.R.D. at 511

(named plaintiffs' claims typical where factual differences between plaintiffs' claims were minor and their legal claim was identical to the class claim of disability discrimination under the ADA); Hughes, 2013 WL 1821077 at *24 (finding typicality where juveniles detained in jail were treated in accordance with same policies and practices and were "made to endure the same allegedly unconstitutional conditions of confinement").

The named Plaintiffs' claims are typical of the class as a whole. They all are incarcerated at St. Clair and have been exposed to the dangerous conditions and substantial risk of serious harm, and, several of the named Plaintiffs, like many of the men in the facility, have already suffered at least one incident of serious bodily harm caused by Defendants' poor management of the facility. See Compl. ¶¶ 25, 36, 47, 53, 58. Each of the Plaintiffs have lived in a number of housing areas throughout the facility, and could potentially be moved to any housing area within the prison. See Ex. X. Estes Dep. 184-85 (testifying that a number of general population inmates were being moved to H dorm).

Plaintiffs, along with the class they represent, are currently incarcerated at St. Clair and are subject to dangers related to the severe overcrowding at the facility. There is no dispute that St. Clair is severely overcrowded. The prison is operating at 134 percent capacity and has multiple housing blocks closed which has further reduced the prison's overall capacity. See supra Part I.; Ex. 103, RESEARCH AND

66

PLANNING DIV., ADOC, MONTHLY STATISTICAL REPORT FOR OCT. 2015 3 (2015); Ex.

6, Walsh, *ADOC Commissioner: Overcrowding, understaffing breeding violence at*

*St. Clair Prison*, WBMA.)

Dramatic understaffing of security personnel at St. Clair "compromise[s] the

safety of all concerned," including the Plaintiffs and the entire class they represent.

Ex. 4, Horn Report, 10-12. St. Clair "is dangerously and severely understaffed

resulting in a pervasive and ongoing level of harm to both inmates and staff that falls

well below sound correctional practice." Ex. 3, Martin Report, 6; see Ex. 4, Horn

Report, 10-12; supra Part II; Compl. ¶¶ 26-27, 73. The facility has approximately half

of the authorized staffing positions filled, leading to staff to inmate ratios that are

among the highest in the country. Ex. 3, Martin Report, 7; Ex. 4, Horn Report, 10-12;

Ex. 2, Estes Dep. 38-40 (128 of 249 authorized correctional officer positions filled);

Ex. 6, Lauren Walsh, *ADOC Commissioner: Overcrowding, understaffing breeding*

*violence at St. Clair Prison*, WBMA) (Commissioner Dunn stating facility is

operating at 57% of authorized staff).

Plaintiffs, like all class members, have dealt with the threat of living in a cell

block where the locks were not functioning or broken. The presence of non-

functioning locks on the majority of cell doors poses a substantial risk to the safety

and security of all men at the facility. See supra Part III; Compl. ¶¶ 36, 40-44.[40]

Plaintiffs reside throughout the facility and, as is the case with the entire class, the prevalence of blind spots creates a substantial risk of harm in their daily lives. Ex. 3, Martin Report, 10-12; Ex. 4, Horn Report, 10-12. There are a number of blind spots in the general population housing areas that go unobserved by security staff for significant periods of the day. See supra Part IV; Compl. ¶ 29;¶ 35-36); Ex. 2, Martin Report, 10-12.

Plaintiffs, as is typical of all class members, are at serious risk of violence from Defendants' failure to ensure that staff adequately supervise housing units and enforce housing assignments. The freedom of movement at the facility "totally undermines the basic security principle of regulated inmate movement, which is quite obviously an essential element of high security management." Ex. 3, Martin Report, 9; see supra Part V; Compl. ¶¶ 27-39; ¶¶ 55-59.

