FILED

2021 Nov-08  PM 10:30
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| MARK DUKE; DALE GILLEY; FRANKY JOHNSON; MICHAEL MAYS; JOHN MILLER; ALLAN WILLIAMS; ROBERT WOODS; ROBERT CARLISLE NATHANIEL HARRIS; BENNY JONES, and JOHNNY YOUNG, on behalf of themselves and all others similarly situated,<br><br>         Plaintiffs,<br><br>    vs.<br><br>COMMISSIONER JEFFERSON S. DUNN; DEPUTY COMMISSIONER DENNIS W. STAMPER; ASSOCIATE COMMISSIONER STEVE WATSON; DIRECTOR JENNY ABBOTT; INSTITUTIONAL COORDINATOR EDWARD ELLINGTON; WARDEN GUY NOE; ASSISTANT WARDEN PHILLIP MITCHELL; ASSISTANT WARDEN DARREL FOX; CAPTAIN CHRISTOPHER WEBSTER; and CAPTAIN GARY MALONE, in their official capacities,<br><br>         Defendants. | Civil Action No.<br>4:14-CV-1952-RDP |

# THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

TABLE OF CONTENTS

PARTIES...................................................................................................2

FACTUAL ALLEGATIONS ....................................................................6

    DEFENDANTS ARE AWARE OF THE EXTRAORDINARILY
    HIGH RISK OF VIOLENCE AT ST. CLAIR................................................6

    DEFENDANTS FAIL TO PROTECT PRISONERS FROM
    PRISONER-ON-PRISONER VIOLENCE.....................................................12

    DEFENDANTS' POLICIES AND PRACTICES WITH REGARD
    TO THE PREVENTION, DETECTION AND RESPONSE TO
    SEXUAL ABUSE PLACE PRISONERS AT RISK OF SEXUAL
    ABUSE. .....................................................................................................37

    DEFENDANTS' FAILURE TO PROVIDE SECURE LOCKING
    MECHANISMS ON INDIVIDUAL CELL DOORS CONTRIBUTES
    TO THE RISK OF VIOLENT ASSAULT AND SEXUAL ABUSE...........58

    DEFENDANTS FAIL TO IMPLEMENT AN EFFECTIVE
    CLASSIFICATION AND HOUSING POLICY, INCREASING THE
    RISK OF PHYSICAL ASSAULTS AND SEXUAL VIOLENCE. .............63

    DEFENDANTS' FAILURE TO ADEQUATELY ENFORCE
    HOUSING ASSIGNMENTS AND MONITOR MOVEMENT
    TIMES CONTRIBUTES TO THE HIGH RISK OF PRISONER-ON-
    PRISONER VIOLENCE AND SEXUAL ABUSE. .....................................73

    DEFENDANTS' FAILURE TO PROVIDE ADEQUATE
    REHABILITATIVE, EDUCATIONAL AND VOCATIONAL
    PROGRAMMING AND THERAPEUTIC SERVICES
    CONTRIBUTES TO THE HIGH RATE OF PRISONER-ON-
    PRISONER VIOLENCE AND SEXUAL ASSAULT. ................................82

    DEFENDANTS' FAILURE TO REASONABLY RESPOND TO
    THE PRESENCE OF DANGEROUS CONTRABAND,
    INCLUDING WEAPONS AND DRUGS, PUTS PRISONERS AT
    RISK OF VIOLENCE. ...............................................................................83

DEFENDANTS' FAILURE TO PROVIDE ADEQUATE AND
SECURE HOUSING AND THERAPEUTIC SERVICES TO
INMATES ASSIGNED TO SEGREGATION CONTRIBUTES TO
THE HIGH RISK OF PRISONER-ON-PRISONER VIOLENCE
AND SEXUAL ABUSE...................................................................86

DEFENDANTS' POLICIES AND PRACTICES PLACE
PRISONERS AT RISK OF EXCESSIVE USE OF FORCE.......................92

CLASS ACTION ALLEGATIONS .....................................................110

EXHAUSTION OF ADMINISTRATIVE REMEDIES .......................113

CLAIMS FOR RELIEF ........................................................................113

First Claim for Relief—42 U.S.C. § 1983
Cruel and Unusual Punishment—Prisoner-on-Prisoner Violence .............113

Second Claim for Relief—42 U.S.C. § 1983
Cruel and Unusual Punishment—Sexual Abuse .........................................114

Third Claim for Relief—42 U.S.C. § 1983
Cruel and Unusual Punishment—Excessive Force .....................................115

PRAYER FOR RELIEF ........................................................................116

## PRELIMINARY STATEMENT

Plaintiffs are men presently and formerly confined in the custody of the Alabama Department of Corrections ("ADOC") at St. Clair Correctional Facility ("St. Clair" or the "Facility"), where mismanagement, poor leadership, overcrowding, inadequate security and unsafe conditions, including broken and nonfunctioning locks, have led to an extraordinarily high homicide rate, weekly stabbings and assaults, sexual abuse, and a culture where violence is tolerated, creating conditions of confinement that violate the Eighth and Fourteenth Amendments to the United States Constitution.  Because of poor management, drugs, knives and other contraband—in many cases contraband that is brought into the Facility and sold to prisoners by officers or ADOC staff—are prevalent. Furthermore, correctional staff fail to follow their own policies and procedures, often engage in unreasonable and excessive use of force against prisoners, and sometimes ignore urgent pleas for assistance that then result in serious violence.  The potential for violence is exacerbated by policies eliminating or severely cutting back mental health and drug treatment services, rehabilitative programming and removing books and other constructive activities from the housing units.  The lack of opportunities to engage in constructive activities and rehabilitative programming, including reading, creates an oppressive and monotonous environment that accommodates

abuse and violence as well as drug abuse in a population with a high rate of mental illness and prior addiction.

Defendants have failed to reasonably and adequately respond to this extremely high rate of prisoner-on-prisoner assaults and homicides, sexual abuse, and correctional staff's excessive use of force, and the dangerous conditions that facilitate the incidents and culture of violence.  Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 for injunctive and declaratory relief to redress Defendants' violations of their rights under the Eighth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). Plaintiffs seek declaratory relief pursuant to 28 U.S.C. § 2201.  Venue is proper pursuant to 28 U.S.C. § 1391(b).

## PARTIES

Plaintiffs:

2.     Plaintiffs Mark Duke, James Edwards, Dale Gilley, Franky Johnson, Michael Mays, Michael McGregor, John Miller, Allan Williams, and Robert Woods were prisoners at St. Clair when the Second Amended Complaint was filed on August 28, 2015.  Of those plaintiffs, Michael Mays and Mark Duke remain at St. Clair as of the date of this Third Amended and Supplemental Complaint; Dale

Gilley, Franky Johnson, John Miller, Allan Williams, and Robert Woods have been transferred to other ADOC facilities but remain at risk of transfer back to St. Clair at any time.  New Plaintiffs—Benny Jones, Johnny Young, Nathaniel Harris and Robert Carlisle—are prisoners at St. Clair as of the date of filing this Third Amended and Supplemental Complaint.  ADOC frequently transfers prisoners across facilities, and named Plaintiffs Franky Johnson and Michael Mays have been transferred to and from St. Clair multiple times since 2015.  Each named Plaintiff has suffered physical harm or is in immediate danger of future harm.  They seek to represent themselves and all other current and future prisoners at St. Clair.

Defendants:

3.      Defendant Jefferson S. Dunn is the Commissioner of the ADOC.  As Commissioner, ADOC's highest ranking official, Defendant Dunn is responsible for the direction, supervision and control of ADOC.  Defendant Dunn is sued in his official capacity.

4.      Defendant Dennis W. Stamper is the Deputy Commissioner of Operations for the ADOC.  As Deputy Commissioner, Defendant Stamper is responsible for ensuring the effective and safe daily operations of prison facilities. Defendant Stamper is sued in his official capacity.  Defendant Stamper is substituted as a party under Fed. R. Civ. P. 25(d) in place of Grantt Culliver.

3

5.      Defendant Steve Watson is the Associate Commissioner for Plans and Programs for the ADOC.   As Associate Commissioner, Defendant Watson is responsible for the Central Records Division, Research and Planning Division, Supervised Reentry Program, Religious Programs, Educational and Vocational Education Programs and Victim-Constituent Services.  Defendant Watson is sued in his official capacity.  Defendant Watson is substituted as a party under Fed. R. Civ. P. 25(d) in place of Terrance McDonnell.

6.      Defendant Jenny Abbott is the Director of Facilities Management for the ADOC.  As Director, Defendant Abbott is responsible for ADOC's Engineering Administrative Division, the Environmental Division and the Security Technologies Division.  She also oversees maintenance operations within ADOC's correctional institutions.  Defendant Abbott is sued in her official capacity.  Defendant Abbott is substituted as a party under Fed. R. Civ. P. 25(d) in place of Greg Lovelace.

7.      Defendant Edward Ellington is the Institutional Coordinator for the Northern Region of the ADOC.  Defendant Ellington is responsible for planning, monitoring, and reviewing day-to-day operations of correctional institutions in his assigned area, including St. Clair.   Defendant Ellington is sued in his official capacity.  Defendant Ellington is substituted as a party under Fed. R. Civ. P. 25(d) in place of Grantt Culliver.

4

8.     Defendant Guy Noe is the Warden III of St. Clair.  As Warden III, Defendant Noe is responsible for the day-to-day operations of the Facility, as well as the safety of all inmates at the Facility and the supervision of all subordinate employees.  Defendant Noe is sued in his official capacity.  Defendant Noe is substituted as a party under Fed. R. Civ. P. 25(d) in place of Dewayne Estes.

9.     Defendant Phillip Mitchell is Warden II of St. Clair.  As Warden II, Defendant Mitchell is responsible for the day-to-day operations of the Facility, as well as the safety of all inmates at the Facility and the supervision of all subordinate employees.  Defendant Mitchell is sued in his official capacity.  Defendant Mitchell is substituted as a party under Fed. R. Civ. P. 25(d) in place of Eric Evans.

10.     Defendant Darrel Fox is Warden I of St. Clair.  As Warden I, Defendant Fox is responsible for the day-to-day operations of the Facility, as well as the safety of all inmates at the Facility and the supervision of all subordinate employees. Defendant Fox is sued in his official capacity.  Defendant Fox is substituted as a party under Fed. R. Civ. P. 25(d) in place of Karen Carter.

11.     Defendant Christopher Webster is a Captain at St. Clair.  As Captain, Defendant Webster is responsible for the safety of all inmates at the Facility, for supervising the security activities of St. Clair and the supervision of all subordinate employees.  Defendant Webster is sued in his official capacity.  Defendant Webster is substituted as a party under Fed. R. Civ. P. 25(d) in place of Carl Sanders.

5

12.     Defendant Gary Malone is a Captain at St. Clair.   As Captain, Defendant Malone is responsible for the safety of all inmates at the Facility, for supervising the security activities of St. Clair and the supervision of all subordinate employees.  Defendant Malone is sued in his official capacity.

FACTUAL ALLEGATIONS

### DEFENDANTS ARE AWARE OF THE EXTRAORDINARILY HIGH RISK OF VIOLENCE AT ST. CLAIR.

13.     St. Clair is a maximum security prison in Springville, Alabama.

14.     Defendants are aware of the extremely high rate of violence at St. Clair. There were six homicides at St. Clair in the 36 months prior to the filing of the original Complaint in 2014.   This constitutes a rate of prisoner-on-prisoner homicides at St. Clair that is drastically higher than the national average in state prisons.  Based on Bureau of Justice Statistics ("BJS") data from 2011, the national homicide rate in state prisons was approximately 5.4 homicides per 100,000 prisoners.   The homicide rate at St. Clair during the same time period was approximately 75.4 homicides per 100,000 prisoners, more than ten times higher. The drastically high homicide rate at St. Clair has increased even further in recent years.   There have been seven homicides at the Facility since February 2018, including homicides most recently in 2020 and 2021.  Based on BJS data from 2018 (the most recent year for which BJS data are available), the national homicide rate in state prisons was approximately 10 homicides per 100,000 prisoners, while at St.

6

Clair the homicide rate during the same time period was approximately 436.7 per 100,000 prisoners, more than forty times higher.

