FILED

2024 Jun-06  PM 11:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

|  |  |  |
|---|---|---|
| | * | |
| MARK DUKE, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| vs. | * | |
| | * | Civil Action No: 4:14-cv-01952-RDP |
| | * | |
| JOHN HAMM, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

## **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

Preliminary Statement....................................................................................................1

Facts..............................................................................................................................3

I.      Background and Procedural history..................................................................3

II.     Current and Ongoing Dangerous Conditions at St. Clair ................................5

      A.     Prisoner-on-Prisoner Violence and Sexual Assault Is
            Commonplace. ......................................................................................5

      B.     St. Clair Is Severely Understaffed and "Critical" Security Posts
            Routinely Go Unfilled...........................................................................7

      C.     Many Cell Door Locks, Cameras and Call Buttons Do Not
            Work And Are Left Unrepaired.............................................................8

      D.     Prisoners Are Able To Move Around the Facility Without
            Authorization. .....................................................................................10

      E.     Drugs and Weapons Are Pervasive and Easily Acquired..........................11

      F.     Frequent Use of Force by Correctional Staff Further
            Contributes to the Culture of Violence. ..............................................12

      G.     Defendants Lack the Will to Implement Measures to Make St.
            Clair Safer .........................................................................................13

III.    Named Plaintiffs ...........................................................................................15

      A.     Mark Duke ..........................................................................................15

      B.     Nathaniel Harris ..................................................................................16

      C.     Johnny Young .....................................................................................16

      D.     Robert Carlile .....................................................................................17

      E.     Benny Jones .......................................................................................18

Legal Standard ............................................................................................................18

Argument .....................................................................................................................19

I.      Plaintiffs Meet the Rule 23(a) Requirements................................................21

      A.     Numerosity..........................................................................................21

      B.     Commonality.......................................................................................22

      C.     Typicality ...........................................................................................33

      D.     Adequacy of Representation ...............................................................35

II.     Plaintiffs Meet the Rule 23(b) Requirements. ...............................................39

Conclusion ..................................................................................................................42

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Access Now, Inc. v. Ambulatory Surgery Ctr. Grp., Ltd.,*
    197 F.R.D. 522 (S.D. Fla. 2000)................................................................36

*Austin v. Hopper*,
    15 F. Supp. 2d 1210 (M.D. Ala. 1998) ..............................................32, 40

*Baby Neal ex rel. Kantor v. Casey*,
    43 F.3d 48 (3d Cir. 1994) ................................................................40, 41

*Braggs v. Dunn*,
    317 F.R.D. 634 (M.D. Ala. 2016)...................................................... passim

*Brown v. Electrolux Home Prods., Inc.*,
    817 F.3d 1225 (11th Cir. 2016) ...............................................................22

*Bumgarner v. NCDOC,*
    276 F.R.D. 452 (E.D.N.C. 2011) ............................................................20

*Busby v. JRHBW Realty, Inc.*,
    513 F.3d 1314 (11th Cir. 2008) ...............................................................35

*Bussey v. Macon City Greyhound Park, Inc.*,
    562 F. App'x 782 (11th Cir. 2014) ..........................................................22

*Carriuolo v. General Motors Co.*,
    823 F.3d 977 (11th Cir. 2016) .................................................................23

*Chianne D. v. Weida,*
    No. 23-cv-985, 2024 WL 1743334 (M.D. Fla Apr. 23, 2024)...................19

*Clark v. Duke Univ.*,
    No. 16-CV-1044, 2018 WL 1801946 (M.D.N.C. Apr. 13, 2018) ..............37

*Coley v. Clinton,*
    635 F.2d 1364 (8th Cir. 1980) .................................................................20

*Cox v. American Cast Iron Pipe Co.*,
    784 F.2d 1546 (11th Cir. 1986) ...............................................................21

*Dujanovic v. MortgageAmerica, Inc.*,
    185 F.R.D. 660 (N.D. Ala. 1999).............................................................22

*Elisa W. v. City of N.Y.*,
    82 F.4th 115 (2d Cir. 2023) .....................................................................31

*Evans v. U.S. Pipe & Foundry Co.*,
    696 F.2d 925 (11th Cir. 1983) ................................................................21

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982)........................................................................33, 36

*Green v. Cady*,
    90 F.R.D. 622 (E.D. Wis. 1981) ........................................................30, 31

*Griffin v. Carlin*,
    755 F.2d 1516 (11th Cir. 1985) ...............................................................35

*Groover v. Prisoner Transp. Servs., LLC*,
    No. 15-cv-61902, 2018 WL 6831119 (S.D. Fla. Dec. 26, 2018)................................23

*Guifu Li v. A Perfect Franchise, Inc.*,
    No. 10-CV-01189, 2011 WL 4635198 (N.D. Cal. Oct. 5, 2011) ..............................38

*Gumm v. Ford*,
    No. 15-cv-41, 2019 WL 2017497 (M.D. Ga. May 7, 2019)........................................20

*Hughes v. Judd*,
    No. 12-cv-568, 2013 WL 1821077, at *24 (M.D. Fla Mar. 27, 2013)  ................34, 36

*Hassine v. Jeffes*,
    846 F.2d 169 (3rd Cir. 1988) ...................................................................33

*Henderson v. Thomas*,
    289 F.R.D. 506 (M.D. Ala. 2012)................................................................ passim

*Hoffer v. Jones*,
    323 F.R.D. 694 (N.D. Fla. 2017) ..............................................................20

*Hunter v. Beshear*,
    No. 16-cv-798, 2018 WL 564856 (M.D. Ala. Jan. 25, 2018)....................................20

*In re Blue Cross Blue Shield Antitrust Litig.*,
    No. 13-CV-20000, 2020 WL 8256366 (N.D. Ala. Nov. 30 2020) ............................19

*In re Consol. Non-Filing Ins. Fee Litigation*,
    195 F.R.D. 684 (M.D. Ala. 2000)...............................................................36

*Kilgo v. Bowman Transp., Inc.*,
    789 F.2d 859 (11th Cir. 1986) .............................................................21, 22

*LaMarca v. Turner*,
    995 F.2d 1526 (11th Cir. 1993) ...............................................................21

*Langley v. Coughlin,*
    715 F. Supp. 522 (S.D.N.Y. 1989)............................................................................31

*Lyons v. Georgia-Pacific Corp. Salaried Employees Retirement Plan,*
    221 F.3d 1235 (11th Cir. 2000) ........................................................................35, 38

*M.D. ex rel. Stukenberg v. Abbott,*
    907 F.3d 237 (5th Cir. 2018) ...................................................................................23

*Murray v. Auslander,*
    244 F.3d 807 (11th Cir. 2001) ................................................................................33

*Norris-Wilson v. Delta-T Grp.,*
    270 F.R.D. 596 (S.D. Cal. 2010) ............................................................................38

*Oliver v. Price,*
    No. 14-CV-2187, 2017 WL 1628550 (N.D. Ala. May 2, 2017)...............................24

*Parsons v. Ryan,*
    754 F.3d 657 (9th Cir. 2014) ...................................................................................23

*Taylor v. Flagstar Bank, FSB,*
    181 F.R.D. 509 (M.D. Ala. 1998)............................................................................33

*Valley Drug Co. v. Geneva Pharm., Inc.,*
    350 F.3d 1181 (11th Cir. 2003) ..............................................................................35

*Vega v. T-Mobile USA, Inc.,*
    564 F.3d 1256 (11th Cir. 2009) ..................................................................23, 33, 35

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011).......................................................................22, 30, 36, 40

*Williams v. Mohawk Indus., Inc.,*
    568 F.3d 1350 (11th Cir. 2009) ........................................................................22, 33

**Statutes & Rules**

Fed. R. Civ. P. 23(a) ......................................................................18, 19, 21, 31

Fed. R. Civ. P. 23(a)(1)..........................................................................................21, 22

Fed. R. Civ. P. 23(a)(2)....................................................................................22, 23, 30

Fed. R. Civ. P. 23(a)(3)..........................................................................................33, 35

Fed. R. Civ. P. 23(a)(4)..............................................................................................35

Fed. R. Civ. P. 23(b) .........................................................................................18, 39, 41

Fed. R. Civ. P. 23(b)(1)(A) ................................................................................. passim

Fed. R. Civ. P. 23(b)(2) ...................................................................................... passim

Fed. R. Civ. P. 23(g) .........................................................................................35, 36, 39

**Other Authorities**

Wright & Miller, 7AA Fed. Prac. & Proc. Civ. (3d ed. 2005) ...........................................20

3B J. Moore & J. Kennedy, Moore's Federal Practice (2d ed. 1980) ...............................20

3B Moore's Federal Practice (2d ed. 1978) ......................................................................21

5 Moore's Federal Practice (3d ed. 2011) .........................................................................35

U.S. Const. amend. VIII .................................................................................... passim

Mark Duke, Robert Carlile, Nathaniel Harris, Benny Jones and Johnny Young (collectively, the "Named Plaintiffs") respectfully submit this Memorandum of Law in support of their Motion for Class Certification.

