FILED
2024 Jun-06  PM 11:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

|  |  |  |
|---|---|---|
| | * | |
| MARK DUKE, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| vs. | * | |
| | * | Civil Action No: 4:14-cv-01952-RDP |
| | * | |
| JOHN HAMM, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

**PLAINTIFFS' INITIAL CONSOLIDATED STATEMENT OF FACTS**

**Table of Contents**

I.    Overview of St. Clair ......................................................................................1

    A.    Inmate Population ..................................................................................1

    B.    Facility Layout ......................................................................................2

    C.    Named Defendants ................................................................................3

II.    The Named Plaintiffs ...................................................................................12

    A.    Mark Duke ...........................................................................................12

    B.    Nathaniel Harris ..................................................................................15

    C.    Johnny Young ......................................................................................17

    D.    Robert Carlile ......................................................................................18

    E.    Benny Jones .........................................................................................21

III.    Violence Occurs Throughout St. Clair's Facility, Including All Cell
    Blocks and Common Areas. ........................................................................24

    A.    Prisoners Violently Assault Other Prisoners, Resulting in Serious
        Injury and Death, Throughout St. Clair. .............................................25

    B.    Prisoners Sexually Assault Other Prisoners Throughout St. Clair. ...........33

    C.    St. Clair Officers Regularly Use Excessive Force Against Prisoners
        Throughout St. Clair. ...........................................................................40

IV.    Defendants' Common Practices.....................................................................43

    A.    Defendants' Practice Is To Allow Unauthorized Movement....................43

        1.    Defendants' Practice Is To Allow Unauthorized Inmate
            Movement. ...............................................................................45

        2.    Defendants Do Not Enforce St. Clair's Wristband Policy............49

        3.    Defendants' Practice Is To Conduct Insufficient Bed Roster
            Counts. .....................................................................................51

        4.    Defendants Do Not Document or Discipline Unauthorized
            Movement. ...............................................................................54

        5.    Defendants' Practices Result In Direct Harm to Inmates. ............55

        6.    Defendants' Failure to Implement the Daniels Plan for
            Controlled Movement. .............................................................57

    B.    Defendants Have a Practice of Not Repairing Broken or
        Obstructed Locks, Call Buttons and Cameras. ..........................................59

        1.    Defendants Have a Practice of Not Conducting or
            Conducting Insufficient Inspections of Locks, Call Buttons
            and Cameras...............................................................................60

        2.    Defendants Have a Practice of Leaving Locks Broken or
            Obstructed at St. Clair................................................................62

3.      Broken or Obstructed Locks Contribute to Violence at St. Clair...................................................................66

4.      Defendants Have a Practice of Leaving Call Buttons Broken or Obstructed at St. Clair...............................69

5.      Broken or Obstructed Call Buttons Contribute to Violence at St. Clair. ........................................................71

6.      Defendants Have a Practice of Leaving Cameras Broken or Obstructed at St. Clair.................................73

7.      Broken or Obstructed Cameras Contribute to Violence at St. Clair. ........................................................75

C.      St. Clair's Policies Do Not Account for Its Dangerously Low Staffing Levels. ........................................79

D.      Defendants Have a Practice of Improperly Training Correctional Staff on Use of Force and Tolerating Use of Excessive Force. ................84

1.      Defendants Do Not Provide Appropriate Use of Force Training..................................................................85

2.      Defendants' Failure To Provide Appropriate Use of Force Training Results in Officers' Use of Excessive Force...................87

E.      Defendants Have a Practice of Improperly Training Staff on Sexual Abuse. ........................................................91

F.      Defendants Have a Practice of Assigning Prisoners to Housing Areas ("Internal Classification") Without Appropriate Risk Screening Data. ........................................................95

1.      The ICB Does Not Control Housing Assignments. .......................97

2.      Housing Assignments Do Not Properly Consider PREA Designations..................................................................98

3.      Housing Assignments Do Not Properly Consider Gang Affiliation..................................................................100

G.      Defendants Have Cell Inspection and Institutional Search Practices that Are Ineffective in Reducing the Enormous Volume of Drugs and Weapons in the Facility........................................101

1.      There Are High Amounts of Contraband at St. Clair. ................103

2.      Defendants' Cell Inspection and Institutional Search Practices Are Ineffective In Limiting the Possession of Contraband in the Facility..........................................107

3.      The Infrequent Institutional Searches Recover Contraband Left by Inmates in Common Areas, Which Defendants Do Not Investigate.................................................108

4.      Defendants Do Not Regularly Search Staff Entering St. Clair..................................................................110

5.    Defendants Do Not Have a Practice of Investigating
      Incidents To Recover Weapons Used In Assaults. .....................111

6.    Contraband Increases the Risk of Harm Inmates Face at St.
      Clair..................................................................................................112

7.    Overdoses and Overdose Deaths Are Common at St. Clair. .......113

H.   Defendants Have a Practice of Conducting Severely Inadequate
     Investigations of Physical and Sexual Assaults. ......................................114

1.    Defendants Have a Practice of Encouraging Victims to
      Sign Prosecution Waivers in Order To Prematurely End
      LESD Investigations. .....................................................................114

2.    After Victims Sign Prosecution Waivers, Defendants Have
      a Practice of Declining To Conduct Administrative
      Investigations. ...............................................................................118

3.    Defendants Have a Practice of Inadequately Responding To
      the Conditions that Lead To Incidents of Violence and
      Sexual Violence (*e.g.*, Contraband). ............................................120

4.    Investigators Close Cases Without Testing Forensic
      Evidence or Properly Evaluating Physical Evidence...................122

5.    Defendants Have a Practice of Failing To Timely and
      Adequately Identify and Investigate Incidents Involving the
      Use of Force..................................................................................123

# STATEMENT OF FACTS

## I.    Overview of St. Clair

1.    ███████████████████████████████████████████████████████

██████████    (Doc. 422-276 at 151.)  As of December 31, 2023, St. Clair housed

1030 male inmates.  (Doc. 422-357; Doc. 422-276 at 151.)

      A.    Inmate Population

2.    As of December 31, 2023, St. Clair housed 474 inmates sentenced to life without

parole and 157 inmates sentenced to life.  (Doc. 422-357.)

3.    The inmate population at St. Clair consists of a diverse group of people, spanning

21 to 90 years of age.  (*Id.*; Doc. 422-101 at 7 tbl. 1.)  The median age of the inmates at

St. Clair is 45.  (Doc. 422-357; Doc. 422-101 at 7 tbl. 1.)  33% of inmates are 55 or older.

(Doc. 422-357; Doc. 422-101 at 7 tbl. 1.)

4.    While St. Clair is a maximum security prison (classified by ADOC as security

level 5), it houses inmates of all custody levels.  (Doc. 422-101 at 31 tbl. 6; Doc. 422-016

at 1, 3.)  The vast majority of the population at St. Clair—902 inmates—are medium

custody ████████████████████████.  (Doc. 422-101 at 31 tbl. 6; Doc. 422-016 at

1, 3.)  Only 68 inmates are close custody, ████████████████████████████

████████████████████████████████████████████████████████

██████.  (Doc. 422-101 at 31 tbl. 6; Doc. 422-016 at 1, 3.)

5.    Inmates with lower custody levels are also housed at St. Clair because there are

"jobs inside the institution [for which] a lower level custody inmate is needed".

(Doc. 422-063 at 223:14-224:9.)  For example, ADOC and St. Clair officials do not trust

higher custody level inmates "to work in the kitchen, to be on the grass-cutting squad, the

trash detail".  (*Id.*)  In addition, inmates with lower custody levels who have serious

physical health issues and need treatment are often housed at St. Clair because it is the only male ADOC facility with a dialysis center.  (*Id.* at 223:2-13; Doc. 422-073 at 221:4-10.)

        B.    <u>Facility Layout</u>



6. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Doc. 422-104; Doc. 422-105; Doc. 422-276 at 152.)

7. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* ▮▮▮▮▮▮ at 246:13-23.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(▮▮▮▮▮▮▮ at 246:13-23.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*)

8. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

C.    Named Defendants

9.    Defendant John Hamm is the Commissioner of the Alabama Department of Corrections ("ADOC"), a position he assumed on January 1, 2022. (Doc. 422-002; Doc. 422-073 at 8:1-4.)

a.    Defendant Commissioner Hamm is the highest-ranking official at ADOC and supervises the entire executive agency of ADOC. (*Id.* at 149:7-10, 150:12-15; *see also* Doc. 422-313.)

b.    Defendant Commissioner Hamm is the departmental head of ADOC. (Doc. 422-002 at 2.) As such, he is responsible for ensuring that departmental employees are properly trained to perform their assigned duties. (Doc. 422-005 at 3.)

c.    As Commissioner, Defendant Hamm is responsible for approving and issuing administrative regulations and changes, which state the policies and procedures that affect the entire organization, including St. Clair. (Doc. 422-001.)

3

d.   Defendant Commissioner Hamm has the authority to give final approval on all

administrative regulations ("ARs") and any necessary changes to the ARs.

(Doc. 422-073 at 151:3-13, 156:17-157:2.)

e.   Defendant Commissioner Hamm controls the operations of ADOC.  (*Id.* at

150:16-20.)

f.   Defendant Commissioner Hamm is involved in the budgeting process for ADOC,

including the annual operating budget through the legislature, and has the discretion

to allocate funds to ADOC facilities and projects, including at St. Clair.  (*Id.* at 171:6-

176:1, 178:11-181:22.)

g.   ███████████████████████████████████

███████████████████████████████

██████████████████  (Doc. 422-017 at 6.)

h.   Defendant Commissioner Hamm and his administration are responsible for

addressing inmate-on-inmate violence, inmate-on-inmate sexual violence, excessive

use of force and unauthorized movement, and overseeing inmate classification.  (*See

generally* Doc. 422-262*.*)

i.   Defendant Commissioner Hamm also "attends meetings on a daily, weekly, and

monthly basis during which corrective action items are discussed across the ADOC",

and he has the authority to "take[] appropriate action to provide the required level of

oversight to ensure areas of concern are addressed".  (*Id.* at 8.)

10.   Defendant Wendy Williams is the Deputy Commissioner of Men's Services for

ADOC, a position she assumed on January 6, 2022.  (Doc. 422-096 at 50:17-51:5.)

4

a.  Defendant Deputy Commissioner Williams reports to Chief Deputy Commissioner Greg Lovelace and Commissioner Hamm.  (*Id.* at 58:11-17.)

b.  Defendant Deputy Commissioner Williams has "operational and executive oversight of the 23 male facilities in the state" of Alabama.  (*Id.* at 76:15-19.)

c.  Defendant Deputy Commissioner Williams is responsible for overseeing the facilities' classification unit and staffing plans, ███████████████████ ████████████████████████████████████ ██████████████████████████████ ████████████████████████ ██████████████████████████████ █████████████████████████████ reviewing internal audit reports, ██████████████████████████████ ██████████████████████████ (Doc. 422-014 at 2; Doc. 422-017 at 6, 7, 22; Doc. 422-006 at 2; Doc. 422-015 at 2; Doc. 422-008 at 2; Doc. 422-003 at 5; Doc. 422-013 at 3; Doc. 422-011 at 3; *see also* Doc. 422-096 at 76:20-77:9.)

d.  Defendant Deputy Commissioner Williams is responsible for working to address inmate-on-inmate violence, inmate-on-inmate sexual violence and excessive use of force, to monitor and oversee ADOC and facility leadership, to ensure compliance with all directives, regulations and policies, and to oversee staffing.  (*See generally* Doc. 422-269.)

11.    Defendant Jenny Abbott is the Director of Facilities Management of ADOC. (Doc. 422-049 at 7:11-13.)

a.   Defendant Director Abbott has been performing the duties of the Director of Facilities Management since 2017.  (*Id.* at 48:16-49:11.)

b.   Her direct supervisor is Chief Deputy Commissioner Greg Lovelace.  (*Id.* at 18:20-23. )

c.   Defendant Director Abbott is responsible for "manag[ing] and supervis[ing] capital improvement construction projects" and "maintenance operations", "oversee[ing] projects requiring substantial capital funding", "procedures [related to] maintenance, construction, and renovation projects", "communicat[ing] [the] status of projects to the ADOC executive leadership" and working with stakeholders to determine "budgeting and funding related to those projects" for ADOC's facilities, including St. Clair.  (*Id.* at 68:7-69:13, 72:3-11.)

d.   By overseeing "the maintenance and renovation of existing ADOC facilities to improve and maintain the overall operations of each ADOC facility[y]" and managing "the budget for all major facility construction projects throughout the ADOC", Defendant Director Abbott is indirectly responsible for reducing inmate-on-inmate violence, inmate-on-inmate sexual violence and excessive use of force.  (*See generally* Doc. 422-261.)

12.    Defendant LaGreta McClain is one of the Regional Directors (or Institutional Coordinators) of ADOC, a position she assumed in June 2023.  (Doc. 422-081 at 38:9-15, 38:23-39:2.)

a.   She succeeds Edward Ellington as the Regional Director over St. Clair.  (*Id.* at 42:13-17.)

6

b.   As Regional Director, Defendant McClain oversees six facilities:  Limestone Correctional Facility, William E. Donaldson Correctional Facility, Julia Tutwiler Prison, Montgomery Women's Facility, Birmingham Community-Based Facility and St. Clair.  (*Id.* at 41:15-21.)

c.   Defendant Regional Director McClain reports to Deputy Commissioner Williams relating to male facilities.  (*Id.* at 39:22-40:6, 215:3-7.)

d.   Defendant Regional Director McClain is responsible for serving as the chairperson for the Security Audit Team and appointing members to the team, which is responsible for conducting and reporting institutional audits and reviewing audit reports.  (Doc. 422-010 at 1-2; Doc. 422-017 at 25.)

e.   The Regional Director is responsible for responding and providing assistant to major incidents at a facility, including St. Clair, reviewing "policies, video surveillance[,] corrective actions, and whatever tasks [Deputy] Williams provides". (Doc. 422-063 at 57:4-58:8.)

f.   As Regional Director, Defendant McClain is notified about all Class A and B incidents, including homicides, fights with a weapon, overdoses, sexual assaults, confiscations of contraband and more, which she reports to Defendant Williams depending on the seriousness of the incident.  (Doc. 422-081 at 76:10-77:1; *see also* (Doc. 422-007 at 1, 3-4.)

g.   Defendant Regional Director McClain is also responsible for "evaluating the wardens in [the facilities] that [she] overs[ees]", responding to staffing shortages and responding to emergency situations at the facilities she oversees, including St. Clair. (Doc. 422-063 at 47:13-16, 63:4-20, 64:14-20.)

h. She is also responsible for concurring or disagreeing with all corrective action for staff in the facilities she supervises before it is escalated to Defendant Williams. (Doc. 422-081 at 70:7-22, 73:6-12.)

i. The Regional Director is responsible for helping to reduce inmate-on-inmate violence, inmate-on-inmate sexual violence and excessive use of force. (*See generally* Doc. 422-259.) For example, the Regional Director is responsible for helping to reduce inmate-on-inmate violence by "recommend[ing], analyz[ing], discuss[ing], evaluat[ing] and otherwise consider[ing] a variety of measures intended to address the violent acts perpetuated by the inmates in custody of ADOC." (*Id.* at 3-4.)

13. Defendant Phillip Mitchell is the Warden III of St. Clair, a position he assumed upon his predecessor Guy Noe's retirement in September of 2023. (Doc. 422-088 at 10:1-16, 17:3-9.)

a. As Warden III, Defendant Mitchell has overall responsibility over the entirety of St. Clair. (*Id.* at 30:22-31:2.)

b. As Warden III, Defendant Mitchell is responsible for reviewing, approving and revising all standard operating procedures ("SOPs") at St. Clair as needed. (Doc. 422-305 at 3; *see also* Doc. 422-088 at 31:3-9.)

c. The Warden III also has the "opportunity to comment on proposed changes to ARs or proposed newly issued ARs". (*Id.* at 33:14-21.)

d. Defendant Warden III Mitchell reviews and approves staffing plans for St. Clair. (*Id.* at 37:9-14.) He is also responsible for "manag[ing], monitor[ing] and

oversee[ing] St. Clair's overall operations to ensure that critical posts are filled and essential functions are being accomplished". (Doc. 422-260 at 9.)

e.  As Warden III, Defendant Mitchell is responsible for reducing inmate-on-inmate violence, inmate-on-inmate sexual violence and excessive use of force. (*See generally id.*)

f.  ████████████████████████████████████████ ██████████████████████ (Doc. 422-088 at 172:12-173:10.)

g.  Defendant Warden III Mitchell reports to the Regional Director, Defendant LaGreta McClain. (Doc. 422-088 at 35:13-23.)

h.  Defendant Warden III Mitchell communicates with the Regional Director on a daily basis, reporting all Class A incidents, some Class B incidents, and "anything unusual or illegal". (*Id.* at 36:18-37:1.)

i.  ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████ (Doc. 422-007 at 3-4.)

j.  ████████████████████████████████████████ ████████████████████████████████████████ ████████████████ (Doc. 422-011 at 4.)

14.  Defendant Darrel Fox is the Warden II of St. Clair, a position he assumed upon the retirement of Guy Noe, then Warden III, and promotion of Defendant Mitchell, then Warden II, to Warden III, in September of 2023. (Doc. 422-088 at 10:4-16, 18:2-7.)

a.  As Warden II, Defendant Fox is responsible for "manag[ing] [his] captains . . . making sure that the details of the facility . . . [are] getting completed", "do[ing]

9

inspections" to ensure cleanliness, "communicat[ing] with the officers", "hav[ing] meetings", "communicat[ing] with the inmates" and "do[ing] walk[s] through the prison . . . to maintain custody and control". (Doc. 422-087 at 27:14-28:5.)

b.   In other words, as Warden II, Defendant Fox is responsible for overseeing the safety and security of the inmate population at St. Clair. (Doc. 422-066 at 37:10-16, 37:20-38:3; Doc. 422-267 at 9.)

c.   To help reduce inmate-on-inmate violence at St. Clair, Defendant Warden II Fox is responsible for reviewing gang activity and trends to minimize the effect of gangs on the inmate population, reviews data regarding violent incidents at St. Clair to look for trends, monitors and institutes improvements to the random search procedure of inmates and dorms to reduce contraband, and conducts shakedowns. (Doc. 422-267 at 8-9.)

d.   To help reduce inmate-on-inmate sexual violence, Defendant Warden II Fox is responsible for working closely with St. Clair's Institutional PREA Compliance Manager ("IPCM"). (*Id.* at 10-11.)

e.   To help reduce excessive use of force, Defendant Warden II Fox is responsible for instructing and reminding staff about ADOC policy, providing guidance on the appropriate use of force and instructing correctional staff at St. Clair on proper use of force. (*Id.* at 11-12.)

f.   As Warden II, Defendant Fox's direct supervisor is the Warden III, Defendant Mitchell. (Doc. 422-066 at 43:3-4.)

g.   Defendant Warden II Fox was promoted from his position as Warden I of St. Clair, a position he assumed in February 2021. (*Id.* at 36:14-21.)

15.  Defendant Christopher Webster was promoted to Warden I in the fall of 2023, after Defendant Mitchell was promoted to Warden III of St. Clair.  (Doc. 422-088 at 10:1-16, 17:3-9, 18:11-14.)

a.  As Warden I, the lowest-grade warden, Defendant Webster is responsible for programming at St. Clair.  (Doc. 422-066 at 37:7-9.)

b.  As Warden I, Defendant Webster supervises the staff involved with running programming at St. Clair, including "the officers and the supervisors that run our CORE program", "recreation" and "faith-based" programs.  (*Id.* at 50:2-21.)

c.  Defendant Warden I Webster is also responsible for reviewing all Class A and Class B incident reports.  (*Id.* at 49:7-13.)

16.  Defendant Omar Parker is a Captain at St. Clair, a position he assumed in November 2022.  (Doc. 422-089 at 70:15-19.)

a.  Specifically, Defendant Parker is the Captain supervising the General Population ("GP") Units.  (*Id.* at 66:14-19.)

b.  As such, the lieutenants who work in GP report to Defendant Captain Parker. (*Id.* at 67:22-68:2.)

17.  Defendant Bradley Howard is a Captain at St. Clair, a position he assumed on December 1, 2022.  (Doc. 422-076 at 30:12-17.)

a.  Specifically, Defendant Howard is the Captain supervising the Restrictive Housing Unit ("RHU"), which houses inmates whose movement is highly restricted compared to the general population.  (*Id.* at 39:18-40:8.)

b.  As such, the lieutenants who work in the RHU report to Defendant Captain Howard.  (Doc. 422-089 at 68:3-6.)

c.   Defendant Captain Howard's responsibilities involve overseeing the RHU and its day-to-day operations, St. Clair SOPs and the post orders, and tracking severe mental illness ("SMI") extenuating circumstances information—in short, "anything and everything inside the restrictive housing unit".  (Doc. 422-076 at 39:18-40:8, 41:10-11.)

d.   As such, he is responsible for reviewing all incidents that happen in the RHU. (*Id.* at 50:12-14.)

e.   As Captains, both Defendants Parker and Howard report to the Wardens I and II. (Doc. 422-089 at 73:2-8.)

f.   Defendants Captains Parker and Howard are responsible for helping to reduce inmate-on-inmate violence, inmate-on-inmate sexual violence and excessive use of force.  (*See generally* Doc. 422-258; Doc. 422-266; *see also* Doc. 422-089 at 103:20-105:15.)

## II.    The Named Plaintiffs

18.    The Named Plaintiffs in this case are Mark Duke, Nathaniel Harris, Johnny Young, Robert Carlile and Benny Jones.  (Doc. 422-044.)

### A.    Mark Duke

19.    Mark Duke has been incarcerated at St. Clair since August 2012.  (Doc. 422-196 at 3.)

20.    Mr. Duke is serving a sentence of life without the possibility of parole. (Doc. 422-061 at 14:10-13.)

21.    Mr. Duke currently lives in the Honor Dorm (H Dorm), where he has lived since 2020.  (Doc. 422-196 at 1; Doc. 422-295 ¶ 2.)

22.    Since he arrived at St. Clair, Mr. Duke has also lived in GP (J Block, K Block, L Block and P Block) and in the RHU (A Block and C Block).  (Doc. 422-061 at 20:15-22; Doc. 422-196; Doc. 422-295 ¶ 2.)

23.    On July 17, 2013, Mr. Duke was stabbed by another prisoner.  (Doc. 422-188.)



(Doc. 422-061 at 61:14-21.)  After the incident, Mr. Duke was treated for five stab wounds ███████████████, two stab wounds ██████████ and abrasions █████ ███████████████. (Doc. 422-188.)

24.    Mr. Duke has witnessed prisoner-on-prisoner violence throughout St. Clair:

a.  In 2022, Mr. Duke witnessed a prisoner chasing another prisoner with a knife in H Dorm.  (Doc. 422-295 ¶ 6.)

b.  Mr. Duke witnessed a prisoner cut another prisoner's throat in the chow hall. (*Id.*)

c.  Mr. Duke witnessed a prisoner hit another prisoner with a lock in H Dorm.  (*Id.*)

d.  ██████████████████████████████████████ ████ (Doc. 422-061 at 90:18-91:10.)

25.    Mr. Duke is aware of multiple instances of sexual violence that have occurred throughout the prison:

a.  Mr. Duke knows that another prisoner was sexually assaulted in 2023 in H Dorm. (Doc. 422-295 ¶ 7.)

b.  Mr. Duke has been warned about a particular prisoner who has sexually abused multiple prisoners outside of H Dorm.  (*Id.*)

26.     In 2015, Mr. Duke was the victim of excessive force by an officer in J/K Block, when he was hit in an area where he had stab wounds from his 2013 stabbing.  (Doc. 422-264 at 11.)