The presence of weapons contraband is pervasive at the facility, leading to a heavily armed inmate population that poses significant risk of harm for Plaintiffs, and

---

[40]See Ex. 3, Martin Report 10-12, 13; Ex. 4, Horn Report 8-9; Ex. 104, Mark Duke Dep. 167 (Sep. 23, 2015) (lived in cell with non-functioning lock in both P and L blocks); Ex. 102, Edwards Dep. 99-100 (current cell door lock in O block was tricked when he moved in, reported but never fixed); Ex. 51, Gilley Decl. SCP02946 (lived in cell in P block with broken lock); Ex. 55, Johnson Dep. 101-04 (assaulted in middle of night when assailant was able to leave his own cell and gain access to Mr. Johnson's cell); Ex. 14, McGregor Decl. SCP02956 (Mr. McGregor assaulted while sleeping in his cell, assailant opened locked door and entered); Ex. 22, Allan Williams Dep. 222-23 (Sep. 24, 2015) (locks in segregation can be tricked); Ex. 105, Robert Woods Dep. 40, 195-95 (Sep. 25, 2015) (robbed in cell in Q block where lock didn't work, currently living in cell in K block with non-functioning lock).

the class of prisoners they represent.  Ex. 3, Martin Report 13-14; Ex. 4, Horn Report 3-7; see supra Part VII; Compl. ¶¶ 63-65).  Plaintiffs' experience with weapons contraband is typical of all inmates at St. Clair, with Plaintiffs observing the proliferation of knives, frequently witnessing stabbings or suffering stabbings themselves.[41]

Plaintiffs' claims concerning Defendants' failure to implement adequate polices and practices necessary to prevent, detect and respond to prisoner on prisoner sexual abuse and assault are typical of the class they represent.  The administration's failure to adequately address allegations of sexual violence and the inappropriate culture around sexual violence at St. Clair creates a substantial risk of harm from sexual violence for all inmates at St. Clair.  See supra Part IX; Compl. ¶¶ 69-77.

Plaintiffs have observed or been victims of assaults by officers, including incidents that were reported but were not investigated, as is typical of the class as a whole.  Defendants and officers at St. Clair frequently resort to extreme levels of force as a means to assert control at the facility, are indifferent to patterns of officer on inmate violence, fail to adequately investigate instances of officer on inmate assault,

---

[41]See Ex. 70, ▮▮▮▮▮▮▮▮▮▮, SCP02989-90 (medical records demonstrating Mr. Duke suffered partially collapsed lung); Ex. 102, Edwards Dep. 138 (recalling a stabbing incident in O block that took place immediately after a shakedown); Ex. 51, Gilley Decl. SCP02945-46 (frequent stabbing throughout facility and knives are "everywhere at St. Clair"); Ex. 69, ▮▮▮▮ ▮▮▮▮▮▮▮▮, SCP02996 (describing knife stab wounds suffered by Mr. Mays); Ex. 14, McGregor Decl. SCP02955(hospitalized after stabbing); Ex. 105, Woods Dep. 42-43 (robbed at knife point by multiple inmates).

and ignore evidence of misreporting in instances that are investigated, creating an environment of excessive force where all inmates at St. Clair are at risk of harm. See supra Part VIII; Ex. 3, Martin Report 15-17; Ex. 4, Horn Report 14-17; Compl. ¶¶ 21-26; Ex. 104, Duke Dep. 193-94 (observed Sergeant striking handcuffed inmate in stomach); Ex. 102, Edwards Dep. 205 (observed Capt. Malone assault a handcuffed inmate in chow hall); Ex. 52, Gilley Dep. 44-46 (reported assault by Lt. Carter involving head injuries to I&I on multiple occasions but never spoke to investigators); Ex. 55, Johnson Dep. 299-308 (assaulted while restrained in segregation by officer with history of serious assaults on inmates); ████████████████████████

████████████████████████████████████████

███████████████████████ ; Ex. 22, Williams Dep. 256-58 (aware of officers' use of excessive force in a number of situations, including the rupturing of an inmate's eardrum and a beating resulting in ten staples to an inmate's skull); Ex.105, Woods Dep. 158-63 (witnessed CERT team assaulting handcuffed inmates during April incident).

The Plaintiffs' claims concerning the substantial risk of harm raised by the absence of an internal classification system are typical of the class as a whole. As classification expert Jim Austin explained, the "absence of a well-structured internal classification system is a direct contributor to the large number of assaults, fights,

intimidations, and the flow of contraband."  Ex. 1, Austin Report, 3; <u>see</u> supra Part VIII; Compl. ¶¶ 45,46, 48, 54, 74, 75.  Because determinations regarding housing and bed assignments are made nearly exclusively on open bed space, and "[c]lassification is not used to make housing decisions," all inmates incarcerated at St. Clair are vulnerable to harm from housing assignments that do not account for their level of risk and rehabilitative needs.  Ex. 93, Estes' Interrogatory Answers, at 8; <u>see also</u> Ex. 1, Austin Report, 3; <u>see also</u> Ex. 92, Evans' Interrogatory Answers, at 8 ("Housing is separate from classification"); Ex. 2, ███████████████; Ex. 5, Malone Dep. 192-93; ████████████████████████████████.; <u>supra</u> Part VIII; Compl. ¶¶ 45-54.