15.    The number of prisoner-on-prisoner assaults and fights at St. Clair also has been high in recent years.  Based on the ADOC's data from October 2013-September 2014 (the Fiscal Year ("FY") 2014)—the year immediately preceding the filing of this lawsuit—there were 17 serious prisoner-on-prisoner assaults at St. Clair, defined as assaults leading to injuries requiring transport to outside medical facilities.  Over that same period, there were 81 prisoner-on-prisoner assaults and fights combined. Since the Complaint was filed, the already high rate of serious violence has increased.  According to ADOC data, the number of serious prisoner-on-prisoner assaults exceeded 2014 levels every year thereafter, ranging from 19 to 50 serious prisoner-on-prisoner assaults each year in fiscal years 2015-2019.  ADOC stopped publicly reporting the number of serious assaults in October 2019. However, the rate of total assaults and fights has remained extraordinarily high, with a total of 102 prisoner-on-prisoner assaults and fights in FY 2020, and 95 prisoner-on-prisoner assaults and fights in October 2020—August 2021, based on currently available FY 2021 data.

16.    Even these staggeringly high statistics do not tell the whole story, as ADOC statistical reports do not reflect all incidents of serious violence.  Defendants engage in a practice of inaccurately classifying or reporting incidents of violence

and prisoner deaths in statistical reports, incident reports and press statements.  The

following examples are illustrative and not exhaustive:



■ ███████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

███████████████████████

17.     Similarly, upon information and belief, numerous prisoners who died by overdose were categorized as "natural" deaths, including, but not limited to, the following incidents:

■ ███████████████████████████

█████████████████████████████████

█████████████████████████████████

█████████████████████████████████

███████████████████████████

■ ███████████████████████████

█████████████████████████████████

███████████████████████████████

18.     Defendants are aware of the extreme level of serious, life-endangering violence at St. Clair.  In a news article from March 16, 2012, former Warden Carter Davenport referred to the overcrowding, contraband and violence at St. Clair as a

9

"security nightmare".  There has been media coverage of each of the prisoner-on-prisoner homicides, which has included official statements from ADOC.

19.    Furthermore, undersigned counsel from the Equal Justice Initiative ("EJI") sent a letter to former Governor Robert Bentley on April 22, 2014, and copied former Commissioner Kim Thomas, regarding the alarming rise in violence and unprecedented homicide rate at St. Clair under former Warden Davenport's leadership and met with the Commissioner to emphasize these concerns.

20.    Less than two months after this meeting regarding the alarming rise in fatalities at St. Clair, another homicide occurred.  Jodey Waldrop was killed inside his cell on June 3, 2014.

21.    On June 9, 2014, following the murder of Mr. Waldrop, EJI sent a second letter to former Commissioner Thomas which documented the high rate of violence and the number of homicides at St. Clair in the preceding 30 months.  In this letter, and in meetings with the Commissioner and his staff, EJI detailed the mismanagement and violent conditions at St. Clair and called for immediate reform and change in leadership.

22.    No changes were made following these communications and the violence at St. Clair continued.  On September 16, 2014, another prisoner, Tim Duncan, died after being assaulted by other prisoners in his block at St. Clair.

10

23.     Defendants' knowledge of the violent and dangerous conditions is also established by institutional reports prepared by Defendants' employees describing violent incidents, and lawsuits filed by prisoners challenging the abuse of authority and conditions of confinement.

24.     Defendants have had further notice of the violent and dangerous conditions at St. Clair since the filing of this lawsuit in 2014.  As described above, despite this lawsuit challenging the conditions at St. Clair, Defendants have allowed the high rate of violence and dangerous conditions to continue.  The United States Department of Justice ("DOJ") provided further notice to Defendants of the unconstitutional conditions of confinement at Alabama's prisons for men when it announced its investigation in 2016, and then provided an extensive report in 2019 which detailed the severe and systemic failure to protect incarcerated men from prisoner-on-prisoner violence and prisoner-on-prisoner sexual abuse.

25.     Defendants are responsible for the care, custody and control of prisoners in their custody, and, through their acts and omissions, Defendants have allowed a dangerous and violent environment to flourish.  Upon information and belief, despite being on notice, Defendants have not made significant efforts, and have not implemented adequate changes in policy or practice to address, or to improve, the conditions at St. Clair that allow violence to proliferate.  Despite the extraordinary rate of violence and homicides at St. Clair, Defendants have failed to

take reasonable, necessary and appropriate steps to prevent and remedy these dangerous conditions.

DEFENDANTS FAIL TO PROTECT PRISONERS FROM PRISONER-ON-PRISONER VIOLENCE.

26.    Defendants have failed to promulgate, implement and enforce policies, procedures, and practices necessary to adequately supervise and monitor the housing units and common areas in the Facility and to maintain the safety and security of prisoners at St. Clair.

27.    The Facility regularly operates at dangerously low staffing levels, contributing to the high level of violence.  In 2018, for example, St. Clair had a correctional officer staffing level of 28%.  As a result of the low staffing levels, searches are not completed, posts are left vacant and prisoners are unsupervised. Defendants' most recent audit under the Prison Rape Elimination Act ("PREA") conducted in 2018 concluded that "[o]f a total allotment of 315 full time security staff allotted to the facility, 127 are actually assigned."  PREA requires confinement facilities, such as St. Clair, to be audited at least once every three years to determine whether facility standards conform to PREA standards.

28.    Defendants are aware that the inadequate supervision by correctional staff has created a dangerous environment, has contributed to numerous homicides and assaults in the Facility and creates a substantial risk of serious harm.  As stated

by former Warden Davenport, the conditions at St. Clair make it a "security nightmare".

29.     Defendants' inadequate supervision includes a pattern or practice of tolerating widespread staff and prisoner noncompliance with rules.  The 2018 PREA audit found:  "Numerous inmates were seen violating rules, sometimes challenged by staff and sometimes not.  When challenged, several of the inmates appeared to not be concerned with the challenge and continued what they were doing in violation of rules."

30.     Defendants are aware that overcrowding contributes to the high level of violence at St. Clair but have failed to take reasonable and adequate steps to address this overcrowding.  Upon information and belief, because of overcrowding, prisoners are housed based not on their classification level, but instead based on bed availability, which contributes to the high rate of violence at St. Clair.

31.     Defendants engage in a practice or pattern of maintaining the restrictive housing unit (the "RHU") at or near capacity.  Upon information and belief, A Block through E Block are segregation blocks within the RHU.  The lack of capacity in the RHU means Defendants are regularly faced with the choice of either (1) not moving a prisoner to the RHU who is a risk to other prisoners, or (2) releasing a prisoner from the RHU to general population who still remains a risk.  The lack of capacity at the RHU contributes to Defendants' arbitrary imposition of discipline at St. Clair.

32.     Defendants similarly maintain a practice or pattern of regularly keeping the Special Safety Unit (the "SSU") at capacity.  The SSU, which was implemented only recently as part of the settlement in this case, was designed to house prisoners who feared for their safety.  The SSU was designed to relieve pressure on the capacity at the RHU, which previously housed prisoners who indicated that they were in danger from other prisoners.  The current lack of capacity in the SSU, however, means prisoners who need protection remain in population or are again housed in the RHU.

33.     Defendants fail to protect prisoners from violence and extortion even when they have advance notice.  ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

34.     Defendants fail to conduct adequate investigations, which contributes to the substantial risk of serious harm faced by prisoners at St. Clair.  Defendants fail to adequately investigate when prisoners express safety concerns, fail to adequately investigate staff when uncontrolled movement leads to violent incidents, and fail to adequately investigate trends in violent incidents to prevent future

14

violence, declaring many allegations "unsubstantiated" based solely on the victim's decision not to press criminal charges.



---

[1] I&I is responsible for investigating all reported violations of law relating to ADOC employees, prisoners, institutions and divisions as directed by the Commissioner's designee or requested by a Warden or Director.





35.     Defendants fail to adequately supervise and monitor the housing blocks in all housing units.  Upon information and belief, St. Clair has cellblocks designated A, B, C, D, E, J, K, L, M, N, O, P, and Q.  Each cellblock is divided into two separate sides, so that they are designated as J-1, J-2, K-1, K-2, etc.  Blocks J and K are paired blocks that are connected by a hallway, as are L and M, N and O, and P and Q.  Each side of a cellblock is composed of 24 cells which house one to two prisoners.  Each cell has a steel door through which prisoners enter and exit their cell.

36.     A single officer is assigned to supervise and monitor each of the housing blocks.  The officer is stationed in a "cube," which has windows that allow the officer to see into both sides of the block.  Upon information and belief, the cube officer is not permitted to leave their post during their shift.  Random patrols of the housing blocks by additional officers occur extremely infrequently.  Upon information and belief, most days, officers only walk through the blocks during scheduled count times that occur three to five times in a 24-hour period.  Therefore, the cube officer is the only officer monitoring both sides of each block the vast majority of the time.  Upon information and belief, the officers in the cube are at times not present, asleep, on the telephone or otherwise not paying attention to the prisoners they are supervising.

37.     Upon information and belief, there are blind spots in all of the blocks that cannot be seen by the cube officer, including the shower area, the TV/day room

18

and inside all of the cells.  Upon information and belief, since the filing of this lawsuit, Defendants installed a camera system at St. Clair.  However, upon information and belief, the cameras are not positioned correctly and, as a result, leave blind spots where violence continues to occur.  Consequently, large sections of the housing blocks are not within the view of any officer during the majority of the day. Despite the blind spots created by the positioning of the cameras, Defendants have failed to remedy the inadequate positioning of cameras throughout St. Clair and to properly maintain cameras throughout the Facility, such that even those cameras that were installed are often not functional.

38.    Upon information and belief, call buttons in the cells are routinely broken or ignored.  If a prisoner is in a locked cell, there is no way for a prisoner in his cell to contact the officer in the cube except by banging on his cell door.

39.    There are also two open bay dorms at St. Clair.  The first is known as "H dorm".  Upon information and belief, there are approximately 200 prisoners who currently reside in H dorm.  The other dorm is known as G dorm.  Upon information and belief, there are approximately 58 prisoners who reside in G dorm.

40.    Upon information and belief, there is one officer who is assigned to sit at a desk at the entrance of G dorm and one officer assigned to sit at the desk at the entrance of H dorm.  That officer is not permitted to leave his assigned post during his shift and is unable to see inside the bathrooms, as well as the back of the dorm

where some prisoners' beds are located, from the desk where he sits.   Upon

information and belief, random patrols of the dorms by additional officers occur

extremely infrequently.   Most days, officers only walk through the blocks during

scheduled count times that occur three to five times in a 24-hour period.   Therefore,

the officer assigned to the desk is the only officer monitoring the open bay dorms

the vast majority of the time and the officers at the desk are, at times, asleep, on the

telephone, or otherwise not paying attention to the prisoners they are supervising.

41.    Upon information and belief, there are blind spots in the open bay

dorms.   The officer assigned to monitor the dorm from the desk near the entrance is

not able to see a portion of the back of the dorm where some prisoners' beds are

located.   Additionally, the officer is not able to see into the bathrooms from his or

her post.   There are few, if any, functioning cameras in the open bay dorms.   And,

as noted above, where Defendants have installed cameras, they are inadequately

positioned and maintained.   Consequently, portions of the open bay dorms are not

within the view of any officer for large parts of the day.

42.    Defendants are aware that the inadequate supervision contributes to the

high rate of prisoner-on-prisoner violence because officers are not present to prevent,

observe or intervene in incidents of violence, prisoners tampering with locks or other

misconduct.   Inattentive officers, the inability to contact officers in an emergency

and blind spots in the units have contributed to numerous violent incidents, many of which have been stabbings that have resulted in serious injury or death.

43.     Knives and weapons contraband are prevalent and easily acquired, increasing the risk of serious violence. ██████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████

44.     Defendants unreasonably fail to promulgate, implement and enforce adequate policies, procedures and practices to reduce the large number of knives and other weapons at the prison.  These continuing failures, along with poor supervision of inmates at the Facility, have resulted in additional inmate-on-inmate stabbings and assaults causing serious injuries.  The following examples of prisoner-on-prisoner assaults are illustrative and not exhaustive:









O.      In July 2015, Omar and Jamal Denson were attacked by multiple inmates.  Jamal Denson was stabbed, receiving serious wounds in his head, kidneys and lungs that required treatment and surgery at UAB Hospital.  Omar Denson was stabbed multiple times.