## PRELIMINARY STATEMENT

Plaintiffs bring this case to redress the unconstitutionally dangerous conditions at St. Clair Correctional Facility ("St. Clair"), which expose all of its prisoners to a substantial risk of serious harm in violation of the Eighth Amendment. Extraordinarily high levels of violence at St. Clair have persisted for more than a decade now due to Defendants' unwillingness to change their practices and manage St. Clair in a safe and secure manner.  Among Defendants' numerous harmful practices at issue in this case are (1) allowing prisoners to move throughout the facility's housing blocks and common spaces without authorization; (2) allowing cell door locks, cell call buttons and surveillance cameras to remain broken for long periods of time without fixing them; (3) providing inadequate training to St. Clair personnel regarding prison rape prevention and official use of force; (4) assigning prisoners to housing areas without appropriate risk screening data; (5) employing cell inspection and institutional search practices that are ineffective in reducing the enormous volume of drugs and weapons in the facility; (6) not implementing an effective staffing plan to ensure that the facility's "critical posts" are always filled; and (7) conducting inadequate investigations of assaults, including encouraging victims of violence to sign prosecution waivers in order to prematurely end investigations.  Deposition testimony from St. Clair's own personnel—as well as internal ADOC correspondence, facility data trackers, incident reports and other documents Plaintiffs received in discovery—prove that these practices exist across the prison.

As a result of these practices, the men confined at St. Clair are subjected to an unreasonable threat of physical and sexual violence from other prisoners as well as unreasonable use of excessive force from the prison's correctional staff. The frequent stabbings, beatings, rapes, drug overdoses and incidents of official mistreatment that occur throughout the facility demonstrate the immediacy of the risks the prisoners continue to face while the practices endure. Named Plaintiffs are five current and former[1] prisoners at St. Clair who have experienced and observed these deplorable conditions firsthand. Defendants, who are the senior officials at ADOC and St. Clair, know there are steps they could take to make to make St. Clair safer. For example, former Deputy Commissioner of Operations Charles Daniels, recognizing the crisis at St. Clair, proposed a plan in 2019 to control unauthorized movement and conduct vigorous sweeps for contraband. But the then-St. Clair wardens refused a direct order to carry out the Daniels plan, and ADOC leadership lacks the will to implement it.

This action is well suited for certification as a class action. Plaintiffs seek declaratory and injunctive relief to remedy the unconstitutional risk of serious harm that persists at St. Clair as a result of Defendants' current and ongoing systemic practices. This action does not concern any particular prisoner's experiences or injuries, but rather addresses the pervasive danger throughout the facility. Thus, Named Plaintiffs and all members of the proposed class are similarly situated, and the relief sought by this action would be appropriate for the class as a whole. Although Defendants contend in their

---

[1] Although they have since been transferred to other facilities, Robert Carlile and Benny Jones were incarcerated at St. Clair at the time Plaintiffs filed the operative Complaint. (Dkt. No. 267 ¶ 2.) As this Court previously found, under these circumstances, the "inherently transitory" exception saves their claims from becoming moot. (Dkt. No. 261 and 1-2.) This is especially so considering the real possibility that Messrs. Carlile and Jones may be transferred back to St. Clair in the future.

summary judgment motion that class treatment is inappropriate because some prisoners have contributed to the unsafe conditions at St. Clair (Dkt. No. 418 at 5), they cite no authority that ever concluded the same and, indeed, multiple courts have directly rejected that argument.  Consequently, a class should be certified.

By this motion, Plaintiffs seek certification of a class, pursuant to Rules 23(b)(1)(A) and 23(b)(2) of the Federal Rules of Civil Procedure, consisting of all persons who are now, or will be in the future, incarcerated at St. Clair.

## **FACTS**

The facts of this case are set out in Plaintiffs' Fourth Amended and Supplemental Complaint filed February 7, 2022 ("FAC", Dkt. No. 267).

## I.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs initiated this action on October 13, 2014, by filing their Class Action Complaint to address St. Clair's "extremely high rate of prisoner-on-prisoner assaults and homicides and the dangerous conditions that facilitate the incidents and culture of violence".  (Dkt. No. 1 at 3.)  The dangerous conditions Plaintiffs identified at the facility included broken and nonfunctioning cell door locks (*id.* at 22), an insufficient risk assessment and classification system (*id.* at 25), the failure to enforce dorm assignments or adequately restrict prisoner movement (*id.* at 32), a lack of adequate rehabilitative programming and therapeutic services (*id.* at 35) and the staff's active role in profiting from the circulation of contraband among the prisoners (*id.* at 36).

On February 17, 2015, this Court denied Defendants' motion to dismiss the complaint for failure to state a claim (Dkt. No. 20 (Hopkins, J.))[2] and on February 22, 2016, Plaintiffs moved to certify a class (Dkt. No. 82).  Before Plaintiffs' motion was decided, on November 1, 2017, the parties entered into a settlement agreement pursuant to which (1) Defendants would implement reforms and remedial measures to address the unconstitutional conditions at St. Clair; (2) Plaintiffs' counsel were designated as monitors to the agreement; and (3) the Court would retain jurisdiction in the event that Plaintiffs reinstated the litigation.  (Dkt. Nos. 180, 203 ¶¶ 5-7.)  Although Plaintiffs agreed on two separate occasions to extend the expiration of their settlement agreement to give St. Clair additional time to improve its conditions (Dkt. Nos. 184, 194), by January 2021, it was clear that Defendants had failed to live up to their end of the bargain and were no longer trying to comply with the settlement agreement.  Indeed, not only did the same problems continue to plague the facility more than four years later, certain conditions had actually further deteriorated.  Plaintiffs therefore reinstated this case on April 15, 2021.  (Dkt. No. 202.)

On November 8, 2021, Plaintiffs filed their Third Amended and Supplemental Complaint (Dkt. No. 240), which Defendants moved to dismiss in part on December 8, 2023 (Dkt. No. 248).  The Court granted that motion in part as to Named Defendants whose duties and powers were not sufficiently alleged under the *Ex parte Young* doctrine, but gave Plaintiffs an opportunity to add further detail in a subsequent complaint.  (Dkt. No. 262.)  Plaintiffs filed their Fourth Amended and Supplemental

---

[2] The Court dismissed one of the ten then-Plaintiffs from the case, but denied the motion "[i]n all other respects".  (Dkt. No. 20 at 19.)

Complaint on February 7, 2022 (Dkt. No. 267) and Defendants again moved to dismiss on the same grounds as before (Dkt. No. 271). This time, the Court denied Defendants' motion in its entirety, holding that Plaintiffs had sufficiently alleged each Defendant's connection to the constitutional violations at issue as well as their authority to implement the relief sought. (Dkt. No. 283, at 18.) Since then, the parties have engaged in extensive document production, depositions and expert discovery, with the last of 12 expert depositions (and the last of over 70 total depositions) occurring on April 30, 2023.

On May 10, 2023, Plaintiffs filed their motion for class certification along with their initial evidentiary submission. (Dkt. Nos. 416, 417.) Plaintiffs submit this memorandum of law in further support of that motion.

## II.    CURRENT AND ONGOING DANGEROUS CONDITIONS AT ST. CLAIR

As demonstrated by the discovery obtained in this case, the following dangerous conditions currently exist throughout St. Clair.

### A.  Prisoner-on-Prisoner Violence and Sexual Assault Is Commonplace.

Prisoners at St. Clair are violently assaulted and sexually abused on a regular basis. The physical assault rate at St. Clair alone is substantially higher than the national average for state maximum security prisons. (SOF ¶ 97 (7.8 assaults per 100 prisoners at St. Clair in 2023 compared to 4.1 assaults per 100 across the nation).) And this only includes the violent incidents that the correctional staff correctly codes in incident reports as "inmate-on-inmate assaults"; a significant number of violent incidents are either miscoded—and therefore are not captured by the statistics—or go unreported entirely. (SOF ¶¶ 95, 103.) Moreover, due to the pervasiveness of contraband, these violent assaults often involve weapons such as knives and ice picks, and frequently result in serious injury or death. (SOF ¶¶ 99-103.) In 2021, more than one quarter of assaults

at St. Clair were so severe the victim had to be transported to an outside hospital, and in 2023, the prisoner-on-prisoner homicide rate at St. Clair was *over double* the national average for state prisons.  (SOF ¶¶ 99, 101.)

Violent incidents like these occur throughout the facility, including in ██ ███████████████. (SOF ¶ 104 (chart).)  Even the supposedly "secure" areas of the prison, like the Restrictive Housing Unit and the Special Safety Unit, experience high levels of violent incidents.  (SOF ¶ 106.)  ████████████████████ ███████████████████████████████ (SOF ¶ 105.)  High-ranking ADOC and St. Clair officers such as the former Deputy Commissioner for Operations Charles Daniels, former Inspector General Mark Fassl and former Warden III[3] Guy Noe have all testified to the extraordinarily high rates of violence at the facility.  (SOF ¶ 107.)  Although, as a condition of the 2017 settlement, St. Clair formed the "Quality Improvement Team" to address the violence, Defendants abruptly disbanded the QIT in 2022, even after its own members acknowledged that there had been a "clear trend in increasing violence at St. Clair" over the preceding year.  (SOF ¶ 98.)

Sexual abuse is also commonplace at St. Clair.  Just based on the incidents that are actually reported—Defendants' prison sexual safety expert testified that male prisoners "tend to cover up the fact that they were sexually assaulted" (SOF ¶ 110)—the data show that sexual assaults occur in every cell block and common area across the prison.  (SOF ¶¶ 115-116.)  St. Clair's Institutional PREA Compliance Manager Kevin

---

[3] At St. Clair, there is one of each Warden III, Warden II and Warden I.  Warden III is the most senior officer at St. Clair, with overall responsibility of the entire facility. (SOF ¶ 13.)  Warden II is the next most senior officer and is responsible for overseeing the safety and security of the inmate population (SOF ¶ 14.)  Warden I, the lowest-ranked warden, is primarily responsible for programming and reviewing all low-level incidents.  (SOF ¶ 15.)