27.     Mr. Duke has witnessed officers use excessive force against prisoners throughout St. Clair:

   a.   In December 2023, Mr. Duke saw an officer assault a prisoner in H Dorm.  (*Id.*)

   b.   In June 2022, Mr. Duke witnessed an officer place a prisoner in a chokehold in the grass in front of the breezeway.  (*Id.*)

   c.   In 2022, Mr. Duke witnessed Captain Malone punch a prisoner who was handcuffed in the breezeway by the shift office.  (*Id.*)

   d.   Mr. Duke witnessed Officer Lett use chemical agent on ████████ and another prisoner in H Dorm.  (*Id.*)

28.     Mr. Duke has seen contraband throughout the prison in the hands of both prisoners and staff:

   a.   Mr. Duke has witnessed officers retrieve packages hanging in St. Clair's barbed wire fence.  (Doc. 422-061 at 66:16-67:13.)

   b.   Mr. Duke has witnessed incidents of prisoner drug use throughout the prison.  (*Id.* at 119:21-123:8; Doc. 422-295 ¶¶ 10-11.)

   c.   Mr. Duke has seen both prisoners and staff possess pocket knives.  (Doc. 422-264 at 7.)

29.     Mr. Duke has seen broken and damaged cameras throughout St. Clair.  (Doc. 422-295 ¶ 12.)

30.    Mr. Duke is willing to serve as class representative because he would like to represent other prisoners at St. Clair and to help improve ADOC's policies and procedures.  (Doc. 422-295 ¶ 22.)

31.    Mr. Duke is similarly situated to other prisoners at St. Clair, with whom he shares a common interest.  (*Id.*)

32.    Mr. Duke understands that this litigation seeks injunctive relief.  (*Id.*)

33.    Mr. Duke communicates with his lawyers and believes they will adequately represent him and the class.  (*Id.* ¶ 23.)

B.    Nathaniel Harris

34.    Mr. Harris has been incarcerated at St. Clair since February 2020.  (Doc. 422-195 at 1.)

35.    Mr. Harris currently lives in J Dorm.  (Doc. 422-074 at 61:23-62:5.)

36.    Mr. Harris has also lived in Q Dorm, M Dorm and N Dorm.  (Doc. 422-296 ¶ 3.)

37.    Mr. Harris has been the victim of physical violence and threats on several occasions:

a.    In October 2023, two prisoners entered Mr. Harris's cell with weapons and cut Mr. Harris across the face and mouth.  (Doc. 422-265 at 9.)

b.    In 2023, a prisoner brandished a large knife at Mr. Harris.  (*Id.*)

c.    In August 2022, a prisoner gained unauthorized access to Mr. Harris's cell with the aid of an officer and brandished a knife.  (*Id.* at 7.)

38.    Mr. Harris has witnessed officers use excessive force against prisoners throughout St. Clair.  (*See id.* at 10.)  In early 2022, Mr. Harris witnessed Lieutenant Amanda Price spray an unarmed prisoner with Sabre Red in the L/M hallway, kick the prisoner in the stomach and groin and slap the prisoner with her radio.  (*Id.* at 10.)

39.    Mr. Harris has seen contraband throughout St. Clair:

a.    Mr. Harris regularly smells marijuana and crack in the facility.  (Doc. 422-074 at 81:15-19; Doc. 422-265 at 7.)

b.    Mr. Harris has seen officers remove weapons from dorms, including blade knives and box cutters.  (Doc. 422-074 at 137:6-14, 137:19-138:4; Doc. 422-265 at 7.)

c.    Mr. Harris has seen heroin, ice (crystal methamphetamine), cocaine, morphine, flakka (a type of synthetic marijuana that can cause paranoia, hallucinations and violent behavior) and fentanyl at St. Clair.  (Doc. 422-265 at 14.)

40.    Mr. Harris has seen damaged ▮▮▮▮▮ locks throughout the facility. (Doc. 422-074 at 115:3-6, 117:16-118:5.)

41.    Although St. Clair purports to have a movement control policy by which prisoners wear colored wristbands, Mr. Harris has not been issued a wristband in approximately four years.  (Doc. 422-296 ¶ 11.)

42.    When Mr. Harris first arrived at St. Clair, he did not meet with a classification specialist or receive any PREA documentation.  (*Id.* ¶ 4.)

43.    Mr. Harris is willing to serve as class representative because he wants to help create a better environment in the prison for all prisoners.  (*Id.* ¶ 21.)

44.    Mr. Harris's experiences are similar to those of other prisoners at St. Clair.  (*Id.*)

45.    Mr. Harris understands that this litigation seeks injunctive relief.  (*See* Doc. 422-074 at 214:7-18.)

46.    Mr. Harris communicates with his lawyers and believes they will adequately represent him and the class.  (Doc. 422-296 ¶ 22.)

16

C.    Johnny Young

47.    Johnny Young has been incarcerated at St. Clair since February 2020.  (Doc. 422-194 at 1.)

48.    Mr. Young was also incarcerated at St. Clair from November 2016 to 2018, and for several shorter periods prior to that.  (*Id.* at 1-2, 7-8, 10.)

49.    Mr. Young currently lives in H Dorm.  (*Id.*; Doc. 422-098 at 202:1-5.)

50.    Mr. Young has also lived in Q1 ███████████ J Block, K Block, ███████ and the RHU.  (Doc. 422-294 ¶ 3.)

51.    In 2021, Mr. Young was assaulted in K Dorm with a hatchet by a prisoner named ███████████.  (Doc. 422-263 at 10.)

52.    Mr. Young has witnessed multiple instances of prisoner-on-prisoner violence throughout St. Clair:

   a.    In 2023, Mr. Young witnessed a fight among prisoners with weapons in H Dorm. (Doc. 422-294 ¶ 7.)

   b.    In December 2021, Mr. Young witnessed a prisoner named ███████ being physically assaulted by another prisoner in K Block.  (Doc. 422-263 at 10.)

   c.    In October 2021, Mr. Young witnessed the stabbing of a prisoner named ██ in L Block.  (*Id.*)

53.    Mr. Young has witnessed officers assault prisoners throughout St. Clair:

   a.    In December 2023, Mr. Young witnessed an assault by an officer in H Dorm requiring free world hospitalization of the prisoner.  (*Id.* at 12.)

   b.    In 2016, Mr. Young observed an officer physically assault a prisoner while trying to take a cell phone from that prisoner.  (*Id.*)

54.    Mr. Young has seen contraband and drug use throughout St. Clair:

a.   In November 2022, Young witnessed a prisoner named ███████ overdose

on drugs.  (*Id.* at 7.)

b.   Mr. Young has observed multiple free-world pocket knives and prisoner-made

weapons at St. Clair.  (*Id.*)

55.     Mr. Young is willing to serve as class representative because he wants the inmates

and staff members at St. Clair to be safe.  (Doc. 422-294 ¶ 2.)

56.     Mr. Young's experiences are similar to those of other prisoners at St. Clair.  (*Id.*)

57.     Mr. Young understands that this litigation seeks injunctive relief and does not

seek monetary damages.  (Doc. 422-098 at 395:22-396:4.)

58.     Mr. Young communicates with his lawyers and believes they will adequately

represent him and the class.  (Doc. 422-294 ¶ 16.)

       D.     <u>Robert Carlile</u>

59.     Robert Carlile was incarcerated at St. Clair for over 22 years.  (Doc. 422-198 ¶ 1.)

60.     Mr. Carlile was first incarcerated at St. Clair from July 1985 to February 1987.

(Doc. 422-197 at 4-5.)  Mr. Carlile returned to St. Clair in September 1993.  (*Id.* at 3.)

61.     Mr. Carlile was released on parole in December 2013.  (*Id.* at 1.)  After

Mr. Carlile's parole was revoked in 2020, he was sent back to St. Clair.  (*Id.*; Doc. 422-

054 at 21:4-25:11.)

62.     In 2022, Mr. Carlile was released from St. Clair ██████████████████

███████████.  (Doc. 422-054 at 19:14-20:10.)  Mr. Carlile is now out on regular

parole, the conditions of which include that he cannot leave the state, drink alcohol or use

drugs. (*Id.*)

63.     Mr. Carlile understands that if he violates his parole, he will likely return to

St. Clair.  (Doc. 422-198 ¶ 3.)

64.    After Mr. Carlile returned to St. Clair in 2020, he lived in M Dorm, H Dorm, the

███████████ and F Dorm ███████████████ (Doc. 422-197 at 1.)

65.    Mr. Carlile has witnessed multiple instances of inmate-on-inmate violence

throughout St. Clair, including stabbings and fights with sticks and knives.  (Doc. 422-

054 at 28:8-13, 52:6-53:21.)

    a.   In April 2021, Mr. Carlile witnessed the stabbing of Benny Jones, another Named

    Plaintiff in this case.  (Doc. 422-268 at 9.)

    b.   Mr. Carlile witnessed an incident in M Dorm ██████████████████████

    ████████████████████████████████████.  (Doc. 422-054 at 52:6-53:21.)

    c.   Mr. Carlile witnessed violence in H Dorm at a frequency of about once per week.

    (*Id*. at 59:22-60:1.)

66.    During his time at St. Clair, Mr. Carlile was repeatedly slammed against walls and

otherwise handled roughly by various officers.  (Doc. 422-268 at 11.)

67.    Mr. Carlile has witnessed multiple instances of excessive force by officers

throughout St. Clair:

    a.   Mr. Carlile witnessed officers kick, slap and drag inmates while taking them to

    lockup.  (Doc. 422-054 at 71:3-72:15.)

    b.   Mr. Carlile witnessed Lieutenant Roderick Gadson physically assault prisoners on

    numerous occasions, including on one occasion when Lieutenant Gadson repeatedly

    slapped and beat a non-resisting prisoner working in the kitchen.  (Doc. 422-268 at

    11.)

c.  On several occasions between 2021 and 2022, Mr. Carlile witnessed correctional

officers spray Sabre Red in the infirmary in such a way that all prisoners in the

infirmary were exposed to the spray.  (*Id.*)

d.  Mr. Carlile witnessed a group of officers, including Officer Jones and Captain

Malone, physically beat a prisoner who was running towards the back gate of

St. Clair.  (*Id.*)

68.    Mr. Carlile has seen multiple inmates move into cells other than their assigned

cell, including in housing blocks to which they were not assigned.  (Doc. 422-054 at

34:1-18, 50:6-9.)

a.  When Mr. Carlile arrived back at St. Clair in 2020, an inmate who was not

assigned to Mr. Carlile's cell moved into the cell and lived there for at least one week.

(*Id.* at 39:11-41:10.)

b.  Mr. Carlile witnessed inmates who were not assigned to M Dorm able to enter

M Dorm because the officers let them in or because the doors were open.  (*Id.* at

51:13-22.)

c.  Mr. Carlile witnessed inmates who were not assigned to H Dorm enter H Dorm.

(*Id.* at 58:16-18.)

69.    Mr. Carlile saw contraband during his time in both H Dorm and M Dorm.

(Doc. 422-054 at 45:5-46:14, 47:23-48:14; Doc. 422-268 at 7-8.)

a.  In the nine months Mr. Carlile lived in M Dorm, Mr. Carlile saw weapons—

including knives, sticks, steel bars and sharpened broomsticks—almost every day,

and he never saw an officer confiscate a weapon from a prisoner.  (Doc. 422-054 at

45:5-46:14; Doc. 422-268 at 7.)

    b.  In M Dorm, Mr. Carlile often saw drugs—including marijuana, cocaine, heroin, flakka and pain pills—and never saw an officer confiscate drugs from a prisoner. (Doc. 422-054 at 47:23-48:14; Doc. 422-268 at 7.)

70.    Mr. Carlile witnessed a prisoner overdose on illegal drugs several times in H Dorm. (Doc. 422-268 at 8.)

71.    Mr. Carlile saw broken cell locks and call buttons throughout St. Clair, and never saw anyone from ADOC fixing locks anywhere at St. Clair. (Doc. 422-054 at 74:4-12, 75:8-11, 126:7-10.)

72.    Mr. Carlile, along with other inmates, asked for additional programming at St. Clair, but no additional programming was provided other than ████████████ ████████████████. (*Id.* at 123:14-125:1.)

73.    Mr. Carlile is willing to serve as class representative because he wants to help the prisoners at St. Clair. (Doc. 422-198 ¶ 2.)

74.    Mr. Carlile's experience is similar to that of other prisoners at St. Clair. (*Id.* ¶ 25.)

75.    Mr. Carlile understands that this litigation seeks injunctive relief. (Doc. 422-054 at 137:12-20).

76.    Mr. Carlile communicates with his lawyers and believes they will adequately represent him and the class. (Doc. 422-198 ¶ 26.)

    E.   <u>Benny Jones</u>

77.    Benny Jones was incarcerated at St. Clair for over 30 years. (Doc. 422-293 ¶ 1.)

78.    Mr. Jones was first incarcerated at St. Clair from October 1985 to July 1991. (Doc. 422-193 at 3.) Mr. Jones was transferred back to St. Clair in October 1991, and

remained there until June 2001. (*Id.* at 2.) Mr. Jones returned to St. Clair in August 2007. (*Id.* at 1.)

79.    Mr. Jones is currently incarcerated at Limestone. (Doc. 422-293 ¶ 1.) Mr. Jones understands that he could be transferred back to St. Clair at any time. (*Id.* ¶ 3.)

80.    After Mr. Jones returned to St. Clair in 2007, he lived in numerous housing units including J Block, L Block and N Block. (Doc. 422-193 at 1.)

81.    In April 2021, Mr. Jones was physically assaulted by another prisoner, ███ ████, who stabbed Mr. Jones by the G Gate during pill call. (Doc. 422-257 at 9.) Officers responded by spraying both Mr. Jones and ████████ with chemical spray. (*Id.* at 17.) Mr. Jones required free world hospitalization for his injuries. (*Id.*)

82.    In February 2020, Mr. Jones was physically assaulted by another prisoner, ████████████, inside of Mr. Jones's cell. (*Id.* at 9.)

83.    Mr. Jones has witnessed numerous instances of prisoner-on-prisoner violence throughout St. Clair:

   a.    When Mr. Jones was assigned to N Block, he witnessed a violent assault of a prisoner that resulted in the prisoner's death. (*Id.* at 10.)

   b.    Mr. Jones witnessed numerous stabbings at St. Clair, including in L Block. (*Id.* at 9.)

   c.    Mr. Jones witnessed an instance where a prisoner was kidnapped, held and assaulted for 3-4 days in O Block. (*Id.*)

84.    Mr. Jones is aware of numerous instances of sexual assault at St. Clair:

   a.    Mr. Jones knows of a prisoner who was beaten and raped in 2022. (Doc. 422-293 ¶ 7.)

b.  In 2021, Mr. Jones saw a prisoner take another prisoner into the showers in

L Dorm and rape him.  (*Id.*)

c.  Mr. Jones is aware of a prisoner who died by suicide after he was raped.  (*Id.*)

85.    Mr. Jones has witnessed numerous instances of officers using excessive force

against inmates throughout St. Clair:

a.  In 2022, Mr. Jones witnessed officers in L and M Blocks bring a prisoner to the

ground, handcuff him and then hit him with batons.  (Doc. 422-257 at 11; Doc. 422-

077 at 136:12-139:21.)

b.  Following an inmate-on-inmate assault in L Block, Mr. Jones witnessed officers

pushing and shoving inmates that were already restrained and in handcuffs.

(Doc. 422-257 at 11; Doc. 422-077 at 141:5-145:22.)

c.  Mr. Jones has witnessed numerous uses of chemical spray on prisoners.

(Doc. 422-257 at 11.)

d.  ███████████████████████████████████████████████

(Doc. 422-077 at 151:6-152:17.)

86.    Mr. Jones has witnessed contraband and drug use throughout St. Clair.

(Doc. 422-257 at 7, 15.)

87.    In 2021, Mr. Jones witnessed multiple prisoners with knives in L Block.  (*Id.*

at 7.)

88.    Mr. Jones has seen marijuana, meth, heroin, ice, flakka, pills, cocaine, fentanyl

and brown clown (a synthetic crystalline powder made of poisonous chemicals) at

St. Clair.  (*Id.* at 15.)

89.    On two separate occasions, Mr. Jones witnessed prisoners overdose in L Block. (*Id.* at 7.)

90.    Mr. Jones is willing to serve as class representative because he wants to make St. Clair safer for all prisoners.  (Doc. 422-293 ¶ 2.)

91.    Mr. Jones's experiences are similar to those of other prisoners at St. Clair.  (*Id.*)

92.    Mr. Jones understands that this litigation seeks injunctive relief.  (*See* Doc. 422-077 at 345:8-10.)

93.    Mr. Jones communicates with his lawyers and believes they will adequately represent him and the class.  (Doc. 422-293 ¶ 18.)

**III.    Violence Occurs Throughout St. Clair's Facility, Including All Cell Blocks and Common Areas.**

94.    The level of violence in St. Clair is unacceptably high and pervasive throughout the facility.  (*See infra* Sections III.A-C.)  Both the frequency and seriousness of the violence make the facility extremely dangerous for St. Clair prisoners.  (*Id.*)  St. Clair prisoners routinely experience the following:

 a.    Violent non-sexual assaults by other prisoners, including but not limited to stabbings and beatings, resulting in serious injury and even death (*infra* Section III.A);

 b.    Violent sexual assaults by other prisoners, including rape and oral sex while the victim is involuntarily drugged, held at knifepoint or held hostage for days (*infra* Section III.B); and

 c.    Excessive force used by officers, including multiple officers teaming up against one prisoner, beating prisoners while they are handcuffed or restrained and spraying

chemicals on prisoners who do not pose a threat of physical violence to others (*infra* Section III.C).

A.    Prisoners Violently Assault Other Prisoners, Resulting in Serious Injury and Death, Throughout St. Clair.

95.    Prisoners frequently assault other prisoners at St. Clair.  (*See* Doc. 422-103 at 13; *infra* ¶¶ 96-98.)  For instance, from January 1, 2021 to December 31, 2021, there were 94 reported violent incidents at St. Clair (*i.e.*, incidents recorded as "inmate-on-inmate assaults" and "fights").  (Doc. 422-103 at 13.)  This amounts to a violent incident occurring every 3.9 days, a figure that does not include the many violent incidents that go unreported or are misreported.  (*Id.* at 13, 34-40.)

96.    Even when only looking at incidents that ADOC codes as assaults, there were 85 reported assaults at St. Clair in 2023 and 82 in 2022.  (*Id.* at 13-14 & Fig. 1.)

97.    The assault rate at St. Clair is consistently higher than the national average for state maximum-security prisons.  (*Id.* at 14-16 & Fig. 2.)  For instance, for 2022 and 2023, the rate of inmate-on-inmate assaults per 100 prisoners at St. Clair was 7.7 and 7.8, respectively, whereas the most recently reported national average annual assault rate for state maximum-security prisons was 4.1 per 100 prisoners.  (*Id.*)

98.    St. Clair's Quality Improvement Team ("QIT"), which was created as a result of the 2017 Settlement Agreement and tracked violent incidents at St. Clair, produced meeting minutes reflecting a "clear trend in increasing violence at St. Clair" from November 2021 to November 2022.  (Doc. 422-065 at 226:9-18; Doc. 422-256, ████████████████████████████████████████████████████████ ; *see also* Docs. 422-316, 422-317, 422-318.)  The QIT

subsequently was suspended, holding its last meeting in December 2022. (Doc. 422-088 at 312:5-14.)

99.    These prisoner-on-prisoner assaults and fights often involve weapons, including knives and ice picks. (*See, e.g., infra* ¶¶ 100, 102-03, 106.) As a result, prisoners suffer serious injury and even death. (*See, e.g., infra* ¶¶ 100-03.) St. Clair's prisoner-on-prisoner homicide rate is over double the national average for state prisons. (Doc. 422-103 ¶ 58 & Fig. 3.) For instance, the most recently reported national average homicide rate for prisoners in state prisons was 0.09 per 1,000 prisoners, as compared to the 1.8 rate of homicide in St. Clair. (*See id.*) More recent comparative national data, now being collected by the Bureau of Justice Assistance, has not been published. (*Id.* at 15 n.56.)

100.    The following is a non-exhaustive list of examples of prisoner-on-prisoner assaults resulting in death:

a.    On May 31, 2023, ███████████ was observed lying unresponsive in cell ████ with a seven-inch prisoner-made knife in his hand. (Doc. 422-166 at 1.) ███████████ was pronounced dead shortly thereafter. (*Id.*) The incident report provides that another prisoner, ███████████, stated that he had killed ███████████ (Doc. 422-103 at 20; Doc. 422-166 at 1.)

b.    On May 15, 2023, ███████████ was observed in cell ████ "laying [sic] unresponsive on his left side faced [sic] down in a pool of blood with no signs of life". (Doc. 422-164 at 2.) ███████████ was pronounced dead shortly thereafter. (*Id.*) The incident report provides that another prisoner, ███████████, stated that he had killed ███████████. (Doc. 422-103 at 20; Doc. 422-164 at 2.)

    c.  On February 8, 2021, ███████████ approached a correctional officer in N Block holding his chest, where he had been stabbed.  (Doc. 422-132 at 1.) ██████████ received emergency medical attention at the Health Care Unit at St. Clair, but life-saving measures were not successful, and ██████████ was pronounced dead.  (*Id.*)  The suspect, another prisoner, █████████, had been observed walking around the facility with a knife, and an ice pick was later confiscated from his cell.  (Doc. 422-103 at 20; Doc. 422-132.)

    d.  For additional examples, see Doc. 422-103 ¶¶ 55-56 at 20.

101.    In addition to prisoners killing other prisoners, prisoner-on-prisoner violence also results in serious injury.  (*See, e.g.*, *infra* ¶¶ 102-03.)  For the violent assaults at St. Clair from January 1, 2021 to December 31, 2021, at least one quarter resulted in transport of a prisoner to an outside medical facility for treatment.  (Doc. 422-103 at 18.)

102.    The following is a non-exhaustive list of examples of prisoner-on-prisoner assaults resulting in transportation of a prisoner to an outside medical facility:

    a.  On February 5, 2023, █████████████ was observed lying on the floor outside of █████ and █████ bleeding following an assault.  (Doc. 422-139 at 1.) ██████████ had multiples injuries to his face and a broken nose and was transported to the University of Alabama at Birmingham ("UAB") Hospital by ambulance to receive treatment for his injuries.  (Doc. 422-103 at 21; Doc. 422-139 at 1.)

    b.  On October 11, 2022, █████████ was assaulted with a weapon by another prisoner in the ██████████████ area near the front entrance stairway.  (Doc. 422-118 at 1.)  As provided in the incident report, ████████ sustained ███████████████

27



(*Id.*) ████ was transported by

helicopter to the UAB Trauma Center "due to a possible punctured/collapsed lung for

a greater chance of survival".  (*Id.*; Doc. 422-103 at 22.)

c.   On September 31, 2021, ████ was "brutal[ly] assault[ed]" by eight

prisoners, resulting in "'massive' blunt force trauma injuries to his facial area".

████ "had to be transported to [UAB] Hospital for treatment", where he

remained for over a week.  (Doc. 422-103 at 19; Doc. 422-187; *see infra* ¶ 269.a.)

d.   On April 6, 2020, ████ was observed bleeding from his chest, leg and

right foot after being assaulted by another prisoner with a weapon in the N Dorm on

the ████ (Doc. 422-112 at 1.) ████ was transported by ambulance to UAB

Hospital due to the stab wound to his chest.  (*Id.*) ████ was treated for

multiple stab wounds and was hospitalized for 12 days.  (*Id.*; Doc. 422-103 at 23.)

e.   For additional examples, see Doc. 422-103 at 21-24.