Defendants' failure to provide adequate programming and treatment creates a risk for all prisoners at St. Clair, including both the Plaintiffs and the class that they represent.  The absence of sufficient educational, vocational, and rehabilitative programming coupled with the lack of adequate treatment for mental health and substance addiction, contributes to an idle environment that increases the risk of violence and dangerous behavior.  <u>See</u> <u>supra</u> Part X; Compl. ¶¶ 50, 61-64).

Plaintiffs' claims concerning Defendants' inadequate response to threats of violence is typical of all inmates in the class they represent. Defendants either ignore reported threats or rely on the harsh conditions in segregation to intimidate and punish

victims of violence and vulnerable inmates.  See supra VII section 3; Compl. ¶¶ 49;

52, 53, 68, 71, 76.

Named Plaintiffs' claims involve the same dangerous conditions that exposes

the class as a whole to a substantial risk of serious harm.   They "possess the same

interest and suffer the same injury as the class" Vega, 564 F.3d at 1275, and therefore

satisfy the typicality requirement of Fed. R. Civ. P. 23(a)(3).

> **d.    The Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Class as Required by Rule 23(a)(4) and this Court should Designate Plaintiffs' Counsel as Class Counsel Pursuant to Rule 23(g).**

The final requirement of Rule 23(a) is that the representative parties will fairly

and adequately represent the interests of the class.  Fed. R. Civ. P. 23(a)(4).  The

adequacy of representation "encompasses two separate inquiries: (1) whether any

substantial conflicts of interest exist between the representatives and the class; and (2)

whether the representatives will adequately prosecute the action." Valley Drug Co.

v. Geneva Pharm., Inc., 350 F.3d 1181, 1189 (11th Cir. 2003) (quoting In re

HealthSouth Corp. Securities Litigation, 213 F.R.D. 447, 460–461 (N.D. Ala.2003)).

With regard to the first prong, " the existence of minor conflicts alone will not defeat

a party's claim to class certification." Id.  Instead, the conflict must be "fundamental."

Id.  For example, a fundamental conflict would exist where a named representative

claims to have been harmed by an action that benefitted some class members. Id.  The

72

second prong requires a determination of the "forthrightness and vigor" with which the named representatives will "assert and defend the interests of the members of the class." Lyons v. Georgia-Pacific Corp. Salaried Employees Retirement Plan, 221 F.3d 1235, 1253 (11th Cir. 2000) (finding class representative inadequate because he had no stake in litigation). If named plaintiffs have satisfied the commonality and typicality requirements, that is strong evidence that they adequately represent the class. See Henderson, 289 F.R.D. at 511. Additionally, "adequate representation requirement involves questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation." Griffin v. Carlin, 755 F.2d 1516, 1533 (11th Cir. 1985); see also Fed. R. Civ. P. 23(g).

The named representatives provide adequate representation to the class. There are no conflicts between named plaintiffs and the rest of the class. The named plaintiffs, like all members of the class, are subjected to the violent and dangerous conditions at the facility. They have the same interest in seeking relief from this significant risk of substantial harm and redress for violation of their Eighth Amendment rights. That named Plaintiffs have the same legal claims as the rest of the class demonstrates their adequate representation. See Henderson, 289 F.R.D. at 511; Hughes, 2013 WL 1821077, at *24 (named plaintiffs who "have been subjected to the same allegedly unconstitutional conditions of confinement at the jail as the rest of the

73

class" and whose "interests are not adverse to those of other class members" were adequate representatives).