P.      In June 2015, Janarious Smith was stabbed by another inmate during yard time in the segregation unit.  While walking in the yard area, another inmate was able to remove his handcuffs and stab Mr. Smith, who was handcuffed behind his back, several times with a knife in the back and arm.

Q.      In May 2015, Victor Russo was robbed and assaulted shortly after returning from the prison store to his cell.  Multiple prisoners were able to open

his cell door and enter his cell because the door had a broken locking mechanism. They attacked Mr. Russo and stole all of his store items.  He suffered facial injuries requiring treatment at UAB Hospital.

R.    In April 2015, Michael McGregor was repeatedly stabbed two days after arriving at St. Clair.  Mr. McGregor was asleep in his cell, with the door locked.  His assailant was able to enter his locked cell and stabbed him in his arms, chest, back, head and neck, using two ice picks.  Mr. McGregor suffered extensive injuries to his back and neck, including chipped vertebrae, requiring treatment at UAB Hospital.   Hours before this assault, Mr. McGregor reported to his classification officer that he needed to be moved because he was being threatened by this assailant.

S.    In March 2015, Jamal Woods was stabbed by three inmates. Mr. Woods was stabbed in his head, face, shoulder and leg, receiving serious injuries that required two trips to UAB Hospital.  The assault was in plain sight of the cube officer, the lone officer in the block overseeing 96 inmates.

T.    In March 2015, James Dorriety was stabbed multiple times in his head and back, suffering a punctured lung.  Mr. Dorriety, an honor dorm resident, was returning to his cell block from the prison canteen when three men armed with knives robbed him of his canteen goods and assaulted him.  His injuries required

treatment at UAB Hospital, where he received numerous staples in his head and surgery to treat his lung injury.

U.     In March 2015, Nakia Echols suffered multiple stab wounds from another inmate.  The inmate entered his cell armed with a knife and ice pick in the early morning hours as Mr. Echols slept and assaulted him.  Following the assault, Mr. Echols was too frightened to return to his cell and slept for a week on a bench, undetected by prison staff.

V.     In March 2015, Jeffrey Peoples was assaulted by multiple assailants while he was sleeping in his cell.

W.     In March 2015, David Beech was stabbed and seriously injured by another inmate while both were waiting in the noon pill call line.  The inmate stabbed Mr. Beech multiple times with a box cutter.  Mr. Beech was treated at UAB Hospital and received numerous staples on his wrist and several each on his head and back.

X.     In March 2015, Dillon Cole was stabbed multiple times by another prisoner.

Y.     In February 2015, Brandon Ladd was stabbed during an attempted robbery in his cell by an inmate assigned to a different block, who was able to enter his block.  Mr. Ladd suffered stab wounds to his forearm and chest,

resulting in a collapsed lung, which required extensive treatment, including surgery, at UAB Hospital.

Z.     In February 2015, Larry Hill was assaulted in his cell block by multiple inmates who were allowed entry into the cell block by the cube officer. Mr. Hill was beaten with knife handles and fists and knocked unconscious.

AA.   In January 2015, Bradley Gant was attacked as he was leaving his block during a meal time.  He suffered head and facial injuries after being struck with a metal lock by an inmate who had previously harassed him.  Mr. Gant required staples in the back of his head and stitches on his chin as a result of the assault. When Mr. Gant reported the earlier harassment, Captain Sanders responded that the other inmate "isn't here to take care of you", and advised Mr. Gant to "get a knife and do something about it".

BB.   In January 2015, Micah Mays was stabbed and cut multiple times, suffering injuries to his face, wrists, neck and shoulders while prisoners from a different block attempted to rob him.  His injuries were so severe he required treatment at UAB Hospital.

CC.   In January 2015, Justen Stinson was stabbed and punched in his cell.  After being assaulted, Mr. Stinson moved undetected through several other blocks seeking help for his injuries from other inmates.

27

DD.   In January 2015, Elliott Blount was robbed and stabbed in his cell by a prisoner from a different block who was allowed to enter an unassigned living area.  Mr. Blount suffered severe head injuries that required extensive surgery at UAB Hospital.

EE.   In January 2015, Derrick LaKeith Brown, an inmate who suffers from hemophilia, was stabbed and seriously injured by another inmate.  His wounds included a punctured liver and internal bleeding that required treatment at UAB Hospital.

FF.   On or about December 3, 2014, Michael Stamper was stabbed approximately eight times, including twice in his forehead and in his lung.  The incident occurred in O Block which was typically reserved for older inmates with good disciplinary records.  Mr. Stamper's assailant was a younger prisoner who was assigned to the cell block after being in segregation.  Mr. Stamper received over 40 stitches and required treatment at UAB Hospital.

GG.   In November 2014, Franky Johnson, a named Plaintiff in this lawsuit, was stabbed in the back of his head, the backs of both arms, his left side and on one of his fingers while in the chow hall and in full view of several correctional officers.  Mr. Johnson required staples to the back of his head and stitches to his finger.

HH.   In November 2014, Mark Archer, an older inmate who had undergone surgery for severe back problems, had all of his personal property stolen from his cell while he was in the shift office.  The stolen items included a special, egg-crate mattress Mr. Archer needed for his back.  Neither Mr. Archer nor St. Clair staff were able to locate the mattress.

II.   In October 2014, Dale Gilley, a named Plaintiff in this lawsuit, was assaulted in the dimly-lit tunnel leading to H dorm following his visit with counsel from EJI.  As Mr. Gilley entered the tunnel, he heard another prisoner say, "Hey, holler at me about that program," and looked up, but did not see the man clearly.  The man then punched him in the face.  Mr. Gilley reported the incident and, because he was unable to identify his assailant, was given the choice of signing a liability release form or going to an isolation cell in segregation.

JJ.   In September or October 2014, Christopher Chapple was beaten over the course of several hours by multiple assailants in Q Block.  There was only a single cube officer in the block, a cadet, who never came out of the cube during Mr. Chapple's assault, nor called for roving officers to assist as the beating continued.

KK.   In September 2014, Joseph Royal was attacked by his cell mate soon after being transferred to P Block.  Mr. Royal was assaulted while sleeping and

woke up covered in blood.  He was taken to Brookwood Hospital, where he received staples in his head.

LL.    In August 2014, Victor Russo, was moved out of the honor dorm for an alleged shaving infraction.  He moved into his new block and soon after was accosted by three younger inmates armed with knives who robbed him.  When Mr. Russo reported the robbery to correctional staff, Captain Sanders suggested he get a knife to protect himself.

MM.  On September 16, 2014, Tim Duncan was murdered by another prisoner or prisoners in N Block.  Mr. Duncan had previously had conflict with individuals in N Block and had made numerous requests to Captain Sanders to be transferred to another block.  These requests were repeatedly denied.

NN.    On or about June 3, 2014, Jodey Waldrop was murdered in his cell by another prisoner, who was able to enter Mr. Waldrop's cell in the middle of the night when the block was on lockdown due to the cell door not locking.

OO.    In June 2014, Derrick White, who lived in P Block, was assaulted in the hallway between P and Q Blocks during a movement time by a prisoner who, upon information and belief, was not assigned to either block.  There were no officers present when Mr. White was assaulted.  He was strangled and then dragged while unconscious into the showers in Q.  He was in the showers from approximately

7:30 a.m. until 1:00 p.m. and was never found by staff, despite the fact that, upon information and belief, a count was conducted during the time he was missing.

PP.    In May 2014, Derrick White was stabbed in the gym by another prisoner.  Mr. White's assailant also stabbed another prisoner during this incident. There were approximately 20 prisoners present in the gym and 200 prisoners in the yard at the time of the stabbing.  Upon information and belief, there was one officer supervising the yard and no officers present in the gym.

QQ.  In May 2014, Antonio Cheatham was assaulted by another prisoner in the bathroom of the H dorm, a known blind spot, while no correctional officers were in view.  Part of his ear was bitten off and flushed down a toilet before any officers responded to the struggle.

RR.    In February 2014, a prisoner was stabbed inside his cell, a blind spot to the cube officer.

SS.    In January 2014, Marquette Cummings was fatally stabbed in the TV room, a blind spot to the cube officer.

TT.    In December 2013, Michael Mays, a named Plaintiff in this lawsuit, was stabbed by another prisoner on the way to the chow hall.  Mr. Mays was stabbed in the neck, in the back and in the elbow.  Mr. Mays had to be taken to an outside hospital for treatment.

UU.   In September 2013, Franky Johnson, a named Plaintiff in this lawsuit, was burned in his cell in the middle of the night by a prisoner who was able to exit his own cell and enter Mr. Johnson's cell.  That prisoner threw a chemical substance that had been heated in a microwave on Mr. Johnson while he was sleeping, resulting in severe chemical burns.

VV.   In July 2013, Mark Duke, a named Plaintiff in this lawsuit, was stabbed several times by another prisoner in the G Yard and suffered a punctured lung.

WW.  Upon information and belief, in July 2013, Stanley Joe Flambo was assaulted by another prisoner from a different cell block, who was armed with a knife and punched him and attempted to force him over the top tier railing of the cell block.

XX.   In 2013, a prisoner was stabbed multiple times with an ice pick outside the gym by another prisoner.  At the time there were approximately 200 inmates in the area, but no officers were present to intervene in the conflict.  The prisoner made it to the infirmary unassisted and was eventually transported by ambulance to an outside hospital because of the seriousness of his wounds.

YY.   In May 2012, John Rutledge was strangled to death inside his cell in the middle of the night when the cells should have been locked down. Multiple assailants were able to enter Mr. Rutledge's cell and hog-tie and strangle

him without being observed by officers.  His cell mate discovered him and reported his condition to the cube officer.  By the time officers reached the cell, Mr. Rutledge was dead from strangulation.

ZZ.    Upon information and belief, Muhammad Al-Ameen, also known as Terry Rivers, was repeatedly stabbed on the yard by another inmate in May 2012.  There were numerous inmates on the yard, but no officers were present when Mr. Al-Ameen was stabbed.  Mr. Al-Ameen's injuries required surgery.

AAA.    In October 2011, Jabari Bascomb was stabbed to death in his cell, a blind spot to the cube officer, after another prisoner broke into his cell.

BBB.    Upon information and belief, in January 2011, Anthony Moss was assaulted in his cell, a blind spot to the cube officer, and suffered an injury which caused him to lose the use of his left eye.

45.    Defendants have also failed to promulgate and enforce adequate and effective policies, procedures and practices in the segregation units meant to keep prisoners isolated from one another for their protection.  Upon information and belief, ADOC policy requires that prisoners in the RHU be placed in handcuffs before their cell door is opened, and that only one door be open at a time so that prisoners in the RHU do not come in contact with each other.

46.    ADOC staff also fail to adequately conduct searches for contraband and knives in the RHU.  The failure to follow the policies of permitting only one prisoner

33

out of his cell at a time and searching for contraband creates a significant risk of

serious harm because these conditions have been the cause of multiple violent

assaults, including but not limited to:



G.     In June 2015, Janarious Smith was stabbed by another inmate during yard time in the segregation unit.  While walking in the yard area, another inmate was able to remove his handcuffs and stab Mr. Smith, who was handcuffed behind his back, several times with a knife in the back and arm.

H.     In August 2014, a prisoner was stabbed by the same prisoner that fatally stabbed Jammy Bell in 2013 (as described below), after the prisoner was assigned to clean the halls in the segregation unit.  The officers failed to secure the food-tray slots on the cell doors prior to sending the prisoner into the unit and the other man was able to stab the prisoner in his leg by sticking a knife attached to a broom handle through his open tray slot.

I.     In August 2013, Jammy Bell was fatally stabbed by another prisoner in the segregation unit after an officer failed to follow proper protocol for opening the cell doors.

J.     Upon information and belief, Jovar Gamble was stabbed multiple times in August 2012, while housed in the segregation unit.  Mr. Gamble was in handcuffs on the walk when another segregation inmate stabbed him.

K.     Upon information and belief, Orlando Porch was assaulted by another inmate while both men were housed in segregation in January 2012.

47.     Plaintiffs also incorporate the numerous instances of violent sexual assaults alleged below (*see infra* ¶ 60) as further evidence of prisoner-on-prisoner violence at St. Clair.