Gillilan testified to knowing about approximately 20 sexual assaults occurring at the facility in the 10 months preceding his deposition.  (SOF ¶ 118.)

Many of the sexual assaults at St. Clair involve drugs, with either the victim being incapacitated by drugs or the perpetrator being under the influence of drugs. (SOF ¶ 112.)  Prisoners are routinely sexually assaulted at knifepoint (SOF ¶ 113) or by multiple assailants acting in concert (SOF ¶ 111-113, 117), and often in connection with owing the perpetrator some sort of debt (SOF ¶ 114).  On one occasion in 2023, a prisoner reported being tied up and raped by multiple prisoners in different cells multiple times.  (SOF ¶ 111.)  On another occasion in 2023, a prisoner reported that he was held against his will and repeatedly beaten, sexually assaulted and burned with cigarettes over an entire week.  (SOF ¶ 111.)  Prisoners deposed in this case have testified to being in constant fear of sexual violence at St. Clair.  (SOF ¶ 119 ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████.)

**B. St. Clair Is Severely Understaffed and "Critical" Security Posts Routinely Go Unfilled.**

St. Clair is dangerously understaffed.  According to ADOC's Quarterly Staffing Report for Q3 2023, St. Clair had a staff vacancy rate of 59.8%.  (SOF ¶ 212.) In fact, St. Clair's staffing vacancy rate has been above 53% every quarter since 2020 (SOF ¶ 213), and its staff-to-inmate ratio has been significantly worse than the national average for more than a decade (SOF ¶ 214).  Even more concerning is that St. Clair frequently lacks sufficient staff to fill even the ████████████████████████

████████████████████████████████████████

████     (SOF ¶¶ 210, 216.)   Predictably, these low staffing levels directly contribute to the pervasive violence at St. Clair:  Officers are routinely absent from the cell blocks during incidents of assault, meaning that nobody is around to intervene or prevent them from occurring (SOF ¶ 224), and nobody is around to assist prisoners once after they have been attacked (SOF ¶ 224).  Stabbings, beatings, rapes, kidnappings and other horrendous conduct go unprevented and unpunished all the time at St. Clair, in part due to lack of staffing.  (SOF ¶¶ 224, 333, 335, 343, 345-346.)

### C.  Many Cell Door Locks, Cameras and Call Buttons Do Not Work And Are Left Unrepaired.

Security devices such as cell door locks, surveillance cameras and call buttons, which are fundamental to operating a maximum-security prison, are frequently broken or otherwise not operational at St. Clair.  Multiple St. Clair officers testified ████ ████████████████████████████████████ (SOF ¶ 171), that the surveillance cameras installed in the dorms and common areas for live-feed viewing are ███████████████ (SOF ¶ 197) and that "half" of the call buttons "don't work" (SOF ¶ 168).  On a recent site visit, Plaintiffs' expert Christopher Miller observed that ████████████████████████████████████████████████ ██████ (SOF ¶173.)  Defendants' experts confirmed they, too, had seen broken locks on their site visits.  (SOF ¶ 174.)  Nevertheless, St. Clair has not hired outside contractors to repair the broken locks since 2020 (SOF ¶ 179) and has refused to obtain a maintenance contract for the real-time repair and replacement of broken locks (SOF ¶¶ 179, 182).

These broken security devices naturally contribute to the high levels of violence at St. Clair.  Without functioning locks, staff is unable "to separate inmates

when necessary and to control inmate movement when necessary".  (SOF ¶ 183.)
Because cell door locks "prevent inmates from entering cells that they are not assigned
to" (SOF ¶ 183), their large-scale state of disrepair at the facility creates a "serious
concern for the safety and security at St. Clair" (SOF ¶ 183).  Without functioning
cameras, correctional staff are unable to prevent assaults occurring in facility blind spots
(SOF ¶ 201) and are unable to properly investigate violent incidents after they have
occurred (SOF ¶¶ 202, 205).  This has led to multiple, preventable inmate assaults across
the prison.  (SOF ¶ 205.)  Without functioning call buttons, a prisoner who is "in duress",
"had a medical emergency" or otherwise "needs officer attention" will often be unable to
get the immediate help he requires.  (SOF ¶ 193.)  Moreover, functioning call buttons are
particularly important at St. Clair because its design affords only limited direct visibility
into the housing cells.  (SOF ¶ 194.)

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

**D.  Prisoners Are Able To Move Around the Facility Without Authorization.**

Prisoners are generally able to move between housing blocks and common areas without authorization or accompaniment by staff.  Such unauthorized movement is both ██████████████████████████████████ and considered to be a main driver of violence at the facility by St. Clair staff and Defendants' own experts (SOF ¶¶ 131, 133, 151).  According to the testimony of numerous members of St. Clair's security staff, prisoners sleep in areas to which they are not assigned "every day" (SOF ¶ 133); the prisoners "just walk in" to the unauthorized areas (SOF ¶ 133); "we've had incidents where inmates . . . don't live in a dormitory but have resided there for several weeks" (SOF ¶ 133).  According to the testimony of prisoners at St. Clair, "[e]verything is wide open.  There not no where you can't go" (SOF ¶ 133).

According to a recently retired captain at St. Clair, the reasons for this free flow of movement are many, including that the correctional officers are ████████████ ██████████████████████████████████ (SOF ¶ 134.)  Although St. Clair has a written policy requiring prisoners to use colored wristbands so that staff can identify the prisoners who are out of place (SOF ¶ 137), Defendants have admitted that the policy is totally unenforced:  "[a]ll prisoners currently are not wearing wristbands" (SOF ¶ 141) and ████████████████████████████(SOF ¶ 141).  Nor do Defendants enforce the bed roster count policy, essentially enabling prisoners to sleep in whichever area of the prison they want without consequence.  (SOF ¶¶ 143, 147, 148.)  St. Clair's Classification Specialist Philip Cox testified that "many times" prisoners will actually go to another person's cell and kick him out, forcing him to sleep in a different housing unit or common area.  (SOF ¶ 149.)

This high volume of unauthorized movement leads to violent incidents, including stabbings and sexual assaults, in all areas of the prison.  That is because, as former Regional Director Edward Ellington explained, if an inmate is "going to fight, they're not going to fight the inmates they're living with . . . it's going to be another guy in another block."  Just a few representative examples of the incidents connected to unauthorized movement include:

- In January 2023, a prisoner assigned to the ████████ was assaulted and robbed near the entrance of the ████████ by four prisoners assigned to █, █ and █ Blocks.  (SOF ¶ 151.)

- In February 2023, a prisoner assigned to █-Block was found lying on the floor of that unit, bleeding, after six other prisoners assigned to four other cell blocks violently assaulted the man.  (SOF ¶ 151.)

- In June 2023, a prisoner assigned to █-Block was discovered in █-Block after being held against his will and repeatedly sexually assaulted there for over two weeks.  (SOF ¶ 151.)

- From June 21 to June 29, 2023, a prisoner assigned to █-Block repeatedly sexually assaulted another prisoner in █-Block.  (SOF ¶ 151.)

**E. Drugs and Weapons Are Pervasive and Easily Acquired.**

The presence of contraband such as weapons and illegal drugs is pervasive at St. Clair.  A 2021 analysis of the facility found drug usage to be ████████ ████████.  (SOF ¶ 275.)  During the third quarter of 2023 alone, more than 2,100 grams of illegal drugs were discovered.  (SOF ¶ 281.)  Of course, this figure represents only a small fraction of the drugs circulating at the prison, given that Defendants have not undertaken a full institutional sweep of St. Clair since 2019 (SOF ¶¶ 276, 280) and the searches that actually are conducted are neither frequent nor thorough (SOF ¶¶ 288-291).  As Named Plaintiff Benny Jones testified, "You see drugs and stuff [in] basically all the blocks."  (SOF ¶ 287.)  And as Named Plaintiff Johnny

Young testified, when discussing drugs at the facility, "I see guys laying out everywhere in the prison.  And I see guards passing them by like it's something normal."  (SOF ¶ 287.)  According to Lieutenant Price, drug overdoses occur daily at St. Clair (SOF ¶ 318),

████████████████████████████████████████████████████ (SOF ¶ 319).

These drugs enter the facility through several avenues, including through St. Clair's own staff.  (SOF ¶ 295.)

Weapons are also pervasive at St. Clair.  During the third quarter of 2023 alone, 65 knives and 122 other weapons were confiscated.  (SOF ¶ 281.)  The weapons circulating at St. Clair are both prisoner made and "free world" (*i.e.*, smuggled in from outside the facility), and ADOC Commissioner John Hamm testified in December 2023 that there has been a recent "uptick in free-world weapons coming in" to St. Clair.  (SOF ¶ 284.)  Warden III Phillip Mitchell similarly testified that finding approximately 100 weapons during an institutional search at St. Clair was "nothing" out of the ordinary (SOF ¶ 285) and Warden II Darrel Fox called that "a low number" because he believes "fifty percent" of the prisoners at St. Clair have a weapon (SOF ¶ 286).  These weapons are frequently used in assaults at St. Clair, often leading to serious injuries or death. (SOF ¶¶ 308-309, 311-312, 314, 337.)