103.   The following is a non-exhaustive list of examples of prisoner-on-prisoner fights,

*i.e.*, incidents not coded as assaults, resulting in transportation of a prisoner to an outside

medical facility for treatment:

a.   On February 28, 2023, prisoners were observed fighting on the N Dorm landing.

████ and ████ both assigned to M Block, entered N Dorm

and ████ prisoners pulled out prisoner-made knives.  (Doc. 422-147 at 1-2.)  A

fight ensued, and ████ had to be transported by ambulance to UAB Hospital

to receive treatment for his stab wounds.  (*Id.*; Doc. 422-103 at 28-29.)

b.  On November 7, 2022, ███████████ and ███████████ were observed in a

physical altercation in the ███████████ area. (Doc. 422-128 at 1.)  Officers

confiscated one prisoner-made knife approximately six inches in length.  (*Id.*)

███████████ sustained multiple puncture wounds to his head, left arm, back and chest

area and had to be transported by ambulance to the UAB Trauma Center for

treatment.  (Doc. 422-103 at 29; Doc. 422-128 at 1-2.)

c.  On August 27, 2022, ███████████ was stabbed in ████████ with ███████████

███████████████████████████████████████████████████████

███████████████.  (Doc. 422-127 at 1-2.)  ███████████ was transported to UAB

Medical Center for treatment.  (*Id.*; Doc. 422-103 at 29.)

d.  On December 31, 2019, officers responded to a fight in the rear of H Dorm, where

███████████ and ███████████ were fighting with weapons.  (Doc. 422-111 at 1.)

███████████ was transported by ambulance to UAB hospital due to head trauma.  (*Id.*)

e.  For additional examples, see Doc. 422-103 at 28-33.

104.  These violent prisoner-on-prisoner assaults and fights occur throughout St. Clair,

███████████████████████████████████.  (*See id.* ¶ 79 & Fig. 6; *infra* ¶¶ 105-07, 109.)

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████





(Doc. 422-103 ¶ 79 & Fig. 6.)

105. 

(Doc. 422-103 ¶¶ 79-80 & Fig. 7.)

106.    Even supposedly "highly secure" areas of St. Clair experience high levels of violent incidents. (Doc. 422-103 ¶¶ 81-84.)

   a.  As one example, in the ▮▮▮ on May 5, 2021, ▮▮▮▮▮▮ entered ▮▮▮▮▮▮ ▮▮▮, which was assigned to ▮▮▮▮▮▮. (Doc. 422-133.) As described in an email from Defendant Warden III (then-Warden II) Mitchell to then-Warden III Noe, "Inmate ▮▮▮ took the weapon from inmate ▮▮▮s and stabbed inmate ▮▮▮ several times." (*Id.*) Then, five minutes later, ▮▮▮▮▮▮ exited the ▮ dormitory and then returned with another prisoner-made weapon and struck ▮▮▮ on the right shoulder. (*Id.*) The email describes the serious injuries both prisoners sustained: "Injuries noted inmate ▮▮▮ received multiple stab wounds ▮▮▮



. Inmate ▮▮▮ received a laceration ▮▮▮▮▮▮

▮▮▮▮ Inmate ▮▮▮▮▮ was transported to the UAB Hospital for further medical

treatment and inmate ▮▮▮ received stiches to his shoulder injury." (*Id.*; Doc. 422-

103 ¶ 83.)

b.  As an additional example, in the SSU, in the ▮▮▮▮▮▮▮▮▮ on

March 10, 2023, ▮▮▮▮▮ stabbed ▮▮▮▮▮ with a prisoner-made metal knife

six inches in length in ▮▮▮▮ left-hand area, and ▮▮▮▮ "str[uck] inmate ▮▮

in the head area with a wooden broom stick". (Doc. 422-148 at 2.) ▮▮▮▮ suffered

a two-inch laceration on the top of his head. (*Id.*; Doc. 422-103 ¶ 81.)

c.  For additional examples of violence in the SSU, see Doc. 422-103 at 113-14.

107.    ADOC staff have testified to the high rate of violent incidents at St. Clair, as well

as their pervasiveness throughout the facility, and the following is a non-exhaustive list of

examples:

a.  Former Deputy Commissioner for Operations Charles Daniels testified that

St. Clair was one of the "facilities that had the highest rates and numbers of

violence". (Doc. 422-057 at 147:6-15; Doc. 422-103 at 16-17.)

b.  Former Inspector General Mark Fassl testified that there was a "clear trend in

increasing violence at St. Clair" from November 2021 to November 2022. (Doc. 422-

065 at 226:9-18; Doc. 422-256 (reflecting 10 incidents of violence in November 2021

as compared to 22 incidents of violence in November 2022).)

c.  Former Warden Noe testified that violent incidents in August of 2022 took place

"in the dining hall, in the D dorm, G yard, the H dorm, the healthcare unit, J dorm,

K dorm, L and M dorm, the N dorm, O dorm, P dorm, and Q dorm".  (Doc. 422-088

at 285:6-23; Doc. 422-316 at 3-4 (listing various locations of violent incidents in

St. Clair).)

d.   Former Warden III Guy Noe also testified that violent incidents "occurr[ed]

throughout the prison" in September, October and November 2022.  (Doc. 422-088

at 299:22-300:18, 309:13-310:18, 313:15-316:15; Doc. 422-317 at 3 (listing various

locations of violent incidents in St. Clair); Doc. 422-318 at 3-4  (same); Doc. 422-256

(same).)

e.   Defendant Captain Omar Parker testified that "incidents of violence occur in the

dorms" over which he is the Population Captain, *i.e.*, G, H, J, K, L, M, N, O, P and Q

Dorms.  (Doc. 422-089 at 123:15-124:22.)

f.   For additional examples, see Doc. 422-103 ¶¶ 16-17.

108.   Prisoners at St. Clair also testified to the frequency and severity of violence at

St. Clair, and the following is a non-exhaustive list of examples:

a.   ███████████  testified that "[a]t a week's time, you might have four days out of the

week where some violence is going to happen" and further testified that he witnessed

50 stabbings during almost five years at St. Clair.  (████████████  at 38:8-13, 280:23-

281:6, 337:21-338:14, 350:17-351:15, 367:4-12.)

b.   Plaintiff Johnny Young testified that "[a]lmost daily at St. Clair, somebody get

whacked", "it ain't a day that go by that somebody is not assaulted in the prison" and

"[I] never know[] when, if I will be a victim of homicide, a victim of assault because

it is a commonplace thing at this institution".  (Doc. 422-098 at 368:8-16, 369:2-3,

408:19-23.)

    c.  For additional examples, see Doc. 422-103 ¶¶ 50-51.

109.  Prisoners also testified that violence happens everywhere at St. Clair, and the following is a non-exhaustive list of examples:

    a.  Plaintiff Robert Carlile testified that "it was just dangerous walking around" St. Clair, and when asked whether there was any part of St. Clair where he felt safe, he testified that "[n]o, there's not".  (Doc. 422-054 at 25:12-26:19, 42:22-43:1.)

    b.  Plaintiff Benny Jones testified that ███████████████████████ (Doc. 422-077 at 212:18-22.)

    c.  Plaintiff Johnny Young testified that "ADOC can't protect you.  They can't protect you in protective custody because guys get killed in protective custody." (Doc. 422-098 at 418:13-15.)

    d.  For additional examples, see Doc. 422-103 ¶ 78.

    **B.**   <u>Prisoners Sexually Assault Other Prisoners Throughout St. Clair.</u>

110.  Prisoners frequently sexually assault other prisoners at St. Clair, although prisoners may underreport instances of sexual assault given the barriers to reporting and fear that incidents will not be taken seriously.  (*See* Doc. 422-102 at 60-69.)  Even Defendants' prison sexual safety expert recognized in deposition that male prisoners "tend to cover up the fact that they were sexually assaulted".  (Doc. 422-292 at 363:11-18.)  (Doc. 422-383; Doc. 422-385; Doc. 422-388; Doc. 422-389; Doc. 422-102 at 66 & n.416.)

111.    Those incidents that prisoners have reported demonstrate that the nature of the
sexual assaults St. Clair prisoners experience is horrific, including prisoners being held
hostage in cells for days at a time to be raped by multiple prisoners, and the following is a
non-exhaustive list of examples:

    a.    On June 2, 2023, a sexual assault was reported via the PREA Hotline.  (Doc. 422-
099 at 29.)  Officers then found ███████████, who was assigned to M Block, in cell
███.  (*Id.*)  He reported that he had been held against his will and repeatedly beaten,
sexually assaulted and burned with cigarettes for over two weeks by another prisoner
in cell ████.  (*Id.*)  He was only able to get assistance when his assailant left his tablet
in the cell, and he used the tablet to call the PREA Hotline.  (*Id.*)  ██████████ was taken
to the Sexual Abuse Nurses Examination ("SANE") Center, where the nurse
documented multiple injuries consistent with his report, and then to the hospital.  (*Id.*
at 29-30; Doc. 422-225.)

    b.    On March 12, 2023, ████████████████ reported being tied up and raped by
multiple prisoners in multiple cells in N Dorm multiple times.  (Doc. 422-149;
Doc. 422-321; Doc. 422-102 at 38.)  The assailants filmed the assault and uploaded it
to Facebook, and "[t]he video appears to depict several unknown inmates assaulting
████████████ while tied up while ████████████ protested", which
"corroborate[s] the statement provided by ████████████".  (Doc. 422-321.)

    c.    For additional examples, see Doc. 422-102 at 38 & n.207.

112.    There are numerous reports of prisoners being sexually assaulted by other
prisoners both after being incapacitated by drugs and by other prisoners on drugs, and the
following is a non-exhaustive list of examples:

a.  During the March 2023 sexual assault of ████████████ (*see*

*supra* ¶ 111.b), ████████ reported being given cigarettes containing illegal

substances, "mak[ing him] high to the point that he is 'out of it'" prior to the assault

(Doc. 422-321).

b. 

. (Doc. 422-272 at 13.)



(*Id.*; Doc. 422-319; Doc. 422-102 at 50.)

c. 





(Doc. 422-203 at 8-9; Doc. 422-320; Doc. 422-102 at 50.)

d.  On August 13, 2021, ████████ reported that he "was drugged and sexually

assaulted by unknown inmates" in M Dorm and "attempted to report the incident"

once he "regained consciousness" but "was shunned and told to shut up". (Doc. 422-

119.) ███████ "reported being sore in inmate ██████ backside area". (*Id.*; Doc. 422-102 at 50.)

e. For additional examples, see Doc. 422-102 at 50.

113. Prisoners are also routinely sexually assaulted by other prisoners wielding weapons. (*See infra* ¶¶ 113.a-d.) In addition to the example included above (*supra* ¶ 112.b), the following is a non-exhaustive list of examples:



a. ████████████████████████████████

████████████████████████████████████

██████████████████████████████ (Doc. 422-

326 at 12.) ████████████████████████████

████████████████████ (*Id.*; Doc. 422-102 at 53.)

b. On June 8, 2021, ███████████ reported that he "was held against [his] will in ██

█ dormitory (1-side) for four days, and was raped by multiple inmates". (Doc. 422-

135.) ██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████ (Doc. 422-239 at 4.) ███████████████

██████████████████████████ (*Id.*; Doc. 422-135; Doc. 422-102 at 53;

Doc. 422-397.)

c. On February 27, 2021, █████████████ reported that two other prisoners entered his cell, ███████ when he was lying down, "hit him in the back of the head", "grabbed his hands, pulled his clothing off, and raped" him. (Doc. 422-238 at 1.) ██████████

reported that they threatened to cut his throat.  (*Id.* at 2; Doc. 422-183; Doc. 422-102 at 53.)

d.  For additional examples, see Doc. 422-102 at 53-54.  (*See also* Doc. 422-395 at 12.)

114.    Prisoners are also sexually assaulted in connection with owing debts or being extorted, and the following is a non-exhaustive list of examples:

a.  On July 5, 2023, ███████ reported that another prisoner "had extorted Inmate ███ for money and had threatened Inmate ███ if the money requested was not paid", and the other prisoner "sexually assaulted Inmate ███ between June 21 and June 29, 2023".  (Doc. 422-168; Doc. 422-102 at 59-60.)  The incident location was reported as the N Dorm ██████.  (Doc. 422-168.)

b.  On April 24, 2023, ██████████ reported that another prisoner "sexually assaulted him inside of G Dormitory on April 20, 2023 due to inmate ██████ owing drug debts with the ████████████".  (Doc. 422-162; Doc. 422-102 at 58.)

c.  On January 26, 2019, ███████████ reported that he "had been sexually assaulted and continued to be physically assaulted" for "the past two days" in his cell, ████, and that the other prisoner "has been trying to extort money from inmate ██████ (Doc. 422-169; Doc. 422-102 at 59.)

d.  For additional examples, see Doc. 422-102 at 57-60 and Doc. 422-103 ¶ 164.

115.    These sexual assaults occur throughout St. Clair, including all population cell blocks and common areas.  (*Supra* ¶¶ 104-05 (listing the distribution of violent incidents in St. Clair for 2022, 2021, 2020 and 2019).)

116.    Even supposedly more secure areas of St. Clair experience high levels of sexual

assaults.  (*See* Doc. 422-103 at 112-14.)

117.    The following is a non-exhaustive list of examples of sexual assaults that occurred

in the special safety unit ("SSU") or RHU:

a.    On August 23, 2023, ████████████████ was sexually assaulted inside his cell

by a prisoner who was assigned to ████.  (Doc. 422-231 at 2.) ████████████

████████████████████████████████████████████████████████

████ (Doc. 422-103 at 113.) ████████████████████████████████

████████████████████. (*Id.*; Doc. 422-231 at 2.)

b.    ████████████████████████████████████████

████████████████████████████████ (Doc. 422-103 at

113.) ████████████████████████████████████████████

████████████████████████ (Doc. 422-273 at 16.)

████████████████████████████████████████

████████████████████████████████████████████

(*Id.* at 16, 19; Doc. 422-103 at 113.)

c.    ████████████████████████████████████

████████████████ (Doc. 422-355 at 1-2, 15.) ████████████████

████████████████████████████████████████████

████████████████ (*Id.* at 15.) ████████████████████████

████████████████████████████████████████

████    (*Id.*)

d.  On April 10, 2023, ███████████ (assigned to █████) notified St. Clair staff that he had been sexually assaulted by two prisoners assigned to █████ and █████, respectively.  (Doc. 422-152 at 2.)  Once he was in the infirmary, ███████████ explained that the previous day, his two attackers held him captive in one of their cells and anally penetrated him with a broomstick.  (*Id.*)  ███████████ was transported to the SANE Clinic.  (*Id.*; Doc. 422-103 at 113; Docs. 422-152–61; Doc. 422-399.)

e.  For additional examples, see Doc. 422-103 at 113-14.  (*See also* Doc. 422-345.)

118.    Defendants and ADOC staff have testified to the seriousness, pervasiveness and frequency of the sexual assaults prisoners experience at St. Clair, and the following is a non-exhaustive list of examples:

a.  Former Warden Noe testified that there were incidents when he was Warden III "where inmates at St. Clair were drugged and then sexually assaulted while they were incapacitated" and that "there w[ere] multiple allegations" of "inmates [being] held against their will for multiple days and raped".  (Doc. 422-088 at 211:2-212:22.)

b.  Defendant Captain Parker testified that "incidents of sexual assault take place in the dorms" over which he is the Population Captain, *i.e.*, dorms G, H, J, K, L, M, N, O, P and Q.  (Doc. 422-089 at 123:15-124:122.)

c.  IPCM Special Investigator Kevin Gillilan, Ph.D. testified to approximately 20 sexual assaults reported at St. Clair over the past 10 months as of his deposition in July 2023.  (Doc. 422-069 at 83:16-84:2.)

d.  For additional examples, see Doc. 422-102 at 50-51.

119.    Prisoners also testified about their constant fear of sexual violence at St. Clair, including █████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

(Doc. 422-077 at 78:8-13.)

120.    The notes of PREA Auditor Darla O'Connor reflect the prisoners at St. Clair's fear of sexual violence.  (*See, e.g.*, Doc. 422-349 at 9.)  For example, Ms. O'Connor's notes from her interview with ███████████ indicate that ██████ "[d]oes not feel safe in any male facility" because "[t]hey are not separating predators and victims".  (*Id.*) ████████ indicated that "[t]here is a predator in the bed next to me".  (*Id.*)  Another prisoner similarly reported, "I don't feel safe here - sexually or physically".  (*Id.* at 3; *see also* Doc. 422-346; Doc. 422-351; Doc. 422-352; Doc. 422-353.)

C.    St. Clair Officers Regularly Use Excessive Force Against Prisoners Throughout St. Clair.

121.    Officers regularly use excessive force against prisoners, including in situations where there are multiple officers teamed up against one prisoner or where officers use force against a prisoner who is handcuffed or otherwise restrained, and the following is a non-exhaustive list of examples:

a.    On September 25, 2023, ██████████ was escorted by Lieutenant Burns to the Health Care Unit to be evaluated for severe chest pain.  (Doc. 422-178.) ████████ told Lieutenant ██████ that several officers beat him in his cell, ████.  (*Id.*; Doc. 422-103 at 118-19.)  Lieutenant ██████ reported the incident to Defendant Captain Parker, who reviewed video footage of the incident and saw several officers enter ██████████ cell.  (Doc. 422-179; Doc. 422-103 at 118-19.)

40

b.  On August 22, 2021, ███████████ reported that he was jumped on and assaulted with batons by Officers █████ and █████ in the RHU shift office in response to asking for bedsheets.  (Doc. 422-103 at 120; Doc. 422-191.)  According to the Use of Force Review Report, █████ was "removed from his prison cell in the RHU, taken to the RHU shift office, and physically assaulted, while handcuffed, by CO █████ and CO █████".  (Doc. 422-234; Doc. 422-103 at 120.)

c.  On February 6, 2019, ███████████ was detained in handcuffs in the breezeway as part of an investigation into another incident.  (Doc. 422-170.)  The incident report provides that "Sergeant Hodge had inmate █████ by the neck and shoving his head up against the wall while being handcuffed to the rear".  (*Id.*; Doc. 422-103 at 123.) ███████████ was brought to the Health Care Unit for medical treatment, and the medical report was consistent with a knot on the back of the head.  (Doc. 422-244 at 5; Doc. 422-103 at 123.)

d.  For additional examples, see Doc. 422-103 at 117-23.

122.    Officers also routinely use chemical spray against prisoners who do not pose a physical threat of violence to officers or others, and the following is a non-exhaustive list of examples:

a.  On January 23, 2023, ███████████ threw an unknown liquid out of his cell █ █ tray door at Sergeant Weaver.  (Doc. 422-175 at 2.)  The incident report provides that "Sergeant Weaver immediately administered a (1) second burst of Sabre █ spray toward inmate █████ [sic] facial area".  (*Id.*; Doc. 422-103 at 126.)

b.  On October 4, 2022, ███████████ was placed on acute suicide watch and had his handcuffs removed to be dressed in suicide watch clothing.  (Doc. 422-117 at 1.)

41

█████████████ was lying on his stomach with his hands behind his back so that his handcuffs could be reapplied, and his left hand had been secured, when he became resistant. (*Id.*) Lieutenant Santa-Maria deployed chemical spray in █████████████ face, even though █████████████ was lying on his stomach with one hand secured. (*Id.*; Doc. 422-103 at 124-25.) The location of this incident is recorded as the Health Care Unit. (Doc. 422-117 at 1.)

c. On September 7, 2021, █████████████ was in his cell (████) and exposed himself through his tray door to a nurse during pill call. (Doc. 422-186.) █████████████ did not comply when Officer Veal ordered him to stop and step back from his cell door. (*Id.*) Officer Veal deployed chemical spray through the cell door's tray door "out of fear of getting assaulted/exposed to bodily fluid from inmate █████████ (*Id.*; Doc. 422-103 at 125.)

d. For additional examples, see Doc. 422-103 at 124-7.

123. Prisoners testified to officers using chemical spray against large groups or whole blocks, and the follow is a non-exhaustive list of examples:

a. █████████████ testified that he had been sprayed with chemicals about 20 to 25 times because "you get maced even when somebody else gets maced . . . . They just come in and spray the whole dorm". (█████████████ at 227:20-228:2, 279:15-280:5.)

b. Plaintiff Robert Carlile testified that he has seen officers use chemical spray in the infirmary multiple times, and the spray gets into the eyes and mouths of everyone in the room, including those prisoners who are "real bad sick on breathing machines". (Doc. 422-054 at 95:9-21.)

c. For additional examples, see Doc. 422-103 ¶ 228.

124.    ADOC staff have testified to officers using force throughout the prison, including Defendant Captain Parker, who testified that "incidents where officers use force against prisoners take place in the dorms" over which he is the population captain, *i.e.*, dorms G, H, J, K, L, M, N, O, P and Q.  (Doc. 422-089 at 123:15-124:22.)

125.    Prisoners testified to the pervasive violence officers use against prisoners, including using force against prisoners who are handcuffed or restrained or multiple officers using force against one prisoner; the following is a non-exhaustive list of examples:



a.

(Doc. 422-077 at 138:1-13, 144:2-4.)

b.              testified that he has been hit while handcuffed "a couple of times" and that he saw two officers

while the prisoner "was in handcuffs".  (              at 301:17-18, 303:2-6.)

c.              testified that officers "assault [prisoners] every day".  (

at 74:22.)

d.    For additional examples, see Doc. 422-103 ¶¶ 223-24.

**IV.    Defendants' Common Practices.**

126.    Prisoners at St. Clair are at risk of serious harm (*supra* Section III) as a result of Defendants' common practices, described as follows (*infra* Sections IV.A-H).

    A.    Defendants' Practice Is To Allow Unauthorized Movement.

127.    St. Clair has a standard operating procedure titled "Inmate Movement Control", SOP 137.  (Doc. 422-033.)

128.    The latest version of SOP 137 produced by Defendants in final form is dated

May 11, 2016.  (*Id.*)  Defendants also produced an unsigned version of SOP 137 dated

May 5, 2021, which contains the same provisions.  (Doc. 422-034.)

129.    SOP 137 provides that 

(Doc. 422-033 at 3.)

130.    SOP 137 also provides that

and that

(*Id.* at 1.)

131.    Controlling the movement of inmates within a correctional facility is critical to its

safe and secure operation.  (Doc. 422-101 at 23-25; Doc. 422-102 at 36-40; Doc. 422-103

at 58, 71-72.)  Testimony highlighting the importance of controlled movement includes:

a.    Former Deputy Commissioner of Operations Charles Daniels testified that "one of

the methods in which we're able to regain control of anyplace that was deemed not in

control is to slow down the cadence of the operation in the units, slow down the

amount of inmates you have to deal with, if there is an event".  (Doc. 422-057 at

130:8-18.)

b.    Former Deputy Commissioner Daniels also testified, "I believe controlled

movement regardless, if you have violence, you have issues regarding security and

safety, one of your primary and easiest tools is to slow down movement, smaller

groups of inmates out at one time, moving to one place at a time, so that staff are

safer and instead of having to resolve an incident with 50 inmates, you can resolve

one with 12". (*Id.* at 206:6-15.)

c.  Former Warden III Guy Noe testified that "by slowing [prisoners] down and

controlling their movement and keeping them in their—in their authorized areas, you

slow down a lot of stuff that happens at a facility". (Doc. 422-088 at 125:9-126:13.)

d.  Defendant Warden III Phillip Mitchell testified that prisoners' movement within

the facility "needs to be controlled" because "[y]ou can better manage the inmates by

having controlled movement. . . . You never know what can happen at any given

time, so you need to know what's going on. You can't open it wide open and just let

them run around, so controlled movement is a necessity . . . ." (Doc. 422-087 at

278:4-279:7.)

e.  Former Regional Director Edward Ellington testified that it is important to control

movement "[t]o limit the number of inmates outside of the cell for safety purposes"

because "[n]ormally, inmates, if they're going to fight, they're not going to fight the

inmates they're living with. So if I'm going to fight, it's going to be another guy in

another block. So if we can control the movement of that unit, that reduces the

opportunity for assaults." (Doc. 422-063 at 305:19-306:10.)

f.  ICS Officer Jeffery Smith agreed that uncontrolled movement undermines

St. Clair's classification system (Doc. 422-093 at 149:15-19), and Defendant Captain

Parker agreed that it was a possibility (Doc. 422-089 at 268:10-14).