Second, the representatives will adequately prosecute the action. As stated above, they have the same interest as the rest of the class in remedying the threat posed by the high rate of violence and dangerous conditions at St. Clair. They have been subjected to violence or face the ongoing threat of continued violence. Moreover, the named plaintiffs represent men with a range of custody levels and who reside in a variety of housing units at the facility. See Ex. 14, McGregor Decl. SCP_02955 (lived in L-Block and H Dorm); Ex. 85, ████. SCP_02959-62 (lived in segregation and H Dorm); Ex. 51, Gilley Decl. SCP_02946 (lived in P Block, J/K Blocks and H Dorm). The incidents in which they were harmed involved a combination and variety of the unsafe and constitutionally deficient conditions at St. Clair. This range of circumstances means they can be expected to assert and vigorously defend the interests of the entire class of present and future prisoners at St. Clair. Furthermore, named Plaintiffs have demonstrated their willingness to adequately prosecute this action; they participated in depositions, responded to interrogatories, and have met with counsel numerous times. See In re Ins. Mgmt. Sols. Grp., Inc. Sec. Litig., 206 F.R.D. 514, 517 (M.D. Fla. 2002) (factors in determining adequacy of named plaintiff included that he had several discussions with

74

counsel, attended depositions, and answered interrogatories).  These factors establish that named plaintiffs will assert and vigorously defend the interests of the entire class of present and future prisoners at St. Clair.

Undersigned counsel meet the requirements of Fed. R. Civ. P. 23(a)(4) and also meet the requirements of Rule 23(g).  Rule 23(g) requires courts to consider: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class.  Counsel have been investigating the conditions at St. Clair for approximately the past twenty months, they have interviewed several dozen men incarcerated at the facility about the conditions there,  have spent several hundred hours on investigation, and have been vigorously prosecuting this case through the discovery process thus far.

Plaintiffs' counsel are qualified, experienced, and able to conduct the proposed litigation.  The named plaintiffs are represented by attorneys from the Equal Justice Initiative, which was founded in 1989 and has decades of experience litigating on behalf of the incarcerated.  EJI has brought numerous civil lawsuits, including class action lawsuits, on behalf of prisoners incarcerated in Alabama Department of Corrections facilities.  Ex. 296, Decl. of Bryan Stevenson.  Counsel has adequate

resources and experience to zealously protect the interests of the class.

## II.   THE REQUIREMENTS OF FED. R. CIV. P. 23(B)(1) ARE SATISFIED BECAUSE PROSECUTING ACTIONS BY INDIVIDUAL CLASS MEMBERS WOULD BE DISPOSITIVE OF THE INTERESTS OF OTHER MEMBERS AND COULD CREATE A RISK OF INCOMPATIBLE STANDARDS FOR DEFENDANTS.

Plaintiffs seek injunctive and declaratory relief that will remedy the unconstitutionally dangerous conditions at St. Clair and class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) and (B).  Certification pursuant to Fed. R. Civ. P. 23(b)(1)(A) is appropriate if separate actions by individual class members would "create a risk of inconsistent or varying adjudications" which could potentially subject Defendants to "incompatible standards of conduct."  Certification pursuant to Fed. R. Civ. P. 23(b)(1)(B) is appropriate if individual actions would create a risk that, "as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications."

Here, both subsections of Rule 23(b)(1) are applicable because all members of the class are subject to these conditions, policies, and practices in the facility, which include mismanagement, poor leadership, overcrowding, inadequate security, and a failure of correctional staff to follow policies and procedures.  Specifically, among these failings are broken and nonfunctioning locks on the majority of cell doors, inadequate supervision of the housing units and common areas, lack of an adequate

classification and housing system, failure to enforce housing assignments, an influx of drugs and weapons contraband, failure to prevent sexual violence, failure to provide adequate rehabilitative programming or treatment for mental illness and drug or alcohol addiction, a dearth of basic hygiene supplies, and a failure to appropriately supervise and discipline staff with a history of excessive use of force or violating other regulations. These unconstitutional conditions have resulted in an extraordinarily high rate of violence.

Because these deficiencies and the dangers they create are system-wide, any injunctive orders prescribing a remedy for the unconstitutional conditions in an individual action at St. Clair would, in all likelihood, necessarily apply to other class members. See Westefer v. Snyder, Nos. CIV. 00-162-GPM, 00-708-GPM, 2006 WL 2639972, at *8 (S.D. Ill. Sept. 12, 2006) (finding class certification appropriate under Rule 23(b)(1) in action alleging retaliation and lack of due process for prisoners who filed grievances and brought lawsuits challenging conditions of confinement).

Likewise, if injunctive relief was granted in more than one individual suit, there is a likelihood that Defendants could be subject to incompatible orders. See Id. (class certification pursuant to Rule 23(b)(1)(A) appropriate where there was at least one other lawsuit with similar claim pending because "[c]ompeting lawsuits concerning the subject matter of the class claims in this case have the potential to disrupt severely

77

the orderly operations of IDOC and the Illinois prison system").