48.     Defendants are aware of the locations and circumstances in which these homicides and assaults have occurred and that inadequate supervision was one of the dangerous conditions that made it possible for these incidents to occur. However, they have failed to adequately increase patrols and supervision of the units, have not adequately installed and maintained cameras or provided any meaningful means for prisoners to call for help in an emergency, nor taken any other reasonable action to increase and improve the quality of supervision, leaving the plaintiff class exposed to the continuing real and imminent substantial risk of serious harm.

49.     Defendants are aware of a history of widespread violence at St. Clair, including the extreme level of serious, life-endangering violence currently taking place at St. Clair.  Defendants' knowledge of the violent and dangerous conditions is also established by institutional reports prepared by Defendants' employees describing violent incidents and institutional failures, and by lawsuits filed by prisoners challenging the abuse of authority and conditions of confinement. Defendants have further notice of the high rate of prisoner-on-prisoner violence as a result of the filing of this lawsuit in 2014, as well as the DOJ's investigation in 2016,

report in 2019 and subsequent lawsuit in 2020 that detailed the numerous issues associated with prisoner-on-prisoner violence at Alabama prisons for men, including St. Clair.  Despite Defendants' knowledge of the policies and practices contributing to a heightened risk of prisoner-on-prisoner violence, Defendants have failed to remedy the ongoing violations and continue to implement the same unconstitutional policies and practices at St. Clair.

> DEFENDANTS' POLICIES AND PRACTICES WITH REGARD TO THE PREVENTION, DETECTION AND RESPONSE TO SEXUAL ABUSE PLACE PRISONERS AT RISK OF SEXUAL ABUSE.

50.    Defendants have failed to take reasonable steps to protect prisoners from a known risk of sexual assault.  Defendants' policies and practices with regard to incidents of sexual violence place prisoners at an increased and unnecessary risk of sexual misconduct and abuse.

51.    Defendants are aware of a history of widespread sexual abuse throughout ADOC facilities including St. Clair and that ADOC policies and practices unnecessarily increase the risk of abuse.  In 2012, EJI issued a report detailing the Department's practices and policies that contributed to a culture of sexual violence at Tutwiler Prison for Women ("Tutwiler"), including placing inmates who report sexual abuse in isolation, failure to provide continued mental health counseling, failure to provide minimally adequate classification and housing assignment to identify and protect vulnerable prisoners, failure to provide adequate

staffing and monitoring, failure to investigate allegations of sexual assault and failure to inform victims of sexual assault about the results of the investigation. In November 2012, the National Institute of Corrections issued a report identifying many of the same policies and practices as contributing to the sexualized environment and harm to prisoners at Tutwiler. In 2013, EJI issued a report about sexual violence at the men's prisons and met with Commissioner Thomas to discuss the lack of PREA compliance and the policies and practices that contribute to sexual violence at the men's prisons. In January 2014, the Department of Justice found that the Alabama Department of Corrections' policies and practices at Tutwiler with regard to sexual misconduct and abuse placed prisoners at higher risk of sexual abuse. These reports put Defendants on notice that sexual violence is widespread at both the men's and women's facilities and that it must take steps throughout its facilities to ensure compliance with PREA and protect its prisoners from the substantial risk of harm due to sexual abuse. Further, the original Complaint in this action, filed in 2014, and the DOJ's investigation in 2016, detailed report in 2019 and subsequent lawsuit in 2020 put Defendants on additional notice of the widespread sexual violence at St. Clair. Defendants are aware that their policies and practices heighten the risk of sexual assault, but continue to employ these same policies and practices at St. Clair.

38

52.     Defendants' failure to prevent the introduction of drugs and weapons contraband at St. Clair contributes to incidents of sexual abuse.  The majority of prisoners who have reported sexual assault at St. Clair have indicated that their assailants were armed with knives.  Prisoners are routinely targeted with sexual violence when they fail to pay a debt related to drugs or other contraband.  Multiple prisoners at St. Clair have also reported being targeted with sexual assault after being drugged, becoming intoxicated or incapacitated by drugs or when the assailant was under the influence of drugs.

53.     Defendants' policy of placing prisoners who report sexual abuse in isolation cells in segregation heightens the risk of sexual assault by discouraging prisoner reporting of sexual abuse.  Policies and practices that discourage and deter prisoner reporting seriously undermine the ability to detect and prevent sexual abuse and exhibit Defendants' deliberate indifference to the constitutional rights of prisoners.

54.     Furthermore, as illustrated by the examples provided in paragraph 60 below, when prisoners report abuse, Defendants fail to adequately respond or investigate, and routinely close investigations into allegations of sexual assault as "unsubstantiated" based solely on the victim's decision not to press criminal charges. Defendants also dismiss sexual assault involving prisoners who identify or are

perceived as gay, bisexual or transgender as consensual "homosexual activity," and minimize sexual assault that occurs as a result of drug debt.

55.     Defendants' policies and practices do not ensure that prisoners who report sexual abuse are provided sight and sound separation from their assailants; are protected from the assailants' known associates; or provided adequate counseling services.   Defendants have prevented victims of sexual abuse at St. Clair from accessing outside support and have not provided sufficient mental health care within the Facility.

56.     Additionally, understaffing contributes to the dangerous risk of sexual assault at St. Clair.   As noted above, a 2018 PREA audit found that only 127 of 315 full time security positions allotted to St. Clair were actually assigned.   According to the report, "With this type of inmate to security staff ratio, in a level five facility, the ability to protect inmates from sexual abuse and sexual harassment is highly questionable."   Defendants are aware that dangerously low staffing levels combined with known architectural and structural conditions significantly increase the risk of sexual abuse, yet Defendants have not taken necessary measures to address these deficiencies.   Defendants do not maintain adequate staffing levels nor do they take into consideration such factors as components of the physical plant (including blind spots), the composition of the population and the number and placement of supervisory staff.

57.    Defendants' classification system and policies and procedures do not adequately identify or separate potential sexual predators and victims.  Without an adequate classification system, Defendants cannot appropriately manage behavior and thereby subject prisoners to an increased risk of harm.

58.    Defendants fail to conduct adequate initial assessment during intake screening to assess the risk of being sexually abused or risk of being sexually abusive towards other people.  Defendants' housing and classification policies and practices do not adequately separate people at high risk of being sexually victimized from those at high risk of being sexually abusive.  Defendants' failure to conduct an adequate initial assessment has contributed to the high rate of sexual assaults occurring where vulnerable prisoners are housed in the same dorm as prisoners with a high risk of being sexually abusive.

59.    Defendants fail to protect victims of sexual abuse from further retaliation.  Victims at St. Clair have faced retaliation from their abusers as they do not have sight and sound separation, even when placed in segregation.  Additionally, Defendants' practice of routinely keeping the SSU at capacity makes segregating victims and abusers difficult and further exposes victims who report sexual abuse to retaliation from their abusers.  Defendants expose victims of sexual abuse to continued abuse by failing to prevent retaliation.

60.   Defendants' policies and practices have led to a high rate of sexual violence at St. Clair.  The following examples are illustrative and not exhaustive:



























FF.    In April 2015, A.Z. was raped in the TC in H Dorm a week after being transferred to St. Clair.  A.Z. was asleep in his bunk when his assailant put a knife to his throat and raped him.  After reporting the rape, A.Z. was placed in an isolation cell in segregation and was unable to participate in the TC.  A.Z. was not provided with continuing medical or mental health treatment.  When placed in an isolation cell in segregation, A.Z. reported to officers that he felt suicidal and in response he was told to kill himself.  A.Z. never heard the outcome of the I&I investigation.  A.Z.'s assailant, a general population prisoner living in H Dorm who was not a participant in the TC, had a history of violence and sexual assault.

GG.   In April 2015, W.C. was raped twice at knifepoint in the middle of the night by his cell partner in P Block.  He had been required to sign a "living agreement" as the only means of avoiding placement in isolation.  Upon information and belief, ADOC provides inmates with Living Agreement Forms after altercations between prisoners.  By signing the Living Agreement Form, prisoners acknowledge that they have been "counseled/reprimanded" by correctional staff, purport to release ADOC officials of any liability and damages, and agree to live at the Facility without any further problems.  Defendants require that victims of violent assaults either remain in an isolation cell in segregation or sign a "living agreement" to be placed

back in population, where they are in contact with the prisoner(s) who assaulted them.  W.C. continued to face retaliation from friends of his assailant.  He did not receive continuing mental health care and never heard the outcome of the I&I investigation.

HH.   On or around February 1, 2015, J.M. was raped by another inmate, who approached J.M. as he was reading on his bunk and placed a knife to his throat.  Both men were assigned to the TC or H Dorm, which is where the rape occurred.  J.M. did not have sight and sound separation from his assailant even while in segregation.  J.M. did not use the shower in segregation because he continued to fear retaliation.  He did not receive mental health counseling and did not hear the outcome of the I&I investigation.

II.   In January 2015, D.C., a nonviolent offender, was raped at knifepoint in L Block.  His assailant told him that he would kill him if he reported the rape.  D.C. was placed in an isolation cell in segregation after reporting the rape, but he still did not have sight and sound separation from his assailant.  D.C. did not receive continuing mental health counseling.

JJ.   In December 2014, J.H. was threatened with sexual assault at knife point while in his cell by the same prisoner who later raped J.M.  J.H. reported the attempted sexual assault and was placed in an isolation cell in segregation.  Upon information and belief, I&I did not investigate the attempted sexual assault.  Two

57

months later, the same assailant sexually assaulted J.M.   The assailant was then moved to segregation and placed in the same block as J.H.

KK.   In July 2014, an assailant entered A.H.'s cell in the M Block with a knife and sexually assaulted him.   A.H. escaped his cell and sought help.   At the infirmary, nurses and officers laughed at A.H. while the nurses conducted an examination.   A.H. reported that he was suicidal and was kept in a crisis cell for five days.   He was then sent to an isolation cell in segregation in the same unit as his assailant.   A.H. did not receive continuing mental health care and he did not receive the outcome of the I&I investigation.

### DEFENDANTS' FAILURE TO PROVIDE SECURE LOCKING MECHANISMS ON INDIVIDUAL CELL DOORS CONTRIBUTES TO THE RISK OF VIOLENT ASSAULT AND SEXUAL ABUSE.

61.   At the time this lawsuit was initiated in 2014, the locking mechanism on the majority of cells were broken.   Defendants rely on a system of locked, secure cells to house inmates safely, rather than visual monitoring, yet Defendants were aware that the locks in the majority of doors at the Facility in all of the housing blocks could be easily tampered with so that they do not lock.   Without locking cell doors, prisoners in the cell blocks have no means of protecting themselves inside their cells.   Defendants had refused requests to fix cell doors and failed to take adequate measures to repair the broken cell locks.

■ ███████████████████████████████████████████

███████████████████████████████████████████████

██████████████

63.    ███████████████████████████████████████

██████    A pattern of broken and tricked locks quickly reemerged.  Defendants have failed to promulgate, implement and enforce policies and practices with regard to the supervision and maintenance of cell door locks.

64.    Defendants, through their acts and omissions, have engaged in a practice of allowing prisoners to be assigned to and have access to cells with broken locks.

65.    Defendants have engaged in a pattern of indifference to tricked locks, routinely ignoring visible obstructions to cell door locks.

66.    The locks on the cell doors can be easily tampered with by using items such as a piece of plastic, a razor blade or paper clips to jam the locking mechanism. Once the locking mechanism is jammed, it does not engage and the door can be "tricked," meaning it can be opened from the inside or from the outside with a plastic ID card which all prisoners carry.

67.    The locks on some of the doors are broken and do not work, even if nothing is jamming the mechanism.  In some doors, the entire mechanism is missing. Cell doors in general population remain open all day, making it possible for prisoners

to jam the locks in other prisoners' doors.  The locks on the doors in segregation can also be easily tampered with by jamming an object, such as a toothpaste cap, in the mechanism that rolls the door, which prevents the lock from engaging.