### F.  Frequent Use of Force by Correctional Staff Further Contributes to the Culture of Violence.

St. Clair correctional officers regularly use unnecessary and/or excessive force when dealing with prisoners.  Groups of officers will often team up against a single prisoner (SOF ¶¶ 121, 125), and officers frequently attack prisoners who are already handcuffed or otherwise restrained (SOF ¶¶ 121, 125).  It is also common for officers to use a burn-inducing chemical spray against prisoners who do not pose a threat of

violence, sometimes deploying the chemical indiscriminately at large groups of prisoners. (SOF ¶¶ 122-123.)  Multiple St. Clair personnel testified to using force against prisoners for reasons such as "when an inmate do[es] not do what he is asked to do", "being disrespectful", "█████████████████████████" or for simply "walking behind" an officer.  (SOF ¶ 233.)  These practices have created an environment in which officers use force as a way to punish and retaliate against prisoners who agitate officers with their behavior, even when those prisoners pose no risk of actual harm.  (SOF ¶ 237.)  Many times these incidents result in severe injuries to the prisoners, requiring treatment in the prison infirmary or even at outside hospitals.  (SOF ¶¶ 234-235.)  Discovery in this case has uncovered numerous gruesome examples of officer-on-inmate assaults across the entire prison, including instances of officers jumping on prisoners, beating them with sticks while handcuffed and even "com[ing] close to killing" some inmates.  (SOF ¶ 235.)  And because officers are responsible for either self-reporting their own uses of force or reporting their fellow officers' uses of force, the real number of these incidents is much higher than the data reflect.  (SOF ¶ 238.)

### G.  Defendants Lack the Will to Implement Measures to Make St. Clair Safer

Defendants' testimony demonstrates their detailed knowledge of the deplorable conditions at St. Clair, including the extreme physical and sexual violence (SOF ¶¶ 98, 107, 118), abundance of drugs and weapons (SOF ¶¶ 275, 284-286, 294-296), broken locks (SOF ¶¶ 168, 171, 184), broken call buttons (SOF ¶ 189), non-functional cameras (SOF ¶ 199), low staffing levels (SOF ¶¶ 215-216), unauthorized movement (SOF ¶¶ 133-135, 141) and prevalence of excessive force (SOF ¶ 233). Despite making a commitment to address these issues as part of the 2017 settlement agreement in this case, Defendants have repeatedly chosen not to implement basic

reforms to improve the safety and living conditions of the people incarcerated at St. Clair. Recognizing these failures, former ADOC Deputy Commissioner of Operations Charles Daniels proposed a plan in 2019 to help St. Clair right its course.  (SOF ¶¶ 153-156, 220-222, 276, 279.)  Daniels' "Short-Term/Mid-Term Plan for St. Clair Correctional Facility" offered a blueprint for, among other things, controlling inmate movement, efficiently utilizing remaining staff and limiting the spread of contraband at St. Clair.  (SOF ¶¶ 153-156, 220-222, 276, 279.)

Although Daniels directly ordered St. Clair's wardens to implement the plan (SOF ¶ 157), ███████████████████████████████████████ ███████████████████████████████ (SOF ¶ 158). ██████████████ ██████████████████████████████████████████████ ███████████████████████████████████████████████████ (SOF ¶¶ 158.) ████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████████████ ██████████████████████ (SOF ¶ 159.)  When Daniels resigned from ADOC in December 2019 to take another job, he continued to believe that St. Clair would benefit from the plan, a sentiment he maintained at his deposition in December 2023.  (SOF ¶ 160.) ███████████████████████████████████████████ ████████████  The solutions outlined in the Daniels plan are as relevant now as they were in 2019, ████████████████████████████████████████ ██████████████████████.  (SOF ¶ 161.)  Rather, Defendants' common refrain has

been that they cannot take any positive steps toward improving St. Clair without a dramatic increase in staffing—the Daniels plan rejects this excuse out of hand by reference to Secretary of Defense Donald Rumsfeld's famous quote:  "You go to war with the Army you have, not the Army you might want or wish to have at a later time." (SOF ¶ 155.)

And as discussed above, in 2022, Defendants abruptly disbanded the Quality Improvement Team, one of the few concrete initiatives to address the problems at St. Clair.  (SOF ¶ 98.)  The fact that this was done soon after concluding there was a "clear trend in increasing violence at St. Clair" from November 2021 to November 2022, further demonstrates Defendants' lack of will to improve the facility's conditions.  (SOF ¶ 98.)

## III.    NAMED PLAINTIFFS

Each of the Named Plaintiffs has experienced the dangerous conditions present at St. Clair discussed above, and each has suffered physical harm or is in immediate danger of suffering physical harm as a result of those conditions.

### A.  Mark Duke

Mark Duke has been incarcerated at St. Clair since August 2012.  (SOF ¶ 19.)  Since arriving at St. Clair, Mr. Duke has been assigned to various housing units including J-Block, K Block, L-Block, P-Block, the RHU (A-Block and C-Block) and, since 2020, the Honor Dorm.[4]  (SOF ¶¶ 21-22.)  On July 17, 2013, Mr. Duke was stabbed

_____

[4] ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████    .  (SOF ¶ 23.)  Mr. Duke has also been a

victim of and witness to officer-on-prisoner excessive force, has witnessed prisoner-on-

prisoner violence throughout St. Clair, has observed contraband in the hands of both

prisoners and staff throughout St. Clair and is aware of multiple instances of sexual

violence that have occurred across the prison.  (SOF ¶¶ 24-28.)  Mr. Duke has also

observed broken and damaged cameras throughout the facility  .  (SOF ¶ 29.)

### B.  Nathaniel Harris

Nathaniel Harris has been incarcerated at St. Clair since February 2020.

(SOF ¶ 34.)  Mr. Harris was assigned to M-Block when he first arrived and currently

lives in J-Block.  (SOF ¶¶  35-36.)  Mr. Harris has been a victim of several instances of

prisoner-on-prisoner violence.  (SOF ¶¶  37.)  In October 2023, two prisoners entered

Mr. Harris's cell with weapons and cut him across the face and mouth.  (SOF ¶ 37.)

Mr. Harris has witnessed officer-on-prisoner excessive force throughout St. Clair. (SOF

¶ 38.)  Mr. Harris has also seen drugs, weapons, █████████████ and damaged locks

throughout St. Clair.  (SOF ¶¶ 39-40.)  Although St. Clair purportedly requires prisoners

to wear color-coded wristbands to prevent unauthorized movement, Mr. Harris has not

been issued a wristband in over three years at the facility.  (SOF ¶ 41.)  When Mr. Harris

arrived at St. Clair, he did not meet with a classification specialist or receive any PREA

documentation.  (SOF ¶ 42.)

### C.  Johnny Young

Johnny Young has been incarcerated at St. Clair since February 2020

(SOF ¶ 47.)  Mr. Young was also incarcerated at St. Clair from November 2016 to 2018,

and for several shorter periods prior to that.  (SOF ¶ 48.)   During his time at St. Clair,

Mr. Young has been housed in various units, including Q-1 ████, J-Block, K-Block, ████ and segregation, and he currently lives in the Honor Dorm. (SOF ¶¶ 49-50.) In 2021, Mr. Young was assaulted with a hatchet in K-Block by another prisoner. (SOF ¶ 51.) Mr. Young has also witnessed numerous instances of prisoner-on-prisoner violence and officer-on-prisoner excessive force throughout St. Clair (SOF ¶¶ 52-53) and has seen contraband and drugs across the facility. (SOF ¶ 54.)

### D. Robert Carlile

Robert Carlile was incarcerated at St. Clair for over 22 years. (SOF ¶ 59.) In 2022, Mr. Carlile was released from St. Clair ████████████████ ████ and is currently out on parole. (SOF ¶ 62.) Under the conditions of his parole, Mr. Carlile cannot leave the state of Alabama, drink alcohol or use drugs; any violation of these terms could result in his return to St. Clair. (SOF ¶¶ 62-63.) While incarcerated at St. Clair from 2020 to 2022, Mr. Carlile lived in M-Block, the Honor Dorm, ████ and F-Block ████████ (SOF ¶ 64.) During that time, Mr. Carlile was slammed against walls and otherwise handled roughly by various correctional officers, and witnessed numerous severe instances of officer-on-inmate excessive force. (SOF ¶ 66.) Mr. Carlile also saw multiple instances of inmate-on-inmate violence at St. Clair, including the stabbing of Plaintiff Benny Jones and other stabbings and fights with sticks and knives. (SOF ¶ 65.) Mr. Carlile has observed many inmates move into cells other than their assigned cells and in housing blocks to which they were not assigned. (SOF ¶ 68.) He has also observed broken cell door locks and call buttons that have gone unfixed for long periods of time. (SOF ¶ 71.)

### E.  Benny Jones

Benny Jones was incarcerated at St. Clair for over thirty years.  (SOF ¶ 77-78.)  Currently, Mr. Jones is incarcerated at Limestone Correctional Facility, but understands that he could be transferred back to St. Clair at any time.  (SOF ¶ 79.)  During his most recent stretch at St. Clair, beginning in 2007, Mr. Jones was housed in numerous units, including J- Block, L-Block and N-Block.  (SOF ¶ 80.)  In April 2021, Mr. Jones was stabbed by another prisoner in a common area during pill call, requiring free world hospitalization for his injuries.  (SOF ¶ 81.)  In February 2020, Mr. Jones was assaulted by another prisoner inside of Jones's own cell.  (SOF ¶ 82.)  Mr. Jones has witnessed numerous instances of prisoner-on-prisoner violence and officer-on-prisoner excessive force throughout St. Clair.  (SOF ¶¶ 83, 85.)  Mr. Jones is also aware of numerous instances of sexual assault at St. Clair and has witnessed contraband and drugs across the facility.  (SOF ¶ 84, 86-89.)