        1.    <u>Defendants' Practice Is To Allow Unauthorized Inmate Movement.</u>

132.  Notwithstanding St. Clair's official written policy and the recognized importance

of controlling inmate movement, Defendants' practice is to allow unauthorized

movement at St. Clair.  (Doc. 422-101 at 23-25; Doc. 422-102 at 36-47; Doc. 422-103 at 58, 71-72.)

133.    Defendants allow St. Clair's staff members to regularly let prisoners into areas where they are not assigned without verifying whether the prisoners are authorized to be in that unit.  (*See infra* ¶¶ 133.a-e, 134-61.)  Deposition testimony, including the following examples, makes clear that Defendants do not control prisoner movement at St. Clair:

a.    Defendant Warden Mitchell testified that prisoners move from one unit to another without hesitation because the doors are open and the prisoners "just walk in". (Doc. 422-087 at 318:16-21.)  Even when the gates are manned, "[t]hey just walk in, like don't say nothing to me.  They just walk in.  Or [they say], 'Hey, I'm going to get this.  I'll be right back.'  So that's coming through a manned gate, walking to the dorms."  (*Id.* at 318:16-319:7.)

b.    When asked how prisoners enter blocks to which they are not assigned, shift commander Lieutenant Roderick Gadson testified, "Who is to say?  It is not an officer with a list checking names as far as like who goes where.  You might get an inmate to say, hey, I'm going to the kitchen, and he may go to the honor dorm, you know." (Doc. 422-068 at 132:12-18.)  Notwithstanding St. Clair's SOPs to the contrary, Lieutenant Gadson further testified, "[a]in't nothing in the regs saying, hey, don't open this door to let this man go get [a] few items".  (*Id.* at 134:6-9.)

c.    Lieutenant Rafael Santa-Maria testified that "[i]t happens probably every day" that "a prisoner is living in a cell other than the one to which he's assigned". (Doc. 422-092 at 183:19-184:3.)  Lieutenant Santa-Maria further explained, "we've

had inmates that have gone from one dormitory to another dormitory and been involved in an incident. We've had incidents—we've had incidents where inmates who don't live in a dormitory but have resided there for several weeks have gotten into an incident." (*Id.* at 219:15-23.)

d. Former Captain Carla Graham testified that she is aware of inmates in dorms to which they are not assigned "[e]very day". (Doc. 422-070 at 316:22-317:2.) When asked whether "it happen[s] that a prisoner spends a significant amount of time in a cell to which they're not assigned", former Captain Graham responded, "[y]es, it does." (*Id.* at 318:10-14.)

e. Prisoner ███████ testified that there "ain't no unauthorized areas. . . . Everything is wide open. There not no where you can't go." (███████ at 325:11-18; *see also* Doc. 422-054 at 34:1-18 (testifying that prisoners "move their stuff" into other prisoners' assigned cells and that he has "never seen [officers] say anything to any of them that was—had moved in another cell").)

134. ████████████████████████████████████

████████████████████████████████████████████

(*See* Doc. 422-070 at 309:9-18.)

a. Former Captain Carla Graham testified, ███████████████████████

███████████████████████████ (*Id.* at 308:22-309:18; *see also* Doc. 422-087 at 315:10-14 ("Q. Had you observed as of this date that the gates at the facility were not being kept locked?" A. Yeah. I've seen those—I've seen it on several occasions.").)

b. ███████████████████████████████████████████

███████████████████████████████████████████

████████████████  (Doc. 422-077 at 211:8-22.)

135.    Defendants' practices permit uncontrolled movement during movement times and gym calls, when doors to multiple housing units remain open.  (*See* Doc. 422-068 at 132:12-133:7 ("Q.  Are the doors to dorms open?  A. Yeah, when we are doing a call like that.  If we are doing a movement, yeah.  Q.  Outside of movement times— A.  Yeah, if it is a gym call, they are open.").)

a.    Lieutenant Rafael Santa-Maria testified that a prisoner may be out of his cell for "legitimate[]" reasons, such as to go to the medical unit, and then "when they see that there's a dorm being released for chow that they want to go to, they'll, you know, file back in with those particular inmates".  (Doc. 422-092 at 220:14-23.)  Lieutenant Santa-Maria also testified that inmates are more likely to be out of place "from sunup to sundown".  (*Id.* at 221:4-7.)

b.    Former Captain Carla Graham testified that prisoners "frequently" enter cell blocks to which they are not assigned, and "[t]he majority of the time" this happens during movement times, such as chow time or gym time.  (Doc. 422-070 at 305:10-306:1.)  Captain Graham further testified that prisoners are able to enter housing units to which they are not assigned because "the supervisors call too many dorms at one time" and when the prisoners are on their way back into the housing units, "they might swap dorms".  (*See id.* at 306:7-307:9; *see also id.* at 307:10-21 ("Q.  Is there ever a scenario where multiple dorms are let out for pill call at once?  A.  It depends. If they are running late in calling pill call and they'll call the work call, mail call, and

yes.  Q.  And that creates the same situation of unauthorized movement?  A.  Yes.");

*id.* at 308:8-21 ("Q.  Okay.  And what about ACI?  A.  Now, ACI, they—it's called

along with work call.  Q.  Okay.  A.  So like if they call work call for several different

dorms, yeah, you can—they'll come out then.  Q.  They'll all come out together?

A.  Yes.  Q.  And so there's the same risk of— A.  Yes.  Q.  —mixing and mingling

dorms?  A.  Yes.").)

2.    <u>Defendants Do Not Enforce St. Clair's Wristband Policy.</u>

136.    Despite St. Clair's longstanding written policy of using wristbands to identify

inmates and prevent unauthorized movement, Defendants' practice is not to enforce the

use of wristbands at St. Clair.  (Doc. 422-101 at 23-25; Doc. 422-102 at 40-42; Doc. 422-

308 at 23.)

137.    St. Clair's SOP 083, titled "Inmate Control Systems (ICS) Officer", provides that

"[t]he ICS Officer will be responsible for issuing colored wristbands to inmates" that

"will be attached to population inmates in order to designate the inmate's assigned

housing unit, thus enabling security staff to control inmate movement".  (Doc. 422-024 at

2-3; *see also* Doc. 422-022 at 5-6; Doc. 422-033 at 2.)

138.    SOP 083 provides that "[i]nmates who have been identified as having

purposefully damaged or altered their wristbands will receive disciplinary action".

(Doc. 422-024 at 3.)

139.    SOP 083 states that "[w]ristbands are an important tool we use in our efforts to

keep unauthorized inmates out of unassigned cellblocks.  When inmates are re-assigned

beds, the wristbands are changed immediately."  (*Id.*)

140.    ███████████████████████████████████████████.  (*See*

Doc. 422-032 at 3.)

49

141.     Deposition testimony, including the following, makes clear that Defendants do not enforce St. Clair's established wristband policy:

   a.  Defendant Captain Parker testified that inmates are supposed to wear wristbands but that "[a]ll prisoners currently are not wearing wristbands" because "[c]urrently, it has not been mandated to check for inmates wearing wristbands".  (Doc. 422-089 at 247:17-19, 249:1-4, 249:12-17.)

   b.  Former Warden Guy Noe testified that when he was Warden III at St. Clair, ████ ████████████████████████████  (Doc. 422-088 at 124:20-21, 125:2-8.)

   c.  ICS Officer Jeffery Smith, who according to the written policy is "responsible for issuing colored wristbands to inmates" (Doc. 422-024 at 2), said that he does not administer the wristband policy and was unaware whether the policy was still in effect (Doc. 422-093 at 28:1-17).

   d.  When asked how often wristbands are checked, shift commander Lieutenant Rafael Santa-Maria testified, "I'd probably say seldom, only because I'm not — you know, you got to pick and choose your battles wisely".  (Doc. 422-092 at 217:13-17; *see also id.* at 217:18-21 ("Q.  Are your supervisors aware that the wristband policy is enforced sporadically?  A.  Yes.").)

   e.  Former Captain Carla Graham testified that inmates "got away with" taking off their wristbands such that the wristbands are not used anymore.  (Doc. 422-070 at 311:19-312:2.)

   f.  Defendant Warden Mitchell testified that "they got bands that they take off . . . . They take the bands off their wrists" and agreed that, in the absence of a wristband,

"you just have to know where [they are] housed".  (Doc. 422-087 at 320:6-18, 320:23-321:3.)

g.  When asked whether the inmates at St. Clair use wristbands to identify their dorm or housing assignment, IPCM Kevin Gillilan testified, "I don't believe they currently do".  (Doc. 422-069 at 247:21-249:3.)

h.  Plaintiff Johnny Young testified that he did not know of a single inmate who wore his wristband and that he was not wearing his wristband during his deposition because "[w]e don't have to wear them".  (Doc. 422-098 at 220:14-15; 221:1-3.)

142.    During their visits to St. Clair, Plaintiffs' experts "observed hardly any wristbands".  (Doc. 422-102 at 41.)  Michelle Bonner explained that when she asked prisoners "about the wristbands, most replied that they fell off, were not replaced by St. Clair staff, and they had not had wristbands for over a year to years".  (*Id.*)

               3.    <u>Defendants' Practice Is To Conduct Insufficient Bed Roster Counts.</u>

143.    Defendants have a practice of not conducting bed roster counts and not ensuring the counts that do occur are conducted properly.  (*See* Doc. 422-102 at 37.)

144.    The purpose of the bed roster count is to verify that each inmate is actually in his assigned cell.  (Doc. 422-092 at 181:9-12.)

145.    SOP 056 provides that █████████████████████████████████████ ██████████████████████████████████████████████████ (Doc. 422-022 at 5.)

146.    Completing a bed roster count requires an officer to print out the inmate bed roster for each housing unit and identify every inmate assigned to that unit according to

the bed roster based on his name, AIS number and/or inmate ID. (Doc. 422-092 at 181:13-19.)

147.    Defendants' practice is to allow St. Clair's staff to regularly not conduct bed roster counts, as testimony makes clear:

    a.   When asked if officers ever skip the bed roster counts, Lieutenant Rafael Santa-Maria testified that "yes, we may". (*Id.* at 181:20-23.)

    b.   Lieutenant Roderick Gadson testified that individuals sleep in cells to which they are not assigned "[p]robably all the time if you have got night shift ain't going around conducting bed rosters". (Doc. 422-068 at 93:1-5.) He later reiterated that "if you have got night shift not conducting bed roster counts like they are supposed to and not moving guys back like they are supposed to, you are probably going to have people sleeping where they aren't supposed to be". (*Id.* at 119:21-120:3.)

    c.   Plaintiff Johnny Young testified that he "can't even remember" the last time a bed roster count was completed in his assigned housing unit. (Doc. 422-098 at 287:17-20.)

148.    Defendants also allow bed count rosters that are completed to be done improperly, without enforcing housing assignments:

    a.   When asked if bed roster counts are conducted improperly sometimes, former Captain Carla Graham testified, "[y]es, they are". (Doc. 422-070 at 315:4-6.) Former Captain Graham further testified that some officers, when they discover that the wrong inmate is in a housing unit, will "have that inmate [] step out and sit in the day room space" and "will just go ahead and write the inmate on the back of the count

sheet" instead of taking the inmate "back to their assigned dorm and then giv[ing] them a disciplinary". (*Id.* at 315:9-22.)

b.   Lieutenant Santa-Maria agreed that he was aware not all officers conduct thorough bed roster counts. (Doc. 422-092 at 183:7-12.)

c.   Prisoner ███████ testified that during the bed roster count, officers are "going to count you wherever you're at. If I ain't in my cell, like I said, I sleep in █ cell. I'm in █ cell. So they going to come to █ cell, they going to ask me what cell I sleep at. I'm going to tell them I sleep in █ cell, and they going to mark me off █ cell." (███████ at 157:7-13.)

d.   Plaintiff Benny Jones testified that when officers do bed roster counts, they ███ ███████████████████████████████████████ ███████████████████████████████████████ ██████████████████████ (Doc. 422-077 at 79:2-9.)

149.    Defendants allow prisoners to prevent other prisoners from sleeping in their assigned cells, forcing the displaced prisoners to sleep in public areas like the dayrooms:

a.   Classification Specialist Philip Cox testified that there were "many times" at St. Clair where a prisoner was forced out of his housing unit by other prisoners, saying "many times, an inmate will pack a guy up and say: 'Get out of here. Go back to the shift office. You're not welcome here. Go to seg. We don't want you in our population.'" (Doc. 422-055 at 107:7-13.)

b.   During the site visit at St. Clair, Plaintiffs' expert Dan Pacholke observed that a prisoner had moved his mattress into the dayroom and was residing there. (Doc. 422-100 at 14; Doc. 422-274; Doc. 422-275.)

c.  Prisoner ███████ testified, "[y]ou got people sleeping in the dayroom.
People ain't got no cell, people who got no cell, they got to sleep in the dayroom".
(█████████ at 179:16-20.)

d.  Plaintiff Robert Carlile testified that when he was assigned to M Dorm in 2020,
████████████████████████████████████████████████
████████████████████████ (Doc. 422-054 at 39:11-23.)  Mr. Carlile
also testified that he saw prisoners sleeping in the dayrooms.  Some prisoners dragged
their mattresses to the dayrooms, while others "just laid down on the cement".  (*Id.* at
121:18-122:5.)

e.  Prisoner ████████ testified that prisoners are forced to sleep in the
dayrooms instead of their assigned cells.  (██████ at 194:15-195:15.)

4.  <u>Defendants Do Not Document or Discipline Unauthorized Movement.</u>

150.    Since Defendants permit staff at St. Clair not to monitor for unauthorized
movement, St. Clair's staff do not document or report unauthorized movement and do not
discipline the prisoner found out of place unless he is involved in a disturbance.
(Doc. 422-102 at 36-37.)

a.  Lieutenant Rafael Santa-Maria testified that an out-of-place prisoner will only
receive a disciplinary, and an incident report will only be done, if the prisoner is
"creating a problem or is involved in the incident"; otherwise, there is "no document"
of the inmate being in the wrong place.  (Doc. 422-092 at 212:1-213:17.)  Lieutenant
Santa-Maria also testified that there is "a good possibility" that officers are aware that
prisoners are out of place but do not record that information anywhere.  (*Id.* at
213:12-17.)

b.   Defendant Captain Parker testified that he is not informed that an inmate was in an unauthorized area unless the prisoner caused a disturbance.  (Doc. 422-089 at 246:17-247:12.)  If there is no incident, the prisoner is just told to return to his housing block.  (*Id.*)

     5.    <u>Defendants' Practices Result In Direct Harm to Inmates.</u>

151.   Defendants' practices of not enforcing housing unit assignments and allowing uncontrolled inmate movement result in frequent violence between prisoners assigned to different housing units and in areas where the prisoners involved are not authorized to be. (*See infra* ¶¶ 151.a-i.)  Examples include but are not limited to:

a.   From June 21 to June 29, 2023, ███████ (assigned to M Block) was repeatedly sexually assaulted by an inmate assigned to J Block.  (Doc. 422-209.)  The victim initially did not report the incident out of fear and because he had been "hiding under a friend's bunk for the last week or so".  (*Id.*; *see supra* ¶ 114.a.)

b.   On June 2, 2023, ███████ (assigned to ██) was discovered in ███████ after reporting a sexual assault via the PREA Hotline as described above.  (Doc. 422-208; *see supra* ¶ 111.a.)

c.   On February 24, 2023, ███████ (assigned to ██ was seen being chased by ███████ (assigned to ██ with a knife, through ███████.  (Doc. 422-146 at 2.)  Simultaneously, ███████ (assigned to ██ was being assaulted with a weapon by ███████ (assigned to O), in the ███████.  (*Id.*)  Both victims were transported to a free world hospital for their injuries.  (*Id.*)

d.   On February 22, 2023, a correctional officer observed ███████ (assigned to █ Block), with a bloody head injury, being carried out of N/O housing unit by several inmates.  (Doc. 422-145 at 2.)  ███████ stated that he had fallen down and

hit his head but later told officers that he had gotten into a physical altercation with several inmates in N/O. (*Id.*) Video footage revealed that ███████ was assaulted by ███████████ (assigned to ██ Block) and ███████████ (assigned to ██ Block). (*Id.*)

e.   On February 5, 2023, ████████████████ (assigned to ███████), was found lying on the floor of ████████, bleeding. (Doc. 422-139 at 1.) A review of camera footage revealed that ███████████ (assigned to ██ Block), ██████████████ (assigned to ██ Block), ███████████ (assigned to ██ Block), and █████████████ (assigned to ██ Block) participated in the assault. (*Id.*) ████████████████ (assigned to ██ Block) and ████████████ (assigned to ██ Block) also assisted with the assault. (*Id.*) ████████████ was taken to a free world hospital for his injuries. (*Id.*)

f.   On January 19, 2023, ██████████████ (assigned to the ████████████) was assaulted and robbed near the entrance of the █████████ tunnel by four other prisoners assigned to M, N, and O blocks. (Doc. 422-136 at 1.) The assailants were "placed on ████████ due to lack of RHU cell availability". (*Id.* at 1-2.)

g.   On February 28, 2023, two prisoners from ██ dorm, members of the ████ gang, tried to enter N dorm. (Doc. 422-147 at 2.) Prisoners from ████████, all members of the ████████████ gang, pulled out weapons and started to fight. (*Id.*) One prisoner was transported to the UAB Hospital for multiple stab wounds. (*Id.*)

h.   On March 20, 2022, at approximately 3:45 a.m., an altercation occurred between two inmates with weapons in O Block. (Doc. 422-123.) One of the inmates involved was assigned to N Block. (*Id.*) It was determined that the inmate assigned to N Block had been allowed to remain in O Block because the bed roster count had not

been completed correctly.  (*Id.*)  Former Warden III Noe agreed that this incident is

"███████████████████████████████████████████████████████

████████████████████".  (Doc. 422-088 at 155:9-14.)

    i.    For additional examples, see *supra* Section III and *infra* Paragraph 269.a.

    6.    <u>Defendants' Failure to Implement the Daniels Plan for Controlled Movement.</u>

152.    Charles Daniels was Deputy Commissioner of Operations from January to December 2019.  (Doc. 422-057 at 6:11-17.)

153.    On April 1, 2019, Deputy Commissioner Daniels submitted the "ADOC's Short-Term/Mid-Term Plan for St. Clair Correctional Facility" (the "Daniels Plan"). (Doc. 422-242.)

154.    Section IV of the Daniels Plan, titled "Limiting Inmate Movement/Controlling the Population", contained a provision describing a "[c]hange in movement opportunities for blocks P and Q".  (*Id.* at 7.)  Specifically, "[s]tarting April 1, 2019, the out of cell time for inmates in blocks P and Q will be 'staggered' or alternated between inmates living in the top tier of the housing unit and those living in the bottom tiers of the housing unit. . . . Similarly, in blocks P and Q, the top tiers and bottom tiers of these cell blocks will be sent to meals, commissary, etc. at alternative times." (*Id.*)

155.    The Daniels Plan stated this controlled movement directive would be "a 'force multiplier' in the sense that it immediately increases the ratio of available staff to inmates who are out of their cells in these blocks".  (*Id.*)  To that end, the Daniels Plan quoted former Secretary of Defense Donald Rumsfeld's quote:  "You go to war with the army you have, not the army you might want or wish to have at a later time."  (*Id.* at 3.)

156.    Deputy Commissioner Daniels believed that the controlled movement directive outlined in the Daniels Plan was "essential" for operations at St. Clair.  (Doc. 422-057 at 189:7-13.)  He created the controlled movement directive outlined in the Daniels Plan because he "believed that it would be effective in reducing acts of violence".  (*Id.* at 200:12-24.)

157.    Deputy Commissioner Daniels directly ordered the wardens at St. Clair to implement the controlled movement directive outlined in the Daniels Plan.  (*See id.* at 191:24-192:14.)

158.    On August 23, 2019, Deputy Commissioner Daniels learned that the wardens at St. Clair ████████████████████████████████████████████████.  (*Id.* at 171:9-173:3; Doc. 422-056 at 3.)  On August 25, 2019, Deputy Commissioner Daniels requested that the Office of the Inspector General (the "OIG") ████████████ ██████████████████████████████████████████████  (*Id.* at 2.)  ████████████████████████████████████████████ ████████████████████████████████  (*Id.*)

159.    ████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████.  (*Id.* at 15-17.)  The report concluded that ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████  (*Id.* at 16.)

160.    When Deputy Commissioner Daniels resigned from ADOC in December 2019, he continued to believe that St. Clair would benefit from the directives outlined in the Daniels Plan.  (*See* Doc. 422-057 at 197:22-198:2.)  He testified, "I did not waiver from the directives outlined in my plan.  I had every expectation that they remain in place until otherwise modified, shut down, new orders issued."  (*Id.*)

161.    ███████████████████████████████████████
████████████████████████████████████████████
█████████████████████ at St. Clair since Charles Daniels resigned as Deputy Commissioner in December 2019.  (*See* Doc. 422-103 at 68.)

     B.    <u>Defendants Have a Practice of Not Repairing Broken or Obstructed Locks, Call Buttons and Cameras.</u>

162.    St. Clair has a standard operating procedure titled "Institutional Security Inspections", SOP 182.  (Doc. 422-035.)  The latest version of SOP 182 that was produced by Defendants in final form is dated November 7, 2023.  (*Id.*)

163.    SOP 182 contains facilities-related inspection and requirements, including:

    a.    ████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████  (*Id.* at 2.)

    b.    ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████  (*Id.* at 4.)

c. ████████████████████████████████

████████████████████████████████████

█████████████████████████████████

████████ (*Id.*)

164.    SOP 182 also contains facilities-related reporting requirements, including:

a. ████████████████████████████████

████████████████████████████████

█████████████████████████████████

███████████████████████████████████

█████████████████████████████ (*Id.* at 2.)

b. ████████████████████████████████

██████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████ (*Id.*)

      1.    <u>Defendants Have a Practice of Not Conducting or Conducting</u>
<u>Insufficient Inspections of Locks, Call Buttons and Cameras.</u>

165.    Defendant Captain Parker admitted at deposition that, contrary to SOP 182 (*id.* at

4), "inspections of cell locks is not conducted daily" since as far back as 2021 (Doc. 422-

089 at 219:11-22).

166.    Defendant Warden Mitchell admitted at deposition that, ███████████████████

(Doc. 422-035 at 4), there is no "written log that would memorialize when [he has]

made . . . a call to maintenance" about ████████████████ (Doc. 422-087 at 94:7-23).

167.    Defendant Captain Parker admitted at deposition that ████████████
████████████.  (Doc. 422-089 at 235:11-14.)

168.    Defendant Warden Mitchell testified that he no longer checks to see if the call buttons work in a particular location:  "I would usually — once before, but I don't because half of them don't work."  (Doc. 422-087 at 114:8-21.)

169.    Contrary to SOP 182 (Doc. 422-035 at 4), ████████████████
████████████████████ Forms:

    a.    Former Captain Graham testified that she reviewed inspection forms "to make sure that [officers] just wasn't copying down what some of the other officers was copying down and making sure that they did the actual inspection".  (Doc. 422-070 at 301:18-302:21.)

    b.    When presented with four inspection forms for J Block from January 10, 2021, Lieutenant Price agreed that inconsistencies across the forms "indicate[d] . . . that some of these inspections are not accurate".  (Doc. 422-090 at 155:16-160:11.)