## III.   The Requirements of Fed. R. Civ. P. 23(b)(2) are Satisfied Because Defendants Have Acted and Refused to Act on Grounds Generally Applicable to the Class.

Plaintiffs are seeking injunctive and declaratory relief that will protect the rights of the class as a whole.  Rule 23(b)(2) authorizes class certification where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.' " Dukes, 131 S.Ct. at 2557.

Certification of a class under Rule 23(b)(2) is warranted because the injuries sustained by the class can be addressed by a single injunction and no differentiation between class members is necessary.    Plaintiffs seek an injunction that would include requiring Defendants to implement systematic, adequate, facility-wide contraband searches and to document and assess the effectiveness of these efforts to control contraband (see Ex. 4, Horn Report 3-7), immediately document all broken or malfunctioning locks and control panels and implement immediate corrective

78

measures including  posting officers inside housing blocks at all times (see Ex. 4, Horn Report 9), request consultation and advice from the National Institute of Corrections (NIC) to address staffing shortages, inmate safety, use of force policy and procedure, contraband policies, count policies and procedures, and search policies and procedures (see Ex. 4, Horn Report 10-12); request consultation and advice from an independent certified the National PREA Resource Center or the NIC PREA Project regarding the prevention, detection, and elimination of sexual violence; implement a sound classification and housing policy (see Ex. 4, Horn Report 12-13); identify and investigate staff perpetrators of violence, contraband smuggling and collusion, provide support necessary to prosecute administrative discipline against staff, review staff disciplinary policies and procedures to determine adequacy and responsiveness, and where necessary, request assistance from other responsible law enforcement agencies; establish a free confidential phone line with prompt and effective response times for prisoners and loved ones to report violence and staff wrongdoing to I&I, and consult with NIC or other independent correctional establish policies and procedures to investigate complaints.  (See Ex. 4, Horn Report 16-17.)   Plaintiffs seek injunctive measures remedy to the unconstitutional conditions, policies, and practices in the facility, which include mismanagement, poor leadership, overcrowding, inadequate security, and a failure of correctional staff to follow policies and procedures.  These

79

unconstitutional conditions have resulted in an extraordinarily high rate of violence. Because these deficiencies and danger they create exist throughout the facility, any remedy would be system-wide and addressed by a single injunction.

Rule 23(b) is a superior means of addressing the unconstitutional conditions at St. Clair. Indeed, the very purpose of Rule 23(b)(2) is to facilitate civil rights litigation in which plaintiffs seek injunctive relief. Fed. R. Civ. P. 23 Adv. Comm. Notes (1966 Amendments); see also See Henderson, 289 F.R.D. at 512 (inmate class challenge to Alabama Department of Corrections policy and requesting prospective relief "fits squarely within Rule 23(b)(2)"). Individual actions could only have a limited impact on conditions at St. Clair. Injunctive relief on a class-wide level will address the underlying, systemic problems. The requirements of Rule 23(b)(2) are met.

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request that this Court certify a class consisting of all current and future prisoners incarcerated at St. Clair Correctional Facility.

Respectfully submitted this 22nd day of February, 2016.

Respectfully submitted,

\S Bryan A. Stevenson

Bryan A. Stevenson (ASB-3184--N75B)

80

Charlotte R. Morrison (ASB-5897-T80M)
Jennae R. Swiergula (ASB-8265-A35S)
Carla C. Crowder (ASB-8573-L74C)
Ryan C. Becker (ASB-7228-R48B)
Equal Justice Initiative
122 Commerce Street
Montgomery, AL 36104
PH: (334) 269-1803
FX: (334) 269-1806
email: bstevenson@eji.org
        cmorrison@eji.org
        jswiergula@eji.org
        ccrowder@eji.org
        rbecker@eji.org

*Counsel for Plaintiffs*

## Certificate of Service

I hereby certify that on the 3rd of March, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

>    Albert S. Butler
>    Alabama Department of Corrections
>    Legal Division
>    301 Ripley Street
>    P.O. Box 301501
>    Montgomery, AL 36130
>
>    Michael A. Fant
>    Waller Lansden Dortch & Davis LLP
>    AmSouth Habert Plaza
>    1901 Sixth Avenue North, Suite 1400
>    Birmingham, AL 35203
>    michael.fant@waller.com

>                          /s/ Charlotte R. Morrison
>                          Charlotte R. Morrison