68.     Consequently, prisoners cannot keep other prisoners from entering their cells and prisoners are able to enter or exit their own and other prisoners' cells at any time, even during lockdown.  This creates a particularly dangerous environment because cells are "blind zones" in the blocks, meaning that officers in the cube cannot see inside the cells and there is no way for a prisoner to call an officer for help in the event of an emergency, other than by banging on the cell to try to get the attention of the cube officer.  Because cube officers are frequently asleep or are otherwise inattentive, this is not an effective means for a prisoner being assaulted to get help.  Defendants know that the locks on some cells do not work.  St. Clair staff have made comments demonstrating their knowledge, have used their own ID cards to open cell doors, and have seen prisoners come out of their cells when the unit is supposed to be on lockdown.

69.     Defendants are aware that the lack of functioning locks creates dangerous conditions because prisoners have been assaulted in incidents where the locks were defeated or non-functioning.  The following examples are illustrative and not exhaustive:





J.      In May 2015, Victor Russo was robbed and assaulted shortly after returning from the prison store to his cell.  Multiple prisoners were able to open his cell door and enter his cell because the door had a broken locking mechanism. They attacked Mr. Russo and stole all of his store items.  He suffered facial injuries requiring treatment at UAB Hospital.

K.      On or about June 3, 2014, Jodey Waldrop was murdered in his cell by another prisoner, who was able to enter Mr. Waldrop's cell in the middle of the night, when the block was on lockdown, due to the cell door not locking.

L.      In August 2013, Jammy Bell was stabbed by another prisoner in segregation after his cell door was tampered with.

M.     In May 2012, John Rutledge was strangled to death by other prisoners who entered his cell in the middle of the night when the cells should have been on lockdown.

N.     Upon information and belief, in June 2011, Derrick Averhart was stabbed in the arm, head and face by another inmate while handcuffed in his cell in segregation.

70.     Defendants have failed to respond in a reasonable manner to the continuing real and imminent substantial risk of serious harm posed to the plaintiff class by the broken, tampered, manipulated or otherwise non-functioning locks on the cell doors.  Defendants do not adequately train staff how to determine if a door is tricked, do not adequately investigate incidents implicating non-functioning locks, do not provide adequate supervision and monitoring of cell door locks, do not regularly check cell doors to make sure the lock is functioning properly or repair locks they know are broken, have refused Plaintiffs' requests to repair broken locks and fail to take reasonable or adequate action to ameliorate the risk of harm created by cell doors that do not lock.

DEFENDANTS FAIL TO IMPLEMENT AN EFFECTIVE CLASSIFICATION AND HOUSING POLICY, INCREASING THE RISK OF PHYSICAL ASSAULTS AND SEXUAL VIOLENCE.

71.     Defendants fail to develop, maintain and implement an effective classification and housing policy for St. Clair, and they fail to ensure that leadership

and staff consistently implement them. Through their policies, practices and omissions, Defendants fail to implement an effective classification and housing policy at St. Clair.

72.   In 2018, after this lawsuit was initiated, Defendants adopted the ███ ████████████████████████████, which governs internal classification.

73.   Defendants fail to adequately train staff on, and fail to implement and enforce, the ██████.

74.   Defendants engage in a pattern or practice of noncompliance with the ██████.

75.   Defendants' failure to train staff on, and failure to enforce an adequate classification and housing policy, puts prisoners at risk of violence.

76.   Defendants continue to engage in a pattern of mixing prisoners who should be kept separate. This pattern includes the failures to investigate and respond reasonably to requests to move, to conduct adequate screenings for risk factors, and to review and account for known risks in making housing assignments.

77.   Defendants fail to adequately screen incoming prisoners to determine if they have enemies in the Facility, based either on personal conflicts, prior conflicts at other facilities in ADOC or gang-based conflicts, and do not adequately take such considerations into account when making housing assignments. Defendants fail to develop and implement policies to address the screening of incoming prisoners.

Without the ability to identify enemies and vulnerable inmates, St. Clair cannot appropriately manage risks of violence, thus exposing prisoners to harm.

78.     Defendants do not have reasonable policies and procedures in place that require classification and PREA reassessments after prisoners are identified as victims and suspects in violent incidents.  As a result, Defendants fail to adequately conduct classification and PREA reassessments after prisoners are identified as victims and suspects in violent incidents.  Defendants fail to ensure that leadership and staff at St. Clair abide by their obligations to identify victims and suspects in violent incidents and conduct PREA reassessments, and Defendants have failed to develop policies, procedures and practices to do so.

79.     Upon information and belief, Defendants do not adequately factor in a prisoner's security level or risk assessment level, including his offense of conviction, sentence and disciplinary record, in making housing assignments.

80.     Minimum, medium and maximum custody prisoners, and low-risk and high-risk prisoners, are assigned to the same units and cells as each other.  Therefore, prisoners with short term of years sentences, convictions for relatively minor offenses and clean or only minor disciplinary histories can be assigned to the same unit, and assigned to share a cell with, prisoners who have life sentences, were convicted of more serious offenses or with a violent institutional history.

81.    Upon information and belief, Defendants fail to adequately and effectively separate prisoners who have had violent confrontations at St. Clair or other ADOC facilities.

82.    In response to violence between prisoners, Defendants place the victim and the aggressor in punitive isolation for an indefinite period.  The victim is then placed in a Catch-22 position of remaining indefinitely in punitive isolation or signing a "living agreement" with the other inmate(s) involved in the altercation in order to be released from segregation back into general population.   Upon information and belief, once a "living agreement" has been signed, Defendants can and do assign prisoners who have engaged in violence or threatened each other to the same unit.  Defendants' requirement that victims of violent assaults must either remain in an isolation cell in segregation or sign a "living agreement," and then be placed back in contact with the prisoner(s) who assaulted them, is not a reasonable response to violent incidents between prisoners.

83.    Defendants do not adequately consider an inmate's mental health status or history of violent conflict with other prisoners in making housing assignments. Upon information and belief, inmates with serious mental health problems or histories of repeated violent conflict live in general population and do not get adequate treatment or supervision.  Defendants also fail to provide adequate training or supervision to staff on how to respond to prisoners who report threats of violence

made by prisoners with known histories of mental instability or violent conflict. Defendants' failure to adequately classify and treat prisoners with mental illness or histories of repeated violent assaults, as well as their failure to provide adequate training or supervision of staff on how to respond to mentally ill or violent prisoners has resulted in substantial harm to Plaintiffs.

84.   Defendants have failed to create and enforce adequate procedures, practices and policies for investigating and responding to inmate requests to be moved to a new cell assignment based on threats or fear for their safety in their current housing assignment.   Defendants have rejected inmate requests for movement with little or no effort made to determine the veracity and seriousness of the threat.

85.   Defendants have responded to Plaintiffs' requests to move based on threats to their safety by telling them to arm themselves with knives, by making comments to the effect that they are tough enough to handle the potential violence, by telling the threatened prisoners that Defendants do not care what happens to them or by telling them that the only option for transfer is to be moved into an isolation cell in segregation.   If a threatened prisoner agrees to move to an isolation cell in segregation for his safety, Defendants have also denied that request.

86.   Defendants are aware that the refusal to classify prisoners and refusal to investigate and grant movement requests based on a prisoner's safety concerns

creates a substantial risk of serious harm because prisoners have been assaulted after

their requests to move housing assignments were denied.  The following examples

are illustrative and not exhaustive:





███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

G.      In April 2015, A.Z. was raped in the TC in H dorm a week after being transferred to St. Clair.  A.Z. was asleep in his bunk when his assailant put a knife to his throat and raped him.  After reporting the rape, A.Z. was placed in an isolation cell in segregation and was unable to participate in the TC Program.  A.Z. was not provided with continuing medical or mental health treatment.  While in isolation, A.Z. reported to officers that he felt suicidal and in response he was told to kill himself.  A.Z. never heard the outcome of the I&I investigation.  A.Z.'s assailant was a general population prisoner living in H dorm who was not a participant in the TC Program and had a history of violence and sexual assault.

███   █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████

I.     For three days in October 2014, Raymond Roberts was forced to sleep outside of the shift office because he feared the assigned bed placement in P Block of general population and Capt. Sanders refused to place him in an isolation cell in segregation.

J.     In June 2014, prior to being assaulted, Derrick White requested to be moved back to an isolation cell in segregation because he believed his life was in danger.  His request was refused and he was strangled and beaten soon after.

K.     In June 2014, a then 60-year-old, physically disabled prisoner was robbed at knife point by another prisoner, who, upon information and belief, was a 23-year-old mentally ill prisoner.  The prisoner was robbed less than 24 hours after being transferred from the honor dorm to L Block, a much more violent block, housing younger inmates.

L.     In February 2014, a prisoner requested to be moved out of his unit after his cell mate tried to stab him and threatened to kill him.  His request was denied without adequate investigation and he was later stabbed by his cell mate inside his cell.

M.     In November 2013, an older prisoner named Carlos Subel was assigned to L Block and he requested to be moved to an isolation cell in segregation instead because he was worried about his safety.  His request to move to segregation was denied and he continued to refuse to sleep in L Block.  He was then forced to

sleep outside the shift office without a mattress for about a week where he was denied his property and access to showers. He was also forced to stand for numerous hours at a time by Lt. Carter and by Lt. Scott. Mr. Subel has several medical conditions and standing for several hours caused him several complications, including bleeding from his rectum.

N.     Upon information and belief, in November 2013, Freddie James Stallworth was stabbed multiple times by another prisoner who was his cell mate. The stabbing caused serious injuries, including a punctured lung, and required surgery at a free world hospital. Prior to the attack, Mr. Stallworth notified Lt. Carla Graham in November 2013, that he was in danger from his cell mate, and requested a move. His request was denied without adequate investigation. He was stabbed soon thereafter.

O.     In September 2013, Allan Williams, a named Plaintiff in this lawsuit, was stabbed by a prisoner, who, upon information and belief, is mentally ill. Mr. Williams was stabbed while he was walking back from his shower. Upon information and belief, the man who stabbed Mr. Williams had a violent history and had stabbed another prisoner a few years before he stabbed Mr. Williams.

P.     In 2011, a prisoner was stabbed by another prisoner, who had requested to go to an isolation cell in segregation for his own protection but whose requests were denied. Upon information and belief, the assailant feared for his safety

due to outstanding debts he owed other prisoners for drugs and attacked the prisoner in order to get moved into an isolation cell in segregation where he felt he would be safer.

87.    These incidents of violence demonstrate Defendants' awareness that the failure to classify prisoners based on security status, a history of conflict and mental health status and to investigate housing movement requests based on fear or threats of violence creates a substantial risk of serious harm.   Even though Defendants know that their current policies and practices contribute to serious incidents of violence, they have failed to take adequate action to address the problems in classification and housing.

DEFENDANTS' FAILURE TO ADEQUATELY ENFORCE HOUSING ASSIGNMENTS AND MONITOR MOVEMENT TIMES CONTRIBUTES TO THE HIGH RISK OF PRISONER-ON-PRISONER VIOLENCE AND SEXUAL ABUSE.

88.    Upon arriving at St. Clair, prisoners are assigned to a particular housing unit.  Defendants do not take reasonable measures to ensure prisoners only have access to the housing unit where they are assigned.

89.    Defendants fail to regularly enforce housing assignments and officers in the cube frequently let prisoners into a unit where they are not assigned without verifying that they reside in the unit.

90.    Although for years Defendants have had a policy of issuing color-coded wristbands to prisoners, which identifies each prisoner's particular housing unit,

officers do not enforce the use of these wristbands.  A 2018 audit found that "the majority of inmates observed were not wearing wrist bands and staff granting access to the different sides of the unit did not check wrist bands."

91.    In the absence of officer enforcement, prisoners are forced to forge associations with other prisoners for their protection in the blocks.  In the absence of officer supervision and enforcement, movement between blocks and block occupancy is enforced through physical threats and violence.

92.    Upon information and belief, uncontrolled movement between housing units frequently occurs during movement times when doors to multiple housing units remain unlocked.

93.    Upon information and belief, St. Clair leadership and staff allow movement between units before and after announcing bed roster counts, making it possible for prisoners to move between units without disciplinary action.