## LEGAL STANDARD

This case should be certified as a class action because it satisfies the prerequisites of Rule 23(a) and at least one of the subsections of Rule 23(b).  Class certification is proper under Rule 23(a) so long as

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  And a court may certify a class action under Rule 23(b) either where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is

appropriate respecting the class as a whole", Fed. R. Civ. P. 23(b)(2), or where

"prosecuting separate actions by or against individual class members would create a risk

of . . . inconsistent or varying adjudications with respect to individual class members that

would establish incompatible standards of conduct for the party opposing the class", Fed.

R. Civ. P. 23(b)(1)(A).[5]

## **ARGUMENT**

Class certification is necessary and appropriate in this action. The

proposed class consists of individuals who are now, or will be in the future, incarcerated

at St. Clair. Each member of this proposed class is or will be exposed to the substantial

risk of serious bodily harm resulting from Defendants' deficient and dangerous facility-

wide practices. The proposed class and class representatives therefore satisfy all four

requirements of Rule 23(a). Furthermore, Plaintiffs are seeking resolution of systemic

practices, which is an appropriate application for class-wide injunctive relief under

Rule 23(b)(2).

"Rule 23(b)(2) has been liberally applied in the area of civil rights,

including suits challenging conditions and practices at various detention facilities."

---

[5] Plaintiffs must also demonstrate that they satisfy the threshold issues of Article III standing for at least one named class representative as well as the "ascertainability" of the class. *In re Blue Cross Blue Shield Antitrust Litig.*, No. 13-CV-20000, 2020 WL 8256366, at *7-8 (N.D. Ala. Nov. 30 2020). Because Named Plaintiffs Mark Duke, Nathaniel Harris and Johnny Young are currently incarcerated at St. Clair and continue to be subjected to a substantial risk of serious physical and sexual harm as a result of Defendants' deficient practices, they have standing to raise the claims in this case. *See id.* at *7 (identifying the elements of Article III standing). Although several courts in this Circuit have indicated that "the ascertainability requirement does not apply to Rule 23(b)(2) injunctive-relief classes", *Braggs v. Dunn*, 317 F.R.D. 634, 671-73 (M.D. Ala. 2016); *see also Chianne D. v. Weida*, No. 23-cv-985, 2024 WL 1743334, at *11 n.9 (M.D. Fla Apr. 23, 2024) ("The court notes that some district courts have questioned whether the ascertainability requirement applies to classes certified under Rule 23(b)(2)."), the proposed class is sufficiently ascertainable because the Court will easily be able to determine "by reference to objective criteria" the people who are incarcerated at St. Clair at any point in time. *See Blue Cross*, 2020 WL 8256366, at *8.

*Braggs v. Dunn*, 317 F.R.D. 634, 667 (M.D. Ala. 2016) (quoting *Bumgarner v. NCDOC*, 276 F.R.D. 452, 457 (E.D.N.C. 2011)); *see also* Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1776 (3d ed. 2005) (discussing the range of civil-rights actions certified pursuant to Rule 23(b)(2), and explaining that "the class suit is a uniquely appropriate procedure in civil-rights cases").  Courts in this Circuit routinely certify class actions in the context of prisoners' rights and conditions of confinement.  *See, e.g.*, *Hoffer v. Jones*, 323 F.R.D. 694, 700 (N.D. Fla. 2017) (certifying class in case challenging Florida Department of Corrections' unconstitutional policies and practices respecting prisoners with Hepatitis C); *Braggs*, 317 F.R.D. at 673-74 (certifying class in case challenging constitutionally inadequate mental-healthcare policies and practices for prisoners in ADOC facilities); *Henderson v. Thomas*, 289 F.R.D. 506, 508, 512 (M.D. Ala. 2012) (certifying class in case challenging ADOC's discriminatory segregation policies for HIV-positive prisoners); *see also Gumm v. Ford*, No. 15-cv-41, 2019 WL 2017497, at *1, *13 (M.D. Ga. May 7, 2019) (certifying settlement class in case challenging prison conditions and practices); *Hunter v. Beshear*, No. 16-cv-798, 2018 WL 564856, at *1, 19 (M.D. Ala. Jan. 25, 2018) (certifying settlement class in case challenging systemic practices for pretrial detainees).

Moreover, courts have observed that class actions are a superior method of litigating actions seeking to remedy unconstitutional prison conditions because they allow for the ability to implement a remedy efficiently and consistently, and to prevent potential difficulties such as inconsistent judgments from multiple proceedings.  *See, e.g.*, *Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980) (class actions are an "especially appropriate vehicle for civil rights actions seeking" prison reform (citing 3B J. Moore & J. Kennedy,

Moore's Federal Practice ¶ 23.40(1) (2d ed. 1980))); *see also LaMarca v. Turner*, 995

F.2d 1526, 1541-42 (11th Cir. 1993) (finding injunctive relief appropriate in

unconstitutional conditions of confinement class action based on prison officials' failure

to protect prisoners from assaults by other prisoners, brought on behalf of all present and

future prisoners at Glades Correctional Institution).

> For the forgoing reasons, this action is particularly well suited to be

certified as a class action.

## I.    PLAINTIFFS MEET THE RULE 23(a) REQUIREMENTS.

> The moving Plaintiffs satisfy the numerosity, commonality, typicality and

adequacy of representation requirements of Rule 23(a).

### A.    Numerosity

> Rule 23(a)(1) requires that the class be so numerous that joinder of all

members is impracticable.  Practicability of joinder "depends on many factors,

including . . . size of the class, ease of identifying its numbers and determining their

addresses, facility of making service on them if joined, and their geographic dispersion".

*Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986) (upholding district

court's determination that numerosity requirement was met where there were thirty-one

individual class members, in addition to "future and deterred job applicants, which of

necessity cannot be identified").  The Eleventh Circuit has recognized that classes

consisting of more than forty members are generally considered to satisfy Rule 23(a)(1).

*Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (citing 3B

Moore's Federal Practice ¶ 23.05[1] at n.7 (2d ed. 1978)).  Plaintiffs "need not show the

precise number of members of the class", *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d

925, 930 (11th Cir. 1983), and the "court may make common sense assumptions to

support a finding of numerosity", *Dujanovic v. MortgageAmerica, Inc.*, 185 F.R.D. 660, 666 (N.D. Ala. 1999) (internal quotations omitted).

The proposed class in this case easily meets the numerosity requirement of Rule 23(a)(1). There are currently around 1,000 men incarcerated at St. Clair. (SOF ¶ 1.) All of these men, along with future prisoners at St. Clair, would be members of the class, rendering joinder impracticable. Joinder is further impracticable because an unknown number of class members will be transferred into the facility. This "fluid nature of a plaintiff class . . . in the prison-litigation context" supports the satisfaction of the numerosity requirement. *Henderson*, 289 F.R.D. at 510 (citing *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986)).

### B. Commonality

Rule 23(a)(2) requires "a plaintiff to show that there are questions of law or fact common to the class" and "that the class members have suffered the same injury". *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (internal quotations omitted). The Eleventh Circuit has characterized the commonality requirement as a "low hurdle", *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009), and "for purposes of Rule 23(a)(2), even a single common question will do", *Wal-Mart*, 564 U.S. at 359. The commonality prerequisite is satisfied as long as the common contention has the capacity to "generate common *answers* apt to drive the resolution of the litigation". *Id.* at 350. Said otherwise, "[a] question is common when 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1238 (11th Cir. 2016) (quoting *Wal-Mart*, 131 S. Ct. at 2551)); *see also Bussey v. Macon City Greyhound Park, Inc.*, 562 F. App'x 782, 788 (11th Cir. 2014) ("Commonality requires that there be at

22

least one issue whose resolution will affect all or a significant number of the putative

class members"). However, Rule 23(a)(2) "demands only that there be questions of law

or fact common to the class. This part of the rule does not require that all the questions of

law and fact raised by the dispute be common." *Vega v. T-Mobile USA, Inc.*, 564 F.3d

1256, 1268 (11th Cir. 2009); *see also Carriuolo v. General Motors Co.*, 823 F.3d 977,

984 (11th Cir. 2016) ("even a single common question will" satisfy the commonality

requirement).

For a claim based on a "risk-of-harm" theory, such as the three claims in

this case, commonality is demonstrated where the plaintiff alleges that "every inmate

suffers exactly the same constitutional injury when he is exposed to a single statewide . . .

policy or practice that creates a substantial risk of serious harm". *Parsons v. Ryan*, 754

F.3d 657, 678 (9th Cir. 2014); *see also M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237,

271 (5th Cir. 2018) ("[W]e conclude that the State's policies with respect to caseload

management, monitoring, and oversight violate plaintiffs' right to be free from a

substantial risk of serious harm on a class-wide basis[.]"). Moreover, courts in this

Circuit have acknowledged the applicability of risk-of-harm class actions in the Eighth

Amendment context. *See, e.g.*, *Groover v. Prisoner Transp. Servs., LLC*, No. 15-cv-

61902, 2018 WL 6831119, at *11 (S.D. Fla. Dec. 26, 2018) ("Defendants dispute that

Plaintiff has satisfied the commonality requirement, contending that the conditions of

proposed class members' transports may have varied. Defendants' point is misguided, as

Plaintiff's claims are focused on USC's policies or practices relating to transporting

individuals. Those policies and practices exposed transportees to the same risks.");

*Braggs*, 317 F.R.D. at 654 ("If, as plaintiffs claim, defendants provide inadequate

numbers of mental-health care providers and thereby subject all prisoners with serious

mental illnesses to a substantial risk of serious harm, then all class members can claim an

actual injury[.]").