170.    Contrary to SOP 182 (Doc. 422-035 at 4), St. Clair officers ████████████
████████████████████████████████████████
████

    a.    Former Captain Graham testified that, ████████████████████
████████████████  (Doc. 422-070 at 297:4-11.)

    b.    Defendant Warden Fox testified that prisoners are only "[s]ometimes" moved away from cells with broken cell door locks, and that he is "not aware" of any policy that requires that prisoners be moved to a cell with a functioning lock.  (Doc. 422-066 at 102:2-11.)

2.    <u>Defendants Have a Practice of Leaving Locks Broken or
Obstructed at St. Clair.</u>

171.    St. Clair officials have testified that many cell door locks are broken or do not

lock properly, including the following examples:

a.    Lieutenant Antoine Price testified that he sees "multiple" tricked cell doors

"[e]very day".  (Doc. 422-090 at 150:9-14.)

b.    Former Captain Graham agreed that that ███████████████████████

███████████████████████████████████████████ (Doc. 422-

070 at 287:11-15, 288:3-9.)

c.    Former Warden Guy Noe agreed that, when he retired in September 2023, "there

were a number of broken security locks" at St. Clair.  (Doc. 422-088 at 342:16-20.)

172.    Prisoners have testified that locks are often broken at St. Clair, including, for

example:

a.    Plaintiff Nathaniel Harris testified that cell doors "don't work" because "[t]hey

are jammed".  (Doc. 422-074 at 117:16-118:5.)  Although the doors are supposed to

lock when you close them, Mr. Harris testified that "[t]hey don't lock.  They will

slam back." (*Id.*)

b.    ██████████████ testified that ████████████████████████". (████████

███ at 313:8-21.)  He further testified that the doors are ██████████████████

████████████████████ (*Id.*)

c.    When asked how many of the 24 cells on his side of N Dorm had broken or

damaged door locks, ██████████████ testified that it was "[p]robably, all of them".

(██████████████ at 146:3-23.)

173.    Plaintiffs' experts observed broken locks during their site visits:

    a.  Christopher Miller observed: ███████████████████████

███████████████████████████████

███████████████████████████████

██████████████████████████████

████████  (Doc. 422-099 at 22.)

    b.  Dan Pacholke visited St. Clair twice.  (Doc. 422-100 at 4-7.)  In April 2022, the dorms he toured had units that "were dark and smoky and many of the cell door locking mechanisms were jammed".  (*Id.* at 4-5.)  On his second visit in December 2023, he toured areas he had not seen before and observed that "the locking system for cells and main entry doors are jammed/tricked to a significant degree".  (*Id.* at 5-7.)

174.    Defendants' experts also observed broken locks during their site visits:

    a.  Bill Bechtold testified, ████████████████████████████████ (Doc. 422-329 at 220:12-16.)

    b.  Kathy Lane confirmed that she "look[ed] at" and saw "cell door locks that weren't operational" during her visit of St. Clair.  (Doc. 422-292 at 244:3-8.)

175.    In 2014, St. Clair contracted with Seay, Seay & Litchfield and Cornerstone Detention Productions, Inc. to replace all of the cell block doors in both the GP and Segregation units (the "2014 Replacement Project").  (Doc. 422-049 at 119:8-122:11.)  The 2014 Replacement Project was not completed until 2021.  (*Id.* at 122:2-5.)

176.    In 2020, an internal team at St. Clair determined that the cell door locks were not functioning, despite the 2014 Replacement Project.  (*Id.* at 126:6-127:1.)

177.    The cell block doors in the RHU are sliding doors (*id.* at 159:9-17), and the cell block doors in the GP Units are swing-style (*see* Doc. 422-079 at 53:2-11).

178.    After he conducted a site evaluation, ADOC employee Johnny Rush emailed Defendant Director of Facilities Abbott on January 21, 2022 describing ███████████

████████████████████████████████████████████████

████████████████████████ (Doc. 422-240; Doc. 422-049 at 158:18-159:5.)

    a.    Regarding the sliding doors at St. Clair, Mr. Rush wrote that "overall design is susceptible to vandalism". (Doc. 422-240 at 2.) ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ (*Id.*)

    b.    Regarding the swing-style doors at St. Clair, Mr. Rush wrote that the ███████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████ (*Id.* at 1.) Mr. Rush wrote further. ████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████ (*Id.*

at 2.)

179.    ADOC has not hired outside contractors to repair broken locks at St. Clair since

2020. (Doc. 422-049 at 141:23-142:10.)

    a.    As Defendant Director of Facilities Management Abbott testified, St. Clair

    "currently do[es] not have a maintenance contract for repair and replacement of

    locks". (*Id.* at 136:15-137:5.)

180.    ADOC engaged JMR+H to repair or replace broken door locks and door frames

starting in 2020, but "none of this is contracted for", nor is the project completed. (*Id.* at

162:18-163:8.)

    a.    Until this project is completed, at least one dorm, P-2, continues to be closed in its

    entirety because of unrepaired locks and call buttons. (Doc. 422-089 at 237:23-

    241:18.)  Defendant Captain Parker confirmed at deposition that this dorm "became

    unavailable for occupancy by inmates on May 6, 2019, for repairs". (*Id.* at 237:23-

    240:22.)  Despite the passage of five years, Defendant Parker also testified, "I don't

    know of any plans to reopen P-2" or make the additional 48 beds in P-2 available for

    housing. (*Id.* at 240:23-241:18.)

181.    When asked whether St. Clair had "any plan in place to prevent or reduce the

number of the new locks that will be tampered with" once JMR+H completes the project,

Chief Deputy Commissioner Lovelace responded, "I don't know". (Doc. 422-079 at

74:13-20.)

182.    Prior to completion of the JMR+H project, Defendants have relied and will continue to rely on a single on-site employee from ████████████████████, to conduct repairs of broken locks.  (*Id.* at 78:5-23, 81:3-12.)

a.    Chief Deputy Commissioner Lovelace confirmed that "until the work on the JMR+H project begins, the only locks that will be repaired at St. Clair are the locks that ████████ is able to repair".  (*Id.* at 81:3-12.)  Chief Deputy Commissioner Lovelace confirmed that, aside from ████████, there is no "other maintenance personnel assigned to St. Clair".  (*Id.* at 78:5-23.)

b.    Defendant Warden Mitchell admitted that he does not necessarily confirm with ████████ if locks that have been reported as broken have been repaired.  (Doc. 422-087 at 102:11-23.)

3.    Broken or Obstructed Locks Contribute to Violence at St. Clair.

183.    Functional locks are critical to ensuring the safety of staff and prisoners at St. Clair.  (*See infra* ¶¶ 183.a-f, 184-85.)  Testimony highlighting the importance of functional locks includes:

a.    Chief Deputy Commissioner Lovelace testified that locks are a "security issue" with "high priority".  (Doc. 422-079 at 13:16-14:1.)

b.    Defendant Director of Facilities Management Abbott testified that secure cell locks are important to "the safety of staff and inmates" because "it's important to be able to separate inmates when necessary and to control inmate movement when necessary".  (Doc. 422-049 at 44:10-45:2.)

c.    Former Institutional Coordinator for Northern Region Ellington testified that it is important that cell doors lock because they "prevent inmates from entering cells that they are not assigned to" and "prevent an assault".  (Doc. 422-063 at 158:15-159:8.)

d.   Defendant Warden Mitchell testified that locking the gate to G block helped "make it easier [to] control movement".  (Doc. 422-087 at 70:16-71:14.)

e.   Former Warden Noe agreed that it is "important to have controlled movement" at a "close security facility like St. Clair", and that unlocked gates "defeats a controlled movement plan".  (Doc. 422-088 at 100:8-21.)

f.   Defendant Warden Fox agreed that locks are a "serious concern for the safety and security at St. Clair".  (Doc. 422-066 at 101:9-102:1.)

184.    Broken and tricked locks contribute to violence and sexual assault at St. Clair, which is highlighted by the following testimony:

a.   Former Institutional Coordinator for Northern Region Ellington agreed that "it's important that cell doors lock to protect the safety of prisoners at St. Clair", adding "as well as the staff".  (Doc. 422-063 at 158:15-159:8.)  Mr. Ellington also agreed that "cell door locks not working creates the possibility of prisoner-on-prisoner violence", adding "as well as on staff".  (*Id.* at 161:3-16.)

b.   Lieutenant Price agreed that "[i]f a prisoner in a cell with a lock that's malfunctioned", that is "a security risk" that "could . . . result in violence against that prisoner" and "sexual assault against that prisoner".  (Doc. 422-090 at 160:20-161:11.)

c.   Former Captain Graham agreed that ████████████████████████ ████████████.  (Doc. 422-070 at 288:10-13.)

d.   Defendant Warden Fox agreed that broken cell door locks are "a serious concern for the safety and security at St. Clair".  (Doc. 422-066 at 101:9-102:1.)

67

185.    Defendants' practice of not repairing broken or obstructed locks leads to issues with cell block doors that contribute to violence and sexual assault at St. Clair; examples of incidents include but are not limited to:

a.   On February 12, 2023 at approximately 1:45 a.m., the ██ cube officer observed ██████, who was assigned to cell ██, running from cell ██, which was assigned to ██████. (Doc. 422-142.) ██████ told officers that ██████ "opened his locked door and robbed and threatened him at knifepoint". (*Id.*) ██████ was found to be in possession of two knives and ██████ property. (*Id.*)

b.   On December 14, 2022 at approximately 3 p.m., ██████ was escorted from ██ side, a RHU, to the property room to receive a telephone call. (Doc. 422-129.) About five minutes later, ██████ "forced open his cell door" in the RHU, cell ██ and hid inside the bottom tier bathroom. (*Id.*) When ██████ returned to ██ at approximately 3:25 p.m., ██████ ran out of the water closet and attacked ██████ (*Id.*) ██████ had remained out of his unlocked cell undetected, waiting to assault ██████, for approximately 20 minutes. (*Id.*)

c.   On July 4, 2022 at approximately 12:28 p.m., an officer "visually observed" ██████ as he "forced open his cell door . . . and physically assault[ed]" ██████ near cell ██ as ██████ was returning from the shower area. (Doc. 422-116.) Officers reported that ██████ "manipulated the locking mechanism of his . . . cell door allowing him . . . to come out of the cell without it being physically/properly unlocked." (*Id.*) ██████ "verbally admitted that he . . . 'tricked' his door so he . . . could get out to fight" ██████. (*Id.*)

d.  On June 12, 2022 at approximately 2:15 a.m., the M Block cubicle officer "observed inmates yelling and crowding around inmate ██████████ (Doc. 422-124.)  When officers arrived to respond, they found "all doors unsecure/Tricked after a lockdown was complete prior to this incident".  (*Id.*)

e.  On September 3, 2020 at approximately 2:45 p.m. in the RHU, ██████████ "opened his altered assigned cell door, ran down from the top tier and entered ██████ Side, and began assaulting inmate ████████ with two 4 inch handmade knifes [sic]."  (Doc. 422-114 at 1.)  ██████ was transported by ambulance to the UAB Trauma Center.  (*Id.*)  An inspection of ██████ cell door "revealed the cell door was altered with soap, not allowing the door to [be] fully secured when closed."  (*Id.* at 2.)

4.    Defendants Have a Practice of Leaving Call Buttons Broken or Obstructed at St. Clair.

186.    Call buttons, which are used by prisoners to call for help when they are inside of their cells, are located within the cell door frames.  (Doc. 422-049 at 123:7-20.)

187.    Door frames were not replaced as part of the 2014 Replacement Project.  (*Id.* at 122:2-5.)

188.    Regarding the swing-style doors at St. Clair, ADOC employee Rush wrote to Defendant Director of Facilities Abbott and stated that the ██████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████.  (Doc. 422-240.)

189.    St. Clair officials have acknowledged that call buttons at St. Clair are nonoperational or broken:

    a.    Former Warden Noe testified, that when he retired, "[t]here were some [cell call buttons] that were not operational".  (Doc. 422-088 at 343:12-18.)

    b.    Defendant Warden Mitchell testified, "[s]ince I've been at St. Clair, they haven't used no call buttons.  I mean, none existed.  So no, I don't.  I don't know what a call button is."  (Doc. 422-087 at 111:2-9.)

    c.    When asked about whether she knew anything about call buttons, former Captain Graham testified, "I mean, I've heard about it, but I don't know if they ever worked since I've been there".  (Doc. 422-070 at 293:5-15.)

    d.    Director of Facilities Management Abbot testified that she did not know how many of the call buttons at St. Clair work.  (Doc. 422-049 at 195:12-17.)

190.    Prisoners have testified that most, if not all, call buttons at St. Clair are broken, including, for example:

    a.    ████████ testified, "I don't think none of [the call buttons] work.  If they do, they don't respond to them."  (█████████ at 446:12-18.)

    b.    ████████ testified that he knows the call buttons don't work because he "[p]ush[es] it every day" and "[n]othing" happens.  (█████████ at 282:16-283:20.)

191.    Plaintiffs' experts observed broken call buttons during their site visits:

    a.    During Christopher Miller's 2023 visit, "not one cell call button could be verified as operational".  (Doc. 422-099 at 27.)

    b.    During Dan Pacholke's 2023 visit, he wrote about Intake Unit O1:  "I saw the remains of where alert buttons were originally installed in their cells.  Other alert

buttons appeared to be disassembled or inoperable, meaning that prisoners who reside
in those cells have no way to request help from COs in the case of an emergency."
(Doc. 422-100 at 12-13.)

192.    Defendants' experts have acknowledged that the call buttons at St. Clair are not
functional:

a.    Bill Bechtold testified that ███████████████████████████████████████
████████████████████████████████████████████████████".  (Doc. 422-
329 at 213:7-15.)

b.    Kathy Lane confirmed that she "look[ed] at" and saw "call buttons that weren't
operational" during her visit of St. Clair.  (Doc. 422-292 at 244:3-14.)

> 5.    <u>Broken or Obstructed Call Buttons Contribute to Violence at
> St. Clair.</u>

193.    St. Clair officials agree that the functionality of call buttons is important because
inmates must be able to get officers' attention in emergency situations:

a.    Former Regional Director Ellington testified that "[i]f an inmate's in a population
or restrictive housing cell and he — he needs attention, needs officer attention, he'll
push the call button, and it'll make notification in the cubicle".  (Doc. 422-063 at
174:15-21.)

b.    Lieutenant Antoine Price testified that "for instance, you have an inmate who's in
duress or, you know, he has a cellmate who's had a medical emergency, they press
the button in the cell, it lights up on the — on the board for the cubicle operator who
will notify a rover or — to come and check and see what's going on".  (Doc. 422-090
at 167:22-168:5.)  Lieutenant Price also testified that it is important for cell call
buttons to be functional "[b]ecause there's no other way for [officers] to get — offer

assistance" when, for example, "you have an inmate who may be — have a medical condition who needs assistance, whether it's an asthma attack or overdose or, you know, there's an altercation between them".  (*Id.* at 167:3-21.)

194.   Plaintiffs' experts have opined that cell call buttons are particularly important at St. Clair because officers have limited direct visibility into the housing cells:

a.   Steve Martin opined that "[w]ithout functioning in-cell call buttons, prisoners are unable to adequately call for help during an emergency" because █████████████ ████████████████████████████████.  (Doc. 422-103 at 76.)

b.   Christopher Miller opined that "[t]he cells at St. Clair are secured by metal doors (rather than bars)", and so "[a]n officer who is directly in front of a cell in the general population dorms is only able to discern what is happening inside the cell by looking into the cell window".  (Doc. 422-099 at 27.)  However, because many cell windows are frequently covered or broken, "[t]he inability of staff to view the interior of a cell through the cell window prevents the detection of inmates committing acts of self-harm, committing acts of violence or sexual abuse, or attempting to escape".  (*Id.*)

195.   Defendants' practice of leaving call buttons broken or obstructed at St. Clair leave prisoners without a way to call from help within their cells, thereby contributing to health emergencies and incidents of violence and/or sexual assault; examples include but are not limited to:

a.   On June 2, 2023, an officer was sent to conduct a welfare check on an inmate who had reported a sexual assault via the PREA Hotline.  (Doc. 422-225 at 1.) Although that inmate was assigned to M Block, he was found in cell ████ where he had been

"held against his will for over two weeks" and was sexually assaulted. (*Id.*) An investigation found the prisoner's accusations to be "[s]ubstantiated". (*Id.* at 2.)

b.  On January 22, 2022, an officer found an incarcerated individual in cell ██ "unresponsive, but breathing". (Doc. 422-241 at 1.) He was taken to the infirmary for "lifesaving measures" and then to St. Vincent's Hospital, where he died. (*Id.*; Doc. 422-122.)

c.  On January 12, 2022 at approximately 5:15 p.m., "inmate ██████ . . . started beating on the window to cell ████ in an "attempt[] to get Officer Wood's attention for help, due to an inmate being down in the unit". (Doc. 422-121.) No officer responded until "the window shattered". (*Id.*) After officers discovered that ██ ████ was "down on the floor unresponsive", they brought ████████ to the health care unit for medical attention. (*Id.*)

        6.    <u>Defendants Have a Practice of Leaving Cameras Broken or Obstructed at St. Clair.</u>

196.  St. Clair has three camera systems at the facility: ████████████ ████████████████████. (Doc. 422-083 at 12:11-19.)

a.  The Samsung system was installed in 2016 and ████████████ ████████████████████████ ████████████████████. (Doc. 422-049 at 169:13-170:18.)

b.  The ████████████████████ ████████████████████████ ████████. (Doc. 422-083 at 36:19-37:17.)

c.  The ███████████████████████████████████████

████████████████████████████████████████ ". (*Id.* at

15:7-16:5.) The ████████████████████████████████ ".

(*Id.* at 39:6-8.)

197.  The ████████████████████████████████████

██████████████████. (Doc. 422-089 at 221:3-222:4.) Specifically, ██████████

███████████████████████████████████████████████

██████████████████████. (Doc. 422-099 at 10-11.)

198.  The newer █████████████████████████████████

█████████████████████████████ (Doc. 422-049 at 176:3-

177:9; *see also* Doc. 422-099 at 8.)

a.  █████████████████████████████████████

██████████████████████ (Doc. 422-089 at 223:17-23.) ████████

█████████████████████████████████████████

███████████████████████. (*Id.* at 223:20-225:4; *see also* Doc. 422-

083 at 26:2-28:17.)

199.  St. Clair staff has admitted that cameras are frequently broken or obstructed at

St. Clair:

a.  Defendant Captain Parker identified ████████████████████████

█████████ (Doc. 422-089 at 221:3-222:4.)

b.  Former Captain Graham confirmed ████████████████████████

(Doc. 422-070 at 290:1-3.)

c.  Defendant Warden Mitchell ███████████████████████████████

███████████████████████  (Doc. 422-087 at 126:3-21.)

d.  Former Warden Noe testified that contact-tracing cameras can become

nonfunctional after inmates "burned them, they put lacquer on them, they painted

over them".  (Doc. 422-088 at 82:8-17.)

200.    Plaintiffs' experts observed broken or obstructed cameras during their site visits

to St. Clair:

a.  Christopher Miller observed:  "During my site visit on December 20, 2023, I

observed that the [Samsung] Cameras and P/Q Cameras are largely inoperable.  In the

cube offices, there are monitors that are supposed to display the feeds from the Video

Surveillance Cameras and the P/Q Cameras.  The monitors, however, showed that the

majority of the cameras are broken, disconnected, or otherwise malfunctioning."

(Doc. 422-099 at 10-11.)

b.  Dan Pacholke observed:  "The surveillance camera coverage is limited and none

of the internal cameras can be viewed by the cubicle officer."  (Doc. 422-100 at 42.)

7.    <u>Broken or Obstructed Cameras Contribute to Violence at St. Clair.</u>

201.    Functional cameras are critical to ensuring safety to staff and prisoners at

St. Clair, partly because there are many blind spots in St. Clair's facility:

a.  As former ADOC Commissioner Dunn testified, ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███ ."  (Doc. 422-062 at 199:4-15.)

b.   Former Institutional Coordinator for Northern Region Ellington agreed that "the existence of blind spots creates the possibility of prisoner-on-prisoner violence". (Doc. 422-063 at 162:21-163:2.)

202.    Functioning cameras are critical to preventing violence at St. Clair, which is highlighted by testimony, including the following:

a.   Former ADOC Deputy Commissioner Daniels testified:  "More cameras allow us to more closely monitor those who may or may not be in an unauthorized area, but it's also excellent in its ability to allow us to come back and reconstruct an incident, who was involved, where were they involved, can we see a weapon, can we see anything else, who are others in that area, and also the activity of our staff." (Doc. 422-057 at 39:10-40:2.)

b.   Defendant Warden Mitchell agreed that █████████████████████████ ████████████████████████████████████████████ ███████████████ (Doc. 422-087 at 123:6-14.)  When asked about the role of cameras in investigate cases of prisoner-on-prisoner assault, Warden Mitchell testified that the existence of cameras "help[s officers in] locating the suspect and getting the situation handled".  (*Id.* at 123:15-22.)

c.   Lieutenant Price agreed that "functioning security cameras [are] important to run a safe prison" because "number one, it's a deterrent for some of the inmates.  If they know that we're watching them, they aren't going to do certain things."  (Doc. 422-090 at 183:7-184:1.)

d.   Former Captain Graham confirmed that ███████████████████████ ███████████████████████ (Doc. 422-070 at 292:17-20.)

203.    At the Tutwiler Prison, ADOC has real-time camera monitoring.  (Doc. 422-081

at 22:23-26:22, 112:10-114:15.)  Defendant Institutional Coordinator McClain confirmed

that, while she was captain at Tutwiler, she oversaw the installation of cameras at the

prison as part of the implementation of a "settlement [that] was reached as a result of a

lawsuit brought by the Department of Justice related to sexual safety and other conditions

at Tutwiler".  (*Id.* at 22:23-26:22.)  When asked whether improving camera use at

Tutwiler improved prisoner safety, Defendant Institutional Coordinator McClain testified

that "[t]he camera system at Tutwiler is good, but it's only as good as the person

watching it. . . .  So it was — it wasn't just the cameras.  It was also boots on the ground."

(*Id.* at 112:10-114:15.)  At Tutwiler, this meant having ████████████████████████

████████████████████████████████████ .  (*Id.*)

204.    At St. Clair, ███████████████████████████████████████████

    a.    Defendant Warden Mitchell confirmed that at St. Clair, ████████████████

████████████████████ .  (Doc. 422-087 at 130:6-8.)  He confirmed that at St. Clair,

"████████████████████████████████████████████████████████

████████  (*Id.* at 125:3-13.)

    b.    Former Warden Noe confirmed that, between 2021 and 2022, "there was nobody

at the St. Clair facility who was monitoring the contract-tracing cameras live".

(Doc. 422-088 at 78:10-79:23.)

    c.    When asked whether anyone on her team was actively monitoring the live feed of

the tracing cameras at St. Clair, Defendant Director of Facilities Management Abbott

responded, ██████████████████████████████████████ ".  (Doc. 422-

049 at 180:6-14.)