94.    Defendants are aware that the failure to enforce housing assignments contributes to the high rate of violence and creates a significant risk of serious harm. While conducting count at the Facility, officers fail to enforce housing assignment locations and focus only on ensuring the prison has an accurate number of prisoners. Prisoners are frequently present in unauthorized areas or other cell blocks at count time with no repercussions.  Upon information and belief, Defendants conduct count at scheduled times throughout the day.  The predictability of the prison count allows

74

prisoners to be absent from their assigned areas with an awareness of when they should be back in their assigned area.  There have been numerous incidents of violence where the failure to enforce housing unit assignments has contributed to the circumstances that made the assault possible and where a prisoner was assaulted in their unit by another prisoner who was not assigned to that unit, including but not limited to:







J.      In July 2015, multiple inmates from dorms on the G Yard traveled to the H Dorm and stole cell phones from several inmates.  Up to 15 inmates from the G Yard later returned to H Dorm with knives.

K.      In February 2015, Brandon Ladd was stabbed during an attempted robbery in his cell in L Block by an inmate assigned to a different block, who was able to enter his block.  Mr. Ladd suffered stab wounds to his forearm and chest, resulting in a collapsed lung, which required extensive treatment, including surgery, at UAB Hospital.

L.      In February 2015, Larry Hill was assaulted in his cell block by multiple inmates who were allowed entry into the cell block by the cube officer.  Mr. Hill was beaten with knife handles and fists and knocked unconscious.

M.      In January 2015, Micah Mays was stabbed and cut multiple times, suffering injuries to his face, wrists, neck and shoulders during a robbery

attempt in N Block.  His assailants had entered N Block from a different block.  His injuries were so severe he required treatment at UAB Hospital.

N.      In January 2015, Justen Stinson was stabbed and punched in his cell in P Block.  After being assaulted, Mr. Stinson moved undetected through several other blocks seeking help for his injuries from other inmates.

O.      In January 2015, Elliott Blount was robbed and stabbed in his cell in N Block.  Mr. Blount's assailant was assigned to P/Q Blocks and was allowed to enter an unassigned living area.  Mr. Blount suffered severe head injuries that required extensive surgery at UAB Hospital.

P.      In June 2014, Derrick White was attacked when another prisoner strangled him in the hallway between P and Q Blocks and was able to drag Mr. White into Q-2, which required him to go through the main unit doors.  Upon information and belief, Mr. White's assailant was not assigned to either P or Q Block.

Q.      In July 2013, Mark Duke, a named Plaintiff in this lawsuit, was threatened at knife point in an attempted robbery in his cell by a prisoner who was not assigned to his block.

R.      Upon information and belief, Benjamin Howlet was stabbed in his cell in November 2011, when correctional officers permitted two unauthorized

inmates to enter Mr. Howlet's cell.  Mr. Howlet suffered numerous injuries to his face, rib area and stomach requiring surgery at an outside hospital.

95.    In addition, Defendants fail to adequately monitor movement by inmates throughout the Facility during designated movement times, such as yard call, meal times and inmate visits to the canteen.  In particular, Defendants fail to keep inmates who are designated enemies separate during movement times and fail to supervise movement as inmates return from the canteen.  Moreover, Defendants have failed to design or implement policies, procedures or standardized practices to keep designated enemies separate to prevent violent incidents.  Such incidents include, but are not limited to:





H.     In May 2015, Victor Russo was robbed and assaulted shortly after returning from the prison store to his cell.  Multiple prisoners were able to open his cell door and enter his cell because the door had a broken locking mechanism. They attacked Mr. Russo and stole all of his store items.  He suffered facial injuries requiring treatment at UAB Hospital.

I.      In March 2015, James Dorriety was stabbed multiple times in his head and back, suffering a punctured lung.  Mr. Dorriety, an H Dorm resident, was returning to his cell block from the prison canteen when three men armed with knives robbed him of his canteen goods and assaulted him.  His injuries required treatment at UAB Hospital, where he received numerous staples in his head and surgery to treat his lung injury.

J.      In January 2015, Bradley Gant was attacked as he was leaving his block during a meal time.  He suffered head and facial injuries after being struck with a metal lock by another inmate who had previously harassed him.  Mr. Gant required staples in the back of his head and stitches on his chin as a result of the assault.  When Mr. Gant reported the earlier harassment, Captain Sanders responded that the other inmate "isn't here to take care of you," and advised Mr. Gant to "get a knife and do something about it".

K.      In February 2014, Tehron Young was stabbed by his former cell partner in the chow hall area.  While they were cell mates, the two inmates had a series of confrontations culminating in a fight, as a result of which Mr. Young and his assailant signed a "living agreement" and the assailant was moved to another living area.  Two days later Mr. Young was stabbed while walking into the chow hall area, receiving serious injuries, including a punctured lung, that required two weeks of treatment at UAB Hospital.

96.     Despite Defendants' knowledge that the failure to enforce block and cell assignments or monitor movement times contributes to serious violent incidents, Defendants have failed to implement adequate changes in policies, procedure and practice to address the substantial risk of serious harm.

DEFENDANTS' FAILURE TO PROVIDE ADEQUATE REHABILITATIVE, EDUCATIONAL AND VOCATIONAL PROGRAMMING AND THERAPEUTIC SERVICES CONTRIBUTES TO THE HIGH RATE OF PRISONER-ON-PRISONER VIOLENCE AND SEXUAL ASSAULT.

97.     In addition to creating an environment where abuse and violence are the norm, Defendants have failed to provide adequate positive, rehabilitative, recreational or religious programming, as well as treatment and services for drug addiction and mental illness, and Defendants have failed to design, implement and enforce policies and procedures to ensure that St. Clair provides these kinds of programming and treatment.  Upon information and belief, Defendants provide inadequate services to address mental illness, disability and drug addiction, despite data that show that the vast majority of prisoners suffer from one or both of these afflictions.   The failure to provide adequate treatment for these conditions contributes to the high level of violence.

98.     Furthermore, rather than providing services, Defendants respond to prisoners suffering from mental illness, disability and drug addiction by placing them in punitive segregation, which isolates them and can exacerbate their

symptoms. These prisoners are then released back into general population more impaired and more traumatized.

99. Upon information and belief, Defendants have severely restricted programs that are aimed at reducing violence, giving prisoners a forum to voice concerns and resolve issues, incentivizing good behavior and providing prisoners an opportunity to educate themselves.

100. The unavailability of positive and constructive programming contributes to conflicts and tensions among prisoners and to the high rate of violence.

DEFENDANTS' FAILURE TO REASONABLY RESPOND TO THE PRESENCE OF DANGEROUS CONTRABAND, INCLUDING WEAPONS AND DRUGS, PUTS PRISONERS AT RISK OF VIOLENCE.

101. Because of poor management, drugs, including methamphetamine, methadone, heroin, suboxone and marijuana, are prevalent at St. Clair, and drug abuse and addiction among prisoners is widespread. Upon information and belief, many of the drugs are brought into the Facility by ADOC staff. Over the past two years, there have been dozens of reports of staff willfully violating DOC policy, including smuggling in contraband. This has enabled widespread corruption among officers, and officers are able to extort money and favors from prisoners in exchange for drugs. Defendants' lax or nonexistent enforcement of policies and procedures designed to prevent the introduction of contraband, including drugs and weapons, has contributed to the dangerous conditions at St. Clair.

102.   Defendants fail to control the introduction of illegal drugs and weapons. Defendants fail to promulgate, implement and enforce reasonable contraband detection and elimination policies.   As a result, illegal drugs and weapons are prevalent and easily acquired.

103.   Defendants fail to take reasonable and adequate steps to detect and prevent the introduction of illegal drugs and other dangerous contraband into the Facility as demonstrated by the prevalence of drugs, knives, guns, ammunition and other dangerous contraband originating from outside of the Facility.

104.   Drugs create a substantial risk of serious harm as demonstrated by the large number of fatal overdoses and overdoses leading to hospitalization.

105.   Drugs are also a major source of conflict at St. Clair, both because of behavior stemming from addiction, for which Defendants have failed to provide adequate services and treatment, and because of the dynamics of debt created by officers' and prisoners' participation in drug sales. ████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

106.   Defendants fail to adequately prevent officers bringing in and participating in the sale of drugs to prisoners in the Facility.   Upon information and

belief, Defendants do not employ effective search protocols and procedures when officers enter the Facility.  Defendants' failure to adequately screen ADOC staff contributes to the dangerous conditions at the prison and the flow of dangerous contraband.  Although ADOC has not allowed visitors since March 2020, access to drugs and dangerous contraband originating in the free world has continued.  This fact has placed Defendants on notice that ADOC staff are a substantial source of contraband introduced into the Facility.

107.  Additionally, once drugs or contraband are found on prisoners or correctional officers, Defendants fail to conduct adequate investigations, which contributes to the substantial risk of serious harm faced by prisoners at St. Clair.  When prisoners are found to be in possession of drugs or weapons, Defendants fail to adequately investigate how, when and from where the drugs or weapons came to be in the prisoner's possession.  Similarly, when Defendants do detect correctional officers in possession of drugs or weapons, Defendants fail to adequately investigate why the officer was in possession of drugs or weapons, to whom he or she intended to provide the drugs or weapons or why the officer intended to introduce drugs and weapons into the prison.  Upon information and belief, these incidents are rarely referred to I&I for investigation.

108.   Defendants' failure to provide meaningful incentives, programming and treatment contributes to prisoners engaging in risky behavior, such as gambling and drug use.

109.   Defendants' failure to reasonably and adequately respond to the prevalence of drugs and weapons in the Facility leaves the plaintiff class exposed to the continuing real and imminent substantial risk of serious harm.

DEFENDANTS' FAILURE TO PROVIDE ADEQUATE AND SECURE HOUSING AND THERAPEUTIC SERVICES TO INMATES ASSIGNED TO SEGREGATION CONTRIBUTES TO THE HIGH RISK OF PRISONER-ON-PRISONER VIOLENCE AND SEXUAL ABUSE

110.   Defendants continue to provide unsafe and non-secure housing conditions in the RHU.

111.   Defendants fail to provide adequate supervision in segregation.   On some shifts, cube positions responsible for monitoring of blocks are left unstaffed entirely.   ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

112.   Defendants are aware that the inadequate supervision in segregation contributes to the high rate of prisoner-on-prisoner violence because officers are not present to prevent, observe or intervene in incidents of violence, prisoners tampering with locks and other misconduct.   Inattentive officers, the inability to contact officers

86

in an emergency and blind spots in the units have contributed to numerous violent incidents, many of which have been stabbings, that have resulted in serious injury or death.

113.   Defendants fail to ensure safe and controlled movement of prisoners in segregation.

114.   Defendants fail to prevent the introduction of dangerous contraband, including weapons and drugs, into the segregation units.

115.   Defendants fail to ensure that all prisoners in segregation are securely housed in cells with operational locks and doors.

116.   Defendants' failures in and around segregation, and Defendants' failed policies, procedures and practices, have directly contributed to the following incidents:









████████████████████████████████████████████

███████████

S.    In May and June 2015, Jonathan Bishop along with another inmate were held overnight in cages outside the Facility's segregation unit because there were no cells available for them indoors.  These outdoor cells, meant to temporarily house inmates who are awaiting a permanent cell assignment, are not equipped with water or protection from the elements.  The men slept exposed in the outdoor cage for multiple days.

T.    In February 2015, Michael Stewart, an inmate who requested to be placed in an isolation cell in segregation because of threats by enemies in population, cut his wrists multiple times in his segregation cell and bled for ten hours before staff noticed his condition and provided medical intervention.  Additionally, Mr. Stewart was housed in a cell with a broken window during several of the coldest winter weeks, and the prison staff failed to provide him with a jacket.

U.    In January 2015, Xavier Smith and Cordarious White spent hours in cages outside the Facility's segregation unit because there were no cells available for them indoors.  Both Mr. Smith and Mr. White were forced to stay in these cages during freezing January weather with no protection aside from their ADOC uniforms.

V.      As of January 2015, Larry Nesbitt had spent at least 15 months in administrative segregation at St. Clair following a probation revocation based on a technical violation.  Given the low-level nature of his offense he should not have been housed at St. Clair, a maximum security prison.  Mr. Nesbitt was eligible for housing at a lower-security facility and the fact that he remained in the segregation unit at St. Clair demonstrates the failure to properly classify inmates based on security status.

W.      In July 2014, an assailant entered A.H.'s cell in the M Block with a knife and sexually assaulted him.  A.H. escaped his cell and sought help.  At the infirmary, nurses and officers laughed at A.H. while the nurses conducted an examination.  A.H. reported that he was suicidal and was kept in a crisis cell for five days.  He was then sent to an isolation cell in segregation in the same unit as his assailant.  A.H. did not receive continuing mental health care and he did not receive the outcome of the I&I investigation.