Here, Plaintiffs challenge a number of Defendants' common practices that

expose all class members to substantial risk of serious harm, including prisoner-on-

prisoner violence, prisoner-on-prisoner sexual abuse and staff-on-prisoner excessive

force. Questions of both fact and law presented by Plaintiffs are common to all members

of the class, and the entire class would benefit from the injunctive relief sought in this

case. These questions include, generally, whether, under the Eighth Amendment,

Defendants' practices—both individually and as "mutually enforced" by each other[6]—

expose all class members to a substantial risk of serious harm. More specifically,

questions common to the class include:

<u>Common Questions of Fact</u>

- Whether Defendants have a practice of allowing prisoners to move between the facility's housing blocks and common areas without authorization;

- Whether Defendants have a practice of allowing cell door locks, cameras and call buttons to remain broken or damaged for long periods of time without prompt repair;

- Whether Defendants have kept in place and continue to follow staffing policies that do not adequately account for St. Clair's dangerously low staffing levels;

- Whether Defendants have a practice of providing inadequate training to St. Clair personnel regarding PREA Standards and appropriate use of force;

---

[6] "It is clear that prisoners can make out an Eighth Amendment confinement violation based on the totality of multiple conditions, rather than demonstrating that each objectionable condition individually is unconstitutional." *Oliver v. Price*, No. 14-CV-2187, 2017 WL 1628550, at *12 (N.D. Ala. May 2, 2017) (citing cases).

- Whether Defendants have a practice of assigning prisoners to cell blocks without pertinent classification information;

- Whether Defendants' cell inspection and institutional search practices are ineffective in limiting the possession of contraband in the facility; and

- Whether Defendants have a practice of inadequately investigating incidents of violence at St. Clair, including a practice of encouraging victims to sign prosecution waivers in order to prematurely end investigations.

Common Questions of Law

- Whether Defendants' adherence to some or all of the above practices constitute deliberate indifference to the risk that inmates at St. Clair will be subjected to prisoner-on-prisoner violence, in violation of the Eighth Amendment;

- Whether Defendants' adherence to some or all of the above practices constitute deliberate indifference to the risk that inmates at St. Clair will be subjected to sexual violence, in violation of the Eighth Amendment; and

- Whether Defendants' adherence to some or all of the above practices constitute deliberate indifference to the risk that inmates at St. Clair will be subjected to officers using excessive force, in violations of the Eighth Amendment.

Each of these questions is amenable to proof and resolution on a classwide basis.



**Unauthorized Movement.** ████████████████████████

████████████████████████████████████████████████████

██████████████████ (SOF ¶ 129), Defendants have a practice of ignoring this rule and

allowing prisoners to move in an uncontrolled manner throughout the facility.  Numerous

St. Clair officers testified that prisoners roam from dormitory to dormitory (SOF ¶ 133)

while security staff do nothing to check whether the prisoners are entering areas to which

they are not assigned (SOF ¶¶ 134-135).  ████████████████████████

████████████████████████████████████████████

████████████████████████████████████ (SOF ¶¶ 134-135.)  Staff

also typically do not pay attention to prisoner movement during high-activity periods

such as meal times, work call, pill call and mail call (SOF ¶ 135), which is especially problematic because multiple dorms are often "let out" together during these times (SOF ¶ 135). To the extent there are written procedures that are supposed to curtail unauthorized movement, Defendants' practice is not to follow them: Defendants do not enforce St. Clair's written policy of using colored wristbands to identify which prisoners are out of place (SOF ¶¶ 136-142); Defendants do not require staff to properly conduct bed roster counts (SOF ¶¶ 143-149); and Defendants do not require staff to document, report or discipline unauthorized movement (SOF ¶ 150). Defendants' practice of allowing uncontrolled inmate movement consistently results in violent incidents between prisoners assigned to different housing units. (SOF ¶ 151.)

**Broken Security Devices.** ███████████████████

███████████████████████████████████

█████████████████████████████ (SOF ¶¶ 163-164), Defendants have a practice of leaving these security devices in disrepair for long periods of time without fixing them. Testimony from high-ranking officers at St. Clair confirms that these inspections are not conducted daily ████████████ ███ (SOF ¶¶ 165, 167-168) and that inspection forms are routinely ignored or filled out improperly (SOF ¶¶ 166, 169). St. Clair officials and Defendants' experts have also testified that many cell door locks are broken or obstructed. (SOF ¶¶ 171, 174.) Yet even though Defendants are aware of the numerous broken cell door locks throughout the facility, they have consistently delayed in getting them fixed or replaced (SOF ¶¶ 175-176, 179-182) and have refused to retain a company that could provide ongoing lock maintenance (SOF ¶¶ 179, 182). Testimony also reveals Defendants are aware that many

call buttons and cameras are not operational and consistently choose not to repair them. (SOF ¶¶ 189, 192, 197, 199.)  Defendants' practice of not promptly fixing these broken security devices has predictably resulted in numerous preventable violent incidents across the prison.  (SOF ¶¶ 184-185, 195, 205.)

**Inadequate Staffing Policies.** ███████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ (SOF ¶¶ 209-210.)  These benchmarks notwithstanding, recent Quarterly Staffing Reports disclose that St. Clair's staff vacancy rate has been over 53% for several years (SOF ¶¶ 212-213) and testimony from St. Clair witnesses shows that even the mandatory "critical posts" often go unfilled (SOF ¶¶ 215-216).  Discovery in this case further reveals that many violent incidents occur in areas of the prison where no officers are positioned due to staffing shortages.  (SOF ¶ 224.)  In light of the dangers these low staffing numbers create, Defendants should revise St. Clair's staffing plan to use available personnel in a way that will adequately address the facility's security needs.  However, Defendants have so far refused to revise St. Clair's staffing plan to address these issues (SOF ¶¶ 217-219) ████████████████

████████████████████████████████████████████ (SOF ¶¶ 220, 223).

**Inadequate Training on Use of Force and Sexual Assaults.**  Despite St. Clair's written policies regarding use of force against prisoners (SOF ¶¶ 225-230, 240-243) and the prevention, detection and reporting of sexual assault (SOF ¶¶ 240-243), Defendants have a practice not to adequately train correctional staff on either subject. Regarding use of force, Defendants do not train St. Clair officers on *when* it is

appropriate to use force or in *how much* force is permissible to use.  (SOF ¶¶ 231-232.)
On the contrary, St. Clair officers are improperly trained to "not hesitate" to use force,
and that it is their "duty" to use force on the job.  (SOF ¶ 231.)  Testimony from
St. Clair's own staff indicates that this inadequate training has led officers to use
excessive force when no force is justified (SOF ¶¶ 233-234, 236) and as a way to punish
or retaliate against prisoners who agitate officers with their behavior, even when those
prisoners pose no risk of actual harm (SOF ¶ 237).  Regarding sexual assault, Defendants
have placed individuals in PREA-specific posts who have no prior training or experience
in that area.  (SOF ¶ 248.)  Moreover, testimony from these individuals confirm their
inability to carry out the essential functions of their roles, which have now largely been
confined in practice to filling out and compiling paperwork in anticipation of PREA
audits.  (SOF ¶¶ 246, 249-250.)

   **Premature Housing Assignments.**  Prior to making either an initial
housing assignment or a change in an existing assignment, St. Clair's written policy
requires the Internal Classification Board ("ICB") to review all pertinent classification
information.  (SOF ¶ 253.)  The purpose of this procedure is to identify the particular
needs and risks associated with the individual being assigned to ensure that he is placed
in an appropriate environment.  (SOF ¶ 251, 254.)  In practice, however, Defendants
permit housing assignments without consideration of pertinent classification information.
For example, prisoners are often housed in contravention of their PREA designations
(SOF ¶¶ 258-259, 263) and without considering relevant gang-affiliation information
(SOF ¶¶ 265-269).  Moreover, testimony from the ICB Chairman demonstrates that the
ICB has regularly permitted the Inmate Control Systems ("ICS") Officer to make the

housing assignments even though he is generally not privy to relevant classification information.  (SOF ¶¶ 256, 260-261.)  As a result of these practices, there have been numerous instances of preventable sexual assaults and gang-related violence.  (SOF ¶¶ 264, 269.)



**Cell Inspection and Institutional Searches.**

(SOF ¶ 270.)

(SOF ¶¶ 270, 272)

(SOF ¶ 270-271).  In practice, however, Defendants employ search protocols that are ineffective in limiting the possession of contraband.  Multiple St. Clair officers testified that institutional searches are conducted infrequently and in a cursory manner.  (SOF ¶¶ 288-291.)  Defendants also commonly allow staff to enter the facility without being searched, patted or scanned.  (SOF ¶¶ 298, 300-303.)  And there are no protocols in place to search for and recover the weapons used in assaults or the drugs connected with overdoses.  (SOF ¶¶ 294, 305-307.)  As a result of these deficient search practices, the levels of drugs and weapons (free world *and* manmade) entering and circulating throughout St. Clair are extraordinarily high (SOF ¶¶ 281-287, 292-293), leading to stabbings and overdoses throughout the prison (SOF ¶¶ 308, 310-311, 314-315, 318-320).