205.    Defendants' practices of ███████████████████████████ and of not

repairing broken or obstructed cameras at St. Clair lead to issues that contribute to

violence and sexual assault or that make it difficult to adequately investigate incidents of

violence and sexual assault; examples of incidents include but are not limited to:

a.    On March 2, 2023, an inmate was assaulted "by means of a deadly weapon or

dangerous instrument" in L Block, leading to his hospitalization.  (Doc. 422-215 at

1.)  The investigative report stated that ████████████████████████████

█████████████████████  and that ████████████████████████

████████  .  (*Id.*)  The case was "closed due to lack of prosecution from both

parties".  (*Id.* at 2.)

b.    On February 19, 2023, an inmate died by what appeared to be an opioid overdose

in the L Block day room.  (Doc. 422-220 at 1.)  The investigative report noted that

████████████████████████████████████████████████████

████████████"  .  (*Id.* at 2.)

c.    On January 10, 2023, an inmate "suffer[ed] physical injuries by means of a

dangerous instrument or deadly weapon" in L Block, resulting in head trauma and

broken arms and the victim's hospitalization.  (Doc. 422-210 at 1.)  Officers did not

observe the incident and officers were unable to review camera footage because "the

cameras in L dorm are obstructed and do not have any view of the assault or of the

search of the area."  (*Id.*)  No suspect was identified due to a lack of information.

(*Id.*)

d.    On June 22, 2022, an inmate was stabbed in L Block.  (Doc. 422-204 at 1.)

However, according to the investigative report, "there was no video evidence of the

assault" because "[a] review of the facility camera systems revealed that the cameras in L-1 were either distorted to the point of images being unrecognizable or inoperable during the time frame of the assault".  (*Id.* at 2.)  As a result, "no camera footage was available for this incident".  (*Id.*)

e.   On January 12, 2022, the O Block cubicle operator observed an inmate "approach the Cubicle and state that he 'was stabbed and needed to go to the Healthcare Unit'".  (Doc. 422-120 at 1.)  The victim was transported by ambulance to the UAB Hospital while "all rovers . . . conduct[ed] a check of all cells and inmates in an attempt to discover a suspect with negative results".  (*Id.*)  The incident report notes that "[d]ue to the area in which the incident occurred being a blind spot to the cubicle operator, no suspects have been identified".  (*Id.*)

C.   St. Clair's Policies Do Not Account for Its Dangerously Low Staffing Levels.

206.   St. Clair has a standard operating procedure titled "Staffing", SOP 031, dated April 9, 2021.  (Doc. 422-020 at 1.)

207.   Under this policy, St. Clair must "implement a staffing plan that shall effectively maintain the ADOC's zero tolerance policy on inmate sexual offenses, sexual harassment, and custodial sexual conduct".  (*Id.* at 1.)

208.   The SOP "identif[ies] the staff and the staffing plans of St. Clair Correctional Facility that are crucial in prohibiting, preventing, detecting, and responding to inmate sexual offenses, sexual harassment, and custodial sexual misconduct".  (*Id.* at 1.)

209.   The ███████████████ amounts to ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████ (*Id.* at 3.)

210.  ██████████████████████████████████████████████

█████████████████████████ (*Id.* at 2-4.)

211.    Despite what is in the SOP, St. Clair is dangerously understaffed.  *See Braggs v.*

*Dunn*, 2018 WL 985759, at *2 (M.D. Ala. Feb. 20, 2018) (finding that ADOC's "lack of

correctional staff 'leaves many ADOC facilities incredibly dangerous and out of control'

and causes 'prisoners and correctional officers alike' to be 'justifiably afraid for their

safety'" (quoting *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1198 (M.D. Ala. 2017)));

(Doc. 422-103 § VII).

212.    According to ADOC's September 2023 Quarterly Correctional Staffing Report,

St. Clair had only 138.5 correctional staff members and a vacancy rate of 59.8%.

(Doc. 422-042.)

213.    These low staffing levels have persisted for years; St. Clair has had a vacancy rate

of more than 53% each and every quarter since 2020.  (*Id.*; Docs. 422-037–40; Doc. 422-

103 at 54-55; Docs. 422-358–68.)

214.    The staff-to-inmate ratio has been higher than the national ratio for more than a

decade; for instance, in 2023, the staff-to-inmate ratio was roughly 1:8, among the

highest in U.S. prisons.  (Doc. 422-103 at 53-54 & fig. 8; *see also* Doc. 422-254 at 12 &

tbl. 9.)

215.    Defendants concede that St. Clair has significant understaffing issues.  (*See*

Doc. 422-073 at 31:19-32:12 (Defendant Commissioner Hamm agreeing that "there was

a significant [under]staffing problem at ADOC when [he] became Commissioner in

January of 2022"); Doc. 422-066 at 143:23-144:3 (Defendant Warden II Fox noting that "we need more people" at St. Clair); Doc. 422-057 at 41:24-42:9 (Former Deputy Commissioner Daniels acknowledging that there was "low staffing statewide", including at St. Clair); Doc. 422-076 at 61:19-23 (Defendant Captain Howard noting that "the biggest issue" at St. Clair "right now is just staffing").)

216.    St. Clair regularly lacks enough staff members to fill even the mandatory critical posts.  (*See* Doc. 422-068 at 49:1-19 (████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████ Doc. 422-073 at 318:2-19 (Defendant Commissioner Hamm acknowledging that Defendant Warden Fox's July 17, 2022 report indicated that "████████████████████████████████████████

████████████████████ Doc. 422-087 at 344:7-12, 348:14-19 (Defendant Warden Mitchell agreeing that "[o]f course" "the facility [has] operated with fewer than those 26 [critical] posts manned" and that there have been "circumstance[s] in which someone has refused mandatory overtime necessary to man a particular critical post"); Doc. 422-063 at 357:16-358:9 (then-Regional Director Ellington acknowledging that when he was Regional Director over St. Clair, "posts generally at St. Clair [we]re often unmanned"); Doc. 422-090 at 54:5-55:6 ████████████████████████████

████████████); Doc. 422-089 at 172:2-6, 174:1-175:15 (Defendant Captain Parker agreeing that on July 6, 2022, "there were at least four posts that were critical posts that were not staffed"); Doc. 422-374 (then-Warden Noe emailing then-Regional Director

Ellington on January 16, 2022 that ████████████████████████████████

████ )

217.    St. Clair's operative staffing SOP has not been revised to account for St. Clair's persistently low staffing levels.  (*Compare* Doc. 422-020 (operative staffing SOP dated April 9, 2021), *with* Doc. 422-021 (dated May 22, 2018), *and* Doc. 422-019 (dated December 7, 2020).)

218.    All three versions of the staffing SOP that Defendants have produced include a boilerplate section on how to address "staffing deviations" but do not otherwise address the staffing shortage.  (Doc. 422-020 at 6-7 ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ and "notify the on call facility duty officer immediately"); Doc. 422-021 (dated May 22, 2018) at 8 (same); Doc. 422-019 (dated December 7, 2020) at 8 (same).)

219.    The staffing SOP does not include any guidance on, for example, how to staff critical posts when fewer than the minimum ██ staff members are available at St. Clair. (*See generally* Doc. 422-020.)

220.    The Daniels Plan is the only plan Defendants have developed over the years that attempts to "ease the correctional officer shortage" by specifying how St. Clair's scarce officer resources should be allocated.  (Doc. 422-242 at 2.)

221.    Former Deputy Commissioner Charles Daniels developed the Plan because he had a responsibility to "insure [sic] that we did whatever we could specific to the time and the amount of staff that we had available" to "house inmates in safe and humane conditions". (Doc. 422-057 at 78:13-14, 80:6-10.)

222.    The Daniels Plan was also intended to promote "[m]ore effective deployment &

management of current security staff" by "phas[ing]-in implementation of 8 hour

shifts . . . to allow SCCF management to mass these security staff members and make

them available at key times and in strategic locations based on what data is telling ADOC

in terms of when and where the threat of violence may be the greatest".  (Doc. 422-242 at

2-3.)  The plan would also implement "[m]andatory assignment of a warden and a captain

to" certain cell blocks in order to "enforce an intensive and deliberate direct supervision

model".  (*Id.*)

223.    ███████████████████████████████████████████████

████████████████████████████████  (Doc. 422-056.)

224.    The low staffing contributes directly to the violence that is commonplace at

St. Clair, including, for example:

a.    When ████████████ was murdered in his cell in M Block around midnight on the

night of May 14, 2023, there were no officers present or rovers staffed in M Block.

(Doc. 422-164; Doc. 422-248 at 28.)

b.    The day before, May 13, 2023, an inmate was transferred to the UAB Trauma

Center for treatment after a fight with weapons broke out in N Block, where no

officers were staffed.  (Doc. 422-163; Doc. 422-248 at 26.)

c.    On February 8, 2023, in two separate incidents, one inmate was stabbed and

another was assaulted and ultimately transferred to a free-world hospital for head

injuries suffered in O Block, ████████████████.  (Doc. 422-140; Doc. 422-

141; Doc. 422-249 at 15; *see also* Doc. 422-103 at 58-64.)

D. <u>Defendants Have a Practice of Improperly Training Correctional Staff on Use of Force and Tolerating Use of Excessive Force.</u>

225. 

(Doc. 422-011 at 1.)  The latest version of AR 327 that was produced by Defendants in final form is dated March 4, 2015.  (*Id.*)

226.   St. Clair also has a written standard operating procedure titled "Use of Force", SOP 120.  (Doc. 422-028.)

227. 

(Doc. 422-011 at 4; Doc. 422-028 at 3

.) 

(Doc. 422-011 at 4; Doc. 422-028 at 3

228. 

(Doc. 422-028 at 3; Doc. 422-011 at 4.) 

(Doc. 422-011 at 4; Doc. 422-028 at 3

229. 

(Doc. 422-011 at 4; Doc. 422-028 at 4.)

84

230.    St. Clair also has an SOP that specifically details the proper use of force by means of chemical spray, which provides that ███████████████████████████████ ██████████████████████████ (Doc. 422-026 at 2; *see also* Doc. 422-009 at 4.)

        1.    <u>Defendants Do Not Provide Appropriate Use of Force Training.</u>

231.    Defendants do not appropriately train St. Clair officers on when it is appropriate to use force or how much force is permissible.  (*See infra* ¶¶ 232-38.)  St. Clair officers are trained to "not hesitate" to use force, and that it is their "duty" to use force on the job.  (*See* Doc. 422-103 at 116 (quoting Doc. 422-278 at 6-7 (Lesson Guide, Use of Force)).)

232.    This lack of training is further evidenced by testimony and documentation showing that St. Clair officers use excessive force, both when *no* force is necessary, justified or reasonable, and in instances where, at most, minimal force may be required.  (*See id.* at 115-30.)

233.    Deposition testimony makes clear that Defendants lack training on appropriate uses of force, including testimony regarding the use of force in instances where no force at all is appropriate:

    a.    Former Captain Carla Graham testified "I'm sure it does" when asked if unnecessary force is used at St. Clair.  (Doc. 422-070 at 238:2-5.)  She testified that officers can use force "when an inmate do not do what he is asked to do".  (*Id.* at 237:2-10.)

    b.    Former Captain Graham testified that she used chemical spray on a prisoner who was "being disrespectful to the clerk" and who refused to leave an area of the prison.  (*Id.* at 247:4-248:3.)

    c.    Former Captain Graham also testified that she recalled an incident where ████ █████████████████████████████ used force, including chemical spray and

physical force, on a prisoner who "really didn't do anything to justify the using of force". (*Id.* at 251:7-16, 252:14-23.) She testified that ███████████ did not write an incident report after the use of force. (*Id.*)

d. ████████████████████████████████████████

████████████████████████████████████████

████████  (Doc. 422-078 at 162:1-5, 163:16-20.) ███████████████████

████████████████████████████████████ (*Id.*; *see also* Doc. 422-103 at 124-28.) Officer Jones testified that he hit a prisoner who was walking behind him, causing the prisoner to fall backwards, despite the fact that he did not know or ask why the prisoner was behind him and despite the fact that the prisoner had no weapon. (Doc. 422-078 at 174:4-18, 177:18-178:12.) That prisoner was not escorted to the infirmary for several hours after force was used. (*Id.* at 178:13-17.)

e. ████████████████████████████████████████

████████████████████████████████████████

████████  (Doc. 422-088 at 370:14-374:13 (testifying about Doc. 422-138).)

f. Lieutenant Roderick Gadson testified that physical force is not always his last option, and that officers "can go and be malicious and use force every day" and "probably get justified for it". (Doc. 422-068 at 154:7-13.) Lieutenant Gadson testified that it is his belief that "whatever the level of force the inmate is using on you, you use it back on him". (*Id.* at 162:21-163:1.)

g. Director of LESD Arnaldo Mercado, as a Rule 30(b)(6) representative of ADOC, similarly testified that officers "should be meeting force with at least equivalent force

based on the totality" of the circumstances, and that "obviously I am not going to

react to you with less of the force that you are attacking me with, for lack of a better

word".  (Doc. 422-083 at 98:19-22, 102:14-103:15; *see also* Doc. 422-103 at 116.)

> 2. <u>Defendants' Failure To Provide Appropriate Use of Force Training
> Results in Officers' Use of Excessive Force.</u>

234.    Incident reports further make clear Defendants' lack of training on appropriate

uses of force, including, for example:

a.   In February 2023, a correctional officer was witnessed chasing a prisoner out of a

dorm while spraying that prisoner with chemical spray.  (Doc. 422-137.)  The officer

did not report a use of force incident, and later said she used force because the

prisoner "failed to obey a direct order to leave M2 dorm and was insubordinate".

(*Id.*)

b.   In July 2022, ███████████ suffered significant injuries, including lacerations to

the front and back of his head ████████████, at the hands of multiple officers.

(Doc. 422-205.)  That use of force, which Lieutenant Roderick Gadson admitted

involved multiple officers hitting ████████ in the head with "palm-heel strikes"

(Doc. 422-068 at 198:16-19), conveniently took place in the shift office, where there

are no cameras (*see* Doc. 422-205).  Video footage after the incident shows officers

dragging ████████, handcuffed and falling down due to his injuries, to the

infirmary.  (*See* Doc. 422-205; Doc. 422-125; Doc. 422-126; Doc. 422-309.)  The

following photographs show the injuries ████████ suffered to the front and back of

his head:



(Doc. 422-126; Doc. 422-125.)

c.   In January 2019, ████████ was beaten with a baton and the hands of Officer

McWilliams and Sergeant Dent, suffering severe injuries to his face, chest and back

and requiring six staples to his forehead.  (Doc. 422-201.)  The two officers involved

in the incident failed to include any information about ████████'s head injury,

including how that injury occurred, the actions of the officers that led to that injury or

the severity of the injury.  (*Id.*)  The use of force was originally found to be justified

by then-Captain Malone, and the investigation was only re-opened after a prisoner

posted a video of the incident on YouTube.  (*Id.*)  That video makes clear that

████████ was attacked by officers with far more force than the situation required, and

far more force than initially recorded by the officers involved.  (*See id.*; Doc. 422-103

at 117-18; Doc. 422-310; Doc. 422-311.)  The following photograph shows the

injuries ████████ suffered to his face:



(Doc. 422-310.)

235.    Testimony from prisoners at St. Clair further confirms this widespread use of

force in both situations where no force is required, and in situations that demand far less

than the amount of force used in order to control the situation.  (*See*, *e.g.*, ████████ at

18:17-20:22 (Lieutenant Gadson "jumped on" ████████ while ████████ was in his

cell); Doc. 422-054 at 62:10-63:4 ██████████████████████████████████████

██████████████████████████; *id.* at 132:15-133:2 ("Officers come close to

killing some [inmates] . . . When they really jump on somebody, they'll get them and take

them somewhere where . . . can't hardly nobody see nothing . . . they drag them off

and . . . whoop them."); Doc. ██████ at 50:15-51:17 (officers jumped on prisoner in

E Block and beat him until he was unconscious, before dragging him to the infirmary and

dropping him there unconscious); ██████████ at 150:4-151:1, 226:7-15 (after a

stabbing, officers started jumping on prisoners who had not been involved, including

hitting prisoners with sticks while prisoners were handcuffed); Doc. 422-061 at 168:2-22

████████████████████████████████████████████; *id.* at 316:5-13 ██████

████████████████████████████████████████████████████████████████;

Doc. 422-077 at 137:1-138:3 ████████████████████████████

████████████████████████████; ████████████ at 193:3-14 (hit with baton

while walking through a walk cage in lockup); ████████████ at 303:1-10 (witnessed

prisoner in handcuffs badly beaten by officers); *see generally* Doc. 422-103 at 118-28.)

236.    Defendants have a practice of tolerating incidents where officers' use of excessive

force fails to stop at the point a prisoner is restrained, as required under ADOC and

St. Clair written policy; for example, in August 2021, ████████████ was assaulted by

officers in the shift office, who punched and hit ██████████ with batons while he was

handcuffed.  (Doc. 422-234 at 3; *see also* Doc. 422-103 at 123-24.)  One of the officers

involved told investigators, "now if [a prisoner] spit in your face that's a total different

ball game.  I think you should least be able to get a punch in if he just spit in your

face . . . if someone spit in your face you probably gon [*sic*] do something about it unless

something wrong with cha [*sic*]."  (Doc. 422-234 at 3; *see also* Doc. 422-103 at 123-24.)

237.    Likewise, those practices have created an environment in which officers use force

as a way to punish and retaliate against prisoners who agitate officers with their behavior,

even when those prisoners pose no risk of actual harm; Plaintiffs' expert Steve Martin

provides a list of examples of the use of force in these instances of prisoners using

"unsavory but non-threatening behavior" in his expert report.  (*See* Doc. 422-103 at 126-

28.)

238.    While uses of force are pervasive throughout St. Clair documentation and

discovery in this case, the real number of instances of use of force is likely even higher

than it appears, as officers are counted on to self-report many uses of force and may not

do so.  (*See* Doc. 422-068 at 154:20-155:2; *see also* Doc. 422-103 at 117.)  Lieutenant

Gadson testified that he is "sure" that officers sometimes don't report when they use force.  (Doc. 422-068 at 154:20-155:2; *see also* Doc. 422-103 at 117.) ████████

████████████████████████████████████████████████████████████

████████████████████████████████ (*See* Doc. 422-245 at 2

████████████████████████████████████████████████████████████

████████████████████████████████████

239.    Defendants have a further practice of conducting inadequate investigations into use of force incidents at St. Clair.  (*See infra* Section IV.H.5.)

> E.    Defendants Have a Practice of Improperly Training Staff on Sexual Abuse.

240.    ADOC has an administrative regulation titled "Inmate Sexual Abuse and Harassment", AR 454.  (*See* Doc. 422-017 (last modified by Change #7, dated December 21, 2021 (Doc. 422-018)).)

241.    St. Clair has a standard operating procedure titled the same, SOP 229.  (Doc. 422-036.)  SOP 229 mirrors many of the requirements provided in AR 454.  (Doc. 422-036; Doc. 422-017; Doc. 422-018.)

242.    These policies provide a list of practices St. Clair must follow toward the aim of "prohibiting, preventing, detecting, responding to and investigating the sexual abuse and harassment of inmates" at St. Clair.  (Doc. 422-017 at 1; Doc. 422-036 at 1 (SOP 229 "establishes responsibilities, policies and procedures to prohibit inmate sexual offenses and custodial sexual misconduct").)

243.    Both policies set out the role and responsibilities of PREA Director, an employee of ADOC with "sufficient time and authority to develop, implement and oversee agency efforts to comply with the [PREA] standards in all of it [sic] facilities" (Doc. 422-036 at

1) and who has "the authority to coordinate and develop procedures to identify, monitor, and track sexual abuse[,] rape and sexual harassment in the ADOC" (Doc. 422-017 at 2).

244.    Both policies also set out the role of the IPCM, who shall have "sufficient time and authority to coordinate the facility's efforts to comply with PREA standards". (Doc. 422-036 at 2; Doc. 422-017 at 2.)

245.    Both the PREA Director and IPCM roles are meant to work at moving St. Clair toward PREA's zero-tolerance policy for sexual violence in prisons.  (Doc. 422-017 at 1.)

246.    But Defendants have made these positions purely administrative, leaving Christy Vincent, ADOC's longstanding PREA Director, and each of St. Clair's IPCMs over the last few years with no power or initiative to take substantive steps to ensure or improve sexual safety at the prison.  (*See* Doc. 422-102 at 10-20.)

247.    Christy Vincent has held the position of PREA Director since 2015.  (Doc. 422-094 at 36:12-16.)  Jessica Billingsley served in the position of St. Clair IPCM from January 2021 to June 2022, at which time Lieutenant Amanda Price took over for a few months.  (Doc. 422-052 at 26:22-27:2, 30:2-14.)  Kevin Gillilan, the current IPCM at St. Clair, started in the position in the fall of 2022.  (Doc. 422-069 at 24:15-19, 27:17-21.)

248.    Testimony of the PREA Director and St. Clair IPCMs show how ill-prepared they were and are to conduct their roles:

a.    Former IPCM Jessica Billingsley testified that she had no background in PREA prior to starting as IPCM.  (Doc. 422-052 at 47:22-48:3.)

b.    Current IPCM Kevin Gillilan testified he had never even heard of PREA prior to starting as IPCM at St. Clair.  (Doc. 422-069 at 34:18-21.)

c.   Prior to starting as PREA Director, Ms. Vincent worked as an operations manager at a juvenile facility that held only about 30 prisoners, where she learned about PREA on the job.  (Doc. 422-094 at 24:2-4, 29:1-20.)  While serving as ADOC's PREA Director, she failed the PREA auditor recertification test, a test that included questions "concerning scenarios, information about PREA audits, information about PREA standards".  (*Id.* at 250:22-251:13, 254:23-257:6.)

249.   Testimony of these individuals tasked with implementing PREA and with improving sexual safety at St. Clair confirms how little they actually do in practice, and how Defendants have permitted them to confine these roles to mere paper-pushing.  (*See* Doc. 422-102 at 12-20.)  For example:

a.   Former IPCM Jessica Billingsley testified that she never asked to make a single change at St. Clair related to PREA during her time in the position.  (Doc. 422-052 at 46:1-17.)  She further testified that her sole concern with records from the SANE Center was to ensure she "put it in a secured file", without any review, analysis or conversations with SANE or LESD staff.  (*Id.* at 82:6-15; *see also id.* at 84:9-20 (describing how incident reports were "placed in a file" once received).)

b.   St. Clair's current IPCM, Kevin Gillilan, testified that he considered the IPCM position to be "highly administrative in the duties" and to involve a "lot of paperwork".  (Doc. 422-069 at 28:13-29:1.)

c.   PREA Director Christy Vincent testified repeatedly that she had never discussed incidents of sexual violence with anyone at St. Clair, and was unaware if any steps or recommendations for changes were made after those incidents.  (*See, e.g.*, Doc. 422-094 at 176:4-19, 191:20-192:7, 196:12-15.)

250.    Testimony of the PREA Director and St. Clair IPCMs further shows how little they ask for information about the conditions at St. Clair that create a risk of sexual violence and how they fail to act to improve those conditions to prevent incidents from occurring, including the following:

a.    When asked if she ever reviewed the facts of an incident report and considered the factors that allowed that assault to take place, former IPCM Billingsley testified that "[t]hat was for LESD investigators", not the IPCM.  (Doc. 422-052 at 84:9-85:2.)

b.    Despite the importance of contraband in sexual assault at St. Clair (including the presence of weapons and drugs, as well as the risk of assault created by drug debt), former IPCM Billingsley testified that she was unaware of contraband in St. Clair, a fact that alone is illuminating on the lack of effort she put forward as IPCM to ensure sexual safety in the prison.  (*See, e.g.*, Doc. 422-052 at 62:2-16, 96:19-104:4 (testifying she could not recall a single instance of a prisoner in debt being sexually assaulted, even though such incidents occurred while she was IPCM); *id.* at 70:22-71:17, 74:15-75:12 (testifying she did not know prisoners at St. Clair had knives,

██████████████████████████████████████████████

████████████ ); *id.* at 87:11-14, 90:17-92:15 (same with drugs).)  When shown incident reports of sexual violence that involved contraband, Billingsley testified that she was not "concerned" about the possibility of there being contraband in the prison because she "just did [her] job".  (*Id.* at 74:10-76:22; 84:3-6.)

c.    Current IPCM Kevin Gillilan and PREA Director Vincent likewise testified that they took no steps regarding the role of contraband in sexual assaults at St. Clair. (*See* Doc. 422-069 at 222:3-226:6, 378:20-379:6; Doc. 422-094 at 191:20-192:13.)

d. St. Clair's IPCMs and PREA Director Vincent also ignored the broken locks at

St. Clair, even though unauthorized movement contributes to many sexual assaults.