## DEFENDANTS' POLICIES AND PRACTICES PLACE PRISONERS AT RISK OF EXCESSIVE USE OF FORCE

117. Defendants' acts or omissions, including verbally abusive and physically aggressive intervention by staff, heighten the tension and make the prison more dangerous.  Defendants discourage victims, their families and advocates from reporting incidents of violence, threats or extortion including through their failure to conduct adequate investigations and retaliation and punishment of prisoners who

report threats and extortion. ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

118.   Further, officers, including high ranking officers, have used excessive force and promulgated the culture of violence through their own actions.  The excessive force used includes unnecessary, disproportionate, punitive or avoidable uses of force including chemical spray and other weapons.

119.   Defendants fail to appropriately supervise staff with patterns of incidents involving excessive force or abusive interactions.

120.   Defendants fail to adequately investigate incidents of use of force, fail to investigate and identify breaches of security protocol or other misconduct implicated in use of force incidents and fail to take reasonable corrective action in response to staff misconduct.

121.   Defendants fail to adequately respond to patterns of use of force against prisoners who are intoxicated, suicidal and disabled.

122.   Defendants fail to adequately respond to patterns of use of force in units housing prisoners in crisis cells or in the infirmary.

123.   Defendants fail to conduct adequate investigations after incidents of use of force, which contributes to the substantial risk of serious harm faced by prisoners at St. Clair.  Defendants fail to adequately investigate when correctional officers use force against prisoners, the circumstances giving rise to the use of force and whether the use of force was excessive under the circumstances.   Upon information and belief, incidents of use of force are rarely referred to I&I for investigation.

124.   For example, 

125.   Defendants' failure to take reasonable steps to prevent unnecessary and excessive use of force has created an environment where the risk of physical harm to prisoners is high.  This is reflected in the numerous assaults on prisoners by correctional staff who have been the subject of repeated complaints of abuse, including but not limited the following assaults:















AA.   In July 2015, Dillon Cole was assaulted by Sergeant Hamilton and Officer McQueen in the C-2 Block of segregation.  He was handcuffed behind his back, thrown to the ground and kicked by the officers.  Mr. Cole did not receive medical treatment and was held in a temporary holding cage outside the segregation unit for approximately eight hours.

BB.   In May 2015, Brandon Ladd was assaulted by Officer Fife and Officer Burns in A Block of segregation during a cell extraction.  While lying on his stomach in handcuffs and shackles, Officer Burns kicked Mr. Ladd and Officer Fife

hit Mr. Ladd repeatedly in the head with handcuffs wrapped around his fist. Mr. Ladd received stitches in the infirmary and was sent to UAB Hospital for treatment the next morning after having several seizures.  This incident occurred the same afternoon that counsel from EJI visited Brandon Ladd.

CC.   In May 2015, Terrance Seay was assaulted by Officer L. Jones and Captain Malone in A Block of segregation during a cell extraction when they hit him with the shield and stood on top of him.  Once in the infirmary, Officer Jones and Captain Malone punched Mr. Seay while he was still handcuffed.  This incident occurred the same afternoon that counsel from EJI visited Terrance Seay.  Mr. Seay was brought back to segregation and kept in the outside holding cages in the yard, handcuffed and shackled, for approximately three days.

DD.   On or about April 17, 2015, Gerald Vann was assaulted by multiple officers when he attempted to comply with orders to return to his cell. Officers beat him with batons, then picked him up and rammed him head-first into a brick wall.  Mr. Vann suffered large gashes on his head and required treatment at an outside hospital including dozens of staples to close.

EE.   On or about April 17, 2015, Darius Mines was assaulted by multiple officers who beat him with batons as he tried to comply with orders to return to his cell.  The officers continued to assault Mr. Mines after he was handcuffed, and he received multiple staples to his head as a result of these injuries.

FF.    On or about April 17, 2015, Bernard Abney was attempting to return to his cell in P Block when officers struck him in the head with a baton, threw him to the ground and struck him multiple times.  Mr. Abney suffered a broken bone in his back and required hospitalization following the assault.

GG.    On or about April 17, 2015, Maurice Green was attempting to return to his cell when he was assaulted by officers who threw him to the ground and kicked him, resulting in several of his teeth being chipped.

HH.    On or about April 17, 2015, Unteyus Stephens was assaulted by officers when he attempted to comply with orders to return to his cell.  Officers struck him with a television stand and struck him in the chin and ribs with batons. After he was handcuffed and taken out of the cell block, Defendant Malone slammed him into a wall.  Mr. Stephens required numerous stitches as a result of his injuries.

II.    In April 2015, Xabrian Austin was assaulted by Officers Tolliver and Burns following a strip search in his cell.  Mr. Austin consented to the search. After the guards searched his cell, Mr. Austin was sprayed with a chemical spray, handcuffed and taken to the shift office.  Inside the shift office, while Mr. Austin remained in restraints, the guards punched him in the face and jaw in the presence of Lt. Carter.

JJ.    In April 2015, Gerald Ingram was assaulted by officers who struck him in the rib cage with a baton.

KK.   On or about February 3, 2015, Demetric Pritchett was assaulted by two officers while handcuffed.  Mr. Pritchett had requested to see a supervisor regarding threats he was receiving from other men in the segregation cell block. Officers Jason Schmid and Patton escorted him outside his cell and took him into a hallway where they repeatedly punched him in the face.

LL.    In January 2015, Justin Jackson was assaulted by multiple officers who punched him, slammed him to the ground, kicked him and struck him with their batons, all while he was handcuffed.  The officers dragged Mr. Jackson to the infirmary, where the assault continued until Mr. Jackson was locked in a temporary holding cage.  Sergeant Cook approached him in the cage, then called Officer Howard who began to beat Mr. Jackson again, all while Mr. Jackson remained handcuffed.  Howard and Cook also struck him with their batons.

MM.  In January 2015, Shakil Gamble was beaten by multiple officers and was ordered to the shift office where he was directed to stand facing the wall. While Mr. Gamble was standing with his hands against the wall, Officer Tolliver repeatedly slammed his head into the wall.  Additional officers entered the shift office, including Lt. Carter.  Officers began to beat Mr. Gamble and strike him with their batons.  Mr. Gamble's head was also slammed against the floor.

NN.   Upon information and belief, in January 2015, Zendarius White was assaulted by officers in L Block.  Mr. White asked officers why they were harassing other inmates, and the officers responded by body-slamming Mr. White.

OO.   In December 2014, Larry Nesbitt was assaulted by four officers in the infirmary, where he was being evaluated for a toothache and high blood pressure.  Officers Howard Jr., Williams, Suggs, and Howard Sr. ordered nurses to leave the room, then slapped and punched Mr. Nesbitt, who was handcuffed throughout the assault.

PP.   On or about December 7, 2014, Antonio Johnson was assaulted by two officers when he attempted to eat in the chow hall without his identification. Mr. Johnson tried to explain his lack of identification but was ordered to go to the shift office.  As he was complying with the order, Officer Burke punched him multiple times in the face.  A second officer, Officer Bowman, approached and the two officers forced Mr. Johnson to the ground and kicked him in the head.

QQ.   On or about December 3, 2014, Marcus Webb was assaulted by Captain Gary Malone while handcuffed in the infirmary.  Mr. Webb suffered head and arm injuries as a result of this assault.

RR.   In November 2014, Tommy Demming was shoved into a wall and punched in the face while handcuffed in his segregation cell by Officer Padgett.

SS.    On or about November 3, 2014, James Howard was assaulted by Officer L. Jones while walking to the chow hall.  Officer Jones grabbed the front of Mr. Howard's shirt, picked him up and slammed him into the ground.  Officer Jones then rolled him over, handcuffed him and kicked him while he was handcuffed. Officer Jones shouted homosexual slurs during the assault.

TT.    In October 2014, Jamie Abrams, at the time a resident of the honor dorm, was beaten and cursed by Officer L. Jones, who grabbed Mr. Abrams by the neck and slammed his head against a wall.  The assault was the result of Mr. Abrams' mistakenly sitting at the wrong table during a Kairos religious program at the prison.

UU.    In October 2014, Officer L. Jones entered Matthew Owens' cell after the Kairos program, grabbed Mr. Owens by the neck and slammed his head into his bunk several times.  Mr. Owens nearly passed out while being choked. Officer Jones also threatened to kill him and shouted numerous profanities at him.

VV.    In October 2014, Joseph Royal was beaten while restrained by several officers in the segregation unit after the officers had been instructed by Captain Gary Malone to beat him.

WW. On or about October 6, 2014, Terrance Seay was assaulted by Officer L. Jones while handcuffed and in leg shackles in the barbershop.  Officer

Jones punched Mr. Seay, throwing him to the ground, then stomped on him and struck him with a broom handle.  Mr. Seay was handcuffed during the assault.

XX.   In September 2014, Arlo Townsend was beaten by Officer Burns while handcuffed and subsequently sprayed with a chemical agent.  Lieutenant Ronald Carter accompanied Mr. Townsend to the infirmary where Lt. Carter inflicted a second beating on the handcuffed Mr. Townsend, which resulted in severe injuries to his jaw, mouth and teeth.

YY.   On or about September 3, 2014, Michael Nelson, a partially-paralyzed stroke victim who relies on a wheelchair, was beaten by Officer Daniel Turner following a disagreement over a clothesline that Mr. Nelson used near his bunk in the G dorm, which is a medical dorm.  Officer Turner cursed at Mr. Nelson, threatened to kill him, then repeatedly punched him in the face and chest.  Officer Turner pushed Mr. Nelson in his wheelchair into a bathroom area, where he threw Mr. Nelson and the wheelchair into a wall, forced Mr. Nelson onto the floor, destroying his wheelchair.

ZZ.   On or about August 4, 2014, Charlie Bennett was sprayed with chemical spray, paraded through the prison naked, and not provided with proper medical treatment to remove the chemical from his body.  Officer Chad Cleveland entered Mr. Bennett's cell and ordered him to strip, squat and cough.  Mr. Bennett complied.  No contraband was found, yet Officer Cleveland ordered him to squat

106

and cough again.  Mr. Bennett again complied and again no contraband was found.

The third time Officer Cleveland ordered him to squat and cough, Mr. Bennett

refused, believing another search was excessive.  Officer Cleveland and Sergeant

Truitt then sprayed him with chemical spray and walked him naked through the

camp.

AAA. In June 2014, Demetric Pritchett was assaulted multiple times

while restrained in segregation.  The final assault occurred at the orders of Captain

Malone.  While Mr. Pritchett was restrained, an officer beat Mr. Pritchett's head and

face.

BBB. In March 2014, Tommy Demming observed Officer Bryan

Chapman beating a handcuffed inmate.  When Mr. Demming verbally intervened,

Officer Chapman opened the door to his cage and punched him three times in the

head.  Mr. Demming was handcuffed while he was assaulted.

CCC. In 2014, Captain Malone punched a prisoner, who was

handcuffed, in the head, chipping the prisoner's tooth.

DDD. In July 2014, Correctional Officers Donald Lukima and

Christopher Smith, officers on Lt. Carter's shift, beat a prisoner.  Officers Lukima

and Smith ordered the prisoner out of his cell in the middle of the night, took him

into the hallway outside his block, handcuffed him and then hit him in the back of

the head with handcuffs wrapped around their knuckles, causing injuries requiring staples.

EEE.  In May 2014, Lt. Carter put his hands around an inmate's neck and applied pressure until he lost consciousness.  The inmate had to be taken to UAB Hospital due to his injuries.

FFF.  Upon information and belief, in May 2014, Lt. Carter forced Dale Gilley to stand outside the shift office facing the wall for fourteen hours and, at one point during that period of time, slammed his head against the wall and punched him in the face.

GGG. Jermaine Tillman was assaulted in February 2013 by Officers Chad Cleveland, M. Desnides and W. Howard.  The officers assaulted Mr. Tillman when he was returning to his cell from the showers and was restrained in handcuffs behind his back.  The officers hit Mr. Tillman in the face, slammed his head into a window, and continued to punch, kick and beat him when he fell to the floor.