**Inadequate Investigations.**  Defendants have a widespread practice of conducting inadequate investigations of alleged assaults at St. Clair.  For example, the evidence demonstrates that victims are encouraged to sign prosecution waivers in order to

prematurely end investigations into incidents of violence and sexual assault.  (SOF

¶¶ 325-330.)  Additionally, Defendants do not require their officers to search for

contraband that was involved in violent incidents or overdoses (SOF ¶¶ 294, 305-307)

and they permit investigators to close cases without testing available DNA evidence or

evaluating other physical evidence left at the scene (SOF ¶ 340).  And there is an

entrenched practice not to adequately identify, investigate or report incidents involving an

officer's use of force against prisoners.  (SOF ¶¶ 341-346.)  As a result of these

inadequate investigations, perpetrators are rarely identified and even more seldom

appropriately disciplined, ultimately preserving the culture of violence that pervades St.

Clair.

   The foregoing—as documented in the extensive record reflected in the

accompanying Statement of Facts—represents significant, concrete evidence that the

practices Plaintiffs challenge are widespread and systemic at St. Clair.  Whether those

practices expose class members to a substantial risk of harm is also a common question

sufficient to satisfy commonality.  Having proffered at least one common question whose

answer is apt to drive the resolution of this litigation, *see Wal-Mart*, 564 U.S. at 350,

Plaintiffs have met their burden under Rule 23(a)(2).

   Notably, this commonality analysis does not change merely because some

members of the class may themselves be perpetrators of violence or sexual abuse.  *See*

*Green v. Cady*, 90 F.R.D. 622, 623-24 (E.D. Wis. 1981).  In *Green*, the defendants

argued that "because the plaintiff inmates complain of the hazards to them arising from

fires set by other inmates, an inmate class would contain antagonistic claims", thus

undermining class cohesiveness. *Id.* at 623-24. The court rejected that contention, holding:

> The case is not rendered inappropriate for resolution through class action merely because the plaintiff inmates challenge the failure of the defendants to protect them from other inmates. The complaint alleges that the plaintiffs' risk of exposure to the hazards of fire is unnecessarily high due to certain actions taken and policies followed by the defendants, such as the failure to repair the mechanism for opening windows in the Adjustment Center. Moreover, Rule 23(a) is liberally applied in constitutional rights cases. *See* 7 Wright and Miller's 1771. Accordingly, I find that the representatives' claims are typical of the class.

*Id.* at 624; *see also Langley v. Coughlin*, 715 F. Supp. 522, 561-62 (S.D.N.Y. 1989)

("The fact that several of the assertedly deranged inmates [in restrictive housing] may have been presumably unwitting agents for creating some of the conditions in question does not demonstrate a legally cognizable conflict between them and the remaining class members."). In other words, the presence of a secondary actor who amplifies or catalyzes the risk of harm created by Defendants' systemic practices does not undermine the appropriateness of classwide relief.[7] *See Elisa W. v. City of N.Y.*, 82 F.4th 115, 126 (2d Cir. 2023) (holding, in vacating the district court's denial of class certification in a risk-of-harm case, that "plaintiffs need not prove that [the defendant's] policies are the sole cause" of the harm "but only that its policies are a proximate cause" of the harm). Moreover, it is the very nature of Defendants' practices that creates the perceived need for prisoners to be prepared for and engage in violent combat.

---

[7] This applies to prisoners who themselves commit violent acts. Of course, this same reasoning applies with respect to St. Clair inmates who possess drugs and weapons, trick the prison's cell locks or move to cell blocks to which they are not assigned.

Nor is commonality defeated by differences across St. Clair's housing blocks that may cause some variation in the *degree* of risk present in certain areas of the prison. Because the practices at issue are employed throughout the facility, "such individual differences do not defeat certification because there is no requirement that every class member be affected by the institutional practice or condition in the same way". *Austin v. Hopper*, 15 F. Supp. 2d 1210, 1225 (M.D. Ala. 1998). The *Braggs* court dealt with this issue directly, concluding that commonality was not defeated by variations in the conditions of different prisons such as "in terms of the populations incarcerated there and the ways that certain forms of mental-health care are delivered . . . , and in terms of the levels of staffing (. . . some facilities have especially severe shortages of custodial staff while others have somewhat more moderate shortages)". *Braggs*, 317 F.R.D. at 660-61. Rather, it held that the important considerations for commonality purposes were that "the practices at issue are fairly consistent across the major facilities" and that the class members "are transferred very frequently between a large number of different facilities". *Id.* at 661. Of further importance to the *Braggs* court's analysis was that the claim "revolves around a prospective risk of harm", and therefore "even if some aspect of the mental-health care at a particular facility is idiosyncratically better or worse, it is clear that numerous class members not currently housed at that facility are likely to be exposed to it in the future". *Id.*

Similarly, here, because the evidence shows that there is widespread unauthorized movement among St. Clair's housing blocks (SOF ¶¶ 133-135, 149, 151) and that prisoners are transferred frequently between housing blocks without any notice (SOF ¶¶ 21-22, 35-36, 49-50, 64, 80), the substantial risk of harm created by Defendants'

systemic practices is sufficiently present in every area of the prison to infer classwide exposure.

### C.  Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class".  In other words, typicality requires that "[a] class representative must possess the same interest and suffer the same injury as the class." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1275 (11th Cir. 2009). While "the commonality and typicality inquiries tend to merge", typicality is focused on "whether a sufficient nexus exists between the claims of the named representatives and those of the class at large". *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13, (1982).  "The claim of a class representative is typical if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009).  Typicality is "somewhat of a low hurdle", *Taylor v. Flagstar Bank, FSB*, 181 F.R.D. 509, 517 (M.D. Ala. 1998), and this "requirement may be satisfied despite substantial factual differences".  *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001).

Courts have routinely found the typicality requirement satisfied in cases challenging unconstitutional conditions of confinement.  *See Hassine v. Jeffes*, 846 F.2d 169, 177-78 (3rd Cir. 1988) (finding named representatives' claims typical, even when they "had not at the time of assertion themselves been injured by those conditions" because named representatives were still "subject to them"); *Henderson*, 289 F.R.D. at 511 (holding named plaintiffs' claims typical where factual differences between plaintiffs' claims were minor and their legal claim was identical to the class claim of

disability discrimination under the ADA); *Hughes v. Judd*, No. 12-cv-568, 2013 WL

1821077, at *24 (M.D. Fla Mar. 27, 2013) (finding typicality where juveniles detained in

jail were treated in accordance with same policies and practices and were "made to

endure the same allegedly unconstitutional conditions of confinement").

      Named Plaintiffs' claims are typical of the class as a whole.  They have all

been exposed to the same dangerous conditions and substantial risk of serious harm to

which every prisoner at St. Clair is currently subjected.  Indeed, several of the Named

Plaintiffs, like many of the men in the facility, have already suffered at least one incident

of serious bodily harm caused by Defendants' practices.  (SOF ¶¶ 23 (Mr. Duke stabbed

by another prisoner); 37 (Mr. Harris cut across the face by two other prisoners); 51 (Mr.

Young assaulted with hatchet by another prisoner); 66 (Mr. Carlile slammed against wall

by correctional officers); 81 (Mr. Jones stabbed by another prisoner.)  All of the Named

Plaintiffs have witnessed extreme prisoner-on-prisoner violence (SOF ¶¶ 24, 52, 65, 83),

instances of prisoner-on-prisoner sexual assault (SOF ¶¶ 25, 84) and unreasonable use of

force by correctional staff against other inmates (SOF ¶¶ 27, 38, 53, 67, 85).  Named

Plaintiffs have collectively lived in nearly every housing area in the facility (SOF ¶¶ 21-

22, 35-36, 49-50, 64, 80 (Blocks A, C, F, H, J, K, L, M, N, P, Q and the RHU)) and have

observed broken locks, cameras and call buttons (SOF ¶¶ 29, 40, 71), excessive amounts

of drugs and weapons (SOF ¶¶ 28, 39, 54, 69-70, 86-89) and the unauthorized presence

of inmates (SOF ¶¶ 23-24, 37, 68) in each area.

      Named Plaintiffs' claims involve the same dangerous conditions that

expose the class as a whole to a substantial risk of serious harm.  They "possess the same

interest and suffer the same injury as the class members", and therefore satisfy the typicality requirement of Rule 23(a)(3).  *See Vega*, 564 F.3d at 1275.

### D.  Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class".  The adequacy requirement "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action."  *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008).  As for the first prong, any alleged conflict between the named plaintiffs and the class "must be more than merely speculative or hypothetical".  *Henderson*, 289 F.R.D. at 512 (quoting 5 Moore's Federal Practice ¶ 23.25[2][b][ii] (3d ed. 2011)).  "[T]he existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). "A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class."  *Id.*  The second prong requires a determination of the "forthrightness and vigor" with which the named representatives will "assert and defend the interests of the members of the class."  *Lyons v. Georgia-Pacific Corp. Salaried Employees Retirement Plan*, 221 F.3d 1235, 1253 (11th Cir. 2000).

Additionally, the "adequate representation requirement involves questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation."  *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985); *see also* Fed. R. Civ. P. 23(g).  In determining counsel's adequacy, courts should consider:

"(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g).

"Adequate representation is usually presumed in the absence of contrary evidence", *Access Now, Inc. v. Ambulatory Surgery Ctr. Grp., Ltd.*, 197 F.R.D. 522, 529 (S.D. Fla. 2000), and the "fact that the plaintiffs have satisfied the commonality and typicality requirements is strong evidence that they adequately represent the class", *Henderson*, 289 F.R.D. at 511 (citing *Wal-Mart*, 564 U.S. at 549 n.5); *see also In re Consol. Non-Filing Ins. Fee Litigation*, 195 F.R.D. 684, 691 (M.D. Ala. 2000)  ("The requirements of commonality and typicality tend to merge into the adequacy-of-representation requirement" (citing *Falcon*, 457 U.S. at 157 n.13)).