(Doc. 422-052 at 102:7-11, 121:9-12; Doc. 422-069 at 102:4-12, 102:17-104:9;

Doc. 422-094 at 130:14-131:13.)  Ms. Vincent did not even know whether St. Clair

cells have call buttons.  (Doc. 422-094 at 136:18-137:8.)  And Ms. Vincent testified

she "can't answer" whether prisoners are permitted to enter cell blocks they are not

assigned to because she is "not familiar with operations procedures".  (*Id.* at 175:2-

21.)

    F.    <u>Defendants Have a Practice of Assigning Prisoners to Housing Areas
("Internal Classification") Without Appropriate Risk Screening Data.</u>

251.    "Classification" refers to the way in which prisoners' security, programmatic and

housing needs are determined within a prison system.  (*See* Doc. 422-101 at 5-6.)

Broadly, there are two types of classification:

    a.    The first is "external classification", which consists of the processes and methods

undertaken to determine a prisoner's "custody level"—a level that correlates with the

degree of supervision necessary for a prisoner—and then accordingly, what

institution matches the level of security required.  (*Id.* at 6.)

    b.    The second is "internal classification", which refers to processes and methods to

determine appropriate housing and programming for a prisoner within a specific

institution.  (*Id.*)

252.    Generally speaking, ADOC's central classification division plays no role in

making assignments to particular housing units or beds within a facility.  (Doc. 422-371

at 20:6-22:5, 27:1-18.)

253. ██████████████████████████████████████████████████

██████████████████████████████████ (Doc. 422-043 at ¶¶ 17-22.)

    a.  Pursuant to SOP 126, the ICB is "[a] multidisciplinary board whose primary duty is to determine the needs and requirements of an inmate to include reviewing the initial and subsequent custody level, programming needs, and housing unit placement for all inmates to St. Clair Correctional Facility". (Doc. 422-029 at 1; Doc. 422-030 at 1.)

    b.  In making an initial housing assignment, the ICB is supposed to review an ICB Checklist that contains pertinent classification information about each inmate, interview the prisoner in person, identify any additional concerns and designate the prisoner to a housing unit (*e.g.*, K Block, M Block, etc.) within the prison. (Doc. 422-029 at 2-3; Doc. 422-30 at 2-3, 7.) The Inmate Control System ("ICS") Officer makes the specific bed assignment. (Doc. 422-029 at 2; Doc. 422-030 at 3.)

    c.  In addition to making intake placements, the ICB is also supposed to "control[] inmate housing unit assignments to, out of, and between all housing units". (Doc. 422-029 at 2; Doc. 422-030 at 3.) This includes both changes in routine housing assignments and movements in and out of the RHU, SSU and program blocks. Despite a requirement that "[t]he ICB review all housing and program assignments", (Doc. 422-029 at 3; Doc. 422-030 at 3), St. Clair removed a provision requiring the ICB to "review bed changes made by the security staff for emergency situations since the last meeting of the ICB" (*see* Doc. 422-030 at 3).

254.    Having a dedicated body to make housing decisions with core review criteria and processes allows the prison to make meaningful and informed decisions about housing and reduce risk of violence in the facility.  (Doc. 422-101 at 33.)

255.    In practice, St. Clair does not have a dedicated body to make these determinations.  (*See infra* ¶¶ 256-69.)  Defendants instead maintain a practice of allowing staff to indiscriminately assign housing without pertinent classification information.  (*See id.*)

       1.    The ICB Does Not Control Housing Assignments.

256.    The ICB is not assigning housing units (contrary to the written policy in the SOP).  (*See supra* ¶ 253; *infra* ¶ 256.b; Doc. 422-101 at 20-23.)  Instead, the practice is that Officer Smith makes initial housing unit and bed assignments within GP, and high-ranking officers have the authority to reassign prisoners freely.  (*See infra* ¶¶ 256.b-c; Doc. 422-101 at 20-23.)

    a.  St. Clair's practice is to assign only the broad type of housing to the prisoner—*i.e.*, GP, the RHU or the SSU—not the specific housing unit.  (Doc. 422-101 at 21.)

    b.  Instead of the ICB, the ICS Officer, currently Jeffrey Smith, makes the housing unit and bed assignment himself.  (*See* Doc. 422-070 at 198:13-199:2; Doc. 422-080 at 242:5-244:14; Doc. 422-093 at 54:13-21.)  Officer Smith is not a member of the ICB.  (Doc. 422-093 at 44:17-45:16.)

    c.  Security staff are afforded wide latitude to make housing decisions without consulting the ICB; for instance, Captain Malone, the Chairman of the ICB, testified that "staff, sergeant[s], [and] lieutenant[s]" are allowed to make bed moves.  (Doc. 422-080 at 331:14-23.)  Defendant Warden Mitchell agreed that "other than

intake and RHU, housing changes within the facility are typically done by security

staff". (Doc. 422-087 at 170:13-17.)

257.    As a result of these practices (ignoring the written policy on the ICB), St. Clair

staff do not consider relevant information when making housing decisions. (*See infra*

¶¶ 260-69; Doc. 422-101 at 22.)

> 2.    Housing Assignments Do Not Properly Consider PREA
> Designations.

258.    Prisoners are routinely housed in contravention of their PREA designation. (*See*

*infra* ¶¶ 263-64.)

259.    ████████████████████████████████████████████████

████████████████████████████. (Doc. 422-315 at 2.)

260.    Although Officer Smith attends ICB Meetings, Officer Smith does not "pay

attention" to the "part" the ICB does, meaning he does not focus on the characteristics,

risk profile or particular housing concerns of the prisoner being assigned. (Doc. 422-093

at 44:17-45:16.) Further, when Officer Smith makes a housing unit and bed assignment,

he does not have access to the ICB Checklist or other pertinent information. (*Id.* at 52:4-

13 (explaining that he doesn't "know what's on that [ICB] checklist" and hasn't seen it);

*id.* at 53:5-10, 71:18-23.)

261.    The only document Officer Smith looks at when making housing decisions is the

PREA Housing Designation Spreadsheet. (*Id.* at 173:2-174:8; 161:11-20.) That is a live

document that records the PREA status of each prisoner at St. Clair. (Doc. 422-253.)

262.    When prisoners arrive at St. Clair, a classification specialist completes a PREA

review prior to the meeting of the ICB where the specialist can designate an individual as

a "potential" victim or predator. (*See* Doc. 422-101 at 18.) A prisoner is not formally

designated as a PREA predator or victim after he has seen mental health staff, which often does not occur until weeks after intake. (*See, e.g.*, Doc. 422-253 (showing dates on which prisoners are screened).) The designation may also be different from the preliminary designation by the classification specialist. (*Id.*) Accordingly, when Officer Smith makes a housing assignment, the information on the PREA Housing Designation Spreadsheet is often inaccurate because a final PREA assessment by a mental health professional has not occurred. (*See id.*)

263.    Even when PREA information is available, St. Clair routinely houses prisoners in contravention of their PREA designations. (*See* Doc. 422-101 at 19-20 (citing examples of prisoners housed incorrectly based on their PREA designation).)

264.    These practices increase the risk of sexual of assault at St. Clair as victims may be housed with predators. (*See* Doc. 422-102 at 32-36.) For example:

a.    ██████████ was initially screened as a "none" designee for PREA, despite being a former sexual assault victim, and was referred to mental health for an additional PREA evaluation. (Doc. 422-252.) Between his initial screening and mental health evaluation, ████████████████████████ ██████ where he was subsequently sexually assaulted two days later, on November 23, 2019. (Doc. 422-172.) ████████ was first seen by mental health over a week after the sexual assault and was designated a victim at that time. (Doc. 422-252; Doc. 422-106 at 57; Doc. 422-172.)

b.    When ████████ was initially screened, his PREA line was left blank. (Doc. 422-108 at 31.) ████████████████████████ ██████ (*See* Doc. 422-134.) ████████ was first seen by mental health a day after

the initial screening and formally designated a PREA "victim"; nevertheless, St. Clair did not adjust ██████████ housing assignment.  (Doc. 422-251.)  ██████████ was sexually assaulted on June 30, 2020, around just two weeks after he was determined to be a PREA "victim".  (Doc. 422-108 at 31; Doc. 422-134; Doc. 422-251.)

3.     Housing Assignments Do Not Properly Consider Gang Affiliation.

265.     Another impact of these internal classification practices is that prisoners are routinely housed without considering their Security Threat Group ("STG") (*i.e.*, gang) affiliation.  (*See infra* ¶¶ 266-69.)

266.     Even though the STG Officer was originally supposed to be a member of the ICB, Defendants removed that officer from the ICB.  (*Compare* Doc. 422-030 at 1, *with* Doc. 422-029 at 1.)

267.     Correctional Officer Lauolefiso Jones, the former STG Officer on the ICB, testified that his role on the ICB was to "[q]uestion[] them about gang activity and looking – reviewing their tattoos, if they had any, or their associates, if they knew certain inmates".  (Doc. 422-078 at 66:11-15.)  This process no longer occurs.  (*See infra* ¶ 268.)

268.     Officer Smith and St. Clair's classification staff do not have access to STG information when making housing or classification designations.  (Doc. 422-064 at 124:21-23; 125:13-20.)  This means that gang information is not included on the ICB Checklists; indeed, Officer Smith testified that he "do[esn't] have any[thing] to do with" STG information at the prison.  (Doc. 422-093 at 134:4-9.)

269.     Failure to take into account gang affiliation in housing decisions increases the risk of violence at St. Clair; examples include:

a.   In early September 2021, ██████████, affiliated with the ██████████████, was involved in a fight with another ██████████-affiliated inmate in N Dorm.

(Doc. 422-189.) ████████ was assigned to bed ███ at the time. (*Id.*) This incident was discussed at the facility's STG meeting that month. (Doc. 422-277.) Following the incident, ████████ was moved to ████████████████████ ████████████████████. (Doc. 422-189.) On September 21, 2021 about three weeks after the incident, ████████ was released back to GP and to the exact same cell—███. (Doc. 422-109.) ████████ ICB Continuation Checklist notes that █████ has "no documented enemy at St. Clair" and that the inmate he was in a fight with was transferred to the Donaldson facility, but there is no mention of any gang activity on the form. (*Id.*) On the same day he was released back to GP, ████████ was seriously assaulted by eight inmates (only two of whom resided in N Block). (Doc. 422-187; Doc. 422-393.)

b. ████████ arrived at St. Clair on February 27, 2020 and was seen by the ICB on March 31, 2020. (Doc. 422-107 at 248.) ████████ was assigned, without an ICB screening, to N Block, where on March 5, 2020, ████████ was the victim of a gang-related stabbing. (Doc. 422-173.) Following the stabbing, he was brought before the ICB, where he was assigned to the SSU. (Doc. 422-107.) No gang information or the stabbing is noted on his ICB Checklist. (*Id.*)

G.    <u>Defendants Have Cell Inspection and Institutional Search Practices that Are Ineffective in Reducing the Enormous Volume of Drugs and Weapons in the Facility.</u>

270.    ████████████████████████████████████████████████████ ████████ (Doc. 422-027.) ████████████████████████████████████ ████████████████████████████████. (*Id.*)

a. ██████████████████████████████████

██████████████████████████████████

███████████████████████ (*Id.* at 1.)

b. █████████████████████████████████

███████████████████████ (*Id.* at 3.)

c. ████████████████████████████████

██████████████████████████████████

██████████████████████ (*Id.* at 1.) ████████

██████████████████████████████████

████████████ (*Id.* at 5.)

d. ███████████████████████████████

██████████████████████████████████

(*Id.* at 3.)

271.    The standard operating procedure titled "Population Cellblock Rover", SOP 056,

provides that ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████ (Doc. 422-022 at 5.)  The latest version of SOP 056 produced by

Defendants in final form is dated June 21, 2022.  (Doc. 422-022.)

272.    ████████████████████████████████████

██████████████████████████████ (Doc. 422-023, at

2.) ████████████████████████████████████

███████████████ (*Id.*)

273.    ADOC also has an Administrative Regulation titled "Security Audits" (AR 322).

(Doc. 422-010.)  The most recent version is dated December 30, 2015.  (*See id.*)  The

purposes of a security audit are to, *inter alia*, "[i]dentify those weaknesses and

deficiencies in security operations" and "[d]etermine if institutional procedures and actual

practices are in compliance with agency policies and procedures".  (*Id.* at 2).

    a.  Defendant Regional Director McClain was unaware that she served as chairperson

    for the Security Audit Team.  (Doc. 422-081 at 104:1-22.)  She did not know whether

    there had been as security audit at St. Clair in the previous three years.  (*Id.* at 106:2-

    4.)

        1.    <u>There Are High Amounts of Contraband at St. Clair.</u>

274.    There are consistently extremely high numbers of illegal drugs, inmate-made

weapons, free world weapons and cellphones at St. Clair.  (*See infra* ¶¶ 275-87.)

275.    ███████████████████████████████████

██████████████████████████████

███████████████████████████████

████████████████████ (Doc. 422-246 at 7.)

276.    ███████████████████████████████████

█████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████ (Doc. 422-056 at 31.)

277.    Deputy Commissioner Daniels testified that only searching "a portion of an

institution would not satisfy my ability that we legitimately interdicted the amount of

weapons in that facility".  (Doc. 422-057 at 84:16-22.)  This is because inmates "have

103

access to other areas [where] they can make weapons and/or hide weapons, narcotics, cellphones, things of that nature". (*Id.* at 85:12-18.)

278.    During Operation Restore Order, personnel confiscated approximately 625 grams of drugs, 110 weapons and 137 miscellaneous items including a tattoo gun and a soldering iron. (Doc. 422-243 at 3-5.) The Evidence and Contraband Search Results from Operation Restore Order lists locations of interest as "cavities in walls, light fixtures, vents, pipe chasers, cavities in mattresses, and cavities in furniture". (*Id.* at 3.)

279.    Deputy Commissioner Daniels planned to follow Operation Restore Order with "focused" "quarterly unannounced searches" at St. Clair by CERT. (Doc. 422-242 at 6.)

280.    Defendants have never undertaken another full institutional sweep of St. Clair like Operation Restore Order. (Doc. 422-082 at 171:16-18, 172:9-12.)

    a.   Former Commissioner Dunn testified that he "would have done it at St. Clair again" but that he "was never able to get to that point to develop those plans". (Doc. 422-062 at 268:7-20.)

    b.   Since he started in his position Warden II at St. Clair in February 2021, Defendant Warden Fox testified that there has not been a search of the entire facility for contraband. (Doc. 422-066 at 116:6-11.)

    c.   The Chief Law Enforcement Officer for the LESD, Mr. Mercado, testified that "it is counterproductive from a law enforcement perspective in general just to hit it one time and never go back". (Doc. 422-082 at 188:16-19.)

    d.   When Mr. Mercado suggested repeating Operation Restore Order to Defendant Deputy Commissioner Wendy Williams and others in April 2022, he was told to "[c]ome up with different ideas". (*Id.* at 173:7-174:6.)

281.    High volumes of contraband persist at St. Clair; for example, in the quarter ending September 30, 2023, 2,114 grams of drugs were discovered along with 65 knives, 122 other miscellaneous weapons, 152 cellphones and 127 other electronic devices.  (*See* Doc. 422-103 tbl. 1, citing ADOC Quarterly Report Ending 09/30/2023.)

282.



(Doc. 422-177.)

283.    The following photograph shows weapons found in a search on September 14, 2023:



(Doc. 422-322.)

284.    Defendant Commissioner Hamm testified that there has been a recent "uptick in free-world weapons coming in". (Doc. 422-073 at 225:19-226:8.)

285.    Defendant Warden Mitchell testified that he was unsurprised that approximately one hundred weapons were found in a single institutional search at St. Clair because "in the field I . . . work in, that's nothing". (Doc. 422-087 at 425:9-426:2.)

286.    Defendant Warden Fox testified that finding nearly one hundred weapons in a search at St. Clair is "a low number". (Doc. 422-066 at 117:6-14.)  He also testified that he believed "[f]ifty percent" of the population at St. Clair has a weapon. (*Id.* at 118:8-14.)

287.    Prisoners also testified to the pervasive presence of contraband at St. Clair:

  a.  Plaintiff Benny Jones testified that drugs and weapons were common place at St. Clair: "Q. Drugs?  A.  I seen all that stuff.  You know, basically, that's a normal thing in St. Clair, you know.  You see drugs and stuff basically all the blocks and stuff." (Doc. 422-077 at 231:9-13.)  Mr. Jones also testified that he had "seen knives, sticks, like hatchets, like made hatchets out of the knives". (*Id.* at 183:1-9.)

  b.  Plaintiff Robert Carlile testified that he saw weapons in M Dorm "practically every day" and that he saw drugs "quite often". (Doc. 422-054 at 45:11-23, 47:23-48:11.)

  c.  Plaintiff Nathaniel Harris testified, "[y]ou got dudes running around wigging out, and all the types stuff.  You got problems, you got drugs inside this camp." (Doc. 422-074 at 274:15-19.)

d.  Plaintiff Johnny Young testified, "I see guys laying out everywhere in the prison. And I see guards passing them by like it's something normal."  (Doc. 422-098 at 66:7-18.)

2.  Defendants' Cell Inspection and Institutional Search Practices Are Ineffective In Limiting the Possession of Contraband in the Facility.

288.  Defendants' practice is to limit institutional searches to common areas rather than searching inmates' cells at St. Clair.  (*See infra* ¶¶ 289-91.)  When staff do conduct searches and shakedowns, these searches are not thorough, permitting large amounts of contraband to remain in the facility.  (*See id.*)

289.  ███████████████████████████████████████████████████████ ████████████  (Doc. 422-068 at 67:2-10.)  ████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████  (*Id.* at 66:18-67:1.)

290.  Defendant Captain Parker testified that he has "not been aware of any of those daily shift searches of inmates in a particular housing unit".  (Doc. 422-089 at 191:10-17.)

291.  Prisoners testified that searches are neither frequent nor thorough:

a.  Plaintiff Benny Jones testified that "[e]ach time [officers] shakedown, they don't never get all the contraband".  (Doc. 422-077 at 232:20-233:2.)

b.  Plaintiff Nathaniel Harris testified that he had not seen an individual cell search in about a year.  (Doc. 422-074 at 139:12-140:3.)

c.  Plaintiff Robert Carlile testified that while confined at St. Clair, he observed officers go into cells and "move a couple things", and then "go on and write it down that they've shook that cell down".  (Doc. 422-054 at 47:2-9, 47:13-17.)  He further

testified that officers will instruct the occupant of the cell that "[i]f somebody comes down and asks you, I shook your cell down". (*Id.*)

d.   Plaintiff Johnny Young testified that searches are only conducted every "five to six months" and that his cell had not been searched in over a year. (Doc. 422-098 at 292:20-294:13.)

e.   █████████ testified that the security staff "ain't doing too much work. They ain't going looking for too much. You got to come to them." (█████████ at 71:20-72:6.)

f.   █████████ testified that when CERT comes in for a shakedown "[t]hey get contraband. They don't never get all of it, though." (Doc. █████ at 175:8-12.)

g.   █████████ testified in November 2023 that it had been "five, six months" since his cell was last searched, and before that, his property had not been searched since 2021. (█████████ at 289:12-22, 363:22-364:14.)

>    3.   The Infrequent Institutional Searches Recover Contraband Left by
>         Inmates in Common Areas, Which Defendants Do Not Investigate.

292.   CERT searches of housing units at St. Clair regularly report finding large amounts of contraband in common areas. (*See, e.g.*, Doc. 422-171; Doc. 422-045; Doc. 422-180; Doc. 422-304; Doc. 422-297; Doc. 422-299; Doc. 422-298.)

293.   Law Enforcement Services Division ("LESD") searches also recover significant amounts of contraband from common areas. (*See, e.g.*, Doc. 422-165; Doc. 422-300–03.)

294.   Defendants acknowledge that inmates leave contraband in common areas for staff to find during searches, which Defendants then do not investigate to determine the source of the contraband:

a.   Defendant Warden Mitchell testified, "[y]ou have a whole lot of people in there, and a lot of people is throwing their stuff out, you know.  It was not — not like they were finding it.  They probably was throwing it out to keep you from finding something else."  (Doc. 422-087 at 426:5-10.)

b.   ██████████████████████████████████████████

██████████████████████  (Doc. 422-070 at 153:9-23, 154:7-17.)  She testified that "[t]he only thing you do if you catch somebody with it, you know, you can write them up for it, but they're not going to tell you where they got it from".  (*Id.* at 51:20-23.)

c.   Former Captain Gary Malone testified that "[i]f the contraband is found in a common area, you can't blame – you can't put the charge on any inmate because it's found – it's not found on the inmate".  (Doc. 422-080 at 183:1-185:8.)

d.   Lieutenant Gadson testified that "you can't investigate a common area" and agreed that inmates sometimes keep their dangerous contraband in common areas to avoid being identified.  (Doc. 422-068 at 85:7-12.)

e.   Officer Jones testified that knives were "probably placed in there [the trash can] when they know the CERT team started coming down the sidewalk.  That's usually how we get bulk knives.  When they see the CERT team coming, they start flushing and throwing."  (Doc. 422-078 at 151:2-10.)

f.   ████████████████████████████████████

████████████████████████████████████

██████  (Doc. 422-076 at 109:23-111:1.)  ███████████████████████



(*Id.* at 109:11-14

)

g.  Prisoner ███████ testified that, "[m]ost of the stuff they get, it be put there for them to get".  (Doc. ██████ at 176:7-8.)

4.  <u>Defendants Do Not Regularly Search Staff Entering St. Clair.</u>

295.  Defendants are aware that staff bring contraband into the facility.  (Doc. 422-087 at 421:16-20; Doc. 422-066 at 79:18-21; Doc. 422-076 at 253:9-11; *see also* Doc. 422-068 at 230:4-9; Doc. 422-092 at 110:23-111:7, 179:22-180:7; Doc. 422-090 at 68:5-20, 69:12-16.)

296.  Former Commissioner Dunn testified, when asked about corruption among certain ADOC staff that bring contraband into the facilities, that "we recognize that it exists". (Doc. 422-062 at 273:19-274:8.)

297.  Prisoners also testified that staff bring contraband into St. Clair:

a.  Plaintiff Robert Carlile testified, when asked how contraband gets into St. Clair, that "[m]ost of it gets in there by the officers".  (Doc. 422-054 at 49:15-18.)

b.  ███████ testified that "[g]angs and officers… work hand in hand" to bring contraband into the facility.  (Doc. ██████ at 57:20-23.)

298.  Defendants allow staff to enter St. Clair with infrequent use of the body scanner. (*See* Doc. 422-103 at 106-07 (citing monthly statistics for use of the Adani Body Scanner ("ABS") at St. Clair in 2023 for staff and inmates).)

299.  

(Doc. 422-088 at 52:7-9.)

300.    In practice, Defendants allow staff to enter St. Clair without being scanned, as ADOC's own records show that the rate of scans is far lower than 30 percent; for example, in the eight months from March 1 to October 1, 2023, there were between 25 and 87 scans of employees per month.  (*See* Doc. 422-103 at 106-07 (citing monthly statistics for use of the ABS at St. Clair in 2023 for staff and inmates; *see also* Doc. 422-331; Doc. 422-333; Doc. 422-335; Doc. 422-337; Doc. 422-339; Doc. 422-341; Doc. 422-343.)