HHH. Upon information and belief, inmate Richardo Eason was beaten by multiple St. Clair officers while handcuffed in February 2013.  While assigned to the segregation unit, Mr. Eason was placed in handcuffs before being allowed to leave his cell for a shower.  Officer Jamychal Howard left his post and approached Mr. Eason, asked him a question, then punched Mr. Eason several times in the face.

Officers Taylor Knight and Chad Cleveland then assisted Howard in slamming Mr. Eason onto the floor.

III.    Upon information and belief, inmate Darrious Mabry was beaten by Officer Matthew Moore in October 2012.  In a dispute over Mr. Mabry leaving the dining hall with extra cake, Officer Moore left his post and attacked Mr. Mabry, who suffered a broken nose, split lip, broken tooth, injured eye and head contusions.

JJJ.    Upon information and belief, in January 2012, inmate Joseph Shack was beaten by Sgt. John Mason and suffered hearing loss as a result. Mr. Shack was handcuffed and shackled during the beating.  Sgt. Mason punched him in the head, face and ear, stomped on his back, kicked him and yelled racial epithets at him.  Mr. Shack had requested the presence of a witness at a disciplinary hearing, and Sgt. Mason responded:  "This is what I do to a [n . . . ] that tries to tell me how to do my job."  Mr. Shack was treated for a ruptured ear, fractured thumb and internal bleeding.  He was fitted for a hearing aid following the rupture.

KKK. Upon information and belief, James Bonds was beaten by officers and suffered a severe eye injury in September 2011.  Three correctional officers shook down his cell, forced him to remove clothes and to squat and cough. After they found a cell phone in his cell, the officers sprayed Mr. Bonds with a chemical agent and struck him with batons, then handcuffed him.  After Mr. Bonds was handcuffed, Officer Donald Lukima arrived at the scene and struck Mr. Bonds

in the eye while Mr. Bonds was handcuffed.   Mr. Bonds suffered a serious eye injury, including an orbital wall fracture to his left eye and massive bleeding.   His injuries required multiple treatments and surgeries at outside hospitals.

126.   Defendants know of St. Clair officers' widespread use of excessive force.   Defendants have been made aware through ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

Despite Defendants' awareness that policies and practices of excessive force exist at St. Clair, Defendants have failed to institute reforms or otherwise remedy the ongoing violations.   Defendants have further notice of the high rate of excessive force as a result of the filing of this lawsuit in 2014 and the DOJ's investigation in 2016, report in 2019 and subsequent lawsuit in 2020, detailing the numerous issues associated with officers' use of excessive force at Alabama prisons for men, including St. Clair.

## CLASS ACTION ALLEGATIONS

127.   Plaintiffs bring this action on behalf of all present and future prisoners at St. Clair Correctional Facility.   This action is brought pursuant to the Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(2).   The class meets the requirements of Rule 23 as follows:

A.      At the time of filing this Third Amended and Supplemental Complaint, there are approximately 980 prisoners confined to St. Clair Correctional Facility, who are subject to a substantial risk of harm.  The membership of this class continually changes, rendering joinder of all members impracticable.    Upon information and belief, dozens of incidents of violent and sexual assaults are filed each year.  Many more incidents go unreported.

B.      The questions of law and fact presented by the named Plaintiffs are common to all members of the class, and include whether Defendants' policies and practices subject prisoners to a substantial and unreasonable risk of significant harm.    The policies and practices include whether Defendants have failed to adequately monitor and supervise prisoners at St. Clair; whether Defendants have failed to adequately assess prisoners for risk of violence and failed to implement an adequate classification system; whether Defendants have failed to adequately enforce housing block, dorm, and cell assignments; whether Defendants have failed to monitor movement times; whether Defendants have failed to adequately investigate housing movement requests based on fear of harm; whether Defendants have failed to provide secure locking mechanisms on individual cell doors; whether Defendants have failed to adequately monitor and police the role of ADOC staff in the availability of contraband items; whether Defendants have failed to adequately train, supervise and discipline staff with a history of harassing and abusing prisoners;

111

whether supervisory Defendants have failed to adequately screen, assign, train and supervise staff; whether Defendants have failed to adequately investigate the excessive use of force by ADOC staff; whether Defendants' policies, practices and procedures contribute to the excessive use of force by ADOC staff; whether Defendants have failed to provide safe and adequate housing in segregation and whether Defendants' policies and practices have led to deliberate indifference to the risk of sexual assault.  As a result, every prisoner confined to St. Clair risks being subjected to these unlawful practices.  The claims and practices alleged in this complaint are common to all members of the class.

C.    The violations suffered by the named Plaintiffs are typical of those suffered by the class.  The entire plaintiff class will benefit from the injunctive and declaratory relief sought.

D.    Mark Duke, Michael Mays, Benny Jones, Johnny Young, Nathaniel Harris, and Robert Carlisle are presently incarcerated at St. Clair Correctional Facility.  Dale Gilley, Franky Johnson, John Miller, Allan Williams and Robert Woods have been transferred to another ADOC facility but remain at risk of transfer back to St. Clair at any time.   These named Plaintiffs will fairly and adequately protect the interests of the class.

E.    The named Plaintiffs are represented by The Equal Justice Initiative, a non-profit legal services organization with decades of experience

challenging unconstitutional conditions of confinement, and Cravath, Swaine & Moore LLP, a nationally recognized law firm with extensive experience in complex litigation and class actions.

F.    Defendants have acted, or failed to act, on grounds generally applicable to the class, thereby making injunctive relief appropriate with respect to the class as a whole.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

128.   There are no administrative remedies within the ADOC for named Plaintiffs or other members of the plaintiff class to exhaust.

## CLAIMS FOR RELIEF

### Causes of Action

### *First Claim for Relief—42 U.S.C. § 1983*

### *Cruel and Unusual Punishment—Prisoner-on-Prisoner Violence*

129.   Plaintiffs incorporate as if fully restated here paragraphs 13-49, 61-77 and 79-116 of the Complaint.

130.   Defendants, through their policies, practices, acts and omissions, exhibit deliberate indifference to the continuing real and imminent substantial risk of serious physical harm to the plaintiff class as a result of prisoner-on-prisoner violence, in violation of the right of the plaintiff class of prisoners to be free from

cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

131.   Defendants, through their policies, practices, acts and omissions, subject the plaintiff class of prisoners to unnecessary and wanton infliction of pain, and emotional and physical injury as a result of prisoner-on-prisoner violence in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

132.   With deliberate indifference to the substantial risk of serious harm to the plaintiff class as a result of prisoner-on-prisoner violence, Defendants fail to appropriately train, assign and supervise staff, subjecting the plaintiff class to substantial risk of serious bodily harm in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

*Second Claim for Relief—42 U.S.C. § 1983*

*Cruel and Unusual Punishment—Sexual Abuse*

133.   Plaintiffs incorporate as if fully restated here paragraphs 24, 35-41, 50-80, 84-85, 86((C), (E)-(H)), 87-93, 97-115 and 116(W)  of the Complaint.

134.   Defendants, through their policies, practices, acts and omissions, exhibit deliberate indifference to the continuing real and imminent substantial risk to the plaintiff class of prisoner-on-prisoner sexual abuse, in violation of the right of

the plaintiff class of prisoners to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

135.   Defendants, through their policies, practices, acts and omissions, subject the plaintiff class of prisoners to unnecessary and wanton infliction of pain, emotional injury and prisoner-on-prisoner sexual abuse in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

136.   With deliberate indifference to the substantial risk of sexual abuse to the plaintiff class, Defendants fail to appropriately train, assign and supervise staff, subjecting the plaintiff class to substantial risk of prisoner-on-prisoner sexual abuse in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

*Third Claim for Relief—42 U.S.C. § 1983*

*Cruel and Unusual Punishment—Excessive Force*

137.   Plaintiffs incorporate as if fully restated here paragraphs 117-126 of the Complaint.

138.   Defendants, through their policies, practices, acts and omissions, exhibit deliberate indifference to the continuing real and imminent substantial risk of serious physical harm to the plaintiff class by ADOC staff as a result of the use of excessive force, in violation of the right of the plaintiff class of prisoners to be free

from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

139.   Defendants, through their policies, practices, acts and omissions, subject the plaintiff class of prisoners to unnecessary and wanton infliction of pain and emotional and physical injury by ADOC staff as a result of the use of excessive force, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

140.   With deliberate indifference to the substantial risk of serious harm to the plaintiff class, Defendants fail to appropriately train, assign and supervise staff, subjecting the plaintiff class to substantial risk of serious bodily harm by ADOC staff as a result of the use of excessive force, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court, including but not limited to:

A.     Assume jurisdiction over this action;

B.     Declare that the suit is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(1) and (2);

C.     Personally conduct an unannounced inspection of St. Clair Correctional Facility and all relevant institutional records and files;

D.    Grant Plaintiffs a full trial and discovery in this matter;

E.    Adjudge and declare that the acts and omissions of Defendants with regard to the class members violate the Eighth and Fourteenth Amendments to the United States Constitution;

F.    Order Defendants to comply with the Constitution and enjoin Defendants from subjecting Plaintiffs and the class to cruel and unusual punishment;

G.    Order Defendants to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that Plaintiffs and the class suffer due to Defendants' policies, practices, acts and omissions.  The plan shall include at a minimum the following:

1.    Reporting and Investigations:  Policies and practices requiring the prompt, accurate and consistent classification, reporting of and investigations of incidents of violence and sexual assault among prisoners and between prisoners and correctional officers to the appropriate ADOC authorities;

2.    Staffing:  The immediate hiring of sufficient medical, mental health and correctional staffing to provide adequate and necessary care and security at St. Clair;

3.    Overcrowding:  The immediate reduction in the number of prisoners housed at St. Clair;

4.    Cameras:  The installation of an adequate system of camera surveillance and the implementation of policies, practices and procedures to maintain the camera surveillance system in sufficient condition to provide adequate security;

5.    Contraband:  The immediate development and implementation of policies, practices and procedures to eliminate the introduction of drugs, weapons and other contraband into St. Clair, including but not limited to policies governing the investigation into and discipline of correctional officers responsible for the introduction of drugs and contraband into St. Clair;

6.    Classification System:  The development and implementation of a classification system to adequately identify and segregate violent and non-violent offenders, as well as PREA offenders and victims, arriving at St. Clair;

7.    Segregation:  The development and implementation of policies, practices and procedures that ensure that prisoners are separated from each other as appropriate to protect their safety and that prisoners remain segregated as necessary;

8.    Locks:  The installation of working locking mechanisms and the implementation of policies, practices and procedures to maintain the locking mechanisms in sufficient condition to provide adequate security;

9.    Programming:  The development and implementation of rehabilitative, educational and vocational programming and therapeutic services; and

10.    Training:  The immediate development and implementation of policies, practices, procedures and training to reduce the excessive use of force by correctional officers against prisoners;

H.    Order a monitor to oversee Defendants' development and implementation of the plan described above and any other measures the monitor may determine is necessary to eliminate the violations of Plaintiffs' and the class's Eighth and Fourteenth Amendment rights;

I.      Award Plaintiffs reasonable attorneys' fees and appropriate costs for expert fees and collateral litigation expenses; and

J.      Order such additional relief as the Court may deem just and proper.

Respectfully submitted this November 5, 2021,

/s/ Bryan A. Stevenson
Bryan A. Stevenson
Charlotte R. Morrison
Alison N. Mollman
Sofia V. McDonald
Benjamin H. Schaefer
Equal Justice Initiative
122 Commerce Street
Montgomery, AL 36104
Telephone :  (334) 269-1803
 Facsimile:  (334) 269-1806
Email:  bstevenson@eji.org
        cmorrison@eji.org
        amollman@eji.org
        smcdonald@eji.org
        bschaefer@eji.org

/s/ Antony L. Ryan
Antony L. Ryan
Lauren M. Rosenberg
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
aryan@cravath.com
lrosenberg@cravath.com

*Counsel for Plaintiffs*

119

CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Albert S. Butler
Alabama Department of Corrections
Legal Division
301 Ripley Street
P.O. Box 301501
Montgomery, AL 36130

William R. Lunsford
Maynard Cooper & Gale PC
655 Gallatin Street
Huntsville, AL 35801

/s/ Antony Ryan
Antony Ryan

120