### 1.  *Named Plaintiffs' Interests Do Not Conflict with Those of the Proposed Class.*

Named Plaintiffs will provide adequate representation to the class.  There are no fundamental conflicts between Named Plaintiffs and the rest of the class because, like all members of the class, Named Plaintiffs are subjected to the same violent and dangerous conditions at the facility.  They therefore have the same Eighth Amendment interests as everyone at St. Clair in seeking relief from the risk of harm created by Defendants' practices.  *See Hughes*, 2013 WL 1821077, at *24 (named plaintiffs who "have been subjected to the same allegedly unconstitutional conditions of confinement at the jail as the rest of the class" and whose "interests are not adverse to those of other class members" were adequate representatives).

To the extent Defendants suggest—as they have throughout the litigation—that some small minority of the class might appreciate certain aspects of Defendants' dangerous practices (such as the freedom of movement that attends widespread broken locks and the abandonment of the wristband policy), this does not create a fundamental conflict with Named Plaintiffs' representation.  The Middle District of Alabama squarely rejected this argument in *Henderson v. Thomas*.  In that case, eight HIV-positive named plaintiff inmates sought to challenge ADOC's policy of segregating HIV-positive inmates from the general prison population, which included excluding them from the policy of allowing transfer to a facility closer to family after six months of good behavior.  289 F.R.D. at 509.  The defendants argued that because ADOC's HIV-positive inmates were often housed in less crowded dorms and given better food than the general population, "some HIV+ inmates may prefer their present accommodations to the right not to be discriminated against".  *Id.* at 512.  The court held that this did not present a problem for class certification because the conflict "must be more than merely speculative or hypothetical" and, in any event, "the defendants are still obliged to provide HIV+ inmates a constitutionally adequate level of care".  *Id.*  Similarly, here, Defendants' speculation about differences in the preferences of the class members is insufficient to defeat adequacy.  Moreover, Defendants are unquestionably required to provide each and every person incarcerated at St. Clair conditions that satisfy the Eighth Amendment—that is the *only* goal of this litigation.

Other courts around the nation have also rejected this precise argument. *See Clark v. Duke Univ.*, No. 16-CV-1044, 2018 WL 1801946, at *8 (M.D.N.C. Apr. 13, 2018) ("The fact that a few class members might be 'unhappy' if they are no longer able

to participate in a plan that is run in a way that breaches the fiduciary duties owed to participants does not create a legal conflict between those class members and the named plaintiffs."); *Guifu Li v. A Perfect Franchise, Inc.*, No. 10-CV-01189, 2011 WL 4635198, at *9 (N.D. Cal. Oct. 5, 2011) ("The fact that all proposed class members may not like each other, or even that some potential class members may prefer their current employment situation, is not sufficient to defeat adequacy."); *Norris-Wilson v. Delta-T Grp.*, 270 F.R.D. 596, 606 (S.D. Cal. 2010) ("Just because potential class members disagree with the spirit of an action doesn't mean it shouldn't be certified. . . . It will almost always be the case that some putative class members are happy with things as they are." (citation omitted)).

## 2.    *Named Plaintiffs and their Counsel Will Adequately Prosecute the Action.*

Named Plaintiffs will adequately represent the class and prosecute the action on its behalf with "forthrightness and vigor". *See Lyons*, 221 F.3d at 1253. As stated above, each Named Plaintiff has suffered from the same dangerous conditions at St. Clair and therefore has the same interest in remedying the risk of serious harm created by Defendants' practices as the rest of the proposed class. Furthermore, Named Plaintiffs have demonstrated their willingness to take on the responsibilities involved in being a class representative, including by meeting with counsel on multiple occasions to provide information, answer questions and learn about the case; participating in depositions; responding to interrogatories; and reviewing and producing the documents in their possession. The efforts Named Plaintiffs have invested in prosecuting this case undoubtedly prove their commitment to the class, particularly when considering the potential retaliation from Defendants that they could face due to their involvement.

In addition, class counsel will adequately represent the class and have extensive experience in constitutional and class action litigation. Rule 23(g) requires courts to consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Plaintiffs are represented by Cravath, Swaine & Moore LLP and the Equal Justice Initiative. Cravath, Swaine & Moore LLP is a large private law firm with significant experience, including by partners Antony Ryan, Lauren Rosenberg and Helam Gebremariam, in litigating complex class action claims. (Decl. of Antony Ryan ¶¶ 5-10.) The Equal Justice Initiative, which was founded in 1989 and has decades of experience litigating on behalf of the incarcerated, has brought numerous civil rights lawsuits—including class actions—on behalf of prisoners incarcerated in ADOC facilities. (Decl. of Bryan Stevenson ¶¶ 3-4.) Together, class counsel are fully qualified, experienced and competent to conduct the litigation.

## II.    PLAINTIFFS MEET THE RULE 23(b) REQUIREMENTS.

Plaintiffs seek to certify this class under two alternative Rule 23(b) bases—Rule 23(b)(2) and Rule 23(b)(1)(A). Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole". As explained by the Supreme Court,

> Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.

> Similarly, it does not authorize class certification when each
> class member would be entitled to an individualized award
> of monetary damages.

*Wal-Mart*, 564 U.S. at 360-61; *see also Sykes*, 780 F.3d at 80.  Civil rights actions are

ideal for class certification under Rule 23(b)(2).  *See* Fed. R. Civ. P. 23(b)(2) advisory

committee's note to 1966 amendment.  Indeed, "some courts have gone so far as to say

that the rule's requirements are 'almost automatically satisfied in actions primarily

seeking injunctive relief.'"  *Braggs*, 317 F.R.D. at 667 (quoting *Baby Neal ex rel. Kantor

v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994).  And "[c]lass certification under Rule 23(b)(2) is

***particularly appropriate in the prison litigation context*** where only injunctive and

declaratory relief are sought."  *Austin v. Hopper*, 15 F. Supp. 2d 1210, 1225 (M.D. Ala.

1998) (emphasis added).

In this prison litigation case, Plaintiffs are seeking injunctive and

declaratory relief that will protect the rights of the class as a whole.  Specifically, the

proposed class seeks an order requiring that Defendants cease their harmful practices and

implement constitutionally sufficient practices.  (FAC, Prayer for Relief, at 124-25.)

Among other relief, Plaintiffs seek the institution of facility-wide policies and practices

requiring:

- the prompt, accurate and consistent classification of prisoners that adequately
  identifies and segregates predatory and vulnerable prisoners;

- the installation of an adequate camera system and the implementation of
  procedures to maintain active, live surveillance of the housing blocks and
  common areas;

- the installation of working locks and implementation of procedures to
  maintain them in sufficient condition to provide continuous adequate security;

- the development and implementation of procedures to effectively limit the
  introduction of drugs and weapons into St. Clair;

40

- the development and implementations of adequate use-of-force training to reduce the application of excessive force by correctional staff against prisoners; and

- the immediate hiring of sufficient medical, mental health and correctional staffing to provide adequate care and protection to the people at St. Clair.

(*Id.*)  Because Defendants' injurious practices are systemic and the risks of harm they create affect prisoners throughout the facility, a single injunction would remedy the injuries of all current and future inmates at St. Clair.  *See Baby Neal*, 43 F.3d at 59 ("What is important [for Rule 23(b)(2) class certification] is that the relief sought by the named plaintiffs should benefit the entire class.").  On the other hand, individual actions could only have a limited impact on conditions at St. Clair, including because the transfer of plaintiffs out of St. Clair would render those lawsuits moot (whether or not the transfer was contrived for that precise purpose).  The requirements of Rule 23(b)(2) are therefore met.  Accordingly, a Rule 23(b)(2) class action is appropriate under the circumstances of this case.

Although it is unnecessary to support class certification under multiple sections of Rule 23(b), Plaintiffs *also* satisfy the requirements of Rule 23(b)(1)(A).  That provision allows a court to certify a class if "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class".  *Id.*  Here, certification of a class seeking facility-wide injunctive relief will ensure that the treatment of the class will be consistent and that the conduct required of the several Defendants will be compatible.  Conversely, if injunctive relief were granted piecemeal across multiple individual suits, there is a

material likelihood that Defendants could be subject to incompatible orders.  *See* Rule 23(b)(1)(A).

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for class certification.

Dated:  May 23, 2024

/s/ *Charlotte R. Morrison*

Bryan A. Stevenson
Charlotte R. Morrison
Benjamin H. Schaefer
Sofia V. McDonald
Equal Justice Initiative
122 Commerce Street
Montgomery, Alabama 36104
Telephone:  (334) 269-1803
Facsimile:  (334) 269-1806
bstevenson@eji.org
cmorrison@eji.org
bschaefer@eji.org
smcdonald@eji.org

/s/ *Antony L. Ryan*

Antony L. Ryan (*pro hac vice*)
Lauren M. Rosenberg (*pro hac vice*)
Helam Gebremariam (*pro hac vice*)
Cravath, Swaine & Moore LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
aryan@cravath.com
lrosenberg@cravath.com
hgebremariam@cravath.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of the foregoing document is being served by electronic mail to the designated counsel of record in the above-captioned action on this 23rd day of May, 2024.

By:                             /s/ *Antony Ryan*

                                 Antony L. Ryan
                                 Cravath, Swaine & Moore LLP
                                 Two Manhattan West
                                 375 Ninth Avenue
                                 New York, NY 10001
                                 Telephone:  (212) 474-1000
                                 Facsimile:  (212) 474-3700