301.    ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████  (Doc. 422-066 at 78:2-79:11.)

302.    Former Captain Ronald England testified that all staff do not have to pass through a body scanner each time they enter St. Clair, and he could not recall the last time he was required to be scanned.  (Doc. 422-369 at 116:15-118:14.)

303.    St. Clair staff also rarely, if ever, use the body scanner on prisoners; for example, between January 1 to October 1, 2023, there were between 0 and 74 scans of inmates per month.  (*See* Doc. 422-332; Doc. 422-334; Doc. 422-336; Doc. 422-338; Doc. 422-340; Doc. 422-342; Doc. 422-344.)

304.    Former Warden Noe testified that "contraband could come in several ways through the back gate.  It's not – it's not being searched".  (Doc. 422-088 at 69:15-22.)

5.    <u>Defendants Do Not Have a Practice of Investigating Incidents To Recover Weapons Used In Assaults.</u>

305.    There is no practice at St. Clair to recover weapons used in assaults.  (*See* Doc. 422-103 ¶¶ 168-169 (citing incident reports for inmate-on-inmate assaults in 2023 where the weapons were not recovered).)

306.    The lack of active supervision at St. Clair (including through monitoring security camera footage) enables inmates to hide weapons used in assaults.  (*See, e.g.*, Doc. 422-150 ("Due to inmate ███████ delay of reporting or discovery of the incident, a search of the inmate ██████ cell and dormitory common area met with negative results for finding of any item that may have been used to cause inmate ███████ injury.").)

307.    There is also no practice at St. Clair to search for drugs following an inmate's overdose.  (*See* Doc. 422-103 ¶ 170 (████████████████████████████████ ██████████████████████████████).)

            6.    <u>Contraband Increases the Risk of Harm Inmates Face at St. Clair.</u>

308.    Assaults at St. Clair frequently involve very serious injuries as a result of the weapons commonly used in inmate-on-inmate assaults.  (*See* Doc. 422-103 ¶ 160.)

309.    Former Deputy Commissioner Daniels testified that "[w]eapons in any correctional environment increase the risk of death, which is why obviously they are prohibited" and that "of course there is a correlation between weapons and violence". (Doc. 422-057 at 29:11-17, 83:14-15.)

310.    Defendant Warden Mitchell testified that "the number one thing that the majority of them say when they come down to the office [is] 'We was in there using illegal drugs, and then this is what happened to me'".  (Doc. 422-087 at 439:3-9.)  Warden Mitchell also agreed that drugs debts contribute to violence among inmates.  (*Id.* at 418:5-14.)

311.    Defendant Warden Fox testified, "I just know that the end of every incident, there's always some form of contraband that's been involved."  (Doc. 422-066 at 139:3-5.)

312.    Former Warden Noe testified that drugs can led to violence among inmates. (Doc. 422-088 at 65:16-21.)  He also testified that it is undesirable to have weapons enter the facility because they can cause serious injuries, including death.  (*Id.* at 64:20-65:3.)

313.    Defendant Regional Director McClain agreed that weapons can exacerbate prisoner-on-prisoner violence.  (Doc. 422-081 at 143:21-23.)

314.    Defendant Captain Parker agreed that knives and drugs are sometimes involved in sexual assaults.  (Doc. 422-089 at 313:18-314:1.)

315.    Former Captain Ronald England testified that drug debts "contribute to violence among the prisoners" at St. Clair.  (Doc. 422-369 at 63:8-13.)

316.    ADOC Deputy Commissioner of Special Services Dion Robinson testified that the presence of narcotics, weapons and cell phones increase the risk of violence at St. Clair.  (Doc. 422-370 at 166:11-168:5.)

317.    PREA Director Christy Vincent testified that the presence of drugs and knives increases the risk of sexual violence.  (Doc. 422-094 at 179:16-21, 180:4-9.)

7.    <u>Overdoses and Overdose Deaths Are Common at St. Clair.</u>

318.    Lieutenant Price testified that drug overdoses occur "[p]retty much" daily at St. Clair, including that on the previous day there was "about two or three.  And tomorrow, tonight, we might have some more".  (Doc. 422-090 at 135:1-17; *see also* Doc. 422-381; Doc. 422-382; Doc. 422-391; Doc. 422-392.)

319.    ███████████████████████████████████████████████████████
(*See* Doc. 422-103 ¶ 165 (citing hospital records).)

320.    Four inmates at St. Clair died of drug overdoses during a single week in February 2023:  ████████████████████████████████████████ . (Doc. 422-220; Doc. 422-219; Doc. 422-217; Doc. 422-216.)

321. ███████████████████████████████████████████████████

███████████████████████████████████████ (Doc. 422-102 at

49.)

322.    Plaintiff Mark Duke testified that he sees inmates high on drugs "[m]aybe once

every three days or so". (Doc. 422-061 at 122:9-17.)

      H.    <u>Defendants Have a Practice of Conducting Severely Inadequate
Investigations of Physical and Sexual Assaults.</u>

323.    Defendants have a widespread practice of conducting severely inadequate

investigations of violent incidents at St. Clair.  (*See infra* ¶¶ 324-46.)

324.    The practice of inadequate investigations at St. Clair perpetuates the risk of

violence, sexual assault and excessive use of force as (i) perpetrators are not held

accountable and (ii) systemic failures in the facilities, personnel issues and security

procedures that contribute to the incidents are not identified and investigated.  (*See*

Doc. 422-103 §§ VI.F, XI.B; Doc. 422-102 § VII.7.)

      1.    <u>Defendants Have a Practice of Encouraging Victims to Sign
Prosecution Waivers in Order To Prematurely End LESD
Investigations.</u>

325.    Defendants have a widespread practice of encouraging victims to sign prosecution

waivers in order to prematurely end investigations into prisoner-on-prisoner violence and

prisoner-on-prisoner sexual violence.  (*See infra* ¶¶ 326-30.)

326.    Defendants' practice of overusing prosecution waivers applies to incidents of

prisoner-on-prisoner violence; for example:

    a.    On February 21, 2023, ████████████ was beaten repeatedly with a wooden

stick by ████████████ (Doc. 422-144.) ████████████████████████

████████████████████████████ (*Id.*)  This incident was coded as

"Assault: Inmate on Inmate with Non Serious Injury." (*Id.*) Even though an officer observed the incident, ███████████████████████████████████████

███████████████████ (Doc. 422-144; Doc. 422-214.) █████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████ (Doc. 422-214.) ████████████████████████████████████████████████████████

██████████████████████. (*Id.*)

b.  On January 2, 2023, ██████████████ was violently assaulted, requiring treatment at a free-world hospital for three deep stab wounds to his back and a possible broken jaw. (Doc. 422-211.) The LESD investigation into the assault was closed on February 14, 2023 because ████████████ declined to prosecute. (*Id.*) █████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ (Doc. 422-213.) ███████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████ (*Id.*)

327.  Defendants' practice of overusing prosecution waivers applies to incidents of prisoner-on-prisoner sexual violence. (Doc. 422-102 at 73.) For example:

a.  On August 5, 2023, ██████████████ reported that he was raped. (Doc. 422-323.) ██████████████ signed a prosecution waiver, and the investigation was closed based on ██████████████ unwillingness to prosecute. (Doc. 422-230.) ███████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ (Doc. 422-325.)

b.   On August 4, 2023, ███████████ reported that he was raped.  (Doc. 422-327.)

Because ██████████ signed a prosecution waiver, his rape kit was not sent to the

Alabama Department of Forensic Science for testing, and the case was closed without

further investigation.  (*Id.*) ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ (Doc. 422-328.) ████████████████████

████████████████████████████ (*Id.*)

c.   On June 2, 2023, ██████████████ reported the sexual assault described above .  (*See*

*supra* ¶¶ 111.a, 151.b.)  On July 27, 2023, LESD closed the investigation based on

█████████ unwillingness to prosecute.  (Doc. 422-227; Doc. 422-167; Doc. 422-354;

Doc. 422-400.)

d.   On November 25, 2020, between the hours of 3 and 4 am, ████████████ was

"anally assaulted with a foreign object".  (Doc. 422-237.) ██████████ signed a

prosecution waiver and indicated that "he did not want to prosecute the assailant"

because he "viewed disclosing information and the suspect's identity [w]as

'snitching'", which "gets you killed in prison".  (*Id.*; Doc. 422-396.)

328.    IPCM Gillilan testified that he "assumes" that any time a victim signs a

prosecution waiver, his PREA allegations are "deemed unfounded" because "[i]t's kind

of important you have a victim".  (Doc. 422-069 at 237:4-8.)  Mr. Gillilan testified that he

could not recall a single instance where he took action to respond to a PREA case where

the victim had declined to prosecute.  (*Id.* at 237:13-23.)  He explained that he refers

cases to LESD and if the victim declines to prosecute, "[t]here was nothing else for me to do". (*Id.*)

329.    Following the signing of a prosecution waiver, LESD investigators and St. Clair officers fail to conduct any further investigation, even if there is evidence that a violent crime has been committed; testimony evidencing this practice includes:

a.    LESD Director Arnaldo Mercado testified that "if a victim refuses to cooperate or prosecute, the case is unsubstantiated and closed due to lack of cooperation or prosecution by the victim" even if "investigators believe a crime has been committed", "there is video evidence of that crime", and even if the suspect has told [the] investigator, 'Yeah, I did it'". (Doc. 422-082 at 125:14-126:6.)

b.    Director Mercado testified that "[i]f a victim . . . signs a prosecution waiver, then . . . the case is dismissed" and LESD "[w]on't refer cases to the D.A.'s office even if there is enough evidence to sustain []probable cause". (*Id.* at 208:6-210:11.)

c.    LESD Agent Clark Hopper testified that "if someone . . . declines to prosecute", he has "no choice but to close the investigation", "[e]ven if there's conclusive evidence indicating that a violent crime took place", as that is a concern for the District Attorney—not LESD. (Doc. 422-075 at 123:1-19.)

d.    Agent Hopper testified that if a prisoner does not "wish to seek charges" and "want[s] . . . to close the case", he "read[s]" them the prosecution waiver, "fill[s] in the blanks and ask[s] them to sign", and "it opens and closes that quickly". (*Id.* at 95:5-20; *see also id.* at 116:4-117:8 (discussing an incident in which Agent Hopper filled out a prosecution waiver for a prisoner even though he never asked or obtained

approval from the prisoner); *id.* at 91:19-92:20 (describing waivers as the "number one way cases are closed" in cases of prisoner violence); Doc. 422-233.)

e.  LESD Senior Agent Bradley Arledge testified that if a victim declines prosecution and/or signs a prosecution waiver, LESD marks the case "unsubstantiated" and "the case is closed out".  (Doc. 422-050 at 270:15-271:9.)  He also testified that he could not recall any instance in which an incident had been prosecuted after the incident had been determined to be unsubstantiated.  (*Id.* at 141:17-22; *see also id.* at 136:1-18.)

330.    LESD investigators and St. Clair officers close their investigations once prosecution waivers are signed even though they acknowledge victims of prisoner violence typically sign prosecution waivers because they are fearful of retaliation:

a.  LESD Agent Hopper testified that victims sometimes "refuse to prosecute because they're fearful of retaliation".  (Doc. 422-075 at 157:7-11.)

b.  LESD Director Mercado testified that he recognized that it's "possible" that victims decline to prosecute because "they're in fear of their assailant", "fear of other gang members who are affiliated with their assailant" or "because they don't feel that they'll be protected from their assailant next time they see them in a prison". (Doc. 422-082 at 126:13-127:12.)

c.  PREA Auditor O'Connor testified that "there's probably a fear of retaliation" if an inmate "cooperated in an investigation of an incident in which they had been a victim of a sexual assault".  (Doc. 422-356 at 120:9-14.)

### 2.    After Victims Sign Prosecution Waivers, Defendants Have a Practice of Declining To Conduct Administrative Investigations.

331.    A majority of LESD investigations into incidents of violence are deemed "unsubstantiated" and closed without adequate investigation.  (Doc. 422-103 ¶ 95.)

332.    Investigatory closures are typically based solely on the victim's decision not to

press *criminal* charges—a decision that the victim often makes quickly and without

sufficient information.  (*Id.*)  For example:

  a.   On June 7, 2023, ███████████ was beaten unconscious by three other inmates.

  (Doc. 422-223.)  Due to the severity of his injuries, ██████████ was transported to a

  free-world hospital for treatment.  (*Id.*)  The assault was captured on surveillance

  video, which showed the assailants beating ██████████ with a 2x4.  (*Id.*)

  Notwithstanding the existence of video footage of the attack, LESD "exceptionally

  closed" the investigation on June 15, 2023 because ██████████ declined to

  prosecute.  (*Id.*)

  b.   On May 13, 2023, ███████████ was stabbed by ███████████,

  requiring ██████████ to be transported to a free-world hospital for treatment of

  several lacerations to both arms.  (Doc. 422-224.)  Video footage of the incident

  captured ██████████ approaching ██████████, taking out a knife and attacking

  ██████████ who was unarmed.  (*Id.*)  The LESD report notes that the

  surveillance footage clearly shows ██████████ attack ██████████ with a knife

  without provocation.  (*Id.*)  Nonetheless, LESD closed the case on June 7, 2023 due

  to ██████████ lack of cooperation.  (*Id.*)

  c.   For additional examples, see Doc. 422-103 ¶ 95.  (*See also* Doc. 422-222;

  Doc. 422-215; Doc. 422-143; Doc. 422-218; Doc. 422-210; Doc. 422-212.)

333.    Defendants conduct no further investigation of alleged violence—administrative

or otherwise—once a victim declines to press criminal charges.  (*See* Doc. 422-102 at 75-

77.)

334. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████  (Doc. 422-250.)  By mid-2023, this policy reverted to exclusive use of

criminal investigations by LESD for all sexual assault allegations.  (*See* Doc. 422-069 at

292:18-293:11.)

335.    Because Defendants do not complete administrative investigations, there is no

discipline or corrective action to track potential perpetrators of future violence and sexual

abuse in the overwhelming majority of cases.  (*See* Doc. 422-102 at 78-79.)

    a.  Perpetrators of sexual assault are moved back into general population, without

    discipline or reclassification, and can abuse again without consequence.  (*See id.* at

    78.)

    b.  As of December 31, 2023, there were only 20 prisoners at St. Clair with "guilty"

    disciplinary infractions for prior sexual abuse.  (Doc. 422-357.)

336.    Defendants' practice of relying exclusively and automatically on victim

recantations is inconsistent with sound correctional practice and undermines one of the

core functions of an investigation, namely to identify the conditions that allowed the

security breach and violence to occur.  (Doc. 422-103 ¶ 95.)

       3.  <u>Defendants Have a Practice of Inadequately Responding To the
Conditions that Lead To Incidents of Violence and Sexual
Violence (*e.g.*, Contraband).</u>

337.    Defendants have repeatedly failed to correct pervasive deficiencies and systemic

failures in their investigation of violent incidents at St. Clair, and the failure to address

these issues increases the risk of future in-custody deaths, leads to violence, sexual

violence and death at St. Clair, and puts prisoners at continued, ongoing risk of substantial harm.  (*Id*. ¶ 96.)

338.    Defendants have a practice of failing to investigate the source of contraband found at St. Clair:

    a.    Defendant Captain Omar Parker testified that he was unaware of "of any type of review that St. Clair has done to identify the sources of contraband at St. Clair". (Doc. 422-089 at 208:2-6.)  Defendant Captain Parker testified that if there is "any investigation done into where that contraband came from", then "it wouldn't be conducted at the St.  Clair — at St. Clair.  That investigation would be done by Law — LESD."  (*Id.* at 208:7-15.)  When asked if he "communicate[s] with LESD while they do investigations of incidents that occur at St. Clair", Defendant Captain Parker testified "[n]o".  (*Id.* at 208:16-19.)

    b.    LESD Agent Clark Hopper testified that LESD lacks the resources or time to investigate the source of contraband beyond asking prisoners and getting "stonewall answers".  (Doc. 422-075 at 170:14-172:5.)  Agent Hopper testified that it is "near impossible" to "figure out how [contraband] originally entered the facility" and said in his "five years" and "experience", LESD has only caught "one . . . or two of them" who had tried to throw contraband over the fence.  (*Id.* at 173:7-18.)  He testified that he has "never had any luck" "follow[ing] a financial paper trail to the source" of any contraband.  (*Id.* at 176:1-177:1.)

    c.    LESD Senior Agent Bradley Arledge testified that he could not identify a single time when he was able to "determine the source of contraband".  (Doc. 422-050 at 170:7-11.)  Agent Arledge similarly testified that he could not recall any particular

investigation in which he "investigated . . . the source of contraband that had been thrown over the fence". (*Id.* at 182:15-22.) When asked whether LESD tries to "figure out" where contraband "might [have] come from in the prison", Agent Arledge answered "[n]o". (*Id.* at 175:12-15.) Agent Arledge testified that he didn't know "what measures", if any, "are taken to determine the sources of prisoner-made weapons at St. Clair". He explained that "[t]hat would be a question for the warden". (*Id.* at 174:2-6.)

4. <u>Investigators Close Cases Without Testing Forensic Evidence or Properly Evaluating Physical Evidence.</u>

339. When sexual assault victims are able to report sexual assault within 72 hours, they are taken to the United Way SANE Center in Birmingham, where a nurse collects a rape kit and other physical evidence. (Doc. 422-091 at 30:15-33:16.)

340. Although LESD collects the physical evidence, if a victim signs a prosecution waiver, LESD has a practice of not testing the rape kit to substantiate sexual assault allegations or identify the perpetrator. (*See, e.g.*, Doc. 422-102 at 77; Doc. 422-232 (LESD notifying ADFS not to test a sexual assault kit after victim signed a prosecution waiver); Doc. 422-082 at 209:22-210:8.) For example:

a. On May 12, 2020, ███████████ reported being "assaulted and sodomized", and presented with visible injuries "on the neck and facial area". (Doc. 422-236.) ███████████ told officers he was sexually assaulted and identified the assailant. (*Id.*) He was transferred to a SANE clinic, where a rape kit was collected. (*Id.*) He then stated that "he did not want to pursue criminal charges against [the assailant]" and "signed a prosecution waiver". (*Id.*) There is no record that LESD ever conducted any further testing of the rape kit that was collected. (*Id.*; Doc. 422-271.)

b.  On October 7, 2021, ████████████ was "forcefully sexually assaulted" and reported the incident to members of the St. Clair infirmary.  (Doc. 422-202.) ████████ suffered a swollen jaw and injuries in the genital area.  (*Id.*) ████████ ███████████████████████████████████ (Doc. 422-398.) However, LESD files related to the incident note that the rape kit was "not sent to the Alabama Department of Forensic Science due to Inmate ██████ refusal to prosecute".  (Doc. 422-202.)  ████████████ alleged assailant later went on to assault another prisoner at St. Clair in 2023.  (*See* Doc. 422-167.)

c.  On June 2, 2023, ████████ reported the sexual assault described above. (*Supra* ¶¶ 111.a, 151.b, 327.c; *see also* Doc. 422-384.)  ████████ signed a prosecution waiver, and LESD never even took a DNA sample from him.  (Doc. 422-226; *see also* Doc. 422-091 at 114:3-117:11.)

d.  For additional examples, see Doc. 422-102 at 77-78.  (*See also* Docs. 422-131, 422-206, 422-167, 422-235, 422-270, 422-091 at 128:14-132:1.)

5.  <u>Defendants Have a Practice of Failing To Timely and Adequately Identify and Investigate Incidents Involving the Use of Force.</u>

341.  Defendants do not adequately identify incidents involving the use of force against prisoners or appropriately investigate such incidents when brought to their attention.  (*See* Doc. 422-103 ¶ 229.)

342.  Prisoners routinely do not report incidents involving unjustified use of force because they fear the consequences they may face:

a.  Plaintiff Robert Carlile testified that he has not reported any incidents involving use of force by officer because he fears "retaliation from the officers".  (Doc. 422-054 at 73:8-74:1.)  He explained that he worried "it would come back on me," and added

that he was aware of no investigations, and could not recall being questioned in

connection with any of the incidents he observed.  (*Id.*)

b.  ███████████ testified that he does not report complaints about the conduct of

officers because "[y]ou better not have nothing to say . . . You'll be next . . . You'll

get beat up" by "[t]he police."  (███████ at 275:21-276:13.)

343.    Officers regularly do not document their own use of force against inmates, ███

███████████████████████████████  (*See* Doc. 422-011 at 4.)

a.  Former St. Clair Captain Graham testified that she was aware of an incident in

which then-Sergeant (now Lieutenant) Santa-Maria used force on an inmate who

"didn't do anything to justify the using of force" and "then he didn't write an incident

report" on it.  (*Supra* ¶ 233.c; Doc. 422-070 at 251:7-13.)

b.  On February 4, 2023, Officer Gregoree Haywood was seen chasing after an

inmate and spraying the inmate's back, neck and head with Sabre Red, and "Officer

Haywood did not report any action, use of force, or incident".  (Doc. 422-151.)

344.    Even when incidents are reported, there is no meaningful review process to ensure

that the application of force was justified under the circumstances:

a.  In incidents involving the application of force against an inmate, a captain is

required to review the incident and determine whether the incident was justified or

not ███████████████████ (Doc. 422-083 at 129:1-130:11.)  Following

that review, the incident is supposed to receive a second round of review from LESD

investigative officers.  (*Id.* at 130:12-131:14.)  If it is determined that an application

of force against an inmate was inappropriate, the warden is responsible for imposing

disciplinary measures, which may either be a reprimand, suspension or dismissal.  (*Id.* at 132:9-18; Doc. 422-004 at 7.)

b.  Defendants fail to prioritize appropriate use of force investigations training for prison leadership, leaving supposed "investigators" without the skills necessary to review use of force incidents; for example, Defendant Captain Parker admitted that he and another captain went several months before conducting use of force investigations training, ultimately attending training just days before their depositions.  (*See* Doc. 422-089 at 271:2-273:7.)

345.    In practice, even when incidents involving the use of force are reported and investigated, St. Clair's documents show that St. Clair officers and LESD investigators fail to appropriately review the incidents and discipline offending officers:

a.  For hundreds of incidents involving officer use of force, the "Use of Force Investigative Report" is a near copy-and-paste of the incident report, followed by a copy-and-paste determination that the use of force was justified:  "This use of force was justified and the appropriate level of force."  (Doc. 422-103 ¶ 232; *see also* Docs. 422-200, 422-199.)

346.    As a result of this ineffective review, Defendants allow officers to use force routinely and repeatedly in a manner inconsistent with sound correctional practices. (Doc. 422-103 ¶ 234.)

Dated:  May 23, 2024

/s/ *Charlotte R. Morrison*

Bryan A. Stevenson
Charlotte R. Morrison
Benjamin H. Schaefer
Sofia V. McDonald
Equal Justice Initiative
122 Commerce Street
Montgomery, Alabama 36104
Telephone:  (334) 269-1803
Facsimile:  (334) 269-1806
bstevenson@eji.org
cmorrison@eji.org
bschaefer@eji.org
smcdonald@eji.org

/s/ *Antony L. Ryan*

Antony L. Ryan (*pro hac vice*)
Lauren M. Rosenberg (*pro hac vice*)
Helam Gebremariam (*pro hac vice*)
Cravath, Swaine & Moore LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
aryan@cravath.com
lrosenberg@cravath.com
hgebremariam@cravath.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document is being served by electronic mail to the designated counsel of record in the above-captioned action on this 23rd day of May, 2024.

By:

*/s/ Antony L. Ryan*
Antony L. Ryan
Cravath, Swaine & Moore LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700