FILED
2025 Jul-22 PM 11:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA MIDDLE DIVISION**

| | | |
|---|---|---|
| **MARK DUKE,** ***et al.*****,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 4:14-cv-01952-RDP** |
| | ) | |
| **JOHN HAMM*****, et al.*****,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' DISPUTED FACTS**

## I. Overview of St. Clair

### A. Inmate Population

### B. Facility Layout

1. Inmates at St. Clair can move between housing units. (*See* Doc. 422-067 at 246:13-23.)

**DEFENDANTS' RESPONSE:** Disputed. The ADOC Officials and St. Clair staff take multiple actions to prevent unauthorized inmate movement. For example, ADOC installed interior fencing at St. Clair to help keep housing units separate. (Doc. 423-4 at 230:10-233:3; Doc. 423-22 at 175:14-176:20). St. Clair implemented an "armband" system to assist with inmate movement control but faced difficulties enforcing it because inmates broke or removed their armbands. (Doc. 423-56 at 124:17-125:1; Doc. 423-63 at 217:22-218:7; Doc. 423-32 at 116:6-14; Doc. 423-45 at 61:9-14). St. Clair policy requires security staff to conduct bed roster checks every day, during which officers "physically go by every dorm and you match inmate to ID." (Doc. 423-25 at 212:6-214:15; Doc. 423-58 at 250:16-252:18; Doc. 423-54 at 255:13-258:17). Inmates testified that St. Clair staff take disciplinary action against inmates who engage in unauthorized movement. (Doc. 423-45 at 18:2-20:20; Doc. 423-38 at 98:7-21; Doc. 423-71 at 278:14-18); Doc. 423-26 at 244:17-245:7; Doc. 423-32 at 301:18-302:13; Doc. 423-72 at 216:5-9; Doc. 423-19 at 67:4-7; Doc. 423-21 at 272:6-8). The ADOC Officials do not dispute that St. Clair inmates sometimes violate institutional rules and engage in unauthorized entry to housing units to which they are not assigned.

### C. Named Defendants

2. To help reduce inmate-on-inmate violence at St. Clair, Defendant Warden II Fox is responsible for reviewing gang activity and trends to minimize the effect of gangs on the inmate population, reviews data regarding violent incidents at St. Clair to look for trends, monitors and institutes improvements to the random

search procedure of inmates and dorms to reduce contraband, and conducts shakedowns. (Doc. 422-267 at 8-9.)

**DEFENDANTS' RESPONSE:** Defendants' issue is that Plaintiffs attribute to Warden Fox testimony from Warden Mitchell.

3. To help reduce inmate-on-inmate sexual violence, Defendant Warden II Fox is responsible for working closely with St. Clair's Institutional PREA Compliance Manager ("IPCM"). (*Id*. at 10-11.)

**DEFENDANTS' RESPONSE:** Defendants' issue is that Plaintiffs attribute to Warden Fox testimony from Warden Mitchell.

4. To help reduce excessive use of force, Defendant Warden II Fox is responsible for instructing and reminding staff about ADOC policy, providing guidance on the appropriate use of force and instructing correctional staff at St. Clair on proper use of force. (*Id*. at 11-12.)

**DEFENDANTS' RESPONSE:** Defendants' issue is that Plaintiffs attribute to Warden Fox testimony from Warden Mitchell.

## II. The Named Plaintiffs

### A. Mark Duke

5. On July 17, 2013, Mr. Duke was stabbed by another prisoner. (Doc. 422-188.) The incident occurred after Mr. Duke was threatened at knife point in an attempted robbery in his cell by the same prisoner, who was not assigned to Mr. Duke's block. (Doc. 422-061 at 61:14-21.) After the incident, Mr. Duke was treated for five stab wounds to his left shoulder blade, two stab wounds to the chest area and abrasions to his right temple, left forehead and left cheek. (Doc. 422-188.)

**DEFENDANTS' RESPONSE:** Disputed. The incident report cited by Plaintiffs indicates that Duke engaged in a fight with weapons, in which "[e]ach inmate had

a weapon," with inmate [redacted] (Doc. 422-188.) A correctional officer "retrieved two inmate made knives from the scene of the incident." (Id.) The incident report also states that "Inmate Duke stated he got into the fight with Inmate [redacted] because Inmate Duke had refused Inmate [redacted]' pressure to be involved in homosexual activity." (Id.) The incident report does not mention an attempted robbery.

6. In 2015, Mr. Duke was the victim of excessive force by an officer in J/K Block, when he was hit in an area where he had stab wounds from his 2013 stabbing. (Doc. 422-264 at 11.)

**DEFENDANTS' RESPONSE:** Disputed. Plaintiffs cite Duke's Amended Interrogatory Responses in support of this statement. Duke's Amended Interrogatory Response states that he "was the victim of officer force," not that he was the victim of "excessive" force. (Doc. 422-264 at 11.) When asked at his deposition if he has ever been injured as a result of staff using force on him, Duke responded, "No." (Doc. 422-061 at 356:20-357:3.)

7. Mr. Duke is similarly situated to other prisoners at St. Clair, with whom he shares a common interest. (Doc. 422-295 ¶ 22.)

**DEFENDANTS' RESPONSE:** Named Plaintiffs claim: "Mr. Duke is similarly situated to other prisoners at St. Clair, with whom he shares a common interest." As Named Plaintiffs acknowledge, Duke lives in St. Clair's honor dorm. (Plaintiffs' SOF, ¶ 21). St. Clair's honor dorm operates under different rules from other housing units at St. Clair. (Doc. 423-21, 21-22 (78:10-85:20)). Duke, therefore, is not similarly situated to St. Clair inmates who live in dorms other than the honor dorm. Moreover, Duke admitted to violating St. Clair's rules regarding inmate movement, and he invoked his Fifth Amendment rights regarding whether he used a contraband cell phone at St. Clair. (ADOC Officials SOF, ¶ 219). Accordingly, Duke is not similarly situated to inmates who abide by St. Clair's institutional rules and policies. Further, Duke admitted he "did not report the instances he observed" involving contraband, inmate violence, inmate

sexual assault, or officer force. (Doc. 422-264, 7, 9, 11). Duke's acts of omission make him responsible for and indifferent to the very issues giving rise to his complaints about St. Clair. Accordingly, to the extent Named Plaintiffs submit these alleged facts to support their argument that the ADOC Officials exhibit "deliberate indifference" to these alleged actions (see Doc. 428, 25), the alleged facts fail to establish the ADOC Officials' knowledge of the alleged practices, much less their deliberate indifference to them.

**B. Nathaniel Harris**

8. Mr. Harris has been the victim of physical violence and threats on several occasions. (Doc. 422-265 at 7, 9.)

**DEFENDANTS' RESPONSE:** Harris interrogatory responses claims being the victim of violence and threats of violence, our issue is these are alleged and were not reported.

9. Mr. Harris has witnessed officers use excessive force against prisoners throughout St. Clair. (*See id.* at 10.) In early 2022, Mr. Harris witnessed Lieutenant [redacted] spray an unarmed prisoner with Sabre Red in the L/M hallway, kick the prisoner in the stomach and groin and slap the prisoner with her radio. (*Id.* at 10.)

**DEFENDANTS' RESPONSE:** Harris interrogatory responses claims witnessing the use of excessive force, our issue is these are alleged and were not reported.

10. Although St. Clair has a movement control policy by which prisoners wear colored wristbands, Mr. Harris has not been issued a wristband in approximately four years. (Doc. 422-296 ¶ 11.)

**DEFENDANTS' RESPONSE:** Disputed. During Mr. Harris' deposition, Mr. Harris testified he received a wristband two (2) years earlier, and Mr. Harris did not have a wristband at the time of his deposition. (Doc. 423-35, 26-27 (101:19-103:8)).

11. When Mr. Harris first arrived at St. Clair, he did not meet with a classification specialist or receive any PREA documentation. (Doc. 422-296 ¶ 4.)

**DEFENDANTS' RESPONSE:** Disputed. Mr. Harris transferred to St. Clair on February 25, 2020 and received his classification screening the same day, his PREA orientation on March 17, 2020, and received a reassessment by the IPCM on March 13, 2020. (Doc. 422-253 at 46.)

12. Mr. Harris's experiences are similar to those of other prisoners at St. Clair. (Doc. 422-296 ¶ 21.)

**DEFENDANTS' RESPONSE:** Named Plaintiffs claim that "Mr. Harris's experiences are similar to those of other prisoners at St. Clair." (Plaintiffs' SOF, ¶ 44). Named Plaintiffs cite paragraph 21 of Harris's declaration for this statement, but the declaration includes nothing about the experiences of other prisoners at St. Clair. (Doc. 422-296, 4). Moreover, as Named Plaintiffs acknowledge, Harris currently lives in J dorm, which is St. Clair's substance abuse program (Therapeutic Community). (Plaintiffs' SOF, ¶ 35; Doc. 422-105). Harris is not similarly situated to other inmates who live in other dorms within St. Clair. Harris admitted he "has not reported the instances he observed" involving contraband (Doc. 422-265, 7) and "did not report any of the instances he observed" involving inmate violence, inmate sexual assault, or officer force. (Id., 9, 11). Accordingly, to the extent Named Plaintiffs submit these alleged facts to support their argument that the ADOC Officials exhibit "deliberate indifference" to these alleged practices (see Doc. 428, 25), the alleged facts fail to establish the ADOC Officials' knowledge of the alleged practices, much less their deliberate indifference to them.

### C. Johnny Young

13. In 2021, Mr. Young was assaulted in K Dorm with a hatchet by a prisoner named [redacted] (Doc. 422-263 at 10.)

**DEFENDANTS' RESPONSE:** Young claims in discovery responses he was assaulted in K dorm with a hatchet, our issue is this is alleged and was not reported.

14. Mr. Young's experiences are similar to those of other prisoners at St. Clair. (Doc. 422-294 ¶ 2.)

**DEFENDANTS' RESPONSE:** Named Plaintiffs claim "Mr. Young's experiences are similar to those of other prisoners at St. Clair." (Plaintiffs' SOF ¶ 56). Named Plaintiffs cite paragraph 2 of Young's declaration in support of this statement. (Id. (citing Doc. 422-294, ¶ 2)). In his declaration, Young states, "I believe that all the inmates at St. Clair want the same things I do. We want safety for ourselves and others." (Doc. 422-294, ¶ 2). This statement fails to establish that Young is similarly situated to all other inmates at St. Clair. As Named Plaintiffs acknowledge, Young lives in St. Clair's honor dorm. (Plaintiffs' SOF, ¶ 49). St. Clair's honor dorm operates under a different set of rules from other housing units at St. Clair. (Doc. 423-21, 21-22 (78:10-85:20)). Young therefore is not similarly situated to St. Clair inmates who live in dorms other than the honor dorm. Young admitted he "did not report many of the instances he observed" involving contraband (Doc. 422-263, 7) and "did not report any of the instances he observed" involving inmate violence, inmate sexual assault, or officer force. (Id., 9, 11-12). Accordingly, to the extent Named Plaintiffs submit these alleged facts to support their argument that the ADOC Officials exhibit "deliberate indifference" to these alleged practices (see Doc. 428, 25), the alleged facts fail to establish the ADOC Officials' knowledge of the alleged practices, much less their deliberate indifference to them.

### D. Robert Carlile

15. During his time at St. Clair, Mr. Carlile was repeatedly slammed against walls and otherwise handled roughly by various officers. (Doc. 422-268 at 11.)

**DEFENDANTS' RESPONSE:** Carlile claims to be slammed against the wall by officers in discovery responses, our issue is this is alleged and was not reported.

16. Mr. Carlile understands that if he violates his parole, he will likely return to St. Clair. (Doc. 422-198 ¶ 3.)

**DEFENDANTS' RESPONSE:** If Carlile violates the terms of his parole, ADOC might house Carlile at Kilby Correctional Facility, Limestone Correctional Facility, Ventress Correctional Facility, Hamilton Aged and Infirmed, St. Clair, Staton Correctional Facility, Fountain Correctional Facility, Bibb Correctional Facility, Easterling Correctional Facility, Bullock Correctional Facility and Elmore Correctional Facility. (Doc. 460-116, 9).

17. Mr. Carlile is willing to serve as class representative because he wants to help the prisoners at St. Clair. (Doc. 422-198 ¶ 2.)

**DEFENDANTS' RESPONSE:** Carlile cannot serve as a class representative because he is no longer incarcerated at St. Clair. (Plaintiffs' SOF, ¶ 62). Accordingly, Carlile is not similarly situated to inmates currently incarcerated at St. Clair and possesses no interest in the injunctive relief sought by Named Plaintiffs.

18. Mr. Carlile's experience is similar to that of other prisoners at St. Clair. (*Id*. ¶ 25.)

**DEFENDANTS' RESPONSE:** Named Plaintiffs purport that Carlile's experience mirrors the experiences of other prisoners at St. Clair. For the reasons stated above, the ADOC Officials disagree. (See supra, ¶ 73). Carlile has not been incarcerated at St. Clair since 2022; thus, his experiences differ greatly from inmates incarcerated at St. Clair today and over the last two (2) years. (Plaintiffs' SOF, ¶ 62). Additionally, Carlile admitted that he "did not report many of the instances he observed" involving contraband (Doc. 422-268, 7). Carlile further testified he "did not report any of the instances he observed" involving inmate violence, inmate sexual assault, or officer force. (Doc. 422-268, 7, 9, 11). Accordingly, to the extent Named Plaintiffs submit these alleged facts to support

their argument that the ADOC Officials exhibit "deliberate indifference" to these alleged practices (see Doc. 428, 25), the alleged facts fail to establish the ADOC Officials' knowledge of the alleged practices, much less their deliberate indifference to them.

19. Mr. Carlile understands that this litigation seeks injunctive relief. (Doc. 422-054 at 137:12-20).

**DEFENDANTS' RESPONSE:** Plaintiffs further contend Carlile "understands that this litigation seeks injunctive relief." (Plaintiffs' SOF, ¶ 75). For the reasons stated above, Carlile's understanding of the injunctive relief sought in this action lacks materiality. (See supra, ¶ 73). Carlile possesses no interest in the injunctive relief sought by Named Plaintiffs because he is no longer incarcerated at St. Clair. (Plaintiffs' SOF, ¶ 62).

20. Mr. Carlile communicates with his lawyers and believes they will adequately represent him and the class. (Doc. 422-198 ¶ 26.)

**DEFENDANTS' RESPONSE**: In paragraph 76, Plaintiffs cite Carlile's declaration for the following statement: "Mr. Carlile communicates with his lawyers and believes they will adequately represent him and the class." Again, because Carlile is no longer incarcerated at St. Clair (and thus cannot serve as a class representative) Carlile's communications with his counsel and beliefs related to the adequacy of his counsel remain irrelevant to this action. (See supra, ¶ 73).

**E. Benny Jones**

21. In April 2021, Mr. Jones was physically assaulted by another prisoner, [redacted] who stabbed Mr. Jones by the G Gate during pill call. (Doc. 422-257 at 9.) Officers responded by spraying both Mr. Jones and Mr. [redacted] with chemical spray. (Id. at 17.) Mr. Jones required free world hospitalization for his injuries. (Id.)

**DEFENDANTS' RESPONSE:** Jones claims to have been stabbed in his discovery responses, our issue is there is no citation to the underlying documents.

22. In February 2020, Mr. Jones was physically assaulted by another prisoner, [redacted] inside of Mr. Jones's cell. (Id. at 9.)

**DEFENDANTS' RESPONSE:** Jones claims to have been physically assaulted in his discovery responses, our issue is this is alleged and it is unclear whether it was reported.

23. Mr. Jones's experiences are similar to those of other prisoners at St. Clair. (Doc. 422-293 ¶ 2.)

**DEFENDANTS' RESPONSE:** Because Jones has not been incarcerated at St. Clair since 2022, Jones's experiences differ significantly from those of other prisoners currently incarcerated at St. Clair. (Doc. 422-293, 1). Additionally, Plaintiff Jones admitted he "did not report the instances he observed" involving contraband (Doc. 422-257, 7) and "did not report any of the instances he observed" involving inmate violence, inmate sexual assault, or officer force. (Id., 9, 10). Accordingly, to the extent Named Plaintiffs submit these alleged facts to support their argument that the ADOC Officials exhibit "deliberate indifference" to these alleged practices (see Doc. 428, 25), the alleged facts fail to establish the ADOC Officials' knowledge of the alleged practices, much less their deliberate indifference to them.

## III. Violence Occurs Throughout St. Clair's Facility, Including All Cell Blocks and Common Areas

24. The level of violence in St. Clair is unacceptably high and pervasive throughout the facility. (See infra[1] Sections III.A-C.) Both the frequency and seriousness of

[1] Internal cross-references within Plaintiffs' Disputed Facts refer to the identified portions of Plaintiffs' Initial Consolidated Statement of Facts (Doc. 430).

the violence make the facility extremely dangerous for St. Clair prisoners. (Id.) St. Clair prisoners routinely experience the following:

a. Violent non-sexual assaults by other prisoners, including but not limited to stabbings and beatings, resulting in serious injury and even death (infra Section III.A);

b. Violent sexual assaults by other prisoners, including rape and oral sex while the victim is involuntarily drugged, held at knifepoint or held hostage for days (infra Section III.B); and

c. Excessive force used by officers, including multiple officers teaming up against one prisoner, beating prisoners while they are handcuffed or restrained and spraying chemicals on prisoners who do not pose a threat of physical violence to others (infra Section III.C).

**DEFENDANTS' RESPONSE:** Because paragraph 94 represents nothing more than Named Plaintiffs' summary of the allegations in subsequent paragraphs in Section III of their Statement of Facts and contains no factual material whatsoever, the ADOC Officials refer the Court to their responses to paragraphs 95 through 125 of Named Plaintiffs' Statement of Facts. The ADOC Officials specifically deny that the alleged facts in paragraphs 95 through 125 establish that "[t]he level of violence in St. Clair is unacceptably high and pervasive throughout the facility;" that "the frequency and seriousness of the violence make the facility extremely dangerous for St. Clair prisoners;" and that "St. Clair inmates routinely experience … [v]iolent non-sexual assaults;" "[v]iolent sexual assaults;" or "[e]xcessive force used by officers." (Plaintiffs' SOF, ¶ 94).

### A. Prisoners Violently Assault Other Prisoners, Resulting in Serious Injury and Death, Throughout St. Clair

25. Prisoners frequently assault other prisoners at St. Clair. (*See* Doc. 422-103 at 13; *infra* ¶¶ 96-98.)

**DEFENDANTS' RESPONSE**: Named Plaintiffs cite the report of their Advocate Martin in support of paragraph 95's description of purported "violent incidents." Contrary to the assertion of Martin, the ADOC Official's Expert Bill Bechtold found, after conducting a comprehensive review of reports of inmate-on-inmate "fights" and "assaults" that occurred at St. Clair between January 2022 and October 2023, that "a large majority of violent incidents at St. Clair remain relatively minor and require no off-site medical treatment." (Doc. 423-74 (Ex. 74), 22). Bechtold concluded that "[t]he rate of serious violent incidents at St. Clair falls within an expected range for a maximum-security facility." (Id., 8).

26. The number of inmate-on-inmate assaults and inmate-on-inmate fights reported in ADOC's Monthly Statistical Reports do not include any incidents that go unreported or are misreported. (Doc. 422-103 at 13, 34-40.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs only offer the opinion of Plaintiffs' expert, Steve Martin in determining that "unreported" or "misreported" incidents are not contained in ADOC's Monthly Reports. Plaintiffs fail to cite sufficient evidence to support this statement.

27. The assault rate at St. Clair is consistently higher than the national average for state maximum-security prisons. (Doc. 422-103 at 14-16 & Fig. 2.)

**DEFENDANTS' RESPONSE**: Named Plaintiffs' Advocate Martin undermined Named Plaintiffs' attempt to compare rates of violence at St. Clair to the so-called "national average." Particularly, Martin admitted that states' differing definitions of violence "makes an apples-to-apples comparison from state to state very difficult." (Doc. 423-46, 48 (189:15-21)). Moreover, Martin admitted he did not prepare the graphs included in his report and could not "testify in federal court that those graphs are accurate." (Id., 50 (194:16-18)).

28. For 2022 and 2023, the rate of inmate-on-inmate assaults per 100 prisoners at St. Clair was 7.7 and 7.8, respectively, whereas the most recently reported national

average annual assault rate for state maximum-security prisons was 4.1 per 100 prisoners. (*Id.*)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs fail to cite sufficient evidence to support this statement. Plaintiffs only offer the opinion of Plaintiffs' expert, Steve Martin. Mr. Martin's report fails to identify the numbers he utilized to calculate the assault rate for St. Clair and fails to cite any evidence to support the numbers in his report. For example, Mr. Martin failed to identify the average prison population for St. Clair utilized in calculating the assault rate per 100 inmates. According to Mr. Martin's report, St. Clair reported a total of 82 assaults in 2022. (Doc. 423-79 at 17). By December 31, 2022, St. Clair housed 1,106 inmates.2 Thus, if using the December 31, 2022, population, St. Clair's assault rate totals 7.4, not 7.7. (See id.; see also Doc. 423-79 at 17). Further, in applying the formula described in Mr. Martin's report (Figure 2), the national average annual assault rate for state maximum-security prisons in 2019 was either 4.7 or 5.0 per 100 inmates, based on Plaintiffs' cited evidence. (See Doc. 422-103 at 19, Fig. 2) (providing the formula for calculating the inmate-on-inmate assault rate per 100 prisoners and the population formula utilized for the Bureau of Justice Statistics 2019 Report); (see also Doc. 422-254 at 7-8, 11 (Tables 1, 2 and 8)). Additionally, the ADOC Officials dispute Plaintiffs attempt to compare St. Clair's 2022 and 2023 numbers to the Bureau of Justice Statistics for 2019. (Doc. 423-46 at 48 (189:15-21) (Plaintiffs' expert Martin admitted that States' differing definitions of violence "makes an apples-to-apples comparison from state to state very difficult.")). Finally, Mr. Martin admitted he did not prepare the graphs included in his report and could not "testify in federal court that those graphs are accurate." (Doc. 423-46 at 50 (194:16-18)).

[2] *Monthly Statistical Report for December 2022*, Alabama Department of Corrections, available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://doc.alabama.gov/docs/MonthlyRpts/December%202022.pdf at 4.

29. These prisoner-on-prisoner assaults and fights often involve weapons, including knives and ice picks. (See, e.g., infra ¶¶ 100, 102-03, 106.) As a result, prisoners suffer serious injury and even death. (*See, e.g.*, *infra* ¶¶ 100-03.)

**DEFENDANTS' RESPONSE:** Argument/opinion.

30. St. Clair's prisoner-on-prisoner homicide rate is over double the national average for state prisons. (Doc. 422-103 ¶ 58 & Fig. 3.) For instance, the most recently reported national average homicide rate for prisoners in state prisons was 0.09 per 1,000 prisoners, as compared to the 1.8 rate of homicide in St. Clair. (*See id.*)

**DEFENDANTS' RESPONSE:** Disputed. Plaintiffs fail to cite sufficient evidence to support this statement. Plaintiffs only offer the opinion of Plaintiffs' expert, Steve Martin. Mr. Martin's report fails to identify the Incident Report numbers he relied on in calculating St. Clair's inmate-on-inmate homicide rate. (Doc. 422-103 at ¶ 58, n.81) (only stating that he relied on incident reports coded as "Death – Inmate-on-Inmate."). Plaintiffs (and Mr. Martin) additionally failed to identify the average prison population for St. Clair utilized in calculating the homicide rate per 1,000 prisoners. (See id.). Plaintiffs (and Mr. Martin) likewise failed to identify the total number of homicides for St. Clair utilized in calculating the homicide rate per 1,000 prisoners. (See id.). Plaintiffs (and Mr. Martin) further fail to identify what numbers Plaintiff (and Mr. Martin) relied on in determining the national average homicide rate for prisons at 0.09. (See id.). Mr. Martin's report cites the Bureau of Justice Statistics "Mortality in State and Federal Prisons, 2001 – 2019 – Statistical Tables" to support this homicide rate. (See id.). However, the BJS report does not include a national average homicide rate for prisons per 1,000 prisoners, the report contains mortality rates (by cause of death) for 2001 to 2019 per 100,000 state prisoners. (Doc. 423-233 at 11) (providing homicide rates of 7 through 12 per 100,000 state prisoners). Further, the BJS report does not provide the national average prison population utilized in providing the mortality rates in order to calculate the homicide rate per 1,000 prisoners.

31. The following is a non-exhaustive list of examples of prisoner-on-prisoner assaults resulting in death:

a. For additional examples, see Doc. 422-103 ¶¶ 55-56 at 20.

**DEFENDANTS' RESPONSE:** Not a factual statement.

32. For the violent assaults at St. Clair from January 1, 2021 to December 31, 2021, at least one quarter resulted in transport of a prisoner to an outside medical facility for treatment. (Doc. 422-103 at 18.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs fail to cite sufficient evidence to support this statement. Plaintiffs only offer the opinion of Plaintiffs' expert, Steve Martin. Mr. Martin's report fails to identify the Incident Report numbers he relied on in calculating that "at least one quarter resulted in transport of a prisoner to an outside medical facility for treatment." (See Doc. 422-103 at ¶ 53). Mr. Martin's report vaguely cites "Incident Reports produced by Defendants from January 1, 2021 to December 31, 2021" to support this opinion. (Id. at 21, n.71).

33. The following is a non-exhaustive list of examples of prisoner-on-prisoner assaults resulting in transportation of a prisoner to an outside medical facility:

a. For additional examples, see Doc. 422-103 at 21-24

**DEFENDANTS' RESPONSE:** Not a factual statement.

34. The following is a non-exhaustive list of examples of prisoner-on-prisoner fights, *i.e.*, incidents not coded as assaults, resulting in transportation of a prisoner to an outside medical facility for treatment

a. For additional examples, see Doc. 422-103 at 28-33.

**DEFENDANTS' RESPONSE:** Not a factual statement.

35. From January 2022 to December 2022, violent incidents, including, *inter alia*, prisoner-on-prisoner deaths, assaults, fights and sexual assaults occurred throughout St. Clair, as depicted in the following chart:




(Doc. 422-103 ¶ 79 & Fig. 6.)

**DEFENDANTS' RESPONSE:** Disputed. Plaintiffs argue the figure provided represents "violent incidents" at St. Clair. In forming the figure, Plaintiffs' expert, Steve Martin, includes accidental deaths, arsons, attempted suicides, fights, riots, and suicides. (Doc. 422-103 at 45). Plaintiffs fail to cite evidence demonstrating that such incidents represent "violent" incidents. Plaintiffs raise no claims in this action regarding accidental deaths, arsons, attempted suicides, riots, or suicides. (See Doc. 422-44). Finally, Mr. Martin admitted he did not prepare the graphs included in his report and could not "testify in federal court that those graphs are accurate." (Doc. 423-46 at 50 (194:16-18)). Mr. Martin's report cites twelve spreadsheets used in forming the information in the figure, but when asked at his deposition whether Mr. Martin "ever [saw] the underlying

spreadsheets that enumerated the data for each of those graphs[,]" Mr. Martin responded, "No." (Doc. 423-46 at 194:2-6; Doc. 422-103 at 45, n.198

36. There was a similar distribution of violent incidents throughout cell blocks and common areas at St. Clair in 2021, 2020 and 2019. (Doc. 422-103 ¶¶ 79-80 & Fig. 7.)

**DEFENDANTS' RESPONSE:** Disputed. Plaintiffs fail to cite sufficient evidence to support this argument. This statement represents nothing more than a reiteration of the opinion proffered by Plaintiffs' expert, Steve Martin. (See Doc. 422-103 at 46). Plaintiffs argue the figure cited represents "violent incidents" at St. Clair in 2021. In forming the figure, Mr. Martin, includes accidental deaths, arsons, attempted suicides, fights, riots, and suicides. (Doc. 422-103 at 45). Plaintiffs fail to cite evidence demonstrating that such incidents represent "violent" incidents. Plaintiffs raise no claims in this action regarding accidental deaths, arsons, attempted suicides, riots, or suicides. (See Doc. 422-44). Finally, Mr. Martin admitted he did not prepare the graphs included in his report and could not "testify in federal court that those graphs are accurate." (Doc. 423-46 at 50 (194:16-18)). Mr. Martin's report cites ten spreadsheets used in forming the information in the figure, but when asked at his deposition whether Mr. Martin "ever [saw] the underlying spreadsheets that enumerated the data for each of those graphs[,]" Mr. Martin responded, "No." (Doc. 423-46 at 194:2-6; Doc. 422-103 at 46, n.199).

37. Even supposedly "highly secure" areas of St. Clair experience high levels of violent incidents. (Doc. 422-103 ¶¶ 81-84.)

**DEFENDANTS' RESPONSE:** Argument.

a. For additional examples of violence in the SSU, see Doc. 422-103 at 113-14.

**DEFENDANTS' RESPONSE:** Not a factual statement.

38. There are violent incidents throughout the facility:

a. Former Deputy Commissioner for Operations Charles Daniels understood that St. Clair was one of the "facilities that had the highest rates and numbers of violence". (Doc. 422-057 at 147:6-15; Doc. 422-103 at 16-17.)

**DEFENDANTS' RESPONSE**: Disputed. The statement as offered by Plaintiffs mischaracterizes Mr. Daniels' testimony. Mr. Daniels' "Short-Term/Mid-Term Plan for St. Clair Correctional Facility" included a plan regarding Contraband Detection and Deterrence, with a first target of St. Clair. (Doc. 423-226 at 5). The plan included a "massive contraband sweep" on February 28, 2019 including more than 300 law enforcement officials. (Id.). As follow up of the February 28, 2019, operation, Mr. Daniels' plan included "[f]ollow-up but more focused searches will be regularly planned for St. Clair by the CERT team." (Id. at 6). Mr. Daniels' plan was to have "quarterly unannounced searches conducted by the CERT team at St. Clair." (Doc. 422-57 at 147:6-9). When asked why Mr. Daniels' "believe[d] that would be a good idea[,]" Mr. Daniels responded, "Once we had a starting point, remember, these facilities that had the highest rates and numbers of violence, so we needed to have ongoing searches …" (Id. at 147:10-16). Mr. Daniels' testimony relates to the overall plan and goal of Operation Restore Order which was the create a "clean [] slate" and then "replicate" Operation Restore Order at "all of [ADOC's] facilities and then start it over again" because "in the span of a human in 24 hours with nothing to do [the inmates] will find a way to beat us and we have to do then spend our 24 hours finding ways to mitigate that." (Id. at 107:25-109:19).

b. Former Inspector General Mark Fassl understood that there was a "clear trend in increasing violence at St. Clair" from November 2021 to November 2022. (Doc. 422-065 at 226:9-18; Doc. 422-256.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs mischaracterize the testimony of Mr. Fassl. During the deposition, Plaintiffs' counsel asked Mr. Fassl

to look at data on the QIT Meeting Minutes from December 6, 2022. (Doc. 422-256). Plaintiffs' counsel asked Mr. Fassl to "take a look at the number of incidents each month from November 2021 and look all the way through November of 2022." (Doc. 422-65 at 226:9-18). Then, Plaintiffs' counsel asked, "And there's a clear trend in increasing violence at St. Clair, right?" (Id.). Mr. Fassl responded, "Yes." (Id.). Mr. Fassl also testified to "concrete steps" St. Clair staff took "to remedy this problem." (See, e.g., id. at 28:18-29:4) (testimony regarding restarting the security audit program); (id. at 61:17-62:2) (testimony regarding the security audit compliance program); (id. at 93:3-94:7) (testimony regarding ongoing training to reduce violent incidents and develop better communication skills); (id. at 94:8-95:1) (testimony regarding improvements to bed counts); (id. at 96:10-22) (testimony regarding improvements to St. Clair's fence); (id. at 131:11-134:6) (testimony of actions taken by the QIT such as discussions on training new officers, conversations about retraining new employees following violent incidents, discussion about tactics, techniques, and procedures for new inmates, conversations about an uptick in violence in certain dorms, discussions about moving inmates due to gang affiliations, and discussions about more supervision by officers); (see also id. at 226:19-227:3).

c. Former Warden Noe understood that violent incidents in August of 2022 took place "in the dining hall, in the D dorm, G yard, the H dorm, the healthcare unit, J dorm, K dorm, L and M dorm, the N dorm, O dorm, P dorm, and Q dorm". (Doc. 422-088 at 285:6-23; Doc. 422-316 at 3-4.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs mischaracterize the testimony of Guy Noe. During the deposition, Plaintiffs' counsel asked Mr. Noe to look at data on the QIT Meeting Minutes from September 7, 2022. (Doc. 422-316). Plaintiffs' counsel asked Mr. Noe to confirm whether the document listed specific locations as the locations where incidents occurred, to which Mr. Noe said, "Uh-huh." (Doc. 422-88 at 285:6-17). Except for N Dorm and Q Dorm, the QIT reported one or two incidents per location for the month of August 2022. (Doc. 422-316 at 3). The QIT reported 5 incidents in Q Dorm. (Id.). Mr. Noe

confirmed that August 2022 represented "one of [St. Clair's] higher months at the time" when compared to the information reported in the QIT Meeting Minutes for 2021. (Doc. 422-88 at 286:2-8). Mr. Noe confirmed that St. Clair saw a "spike" in the inmate population numbers. (Id. at 286:10-287:12). Mr. Noe also testified that, "[W]hen we get a big change in like this, you'll see a – you'll see an increase in violence. But once the initial settle – it settles down and every – and they go into – into – you know, they get accustomed to the environment, the incidents go – go back down." (Id.).

d. Former Warden III Guy Noe also understood that violent incidents "occurr[ed] throughout the prison" in September, October and November 2022. (Doc. 422-088 at 299:22-300:18, 309:13-310:18, 313:15-316:15; Doc. 422-317 at 3; Doc. 422-318 at 3-4; Doc. 422-256.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs mischaracterize the testimony of Guy Noe. During Mr. Noe's deposition, Plaintiffs' counsel read QIT Meeting Minutes to Mr. Noe and asked him to confirm whether the document stated certain information, to which Mr. Noe said "Okay." Below is an example where Plaintiffs' counsel showed Mr. Noe QIT Meeting Minutes from October 4, 2022:

> Q: And then do you see then on the third page of this Exhibit 21, there's a listing again of where the various violent incidents occurred that month, namely September 2022?
> A: Okay.
> Q: And do you see that there were two incidents in A dorm, an incident in B dorm, one in the breezeway, four in the C dorm, two in the D dorm, two in the E dorm, one in the healthcare unit, one in the K dorm, one in the M dorm, two in the N dorm, one in the population yard, one in the property room, and five incidents in the Q dorm?
> A: Okay.
> Q: So again we see here that these violent incidents are occurring throughout the prison; right?
> A: Okay.

(Doc. 422-88 at 299:22-300:18). Mr. Noe's testimony for Plaintiffs' other cited examples is similar in that Mr. Noe merely confirmed what certain documents said. (Id. at 309:13-310:18) (Mr. Noe responding with "Uh-huh" and "Okay"

when Plaintiffs' counsel read the document); id. at 313:15-316:15 (Mr. Noe responding with "Uh-huh" when Plaintiffs' counsel read the document)).

e. For additional examples, see Doc. 422-103 ¶¶ 16-17.

**DEFENDANTS' RESPONSE:** Not a factual statement.

39. Violence is frequent and severe at St. Clair:

a. [redacted] witnessed 50 stabbings during almost five years at St. Clair (Doc. 422-084 at 38:8-13, 280:23-281:6, 337:21-338:14, 350:17-351:15, 367:4-12.)

**DEFENDANTS' RESPONSE:** Disputed. Mr. [redacted] testifies that he'd "heard" but had never "seen … people getting killed at St. Clair." (Doc. 422-84 at 281:4-6). Mr. [redacted] confirmed he does not know "of any inmates who have murdered other inmates at St. Clair." (Id. at 280:20-22). Then, he testifies that while he was housed at St. Clair he observed "at least over ten" stabbings. (Id. at 350:17-23). Finally, he testifies that he saw "ten [stabbings] in 2021. Probably over ten in 2021, 2022. 2019, over ten. 2018, I know over ten. The time I was there, over ten stabbings each year." (Doc. 422-84 at 366:23-367:3). Mr. [redacted] also confirmed that he was "guessing." (Id. at 268:18-19). Mr. [redacted] deposition contradicts itself throughout the transcript.

b. Plaintiff Johnny Young believes that he "never knows when, if [he] will be a victim of homicide, a victim of assault because it is a commonplace thing at this institution"". (Doc. 422-098 at 368:8-16, 369:2-3, 408:19-23.)

**DEFENDANTS' RESPONSE:** Argument not supported by cited evidence.

c. Plaintiff Johnny Young believes that, even in protective custody, "ADOC can't protect you" (Doc. 422-098 at 418:13-15.)

**DEFENDANTS' RESPONSE**: Argument not supported by cited evidence.

d. For additional examples, see Doc. 422-103 ¶¶ 50-51.

**DEFENDANTS' RESPONSE:** Not a factual statement.

40. Prisoners also believe that violence happens everywhere at St. Clair:

a. For additional examples, see Doc. 422-103 ¶ 78.

**DEFENDANTS' RESPONSE:** Not a factual statement.

**B. Prisoners Sexually Assault Other Prisoners Throughout St. Clair**.

41. Prisoners may underreport instances of sexual assault. (See Doc. 422-102 at 60-69.)

**DEFENDANTS' RESPONSE**: Argument and expert opinion.

42. And when prisoners try to use a PREA Hotline to report a sexual assault, the recorded prompts may speak over the prisoner calling for assistance or the audio quality is so poor it is difficult to discern what the prisoner is reporting. (Doc. 422-383; Doc. 422-385; Doc. 422-388; Doc. 422-389; Doc. 422-102 at 66 & n.416.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs' cited evidence fails to support that "it is difficult to discern what the prisoner is reporting." For example, none of Plaintiffs' cited evidence is testimony from any ADOC or St. Clair staff indicating they possess difficulty in hearing the inmate or understanding the recording. Instead, Plaintiffs merely cite to audio recordings of PREA hotline calls and insert their own opinion that the recordings are difficult to understand. Additionally, Plaintiffs improperly attempt to place blame on the pre-recorded audio prompt associated with the PREA hotline for the inmate purposely speaking while the prompt is running. Instead, the call is silent after telling the inmate to leave the recording and permits the inmate an opportunity to record their message. Additionally, the inmates continue speaking into the recording for

extended periods of time such that the audio prompt plays to confirm the recording at the end. (See (Doc. 422-383; Doc. 422-385; Doc. 422-388; Doc. 422-389). Finally, Plaintiffs cite to Plaintiffs' expert's report to support this proposition merely inserting Michelle Bonner's opinion as fact.

43. Those incidents that prisoners have reported demonstrate that the nature of the sexual assaults St. Clair prisoners experience is horrific, including prisoners being held hostage in cells for days at a time to be raped by multiple prisoners, and the following is a non-exhaustive list of examples:

   a. For additional examples, see 422-102 at 38 & n.207.

**DEFENDANTS' RESPONSE:** Not a factual statement.

44. There are numerous reports of prisoners being sexually assaulted by other prisoners both after being incapacitated by drugs and by other prisoners on drugs, and the following is a non-exhaustive list of examples:

   a. For additional examples, see Doc. 422-102 at 50.

**DEFENDANT'S RESPONSE**: Not a factual statement.

45. Prisoners are also routinely sexually assaulted by other prisoners wielding weapons:

   a. For additional examples, see Doc. 422-102 at 53-54. (See also Doc. 422-395 at 12.)

**DEFENDANTS' RESPONSE:** Not a factual statement.

46. Prisoners are also sexually assaulted in connection with owing debts or being extorted, and the following is a non-exhaustive list of examples:

   a. For additional examples, see Doc. 422-102 at 57-60 and Doc. 422-103 ¶ 164.

**DEFENDANTS' RESPONSE:** Not a factual statement.

47. These sexual assaults occur throughout St. Clair, including all population cell blocks and common areas. (*Supra* ¶¶ 104-05.)

**DEFENDANTS' RESPONSE:** Argument and opinion.

48. Even the more secure areas of St. Clair experience high levels of sexual assaults. (See Doc. 422-103 at 112-14.)

**DEFENDANTS' RESPONSE**: Argument and opinion.

49. The following is a non-exhaustive list of examples of sexual assaults that occurred in the special safety unit ("SSU") or RHU:

    a. For additional examples, see Doc. 422-103 at 113-14. (*See also* Doc. 422-345.)

**DEFENDANTS' RESPONSE**: Not a factual statement.

50. The sexual assaults prisoners experience at St. Clair are serious, pervasive and frequent:

    a. There were incidents when Former Warden Noe was Warden III "where inmates at St. Clair were drugged and then sexually assaulted while they were incapacitated" and "there w[ere] multiple allegations" of "inmates [being] held against their will for multiple days and raped". (Doc. 422-088 at 211:2-212:22.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs mischaracterize the testimony of Mr. Noe. When asked about whether particular sexual assaults occurred while he was Warden III, Mr. Noe responded, "There was probably a few, and that was the allegations that the inmate – inmate said." (Doc. 422-88 at 211:2-9) (emphasis added). Mr. Noe also testified that when inmates presented those allegations, "we do the steps, we take – get them turned over to an outside

investigator. We get them taken to the SANE center, and then the investigation pretty much goes through the IPCM and the outside investigations." (Id. at 211:12-22). Mr. Noe also testified as to steps he took to prevent certain PREA allegations including

> increased staffing, increased supervisors, increased walk-throughs of the facility, have a – have a warden's call every Thursday that the inmates can sign up for. I get notes all day long. We got a PREA box. We got a PREA compliance manager. We got lieutenants. We've got medical. If anything of this occurs, we take it seriously, and we got a zero – zero policy on it, and we will do what the policy says, whether it's … if allegations were made, we separate the victim and the predator. We lock up – we lock up the potential predator, and we investigate through PREA, investigate through LESD, and determine whether an inmate needs to be transferred to an enemy-free facility or what the deal is.

(Id. at 214:18-215:15).

b. Approximately 20 sexual assaults were reported at St. Clair over the past 10 months as of July 2023. (Doc. 422-069 at 83:16-84:2.)

**DEFENDANTS' RESPONSE:** Disputed. During his deposition, Plaintiffs' counsel asked Dr. [redacted] to guess as to "how many incidents of sexual assault have been reported" since he became the Special Investigator IPCM. Dr. [redacted] while guessing, stated, "maybe twenty." (Doc. 422-69 at 83:16-23). Dr. [redacted] also testified that he notified of each of the incidents, he conducted the preliminary investigation for the sexual assault allegations, and then forwards them to LESD. (Id. at 84:9-85:13).

c. For additional examples, see Doc. 422-102 at 50-51

**DEFENDANTS' RESPONSE**: Not a factual statement.

51. Prisoners are in constant fear of sexual violence at St. Clair, where some of them believe "it's not safe at any time, you know, as far as, you know, not worrying about somebody doing something to you, or hurting you, or trying to rape you or something, or stick you with something. It's not safe." (Doc. 422-077 at 78:8-13.)

**DEFENDANTS' RESPONSE**: Broad statement not supported by cited evidence.

52. The notes of PREA Auditor Darla O'Connor reflect the prisoners at St. Clair's fear of sexual violence. (See, e.g., Doc. 422-349 at 9.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs mischaracterize the notes of Ms. O'Connor and attempt to connect separate notes written by Ms. O'Connor into Plaintiffs' own interpretation. The ADOC Officials do not dispute that Ms. O'Connor wrote notes during her interview with inmate [redacted] but dispute that Ms. O'Connor wrote that inmate [redacted] does not feel safe at any male facility "because 'they are not separating predators and victims.'" Ms. O'Connor's notes state "Does not feel safe in any male facility" and then separately, and several lines down in a separate section "They are not separating predators and victims." (Doc. 422-349 at 9). He also stated that he identifies as transgender, and that staff asked him questions about his safety. (Id. at 8). Inmate [redacted] also answered the question "How would you report sexual abuse?" with "there are some responsive officers but it would have to be serious." (Id. at 7). Inmate [redacted] further reported that he can report PREA anonymously, can report in person, and can report to a third party. (Id.). Inmate [redacted] also said he has never made a PREA report. (Id.).

## C. St. Clair Officers Regularly Use Excessive Force Against Prisoners Throughout St. Clair

53. Officers have used excessive force against prisoners, including in situations where there are multiple officers against one prisoner or where officers use force against a prisoner who is handcuffed or otherwise restrained, and the following is a non-exhaustive list of examples:

a. For additional examples, see Doc. 422-103 at 117-23.

**DEFENDANTS' RESPONSE**: Not a factual statement.

54. Officers have used chemical spray against prisoners who do not pose a physical threat of violence to officers or others, and the following is a non-exhaustive list of examples:

a. For additional examples, see Doc. 422-103 at 124-7

**DEFENDANTS' RESPONSE**: Not a factual statement.

55. Prisoners testified to officers using chemical spray against large groups or whole blocks, and the follow is a non-exhaustive list of examples:

a. [redacted] had been sprayed with chemicals about 20 to 25 times because "you get maced even when somebody else gets maced . . . . They just come in and spray the whole dorm". (Doc. 422-060 at 227:20-228:2, 279:15-280:5.)

**DEFENDANTS' RESPONSE**: Disputed. Mr. [redacted] testified that when officers spray a dorm, "[i]t just sprayed in the air" and not directly other inmates. (Doc. 422-60 at 285:7-11). Mr. [redacted] also testified that the last time he was sprayed was two years prior to his October 2023 deposition. (Id. at 226:18-227:1). Mr. [redacted] also testified that the reason officers last sprayed in his dorm was due to an incident where two inmates were stabbing each other and the officers "wanted everybody to get out." (Id. at 284:5-285:14).

b. Robert Carlile had seen officers use chemical spray in the infirmary multiple times, and the spray gets into the eyes and mouths of everyone

in the room, including those inmates who are "real bad sick on breathing machines". (Doc. 422-054 at 95:9-21.)

**DEFENDANTS' RESPONSE**: Disputed. Mr. Carlile's testimony related to when he worked in the infirmary which was around 2007, nearly 18 years ago. (Doc. 422-54 at 94:21-96:1). Mr. Carlile's testimony also failed to indicate officers were spraying inmates directly. (See id.). Mr. Carlile also testified that he has seen "a couple of time" that when the officers sprayed "anywhere in this room" officers "move[d] everybody up out of the infirmary." (Id.).

c. For additional examples, see Doc. 422-103 ¶ 228.

**DEFENDANTS' RESPONSE**: Not a factual statement.

56. Officers have used force against prisoners who are handcuffed or restrained, and multiple officers have used force against one prisoner:

a. Officers "rough[] [inmates] up" when "they are already in handcuffs". (Doc. 422-077 at 144:2-4.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiff [redacted] testified as to a particular incident around 2020 or 2022 where inmates were fighting and at least one inmate was "swinging a knife at the other." (Doc. 422-77 at 141:5-145:22). When officers arrived at the incident, Plaintiff [redacted] testified he saw the officers "snatching [the inmates] up … pushing them around and stuff." (Id.). When asked what he meant, Plaintiff [redacted] said "like if I'm down on the floor and you got me in handcuffs, you snatch me up." (Id.).

b. [redacted] has been hit while handcuffed "a couple of times" and saw two officers "beat a man" while the inmate "was in handcuffs". (Doc. 422-097 at 301:17-18, 303:2-6.)

**DEFENDANTS' RESPONSE**: Disputed. When asked if "an officer ever hit you while you were handcuffed," Mr. [redacted] testified, "Probably so." (Doc. 422-97 at 301:9-11). When asked who hit him, he said "It ain't recorded, I don't think."

(Id. at 301:12-14). When asked what happened, he said "I ain't going to worry about it. Just keep on going. It ain't recorded or nothing." (Id. at 301:19-22).

c. [redacted] testified that officers "assault [prisoners] every day". (Doc. 422-067 at 74:22.)

**DEFENDANTS' RESPONSE**: The ADOC Officials object to Named Plaintiffs' characterization of the cited deposition testimony as establishing that officers "pervasive[ly]" use "violence" against prisoners at St. Clair.

d. For additional examples, see Doc. 422-103 ¶¶ 223-24

**DEFENDANTS' RESPONSE**: Not a factual statement.

## IV. Defendant's Common Practices

57. Prisoners at St. Clair are at risk of serious harm (supra Section III) as a result of Defendants' common practices, described as follows (infra Sections IV.A-H).

**DEFENDANTS' RESPONSE**: Paragraph 126 contains no factual allegations and instead contains only references to Section III and Sections IV.A–H of Plaintiffs' SOF. Thus, the ADOC Officials refer the Court to their responses to Named Plaintiffs' factual allegations in Sections III and IV.A–H of Plaintiffs' SOF. However, the ADOC Officials deny that "[p]risoners at St. Clair are at risk of serious harm … as a result of [the ADOC Officials'] common practices[.]" (Plaintiffs' SOF, ¶ 126).

### A. Defendant's Practice Is To Allow Unauthorized Inmate Movement

58. Controlling the movement of inmates within a correctional facility is critical to its safe and secure operation. (Doc. 422-101 at 23-25; Doc. 422-102 at 36-40; Doc. 422-103 at 58, 71-72.)

**DEFENDANTS' RESPONSE**: Argument and expert opinion.

a. Uncontrolled movement undermines St. Clair's classification system (Doc. 422-093 at 149:15-19; Doc. 422-089 at 268:10-14.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs mischaracterize the cited testimony. During the deposition of Officer [redacted] Plaintiffs discussed a particular incident report where an inmate was in a dorm he was not assigned to and asked Officer [redacted] whether "this type of movement undermines their housing assignments." (Doc. 422-93 at 148:3-149:19) (emphasis added). Officer [redacted] did not testify that St. Clair's entire classification system was undermined by a particular incident where an inmate was in a different housing unit. Likewise, when Plaintiffs' counsel asked Captain Parker whether he agreed that "unauthorized movement undermines the classification system at St. Clair[,]" Captain Parker responded, "It could. But that's not the – that's not the end-all be-all of why incidents – or an incident takes place." (Doc. 422-89 at 268:10-16).

**1. Defendant's Practice Is To Allow Unauthorized Inmate Movement**

59. Notwithstanding St. Clair's official written policy and the recognized importance of controlling inmate movement, Defendants' practice is to allow unauthorized movement at St. Clair. (Doc. 422-101 at 23-25; Doc. 422-102 at 36-47; Doc. 422-103 at 58, 71-72.)

**DEFENDANTS' RESPONSE**: The ADOC Officials deny that "unauthorized movement [occurs] at St. Clair" as a matter of practice. (Plaintiffs' SOF, ¶ 132). Paragraph 132 of Plaintiffs' SOF cites only the reports of Named Plaintiffs' Advocates Austin (Doc. 422-101), Bonner (Doc. 422-102), and Martin (Doc. 422-103). The arguments of Named Plaintiffs' Advocates fail to qualify as "facts" for purposes of this action. (See also Plaintiffs' SOF, ¶¶ 290–305; infra, ¶¶ 133–161,).

60. Defendants and other St. Clair's staff members let prisoners into areas where they are not assigned without verifying whether the prisoners are authorized to be in that unit. (*See infra* ¶¶ 133.a-e, 134-61.):

a. Prisoners move from one unit to another when the doors are open and the prisoners "just walk in". (Doc. 422-087 at 318:16-21.) Even when the gates are manned, "[t]hey just walk in, like don't say nothing to me. They just walk in. Or [they say], 'Hey, I'm going to get this. I'll be right back.' So that's coming through a manned gate, walking to the dorms." (Id. at 318:16-319:7.)

**DEFENDANTS' RESPONSE:** Disputed. Plaintiffs mischaracterize the cited deposition testimony. Former-Warden Mitchell provided testimony regarding supervisor meeting minutes from September 21, 2022. (Doc. 422-87 at 313:10-319:7). Plaintiffs asked former-Warden Mitchell about the document that read "Do not let inmates out or let them go to a dorm they don't live in." (Id. at 317:13-15). Plaintiffs asked former-Warden Mitchell what his understanding was of "how inmates were getting into the dorms that they don't live in" for that particular meeting. (Id. at 318:16-19). Plaintiffs improperly attempt to utilize former-Warden Mitchell's testimony about a particular occasion to apply to St. Clair as whole.

b. Prisoners enter blocks to which they are not assigned, where "[i]t is not an officer with a list checking names as far as like who goes where. You might get an inmate to say, hey, I'm going to the kitchen, and he may go to the honor dorm, you know." (Doc. 422-068 at 132:12-18.) Notwithstanding St. Clair's SOPs to the contrary, there "[a]in't nothing in the regs saying, hey, don't open this door to let this man go get [a] few items". (Id. at 134:6-9.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs mischaracterize the quoted deposition testimony of Mr. [redacted] Plaintiffs' counsel asked Mr. [redacted] "How do prisoners enter blocks they are not assigned to?" (Doc. 422-68 at 132:12-18). Mr. [redacted] responded, "Who is to say?" and then further went on to guess as to scenarios by which he could imagine inmates enter dorms they are not assigned to. (Id.). The ADOC Officials also dispute, and deny, Plaintiffs' inserted

argument that "Notwithstanding St. Clair's SOPs to the contrary" as that is not a factual statement. Finally, Mr. [redacted] testimony regarding opening the door for inmates was not related to letting inmates into dorms they are not assigned to. Mr. [redacted] testified that "There's nothing in the regs saying that an officer can't open a door to let an inmate out to go somewhere. So if [the officer] uses his discretion and he's thinking an inmate will come right back, that is his discretion. Ain't nothing in the regs saying, hey, don't open this door to let this man go get this man these few items." (Id. at 134:2-9) (emphasis added).

c. "It happens probably every day" that "a prisoner is living in a cell other than the one to which he's assigned". (Doc. 422-092 at 183:19-184:3.) There are incidents at St. Clair where "inmates that have gone from one dormitory to another dormitory and been involved in an incident" and "incidents where inmates who don't live in a dormitory but have resided there for several weeks have gotten into an incident." (Id. at 219:15-23.)

**DEFENDANTS' RESPONSE**: Broad statement not supported by cited evidence.

d. At St. Clair, "prisoner[s] spend a significant amount of time in a cell to which they're not assigned." (Id. at 318:10-14.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs insert this testimony in a misleading manner by ignoring that St. Clair possesses general population housing units in which outside of lockdown time at night or during a count, the population cell doors remain open and inmates are permitted to go to other cells. (Doc. 423-58 at 215:7-216:5).

e. There "ain't no unauthorized areas. . . . Everything is wide open. There not no where you can't go." (Doc. 422-097 at 325:11-18; see also Doc. 422-054 at 34:1-18.)

**DEFENDANTS' RESPONSE**: Disputed. Inmate [redacted] testimony quoted by Plaintiffs is in response to the question, "Should prisoners be prosecuted for going

into unauthorized areas at this facility" to which inmate [redacted] responded, "No." (Doc. 422-97 at 325:6-18). Despite inmate [redacted] stating, there "ain't no unauthorized areas[,]" inmate [redacted] also testified that he received disciplinaries (or "write-ups") for being in unauthorized areas on multiple occasions. (Id. at 349:8-12; 354:9-13; 362:5-18; 370:17-21; 387:18-22; 395:7-12; 397:1-6).

61. Correctional staff members "frequently" do not close and lock the gates that separate housing units, allowing prisoners at St. Clair to move freely about the facility. (See Doc. 422-070 at 309:9-18.)

**DEFENDANTS' RESPONSE:** Disputed. Plaintiffs mischaracterize the deposition testimony cited. Former-Captain [redacted] testified that "gates [are] left open when a rover is called from one place to another[.]" (Doc. 422-70 at 308:22-309:2). Former-Captain [redacted] never testified that officers "frequently do not close and lock the gates that separate housing units, allowing prisoners at St. Clair to move freely about the facility." Such information is argument inserted by Plaintiffs as former-Captain [redacted] cited testimony does not even touch on inmates moving through the facility. (Id. at 309:9-18).

a. Former Captain [redacted] has seen the gates at the facility not being kept locked on "several occasions". (Id. at 308:22-309:18; see also Doc. 422-087 at 315:10-14).

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs mischaracterize the deposition testimony cited. Former-Captain [redacted] testified that "gates [are] left open when a rover is called from one place to another[.]" (Doc. 422-70 at 308:22-309:2). Former-Captain [redacted] never testified that officers "frequently do not close and lock the gates that separate housing units, allowing prisoners at St. Clair to move freely about the facility." Such information is argument inserted by Plaintiffs as former-Captain [redacted] cited testimony does not even touch on inmates moving through the facility. (Id. at 309:9-18).

b. Prisoners visit blocks they were not assigned to "because the doors was open . . . you have access to go to any of the blocks you want". (Doc. 422-077 at 211:8-22.)

**DEFENDANTS' RESPONSE:** Disputed. Plaintiff Jones' testimony related solely to general population housing units during "yard time." Plaintiff Jones' full testimony is:

> If they open, just say I stay in L and M. Okay. They'll open the gate to K, J and K, right. They got a fence between there, right. They'll open that fence up, and they might *not* open the rest of the gates and you can['t] go there. Now, you got all the gates open, you have access to go to any of the blocks you want *on the yard time*. You know, a lot of times they would have what they call yard call, *it's just in population*, you know, you're allowed to go to the block *for population*, because they didn't open the gym. They might not even open the gym, period. So you have access *if they had all the gates up*.

(Doc. 422-77 211:14-212:6). Plaintiff Jones also testified that if St. Clair had yard call "they used to let, you know, this half [of the dorm] go out in the morning, in the evening time they'll let the other half go out." (Id. at 212:7-14).

62. During movement times and gym calls, doors to multiple housing units remain open. (See Doc. 422-068 at 132:12-133:7.)

**DEFENDANTS' RESPONSE**: Disputed. Lieutenant [redacted] never testified that "doors to multiple housing units remain open" during movement. Lieutenant [redacted] actually testified that "doors to dorms" are open "when we are doing a call like … gym call[.]" (Doc. 422-68 at 132:19-133:7). Lieutenant [redacted] testimony never says that multiple housing units are open at one time.

a. Inmates are more likely to be out of place "from sunup to sundown". (Id. at 221:4-7.)

**DEFENDANTS' RESPONSE**: Disputed. By eliminating the entirety of Lieutenant [redacted] testimony, Plaintiffs mischaracterize his statement.

When asked "Are there particular times of day where prisoners are more likely to be out of place?" Lieutenant [redacted] responded, "Probably from sunup to sundown." (Doc. 422-92 at 221:4-7).

b. Prisoners are able to enter housing units to which they are not assigned because "the supervisors call too many dorms at one time" and when the prisoners are on their way back into the housing units, "they might swap dorms". (See id. at 306:7-307:9; see also id. at 307:10-21; id. at 308:8-21.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs eliminate portions of the quoted testimony which causes the information to be misleading. Former-Captain [redacted] testified that "[m]aybe the supervisors call too many dorms at one time" in response to Plaintiffs' counsel asking "how does it happen that during these movement times that people are moving into cells to which they're not assigned[.]" (Doc. 422-70 at 306:7-12) (emphasis added). The second quotation is not a quotation of former-Captain [redacted] but instead a quote of Plaintiffs' counsel. (Id. at 306:18-19).

**2. Defendants Do Not Enforce St. Clair's Wristband Policy**

63. Defendants' practice is not to enforce the use of wristbands at St. Clair. (Doc. 422-101 at 23-25; Doc. 422-102 at 40-42; Doc. 422-308 at 23.)

**DEFENDANTS' RESPONSE**: Argument and expert opinion.

64. Deposition testimony, including the following, makes clear that Defendants do not enforce St. Clair's established wristband policy:

a. Captain Parker understands that inmates are supposed to wear wristbands but that "[a]ll prisoners currently are not wearing wristbands" because as of his deposition "it has not been mandated to check for inmates wearing wristbands". (Doc. 422-089 at 247:17-19, 249:1-4, 249:12-17.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs cited testimony from Captain Parker is misleading and incomplete. Captain Parker further testified

that "part of the design has been to increase more structured living areas, so there's been some different programs that have been put in place, and these programs are put in place to assist with – and they've been placed in difference places to – in difference areas on the population yard to assist with maintaining everyone wearing a wristband." (Doc. 422-089 at 248:19-249:4).

b. When Former Warden Guy Noe was Warden III at St. Clair, "[t]he wristbands were not — were not enforced". (Doc. 422-088 at 124:20-21, 125:2-8.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs mischaracterize Warden Noe's testimony by removing a portion of Warden Noe's testimony. Warden Noe's full testimony states, "The officers did challenge the inmates. We did – they did have to have their ID cards to go to places. The wristbands were not – were not enforced. There were a couple of reasons. One, they were cutting them off; and two, we were having a hard time getting them – getting them in." (Doc. 124:17-125:1).

c. ICS Officer [redacted] who according to the written policy is "responsible for issuing colored wristbands to inmates" (Doc. 422-024 at 2), does not administer the wristband policy and was unaware whether the policy was still in effect (Doc. 422-093 at 28:1-17).

**DEFENDANTS' RESPONSE**: Disputed. Disputed. Plaintiffs cited testimony from ICS Officer [redacted] is misleading and incomplete. When asked who administers the wristbands, Officer [redacted] testified that "[t]hey do that in the shift officer. My office is far removed from where all the inmate traffic is, so they do that a the – in the shift office. They keep them up there." (Doc. 422-93 at 28:7-12). When asked whether the policy was still in effect, Officer [redacted] said, "I can't answer that, because I don't administer it." (Id. at 13-17). When asked if he has seen inmates wearing wristbands, Officer [redacted] responded, "yes." (Id. 28:18-23). Under SOP 83, "[t]he ICS Officer will be responsible for issuing colored

wristbands to inmates," and "Shift Commanders are responsible for making inmate wristbands when the ICS Officer is not present." (Doc. 422-024 at 2, 3).

d. Wristbands are seldom checked at St. Clair because "you got to pick and choose your battles wisely". (Doc. 422-092 at 217:13-17; see also id. at 217:18-21.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs mischaracterize the quoted testimony. Lieutenant [redacted] testified that checking wristbands "every time a prisoner is moving on the yard or going back to their dorm" is "probably" done "seldom because … you got to pick and choose your battles wisely." (Doc. 422-92 at 217:9-17). When asked "[d]oes anyone check whether prisoners are wearing wristbands[,]" Lieutenant [redacted] responded, "Yes, ma'am." (Id. at 217:3-5).

e. Inmates "got away with" taking off their wristbands such that the wristbands are not used anymore. (Doc. 422-070 at 311:19-312:2

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs mischaracterize the cited testimony. When asked "Are prisoners supposed to wear wristbands" former Captain [redacted] responded, "They started off wearing wristbands, but it was such a problem and no one kept it on. They just got away with it." (Doc. 422-70 at 311:17-22). The testimony appears to indicate Captain [redacted] meant they "got away with" the policy. (Id.).

f. Defendant Warden Mitchell understands that inmates "got bands that they take off . . . . They take the bands off their wrists" and that, in the absence of a wristband, "you just have to know where [they are] housed". (Doc. 422-087 at 320:6-18, 320:23-321:3.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs mischaracterize the cited testimony. Former Warden Mitchell testified that, "[T]hey got bands that they take off. And we got some more ordered. They take the bands off their wrists. So unless you really know, like my lieutenants and sergeants and some of my

officers, that's the easiest way to know where that person lives at, and you got a better chance of catching them before they even get in there." (Doc. 422-87 at 320:9-18). Former Warden Mitchell's testimony related to the "easiest way" to know an inmate lives in a dorm is by knowing them, not that it was the only way. The ADOC Officials do not dispute that members of the putative class remove their wristbands.

**3. Defendants' Practice is to Conduct Insufficient Bed Roster Counts**

65. Defendants have a practice of not conducting bed roster counts and not ensuring the counts that do occur are conducted properly. (See Doc. 422-102 at 37.)]

**DEFENDANTS' RESPONSE**: The ADOC Officials deny that they "have a practice of not conducting bed roster counts and not ensuring the counts that do occur are conducted properly." (Plaintiffs' SOF, ¶ 143). The ADOC Officials deny that isolated incidents of improper or incomplete bed counts constitute a "practice."

66. Defendants' practice is to allow St. Clair's staff to regularly not conduct bed roster counts, as testimony makes clear:

a. Lieutenant Rafael Santa Maria understands that officers may skip the bed roster counts. (Id. at 181:20-23.)

**DEFENDANTS' RESPONSE:** Disputed. Plaintiffs mischaracterize Lieutenant Santa Maria's testimony by removing a portion of Lieutenant Santa Maria's testimony. Lieutenant Santa Maria testified that, "[i]f we don't have the staff to do it, yes we may." (Doc. 181:20-23). He further testified that occurs "[m]aybe once in a blue moon" and had happened "once so far" in the month and a half he had been on night shift. (Id. at 182:1-8).

b. Lieutenant [redacted] understands that individuals sleep in cells to which they are not assigned "[p]robably all the time "if you have got night shift ain't going around conducting bed rosters". (Doc. 422-068 at 93:1-5.)

At St. Clair, "if you have got night shift not conducting bed roster counts like they are supposed to and not moving guys back like they are supposed to, you are probably going to have people sleeping where they aren't supposed to be". (Id. at 119:21-120:3.)

**DEFENDANTS' RESPONSE:** Disputed. Plaintiffs mischaracterize the cited testimony. Lieutenant [redacted] provided hypothetical scenarios and guesses, not factual statements, in response to Plaintiffs' question. (Doc. 422-68 at 93:1-16). Lieutenant [redacted] testimony says "*if* you have got night shift ain't going around conducting bed rosters" then "probably" you have inmates sleeping in cells they are not assigned to. (Id.) emphasis added). Again, Lieutenant [redacted] stated, "But *if* you have got night shift not conducting bed roster counts like they are supposed to and not moving guys back like they are supposed to, you are *probably* going to have people sleeping where they aren't supposed to be." (Id. at 119:21-120:3).

c. Plaintiff Johnny Young "can't even remember" the last time a bed roster count was completed in his assigned housing unit. (Doc. 422-098 at 287:17-20.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiff Young further testified that St. Clair conducts regular counts of his dorm at 6:00 p.m., 9:30 p.m., 7:00 a.m., and another count around 12:00 p.m. (Doc. 422-98 at 288:1-10).

67. Defendants also allow bed count rosters that are completed to be done improperly, without enforcing housing assignments:

a. Lieutenant [redacted] was aware not all officers conduct thorough bed roster counts. (Doc. 422-092 at 183:7-12.)

**DEFENDANTS' RESPONSE:** Disputed. Plaintiffs' cited testimony from Lieutenant [redacted] is misleading and incomplete. Lieutenant [redacted] testified that he conducts bed roster counts properly but "can't attest to what happens when I'm not there or how it's done when I'm not around." (Doc. 422-092 at 182:19-183:6).

68. Defendants allow prisoners to prevent other prisoners from sleeping in their assigned cells, forcing the displaced prisoners to sleep in public areas like the dayrooms:

a. There were "many times" at St. Clair where a prisoner was forced out of his housing unit by other prisoners, and "many times, an inmate will pack a guy up and say: 'Get out of here. Go back to the shift office. You're not welcome here. Go to seg. We don't want you in our population.'" (Doc. 422-055 at 107:7-13.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs mischaracterize the testimony of [redacted] Mr. [redacted] never testified that on occasions where an inmate "will pack a guy up" that the other inmate was "forced out of his housing unit" by that inmate. Such a statement is an argument inserted by Plaintiffs and unsupported by the cited testimony. Instead, Mr. [redacted] testified that if those inmates were relocated, it would "typically be by the security officer" or "the shift commander of that shift. Or sometimes the warden will intervene and then –" (Plaintiffs' counsel interrupted the deponent who did not finish this sentence). (Doc. 422-55 at 107:14-19). Mr. [redacted] went on to say that these bed movements are "documented every day, if not twice a day." (Id. at 20-23).

b. Lieutenant [redacted] agreed that he was aware not all officers conduct thorough bed roster counts. (Doc. 422-092 at 183:7-12.)

**DEFENDANTS' RESPONSES:** Lieutenant [redacted] testified that he completes bed roster counts correctly and "can't attest to what happens when I'm not there or how it's done when I'm not around." (Doc. 422-92, 183:4-6).

c. There are "people sleeping in the dayroom. People ain't got no cell, people who got no cell, they got to sleep in the dayroom". (Doc. 422-097 at 179:16-20.)

**DEFENDANTS' RESPONSE**: Disputed. Inmate [redacted] provided conflicting testimony regarding inmates sleeping in the dayroom. First, inmate [redacted]

testimony cited by Plaintiffs related only to O Dorm. (Doc. 422-97 at 179:14-20). Then, when asked, "So in O Dorm tonight if we were to go look, there would be people in there sleeping without mattresses?" to which inmate [redacted] responded, "No, we kicked all them out." (Id. at 185:4-7). Inmate [redacted] proceeded with, "We don't keep our dorms like that …. Just tell them you got to leave. You can't sleep back here. Ain't nobody sleeping back in the dayroom." (Id. at 185:4-19).

d. Prisoners are sometimes forced to sleep in the dayrooms instead of their assigned cells. (Doc. 422-095 at 194:15-195:15.)

**DEFENDANTS' RESPONSE**: Disputed. When asked whether inmate [redacted] agreed that some inmates "chose to sleep in the dayroom," inmate [redacted] responded, "Maybe forcibly." (Doc. 422-95 at 194:5-9). Inmate [redacted] further stated it was not "physical force" but "verbal." (Id. at 195:13-15). When asked if inmate [redacted] had any evidence of that, he said "No, sir" and when asked if [redacted] ever heard it himself, he said "No, sir" and that his testimony was "a guess." (Doc. 422-95 at 195:16-196:3).

### 4. Defendants Do Not Document or Discipline Unauthorized Movement

69. St. Clair's staff do not document or report unauthorized movement and do not discipline the prisoner found out of place unless he is involved in a disturbance. (Doc. 422-102 at 36-37.)

**DEFENDANTS' RESPONSE**: Expert opinion. This paragraph cites only an expert report for the proposition that there is no documentation or report or discipline "often" for inmates found out of place.

a. An out-of-place prisoner will only receive a disciplinary, and an incident report will only be done, if the prisoner is "creating a problem or is involved in the incident"; otherwise, there is "no document" of the inmate being in the wrong place. (Doc. 422-092 at 212:1-213:17.) There is "a good possibility" that officers are aware that prisoners are out of place but do not record that information anywhere. (Id. at 213:12-17.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs mischaracterize the deposition testimony cited to. Lieutenant [redacted] testified that "if on a night shift a prisoner is in the wrong location" and the facility is "understaffed[,]" the staff will permit the inmate to stay in the wrong location "[i]f they're not a problem" because "[m]ost of the time, if the inmates are in there, it's because it's where they want to be and where they feel safe, so they will be allowed to stay there." (Doc. 422-92 at 212:6-17). Lieutenant [redacted] also testified that an incident report and disciplinary report will be generated "[i]f he's creating a problem or is involved in the incident" and that an inmate will "receive a disciplinary …for … being in an unauthorized location[.]" (Id. at 213:1-8).

### 5. Defendants' Practices Result in Direct Harm to Inmates

70. Violence at St. Clair occurs between prisoners assigned to different housing units and in areas where the prisoners involved are not authorized to be. (*See infra* ¶¶ 145.a-i.) Examples include but are not limited to:

a. From June 21 to June 29, 2023, [redacted] (assigned to M Block) was repeatedly sexually assaulted by an inmate assigned to J Block. (Doc. 422-209.) The victim initially did not report the incident out of fear and because he had been "hiding under a friend's bunk for the last week or so". (Id.)

**DEFENDANTS' RESPONSE:** Disputed. Plaintiffs offered this statement as an example of incidents involving inmates assigned to different housing units; however, the cited evidence fails to support this proposition. The Duty Officer Report states that on July 5, 2023, the IPCM received a PREA hotline call regarding an incident that occurred between June 21, 2023 and June 29, 2023. (Doc. 422-209). The report fails to indicate what housing units the suspect and victim were assigned to at the time of the alleged incident and only provide their assignments as of the date of the report (i.e., at least six days later). Thus, the victim and suspect could have been assigned to the same housing unit at the time of the incident. Regardless, the IPCM reported the incident to the Captains, placed the victim on retaliation monitoring, and reported the victim's request for voluntary placement in RHU. (Id.).

**DEFENDANTS' RESPONSE:** Not a factual statement.

**6. Defendants' Failure to Implement the Daniels Plan for Controlled Movement**

71. Deputy Commissioner Daniels believed that the controlled movement directive outlined in the Daniels Plan was "essential" for operations at St. Clair. (Doc. 422-057 at 189:7-13.) He created the controlled movement directive outlined in the Daniels Plan because he "believed that it would be effective in reducing acts of violence". (Id. at 200:12-24.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs misquote and mischaracterize Mr. Daniels' testimony. Mr. Daniels testified about the physical presence of the Warden I and another senior officer in P and Q dorm and written accountability in the dorm logbooks. (Doc. 422-57 at 188:14-189:13). Mr. Daniels testified as "as a corrections professional, I believe they are essential." (Id.). Mr. Daniels also testified that after the implementation of the Daniels Plan, he "would measure the results over time to see if it was effective." (Id. at 200:18-24). When asked whether Mr. Daniels learned anything between the implementation of the Daniels Plan and when he left the ADOC, Mr. Daniels responded:

> Let me answer it a little bit more holistically. There will always be change in prisons and how we operate and function because humans are the ones that were planning against humans are very creative individuals and if you give them time they can find ways to beat your measures, your countermeasures and anything else. At the time I believe these activities, these directives to be the best I could possibly create at that time. Moving forward, these are directives I still employ when I'm addressing issues regarding violence. For example, here in New York I'm preparing to implement the same thing with no deviation other than to provide the outline and we're right now under a Federal monitor and part of this is in response to a consent decree that we mitigate violence in our prisons. Part of that prior to my arrival was -- and the monitor has been here seven years, but the bar hasn't changed at all with all sorts of procedures implemented. So now I'm here and this is my second month. I'm creating a plan. We have 31,000 cameras and the violence hasn't gone down. I'm working feverishly

> to implement procedures that are consistent with these to mitigate the violence. So something such as just cameras, themselves, are no good if you don't have people that can monitor them, and they have to be realtime so you can direct activity. So the reason for me telling you it this way is there are a lot of variables, a lot can happen, things change. So I don't want to speak for people future-oriented, and I will be responsible for defining what I did when I was in command there, but my command ended my last day of employment. What happens afterwards I don't comment on, primarily because I have no control over the future or the future leadership or supervision. There is also a political apparatus that has to be taken in consideration. I also don't know what the next commissioners or deputy commissioners have to address and I certainly can't control what's going on in the legislatures, I can't control what's going on in society, such as COVID in response to that, so all your numbers are skewed. So I will tell you on my last day of duty it was my expectation that these procedures would move forward as is, but I certainly don't have any issue with those following me modifying, changing, getting rid of whatever I put in place.

(Id. at 201:7-204:3).

72. Deputy Commissioner Daniels directly ordered the wardens at St. Clair to implement the controlled movement directive outlined in the Daniels Plan. (*See id.* at 191:24-192:14.)

**DEFENDANTS' RESPONSE**: Disputed. The cited evidence fails to support this statement. Plaintiffs cite to the testimony of Mr. Daniels during which they read a document to Mr. Daniels. (Doc. 422-57 at 191:24-192:6). The testimony merely stated the Warden III at St. Clair in August 2019 had no knowledge of the "controlled movement directive and the tiered movement of the P and Q dormitories." (Id.). Mr. Daniels said "[i]t appeared to be a willful disobeyance of a direct order." (Id.).

73. When Deputy Commissioner Daniels resigned from ADOC in December 2019, he continued to believe that St. Clair would benefit from the directives outlined in the Daniels Plan. (See Doc. 422-057 at 197:22-198:2.) He also "had every

expectation that they remain in place until otherwise modified, shut down, new orders issued." (Id.)

**DEFENDANTS' RESPONSE:** Disputed. Plaintiffs omit the following testimony from former Deputy Commissioner Daniels: "So I don't want to speak for people future-oriented, and I will be responsible for defining what I did when I was in command there, but my command ended my last day of employment. What happens afterwards I don't comment on, primarily because I have no control over the future or the future leadership or supervision. . . . So I will tell you on my last day of duty it was my expectation that these procedures would move forward as is, but I certainly don't have any issue with those following me modifying, changing, getting rid of whatever I put in place." (Doc. 422-057 at 203:2-204:2.)

74. Defendants did not ensure that the Daniels Plan was implemented following the OIG's investigation and have not created or implemented any similar controlled movement directives at St. Clair since Charles Daniels resigned as Deputy Commissioner in December 2019. (See Doc. 422-103 at 68.)

**DEFENDANTS' RESPONSE**: Expert opinion.

### B. Defendants Have a Practice of Not Repairing Broken or Obstructed Locks, Call Buttons and Cameras

#### 1. Defendants Have a Practice of Not Conducting or Conducting Insufficient Inspections of Locks, Call Buttons and Cameras

75. There is no "written log that would memorialize when . . . a call to maintenance" about malfunctioning locks is made (Doc. 422-087 at 94:7-23).

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs mischaracterize the testimony of former Warden Mitchell by presenting an incomplete excerpt. Former Warden Mitchell testified that there is no written log to memorialize his

calls to maintenance regarding broken locks, "[b]ut I radio, and he comes out." (Doc. 422-087 at 94:7-23.)

76. St. Clair officers often do not accurately fill out *Cell Lock/Call Button/Camera Inspection* Forms:

a. Inconsistencies across four inspection forms for J Block from January 10, 2021, "indicate . . . that some of these inspections are not accurate". (Doc. 422-090 at 155:16-160:11.)

**DEFENDANTS' RESPONSE**: Disputed based on its vagueness and lack of clarity. As currently drafted, the paragraph lacks context as to what cells Captain [redacted] is referring to, why inmates are in the cells, and why inmates would stay in the cells. Because the paragraph lacks essential context, it also lacks materiality for the purpose of summary judgment. Further, Captain [redacted] later stated that "most of the time," security staff remove inmates from cells with inoperable locks and hold the inmates in the gym while outside maintenance people fix the inoperable lock. (Doc. 422-70 at 297:19-22).

77. St. Clair officers commonly do not remove prisoners from cells with broken or malfunctioning locks to different cells with working locks:

a. If there is no available cell, the prisoners "just have to stay in the cell". (Doc. 422-070 at 297:4-11.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs' cited testimony from Lieutenant [redacted] is misleading and incomplete. Lieutenant [redacted] also testified that "[the officers] work pretty hard to make sure [the locks] are secured where they're supposed to be." (Doc. 422-090 at 152:8-10). He also testified that he reviews cell lock inspection forms "[e]very night [and]…send[s] the packet to everyone in the executive staff." (Doc. 422-090 at 152:8-153:3).

### 1. Defendants Have a Practice of Leaving Locks Broken or Obstructed at St. Clair

78. Prisoners have testified that locks are often broken at St. Clair, including, for example:

a. Plaintiff Nathaniel Harris testified that cell doors "don't work" because "[t]hey are jammed". (Doc. 422-074 at 117:16-118:5.) Although the doors are supposed to lock when you close them, Mr. Harris testified that "[t]hey don't lock. They will slam back." (Id.)

b. [redacted] testified that "the doors don't lock in population". (Doc. 422-067 at 313:8-21.) He further testified that the doors are "open 24/7", so "inmates could come in to kill you". (Id.)

c. When asked how many of the 24 cells on his side of N Dorm had broken or damaged door locks, [redacted] testified that it was "[p]robably, all of them". (Doc. 422-071 at 146:3-23.)

**DEFENDANTS' RESPONSE**: The inmate testimony regarding broken locks reveals St. Clair inmates engage in behaviors which break locks at St. Clair, which Named Plaintiffs fail to recognize. (See ADOC Officials' SOF, ¶¶ 264, 268 (multiple inmates testifying that inmates damage locks at St. Clair)).

79. ADOC has not hired outside contractors to repair broken locks at St. Clair since 2020. (Doc. 422-049 at 141:23-142:10.)

**DEFENDANTS' RESPONSE**: Disputed. [redacted] full testimony states, "[f]rom my understanding, that the facility staff and the security staff communicate on what locks are nonfunctioning. And if he is able to repair the lock, then he will perform that work." (Doc. 422-049 at 139:3-8). If the maintenance staff is unable to perform work, "[i]t's included in this project for a general contractor to come in and perform the work." (Id. at 9-14). Further, lock projects at St. Clair included, "[t]he lock project that was done under Seay, Seay

& Litchfield. The lock project that is being conducted with JMR+H." (Id. at 12:7-15). JMR+H was "engaged" to do the lock project, after "an assessment of the locks that are inoperable or not working at the—on the segregation side as well as the general population side" was completed. (Id. at 124:6-11). "JMR+H [was hired] to either replace those locks or repair those locks and on the door frame, to basically utilize angle iron to thicken the door frame so that an inmate would have a much more difficult time getting into the frame to get to those wires." (Id. at 124:11-17).

a. St. Clair "currently do[es] not have a maintenance contract for repair and replacement of locks". (Id. at 136:15-137:5)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs mischaracterize the testimony of [redacted] by only selecting a portion of testimony. [redacted] full testimony states, "I would not have been able to provide a maintenance contract under that agreement. That's considered a public work construction project, and I would not have been able to do that." (Doc. 422-049 136:15-22).

80. Chief Deputy Commissioner Lovelace does not know whether St. Clair had "any plan in place to prevent or reduce the number of the new locks that will be tampered with" once JMR+H completes the project. (Doc. 422-079 at 74:13-20).

**DEFENDANTS' RESPONSE:** Disputed. This question was outside the scope of Chief Deputy Commissioner Lovelace's testimony as a 30(b)(6) representative.

81. Prior to completion of the JMR+H project, Defendants have relied and will continue to rely on a single on-site employee from Facility Maintenance, [redacted] to conduct repairs of broken locks. (Id. at 78:5-23, 81:3-12.)

a. Defendant Warden Mitchell does not confirm with Mr. [redacted] if locks that have been reported as broken have been repaired. (Doc. 422-087 at 102:11-23).

**DEFENDANTS' RESPONSE**: Disputed. When asked if he "think[s he] has a responsibility, any responsibility besides notifying maintenance to try to fix the locks at St. Clair," former Warden Mitchell responded, "Yes. Making sure that maintenance – if he's not there or not, making sure that he go and look at that lock and report back. So that's my responsibility there." (Doc. 422-087 at 101:13-23.) When asked if "the maintenance person is then supposed to report back once he has actually fixed the lock and sort of confirm that with you," Warden Mitchell testified that "they report back to whoever. It might be the shift commander. It might be anyone. But he got to let us know that – what's going on with it." (Id. at 102:1-10).

2. **Broken or Obstructed Locks Contribute to Violence at St. Clair**

3. **Defendants Have a Practice of Leaving Call Buttons Broken or Obstructed at St. Clair**

4. **Broken or Obstructed Call Buttons Contribute to Violence at St. Clair**

82. Call buttons are often broken or obstructed such that prisoners are without a way to call from help within their cells, thereby contributing to health emergencies and incidents of violence and/or sexual assault; examples include but are not limited to:

a. On January 12, 2022, at approximately 5:15 p.m., "inmate [redacted] . . . started beating on the window to cell C-32" in an "attempt[] to get Officer [redacted] attention for help, due to an inmate being down in the unit". (Doc. 422-121.) No officer responded until "the window shattered." (Id.) After officers discovered that [redacted] was "down on the floor unresponsive," they brought Mr. [redacted] to the health care unit for medical attention. (Id.)

**DEFENDANTS' RESPONSE**: Disputed. On January 12, 2022, Officer [redacted] was walking past C-Dorm when he noticed an inmate beating on the glass

window so much that it shattered. (Doc. 422-121). Officers [redacted] and a Howard responded, rendering aid to the cellmate [redacted] who was unresponsive. (Id.) Officer [redacted] escorted [redacted] to the Health Care Unit where for medical assessment and monitoring of his blood pressure. (Id). After a few hours of observation, St. Clair health staff released [redacted] back to the RHU without further incident. (Id.).

5. **Defendants Have a Practice of Leaving Cameras Broken or Obstructed at St. Clair**

83. St. Clair has three camera systems at the facility: a "Samsung" system, a "Wisenet Viper" system and a "Genetec" system. (Doc. 422-083 at 12:11-19.)

a. The Samsung system was installed in 2016 and included cameras placed in J, K, L, M, N, O, P and Q Blocks, including day rooms, and in the administration tunnel area, the entrance area of the administrative building and the visitation yard. (Doc. 422-049 at 169:13-170:18.)

**DEFENDANTS' RESPONSE**: Disputed. Between 2015 and 2021, ADOC installed cameras as part of the Seay, Seay & Litchfield security project in the main day room and multiple spaces in the RHUP. (Doc. 422-49 at 169:13-170:18)

84. Specifically, the Samsung cameras in the day rooms—i.e., the common areas where inmates often congregate—are "completely nonoperational". (Doc. 422-099 at 10-11.)

**DEFENDANTS' RESPONSE**: Expert opinion.

85. The newer Genetec system cannot be monitored by line staff at the facility but is only viewable from a remote platform that no one monitors live. (Doc. 422-049 at 176:3-177:9; *see also* Doc. 422-099 at 8.).

**RESPONSE:** Disputed. Authorized ADOC staff and securities technology team members may access live footage from the Genetec cameras through an online site. (Doc. 422-049 at 176:3-177:9).

86. Cameras are frequently broken or obstructed at St. Clair:

a. The entire Samsung system is "the one that's not working". (Doc. 422-089 at 221:3-222:4.)

b. "Cameras are frequently broken". (Doc. 422-070 at 290:1-3.)

c. Cameras at St. Clair can remain unrepaired for "a week or so". (Doc. 422-087 at 126:3-21.)

d. Contact-tracing cameras can become nonfunctional after inmates "burned them, they put lacquer on them, they painted over them". (Doc. 422-088 at 82:8-17.)

**DEFENDANTS' RESPONSE:** Disputed. Plaintiffs' characterization of St. Clair's cameras is misleading. As of the August 21, 2023, Warden Mitchell reported only a few of St. Clair's cameras were not functioning, and those issues were "not widespread." (Doc. 422-087 at 126:3-21.). St. Clair staff or contract staff normally repair broken cameras in "a week or so." (Id.).

### 6. Broken or Obstructed Cameras Contribute to Violence at St. Clair

87. At the Tutwiler Prison, ADOC has real-time camera monitoring. (Doc. 422-081 at 22:23-26:22, 112:10-114:15.) While McClain was captain at Tutwiler, she oversaw the installation of cameras at the prison as part of the implementation of a "settlement [that] was reached as a result of a lawsuit brought by the Department of Justice related to sexual safety and other conditions at Tutwiler." (Id. at 22:23-26:22.) For the purposes of improving prisoner safety at Tutwiler, "[t]he camera system at Tutwiler is good, but it's only as good as the person

watching it. . .. So, it was — it wasn't just the cameras. It was also boots on the ground." (Id. at 112:10-114:15.) At Tutwiler, this meant having "a camera observation room with dedicated staff watching the cameras in real time". (Id.)

**DEFENDANTS' RESPONSE**: Disputed. Former Regional Director McClain was not involved in the implementation of cameras at Tutwiler. (Doc. 422-081 at 26:6-11).

### C. St. Clair's Policies Do Not Account for Its Dangerously Low Staffing Levels

88. Despite what is in the SOP, St. Clair is dangerously understaffed. See *Braggs v. Dunn*, 2018 WL 985759, at *2 (M.D. Ala. Feb. 20, 2018).

**DEFENDANTS' RESPONSE**: Argument and opinion.

89. The staff-to-inmate ratio has been higher than the national ratio for more than a decade; for instance, in 2023, the staff-to-inmate ratio was roughly 1:8, among the highest in U.S. prisons. (Doc. 422-103 at 53-54 & fig. 8; see also Doc. 422-254 at 12 & tbl. 9.)

**DEFENDANTS' RESPONSE:** Disputed. Plaintiffs cite the report of their expert Martin for the statements that St. Clair's "staff-to-inmate ratio has been higher than the national ratio for more than a decade" and St. Clair's staff-to-inmate ratio in 2023 "was . . . among the highest in U.S. prisons." Martin cited no source for these statements in his report. (Doc. 422-103 at 56-57 and Fig. 8.) Moreover, Martin compared St. Clair's average staff-to-inmate ratio for 2013, 2014, 2015, 2016, 2017, 2020, 2021, 2022, and 2023, to "the average staff-to-inmate ratio for maximum security prisons nationally in 2019," a number for which he cited no source. (Id.).

90. St. Clair regularly lacks enough staff members to fill even the mandatory critical posts. (See Doc. 422-068 at 49:1-19; Doc. 422-073 at 318:2-19; Doc. 422-087 at 344:7-12, 348:14-19; Doc. 422-063 at 357:16-358:9; Doc. 422-090 at 54:5-55:6; Doc. 422-089 at 172:2-6, 174:1-175:15; Doc. 422-374.)

**DEFENDANTS' RESPONSE**: Disputed. At most, the evidence cited by Plaintiffs establishes that critical posts go unfilled on isolated occasions, not "regularly." Moreover, Plaintiffs mischaracterize the testimony they cite. Ellington's testimony cited in this paragraph refers to "posts generally," not "critical posts." (Doc. 422-063 at 357:23-358:8.) When asked if critical posts "ever have to go unfilled due to understaffing," Lieutenant [redacted] responded, "Yes," but he also testified, "I do whatever I can to make sure that we are in compliance as much as possible when we have staff challenges . . . ," and he makes sure no housing block "goes without any security inspections or anything like that for long periods of time . . . ." (Doc. 422-090 at 54:5-56:1.) Captain Parker testified about a post deviation log from July 6, 2022, which listed four critical posts as "closed" for periods between two hours and three hours and 45 minutes, not for an entire shift. (Doc. 422-089 at 172:2-175:15). Captain Parker further testified: "If -- if you don't have an officer assigned to a block, you may have -- a security check or a population check will still get conducted. It may be conducted by a supervisor, or the supervisor may relieve an officer that's assigned to a -- to a post to where that officer can go conduct the check. So a dorm or a post that does not have an officer assigned doesn't mean that that dorm would have zero security checks or zero officer going into that dorm or block for the course of a shift." (Id. at 178:12-179:1.) Commissioner Hamm was asked about a document that indicated that, on July 17, 2022, the day shift began with 20 officers and 25 critical posts. (Doc. 422-073 at 317:19-318:19.) When asked if "the staffing for this 12-hour shift at St. Clair was insufficient to man even just the critical posts," Commissioner Hamm responded that he "would really have to ask Warden Fox or Warden Noe at the time. That's what it said, you know, day shift, 20 assigned officers and 2[5] critical posts. Did they do any mandation of overtime or have any volunteers of overtime to cover those other five posts." (Id. at 318:9-19.) Former Warden Mitchell testified that, when a shift lacks enough officers to cover all critical posts, "[w]hat we do is mandate. So we mandate people to stay over. So not only -- so how many people we're short, how many – we mandate those people, so they get mandated to stay over to cover those posts."

(Doc. 422-087 at 344:7-22.) When asked if there was ever "a circumstance in which someone has refused mandatory overtime necessary to man a particular critical post," former Warden Mitchell responded, "[y]es," and, when asked "[h]ow often" that happens, he responded "[n]ot much . . . ." (Id. at 348:9-349:8.) When asked how many security officers "are present on a shift per number of prisoners," Lieutenant [redacted] responded, "I don't know. I mean you would be good --I don't know. You will be good to have on a good day twenty-four, twenty-five officers that is good, but we don't have that every day." (Doc. 422-068 at 49:1-8.) Lieutenant [redacted] also testified that, during periods of short staffing, supervisors "are the acting rovers, like the responding officers." (Id. at 50:16-22.) Doc. 422-374 is an email from former Warden Noe to Ellington dated January 16, 2022, stating that, at 1:32 a.m. that day, there were "only 14 officers at the facility;" Warden Noe was "going in at 2:00 a.m." and would "remain until day shift gets in and settled;" and "[t]hey have been instructed to lockdown the facility at 1030pm and run only under controlled movement." None of this evidence establishes that St. Clair "regularly" lacks enough staff members to cover critical posts.

91. St. Clair's operative staffing SOP has not been revised to account for St. Clair's persistently low staffing levels. (*Compare* Doc. 422-020 (operative staffing SOP dated April 9, 2021), *with* Doc. 422-021 (dated May 22, 2018), *and* Doc. 422-019 (dated December 7, 2020).)

**DEFENDANTS' RESPONSE:** Disputed. SOP 031 includes a section that sets forth "[t]he plan of action for a staff shortage." (Doc. 422-020 at 6.) This "plan of action" requires the Shift Commander to "determine the number of officer[s] that it would be necessary to mandate to remain on duty" and "notify the on call facility duty officer immediately." (Id. at 6-7). Additionally, SOP 031 provides that "[t]he Shift Commander is responsible for . . . [e]nsuring that all critical posts are manned. Approval from a Captain or above must be obtained before pulling officers from a critical post." (Id. at 2-3.) SOP 031 further provides that "[a]ll supervisors will be present at work during the times when the shift(s) experience

shortage of officers." (Id. at 4.) Furthermore, "where a shift does not meet adequate staffing requirements the Shift Commander shall provide a signed written justification for the deviation," which "shall include the date, shift, duration, and reason(s) for the deviation from the staffing plan." (Id. at 7.) SOP 031 notes that "[s]pecial considerations was taken in account in developing and implementing this SOP, including "[s]tate staff levels." (Id.) Finally, SOP 031 provides, "Once a year the Institutional PREA Compliance Manage[r], the Warden and the Departmental PREA Coordinator will assess, determine, and document whether adjustments to SOP are needed." (Id.) The ADOC Officials do not dispute that all three versions of SOP 031 cited by Plaintiffs contain the language quoted above.

92. All three versions of the staffing SOP that Defendants have produced include a section on how to address "staffing deviations" but do not otherwise address the staffing shortage. (Doc. 422-020 at 6-7 ("The plan of action for a staff shortage is as follows: . . . The Shift Commander shall determine the number of officer [sic] that it would be necessary to mandate to remain on duty" and "notify the on call facility duty officer immediately"); Doc. 422-021 (dated May 22, 2018) at 8 (same); Doc. 422-019 (dated December 7, 2020) at 8 (same).)

**DEFENDANTS' RESPONSE:** Disputed. In addition to the language quoted by Plaintiffs, SOP 031 provides that "[t]he Shift Commander is responsible for . . . [e]nsuring that all critical posts are manned. Approval from a Captain or above must be obtained before pulling officers from a critical post." (Id. at 2-3.) SOP 031 further provides that "[a]ll supervisors will be present at work during the times when the shift(s) experience shortage of officers." (Id. at 4.) Furthermore, "where a shift does not meet adequate staffing requirements the Shift Commander shall provide a signed written justification for the deviation," which "shall include the date, shift, duration, and reason(s) for the deviation from the staffing plan." (Id. at 7.) SOP 031 notes that "[s]pecial considerations was taken in account in developing and implementing this SOP, including "[s]tate staff levels." (Id.) Finally, SOP 031 provides, "Once a year the Institutional PREA Compliance

Manage[r], the Warden and the Departmental PREA Coordinator will assess, determine, and document whether adjustments to SOP are needed." (Id.)

93. The staffing SOP does not include any guidance on, for example, how to staff critical posts when fewer than the minimum 26 staff members are available at St. Clair. (*See generally* Doc. 422-020.)

**DEFENDANTS' RESPONSE:** Disputed. As set forth above, SOP 031 provides the following guidance for staffing critical posts in the event of a staff shortage: "The Shift Commander is responsible for . . . [e]nsuring that all critical posts are manned. Approval from a Captain or above must be obtained before pulling officers from a critical post." (Doc. 422-020 at 2-3.) SOP 031 further provides that "[a]ll supervisors will be present at work during the times when the shift(s) experience shortage of officers." (Id. at 4.)

94. The Daniels Plan is the only plan Defendants have developed over the years that attempts to "ease the correctional officer shortage" by specifying how St. Clair's scarce officer resources should be allocated. (Doc. 422-242 at 2.)

**DEFENDANTS' RESPONSE:** Disputed. As set forth above, SOP 031 provides guidance as to allocation of St. Clair's staffing resources. In addition, ADOC created an internal Resource Planning Unit, which created updated staffing plans for all ADOC facilities, including St. Clair. (Doc. 422-276.) The ADOC Officials took numerous other steps to ensure effective deployment of staffing resources, including but not limited to the following: in 2016, ADOC introduced Correctional Cubicle Operators, who do not come into direct contact with inmates, which increased the availability of fully-trained correctional officers for other tasks. (Doc. 423-235 at 13); in May 2022, Commissioner Hamm requested and received State Personnel Department approval to hire 14 special investigators to serve as hearing officers at inmate disciplinary proceedings, enabling uniformed correctional staff to remain on correctional posts (Boykins v. Dunn, 4:19-cv-01934, Doc. 141-2, ¶ 15); Commissioner Hamm oversaw the implementation of a training program that enables qualified ADOC support

personnel to volunteer to work overtime in non-contact posts in Level IV and V facilities (id., ¶ 14); and ADOC obtained an increase in the salary cap for retired state law enforcement officers to fill posts in ADOC facilities (Braggs Doc. 4062 at 12.) Each of these efforts helps the ADOC Officials to deploy existing staff as effectively as possible.

95. Defendants never implemented the Daniels plan. (Doc. 422-056.)

**DEFENDANTS' RESPONSE:** Disputed. Plaintiffs inaccurately state that the ADOC Officials "never implemented the Daniels plan." In support of this statement, Plaintiffs cite an investigation by ADOC's Office of Inspector General that recommended corrective action for St. Clair staff members who allegedly altered the Daniels plan without authorization. (Doc. 422-056 at 19.) This document fails to establish that the ADOC Officials "never implemented" the Daniels plan.

96. The low staffing contributes directly to the violence that is commonplace at St. Clair, including, for example:

a. The day before, May 13, 2023, an inmate was transferred to the UAB Trauma Center for treatment after a fight with weapons broke out in N Block, where no officers were staffed. (Doc. 422-163; Doc. 422-248 at 26.) (Plaintiffs' Fact 224b)

**DEFENDANTS' RESPONSE**: Disputed to the extent the evidence cited indicates that Officer [redacted] was assigned as the N-Housing Unit Control Room Officer" at the time of the incident. (Doc. 422-163, 2).

### D. Defendants Have a Practice of Improperly Training Correctional Staff on Use of Force and Tolerating Use of Excessive Force

#### 1. Defendants Do Not Provide Appropriate Use of Force Training

97. Deposition testimony makes clear that Defendants lack training on appropriate uses of force, including testimony regarding the use of force in instances where no force at all is appropriate:

a. Lieutenant [redacted] believes that "whatever the level of force the inmate is using on you, you use it back on him". (Id. at 162:21-163:1.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs provide information that is misleading. When asked if she thought unnecessary force was ever used at St. Clair, former Captain [redacted] testified "I'm sure it does". (Doc. 422-070 at 238:2-5.) When asked if she "believe[s] that unnecessary force is often used at St. Clair," she responded, "No." (Id. at 237:21-238:1.) She further testified that officers can use force "When an inmate come with him – come at him with force, when an inmate do not do what he is asked to do, and then when he's into a fight or something with another inmate and he tries to get them to stop and he doesn't stop, then he could use force". (Id. at 237:2-10.) Lieutenant [redacted] testified that he uses force "when all things that I have tried to do before, they don't comply, I mean sometimes you are just going to have to use force." (Doc. 422-068 at 153:20-154:6.) When asked if force is always his last option, Lieutenant [redacted] responded: "No, it is not. If I can – it is – what I am trying to tell you is an officer can go and be malicious and use force every day and probably get justified for it, but you don't. You don't do that.". (Doc. 422-068 at 154:7-13.) When asked if it was his "understanding that it is appropriate to punch prisoners," Lieutenant [redacted] responded: "I mean no, it's not good – it ain't just good to go around hitting prisoners for nothing. But if he punched me, we trained whatever the level of force the inmate is using on you, you use it back on him." (Id. at 162:16-163:1.)

### 2. Defendants' Failure to Provide Appropriate Use of Force Training Results in Officers' Use of Excessive Force

98. At St. Clair force is used both situations where no force is required, and in situations that demand far less than the amount of force used in order to control

the situation. (See, e.g., Doc. 422-053 at 18:17-20:22; Doc. 422-054 at 62:10-63:4; id. at 132:15-133:2; Doc. 422-059 at 50:15-51:17; Doc. 422-060 at 150:4-151:1, 226:7-15; Doc. 422-061 at 168:2-22; id. at 316:5-13; Doc. 422-077 at 137:1-138:3; Doc. 422-084 at 193:3-14; Doc. 422-097 at 303:1-10; see generally Doc. 422-103 at 118-28.)

**DEFENDANTS' RESPONSE:** Argument

99. Officers use force in instances of prisoners using "unsavory but non-threatening behavior". (See Doc. 422-103 at 126-28.)

**DEFENDANTS' RESPONSE:** Argument and expert opinion.

100. While uses of force are pervasive throughout St. Clair documentation and discovery in this case, the real number of instances of use of force is likely even higher than it appears, as officers are counted on to self-report many uses of force and may not do so. (See Doc. 422-068 at 154:20-155:2; see also Doc. 422-103 at 117.) Officers are able to get away with doing so because they know where cameras are located and they've been warned about using force in front of those cameras. (See Doc. 422-245 at 2 (minutes from a Supervisor Meeting in April 2021 where former Warden Noe reminded officers, when discussing use of force, that "[t]he cameras are hot").

a. Lieutenant [redacted] is "sure" that officers sometimes don't report when they use force. (Doc. 422-068 at 154:20-155:2.)

**DEFENDANTS' RESPONSE:** Disputed as misleading. When asked "Do officers ever not report uses of force?", Lt. [redacted] responded, "I am sure it do happen, It ain't never happened to me personally as being a supervisor, but I am sure they do it." (Doc. 422-068 at 154:20-155:2.)

### E. Defendants Have a Practice of Improperly Training Staff on Sexual Abuse

101. Both the PREA Director and IPCM roles are meant to work at moving St. Clair toward PREA's zero-tolerance policy for sexual violence in prisons. (Doc. 422-017 at 1.)

**DEFENDANTS' RESPONSE:** Argument and not supported by the evidence.

102. Testimony of the PREA Director and St. Clair IPCMs show how ill-prepared they were and are to conduct their roles:

a. Former IPCM [redacted] had no background in PREA prior to starting as IPCM. (Doc. 422-052 at 47:22-48:3.)

**DEFENDANTS' RESPONSE:** Disputed as misleading. She said she had no background other than the "regular training, yearly training." (Doc. 422-052 at 47:22-48:3.)

103. The individuals tasked with implementing PREA and with improving sexual safety at St. Clair do little in practice, and Defendants have permitted them to confine these roles to administrative. (See Doc. 422-102 at 12-20.) For example:

a. Former IPCM [redacted] never asked to make a single change at St. Clair related to PREA during her time in the position. (Doc. 422-052 at 46:1-17.) Her sole concern with records from the SANE Center was to ensure she "put it in a secured file", without any review, analysis or conversations with SANE or LESD staff. (Id. at 82:6-15; see also id. at 84:9-20.)

b. St. Clair's current IPCM, [redacted] considered the IPCM position to be "highly administrative in the duties" and to involve a "lot of paperwork". (Doc. 422-069 at 28:13-29:1.)

c. PREA Director Christy Vincent had never discussed incidents of sexual violence with anyone at St. Clair, and was unaware if any steps or recommendations for changes were made after those incidents. (See, e.g., Doc. 422-094 at 176:4-19, 191:20-192:7, 196:12-15.)

**DEFENDANTS' RESPONSE:** Disputed. First, the clear opinion statement about the ADOC Officials "do[ing] little in practice" is improper in light of the Court's prior instructions to eliminate opinion statements. Additionally, the ADOC Officials deny that the testimony cited in paragraph 249, including

subparagraphs a. through c., establishes that the PREA Director and IPCM roles "do little in practice." For example, the PREA Director and St. Clair IPCM remain on call at all times. (ADOC Officials' SOF, ¶¶ 353, 355). These ADOC Officials train other employees, ensure that inmates can report PREA incidents, investigate alleged PREA incidents, and audit St. Clair for PREA compliance. (Id., ¶¶ 345-362). Former IPCM [redacted] role involved ensuring that the facility was following the PREA protocols, standards, policy and procedures; ensuring the safety of the inmates, officers, and staff; and, if necessary, moving inmates after a PREA allegation. (Doc. 422-052 at 85:9-86:5.) St. Clair's current IPCM, [redacted] testified that he considered the IPCM position to be "highly administrative in the duties" and to involve a "lot of paperwork", but it also "had an investigative component to it". (Doc. 422-069 at 28:13-29:1.) PREA Director Christy Vincent testified that she did not discuss specific incidents of sexual violence with anyone at St. Clair and was unaware if any steps or recommendations for changes were made after one specific alleged incident. (See, e.g., Doc. 422-094 at 176:4-19, 191:20-192:7, 196:12-15.)

104. The PREA Director and St. Clair IPCMs seldom ask for information about the conditions at St. Clair that create a risk of sexual violence and fail to act to improve those conditions to prevent incidents from occurring, including the following:

a. Former IPCM [redacted] did not review the facts of an incident report or consider the factors that allowed an assault to take place because "[t]hat was for LESD investigators", not the IPCM. (Doc. 422-052 at 84:9-85:2.)

b. Despite the importance of contraband in sexual assault at St. Clair (including the presence of weapons and drugs, as well as the risk of assault created by drug debt), former IPCM [redacted] was unaware of contraband in St. Clair. (*See, e.g.*, Doc. 422-052 at 62:2-16, 96:19-104:4; *id.* at 70:22-71:17, 74:15-75:12; *id.* at 87:11-14, 90:17-92:15.) [redacted] was not "concerned" about the possibility of there being contraband in the prison when it related to sexual violence that involved contraband, because she "just did [her] job". (*Id.* at 74:10-76:22; 84:3-6.)

c. Current IPCM [redacted] and PREA Director Vincent likewise took no steps regarding the role of contraband in sexual assaults at St. Clair.

(*See* Doc. 422-069 at 222:3-226:6, 378:20-379:6; Doc. 422-094 at 191:20-192:13.)

d. St. Clair's IPCMs and PREA Director Vincent also ignored the broken locks at St. Clair, even though unauthorized movement contributes to many sexual assaults. (Doc. 422-052 at 102:7-11, 121:9-12; Doc. 422-069 at 102:4-12, 102:17-104:9; Doc. 422-094 at 130:14-131:13.) Ms. Vincent did not even know whether St. Clair cells have call buttons. (Doc. 422-094 at 136:18-137:8.) And Ms. Vincent "can't answer" whether prisoners are permitted to enter cell blocks they are not assigned to because she is "not familiar with operations procedures". (*Id.* at 175:2-21.)

**DEFENDANTS' RESPONSE**: Disputed. The testimony cited in paragraph 250, including subparagraphs a. through d., does not demonstrate that the PREA Director and IPCMs "seldom ask for information about conditions at St. Clair" or "fail to act to improve" conditions at St. Clair. Named Plaintiffs take much of the testimony cited in this paragraph out of context. For example, Named Plaintiffs cite former St. Clair IPCM [redacted] testimony that investigations of incidents were "for LESD investigators," but they omit her testimony that she bore responsibility for "[e]nsuring that the facility was following the PREA protocols, standards, policy and procedures, and – and the safety of the inmates and officers as well, the staff," and, if necessary, "mov[ing] the inmate" after a PREA incident. (Doc. 422-52, 22 (85:9-86:5)). She further testified: "After an incident, I would talk to the inmates. I don't want them to relive their trauma of what their allegations are, but if there's something that the inmate wants to disclose with me, then they -- they have the choice to do that. If not, then I don't -- I'll allow LESD to handle their, you know, their job." (Id. at 92:20-93:5.) [redacted] testified that he "ha[s] inquired about the sources of contraband. It's usually not disclosed. But I'm not an active participant in searches or narcotic enforcement." (Doc. 422-069 at 224:1-10.) When asked if he would "go to . . . the security team and say that they need to conduct a search in that cell" if contraband is involved in an incident, [redacted] testified that, if he "had knowledge of that, [he] would probably share that with the shift commander," and he "feel[s] in good faith that they would do so." (Id. at 225:6-21.) He testified, however,

that he "never had a case that was so – that the timing of that case necessitated that [he] felt a search be conducted." (Id. at 378:20-379:6.)

### F. Defendants Have a Practice of Assigning Prisoners to Housing Areas ("Internal Classification") Without Appropriate Risk Screening Data

105. "Classification" refers to the way in which prisoners' security, programmatic and housing needs are determined within a prison system. (See Doc. 422-101 at 5-6.) Broadly, there are two types of classification:

a. The first is "external classification", which consists of the processes and methods undertaken to determine a prisoner's "custody level"—a level that correlates with the degree of supervision necessary for a prisoner—and then accordingly, what institution matches the level of security required. (Id. at 6.)

b. The second is "internal classification", which refers to processes and methods to determine appropriate housing and programming for a prisoner within a specific institution. (Id.)

**DEFENDANTS' RESPONSE**: Expert testimony.

106. Having a dedicated body to make housing decisions with core review criteria and processes allows the prison to make meaningful and informed decisions about housing and reduce risk of violence in the facility. (Doc. 422-101 at 33.)

**DEFENDANTS' RESPONSE**: Expert opinion.

#### 1. The ICB Does Not Control Housing Assignments

107. The ICB does not generally assign housing units. (See supra ¶ 253; infra ¶ 256.b; Doc. 422-101 at 20-23.) Instead, the practice is that Officer [redacted] makes initial housing unit and bed assignments within GP, and high ranking officers have the authority to reassign prisoners freely. (See infra ¶¶ 256.b-c; Doc. 422-101 at 20-23.)

a. St. Clair's practice is to assign only the broad type of housing to the prisoner—i.e., GP, the RHU or the SSU—not the specific housing unit. (Doc. 422-101 at 21.)

b. Instead of the ICB, the ICS Officer, currently [redacted] makes the housing unit and bed assignment himself. (See Doc. 422-070 at 198:13-199:2; Doc. 422-080 at 242:5-244:14; Doc. 422-093 at 54:13-21.) Officer [redacted] is not a member of the ICB. (Doc. 422-093 at 44:17-45:16.)

c. Security staff are afforded wide latitude to make housing decisions without consulting the ICB; for instance, the "staff, sergeant[s], [and] lieutenant[s]" are allowed to make bed moves. (Doc. 422-080 at 331:14-23.) "[O]ther than intake and RHU, housing changes within the facility are typically done by security staff". (Doc. 422-087 at 170:13-17.)

**DEFENDANTS' RESPONSE**: Disputed. At [redacted] deposition, when asked if the ICS officer "specifically identifies which bed assignment [an] inmate will have after the ICB has conferred," Mr. [redacted] confirmed, "He conducts all bed assignments." Then, when asked, "Is he making that decision in the ICB meeting or could it be outside of the ICB meeting?", he responded, "It could be outside of the ICB meeting." When asked for confirmation that "the ICB together determines whether or not the inmate will go to pop, SSU, or RHU," Mr. [redacted] responded, "That's correct." (See Doc. 422-080 at 242:5-244:14; Doc. 422-070 at 198:13-199:2; Doc. 422-093 at 54:13-21.) Named Plaintiffs also claim as undisputed that "Officer [redacted] is not a member of the ICB" based on Officer [redacted] deposition testimony from August 10, 2023. Captain [redacted]'s May 10, 2024, declaration confirms Officer [redacted] is a member of the ICB. (Doc. 423-217, ¶ 4). Even at the time of his deposition, Officer [redacted] confirmed he attended ICB meetings and possessed access to inmates' PREA information and other relevant information when making bed assignments. (ADOC Officials SOF, ¶¶ 308-312; Doc. 423-217, ¶ 15)). Named Plaintiffs claim "[s]ecurity staff are afforded wide latitude to make housing decisions without consulting the ICB." (Plaintiffs' SOF, ¶ 256c). Former Warden Mitchell testified that, while the shift commander can handle a move within a dorm, moves between dorms require involvement from the ICB, a captain, or the Warden. (Doc. 422-87, 170:13-178:19). In addition,

ICS Officer [redacted] reviews the Inmate Movement Sheet every morning to make any necessary modifications to bed movements. (Doc. 423-217, ¶ 19).

108. As a result of these practices (ignoring the written policy on the ICB), St. Clair staff do not consider relevant information when making housing decisions. (See infra ¶¶ 260-69; Doc. 422-101 at 22.)

**DEFENDANTS' RESPONSE:** In paragraph 257, Named Plaintiffs cite paragraphs 260-269 of Plaintiffs' Statement of Facts, as well as Austin's report, for the proposition that "St. Clair staff do not consider relevant information when making housing decisions." As set forth above, Named Plaintiffs failed to establish any constitutional obligation for the ADOC Officials to even maintain an ICB, much less any constitutional requirements dictating the responsibilities or operations of the ICB. The ADOC Officials otherwise refer to their responses to paragraphs 260-269 in response to this paragraph.

**2. Housing Assignments Do Not Properly Consider PREA Designations**

109. Although Officer [redacted] attends ICB Meetings, Officer [redacted] does not "pay attention" to the "part" the ICB does, meaning he does not focus on the characteristics, risk profile or particular housing concerns of the prisoner being assigned. (Doc. 422-093 at 44:17-45:16.) Further, when Officer [redacted] makes a housing unit and bed assignment, he does not have access to the ICB Checklist or other pertinent information. (Id. at 52:4-13; id. at 53:5-10, 71:18-23.)

**DEFENDANTS' RESPONSE**: Disputed. At Officer [redacted] deposition, when he was asked if he "witness[es] [ICB's] discussions about certain prisoners" at ICB Meetings, he responded, "I hear some of it. I'm usually at the end of the table. I don't pay attention to their – the part they do. When they get done and they look – they're looking for a bed, I give them a bed assignment that they could use." (Doc. 422-093 at 44:17-45:16.) When Officer [redacted] was asked, "what is the process for a prisoner is who is brought before the ICB?", he responded, "The ICB has a checklist that they go through. I haven't seen it. I

mean, I don't know what's on that checklist. But that's part of what they do when they meet with the inmate. They answer any questions that the inmate might have, stuff like that." (Id. at 52:4-13; id. at 53:5-10, 71:18-23.) ICS Officer [redacted] attends each ICB meeting. (Doc. 423-217 at ¶ 15.) After the ICB meeting, Officer [redacted] takes the ICB's classification designation (general population, restrictive housing unit (RHU), protective housing reintegration unit, etc.) and assigns the inmate to a specific bed meeting that designation. (Id.) Officer [redacted] also maintains access to a spreadsheet that the Special Investigator IPCM updates with each inmate's PREA designation in order to ensure the inmate's placement does not contradict the inmate's PREA designation." (Id.)

110. When prisoners arrive at St. Clair, a classification specialist completes a PREA review prior to the meeting of the ICB where the specialist can designate an individual as a "potential" victim or predator. (See Doc. 422-101 at 18.) A prisoner is not formally designated as a PREA predator or victim after he has seen mental health staff, which often does not occur until weeks after intake. (See, e.g., Doc. 422-253 (showing dates on which prisoners are screened).) The designation may also be different from the preliminary designation by the classification specialist. (Id.) Accordingly, when Officer [redacted] makes a housing assignment, the information on the PREA Housing Designation Spreadsheet is often inaccurate because a final PREA assessment by a mental health professional has not occurred. (See id.)

**DEFENDANTS' RESPONSE**: Disputed. The Classification and PREA Mental Health Referral Chart neither supports the proposition that the information on the PREA Housing Designation Spreadsheet is "often inaccurate"; nor, does it support the proposition that mental health referrals "often do[] not occur until weeks after intake." (Doc. 422-253.) Further, when an inmate's PREA designation changes, the inmate receives a housing move in accordance with the new PREA designation. (Doc. 422-93, 24 (93:2-7)).

111. Even when PREA information is available, St. Clair routinely houses prisoners in contravention of their PREA designations. (See Doc. 422-101 at 19-20 (citing example of prisoners housed incorrectly based on their PREA designation).)

**DEFENDANTS' RESPONSE:** Argument and expert opinion.

112. These practices increase the risk of sexual of assault at St. Clair as victims may be housed with predators. (See Doc. 422-102 at 32-36.) For example:

a. [redacted] was initially screened as a "none" designee for PREA, despite being a former sexual assault victim, and was referred to mental health for an additional PREA evaluation. (Doc. 422-252.) Between his initial screening and mental health evaluation, Mr. [redacted] was assigned to the "predator" side of O Block, where he was subsequently sexually assaulted two days later, on November 23, 2019. (Doc. 422-172.) Mr. [redacted] was first seen by mental health over a week after the sexual assault and was designated a victim at that time. (Doc. 422-252; Doc. 422-106 at 57; Doc. 422-172.)

b. When [redacted] was initially screened, his PREA line was left blank. (Doc. 422-108 at 31.) He was assigned to Cell N-26, on the 2-side of N Block. (See Doc. 422-134.) Mr. [redacted] was first seen by mental health a day after the initial screening and formally designated a PREA "victim"; nevertheless, St. Clair did not adjust Mr. [redacted] housing assignment. (Doc. 422-251.) Mr. [redacted] was sexually assaulted on June 30, 2020, around just two weeks after he was determined to be a PREA "victim". (Doc. 422-108 at 31; Doc. 422-134; Doc. 422-251.) (Plaintiffs' Fact 266)

**DEFENDANTS' RESPONSE**: Disputed. According to [redacted] PREA assessment form, on November 22, 2019, he was initially screened as a "none" designee for PREA, and was referred to mental health for an additional PREA evaluation. (Doc. 422-252.) According to a St. Clair incident report, Mr. [redacted] reported that he had been sexually assaulted by [redacted] on November 23, 2019, in cell O-43. (Doc. 422-172.) Mr. [redacted] was seen by

mental health on December 2, 2019, and was designated a victim at that time. (Doc. 422-252; Doc. 422-106 at 57; Doc. 422-172.) While ADOC and St. Clair policies provide for separate housing of PREA "victims" and "predators," they do not provide for separation of inmates with no designation from "predators," nor could they realistically do so. According to a St. Clair ICB Assessment and Housing Checklist completed for [redacted] on June 16, 2020, the PREA line was left blank. (Doc. 422-108 at 31.) According to Mr. [redacted] PREA assessment form, he was referred to mental health on June 17, 2020, and designated a PREA "potential victim." (Doc. 422-251 at 1, 2.) According to a St. Clair incident report, on June 26, 2020, Mr. [redacted] reported that he was sexually assaulted by [redacted] on June 23, 2020. (Doc. 422-134.) On June 26, 2020, he was formally designated a PREA "victim". (Doc. 422-251 at 2.) Paragraph 264b misstates the date of the alleged sexual assault involving inmate [redacted] The alleged incident occurred on June 23, 2020, not June 30, 2020. (Doc. 422-134). [redacted] received his final "victim" designation on June 26, 2020. (Doc. 422-251, 2). Nonetheless, the ADOC Officials deny this isolated alleged incident demonstrates a "routine" placement of inmates by St. Clair staff in contravention of an inmate's PREA designation.

### 3. Housing Assignments Do Not Properly Consider Gang Affiliation

113. Officer [redacted] and St. Clair's classification staff do not have access to STG information when making housing or classification designations. (Doc. 422-064 at 124:21-23; 125:13-20.) This means that gang information is not included on the ICB Checklists; indeed, Officer [redacted] "do[esn't] have any[thing] to do with" STG information at the prison. (Doc. 422-093 at 134:4-9.)

**DEFENDANTS' RESPONSE**: Disputed. Plaintiffs' assertion that St. Clair's classification staff "do not have access to STG information when making housing or classification designations" inaccurately represents Ms. Estelle's testimony. (Plaintiffs' SOF, ¶ 268). Ms. [redacted] testified that St. Clair staff may inform her of an inmate's STG affiliation. (Doc. 422-64, 33 (126:13-16)). Ms. [redacted] also

noted that when classification staff interview an inmate to complete the PREA risk assessment form, the staff member gathers information on gang affiliation. (Doc. 422-64, 38 (146:5-9)). Also, if gang affiliation information is determined to be necessary, members of the ICB can easily access such information. (Doc. 423-78, 102). Officer [redacted] testified "that correctional staff place gang information and activity into the IMS (Inmate Management System)." (Id.). The correctional and classification staff, who do sit on the ICB, maintain access to the IMS. (Id.). Captain Howard, a "backup STG coordinator[] at St. Clair[,]" testified that St. Clair staff limit the numbers of each STG's members in any dorm, separate the gang leaders from subordinates, and separate major STG leaders. (Doc. 422-76, 28 (106:3-22)). Mitchell testified St. Clair houses STG information on the IMS. (Doc. 422-87, 60 (234:7-235:18)). Furthermore, Mitchell testified that he exercised his power to override the ICB's decisions on "rare" occasions when he possessed concerns about gang affiliations of certain inmates. (Id., 43 (168:22-169:21)). Mitchell testified that these occasions are "rare" because Captain Malone, as chairperson of the ICB, "does a great job." (Id., 43 (169:18-20)).

114. Failure to take into account gang affiliation in housing decisions increases the risk of violence at St. Clair; examples include:

a. In early September 2021, [redacted] affiliated with the "Gangster Disciples", was involved in a fight with another Gangster Disciple-affiliated inmate in N Dorm. (Doc. 422-189.) Mr. [redacted] was assigned to bed N-32 at the time. (*Id.*) This incident was discussed at the facility's STG meeting that month. (Doc. 422-277.) Following the incident, Mr. [redacted] was moved to Q Block, which at the time was designated as the Intake Unit. (Doc. 422-189.) On September 21, 2021 about three weeks after the incident, Mr. [redacted] was released back to GP and to the exact same cell—N-32. (Doc. 422-109.) Mr. [redacted] ICB Continuation Checklist notes that [redacted] has "no documented enemy at St. Clair" and that the inmate he was in a fight with was transferred to the Donaldson facility, but there is no mention

of any gang activity on the form. (*Id.*) On the same day he was released back to GP, Mr. [redacted] was seriously assaulted by eight inmates (only two of whom resided in N Block). (Doc. 422-187; Doc. 422-393.)

b. [redacted] arrived at St. Clair on February 27, 2020 and was seen by the ICB on March 31, 2020. (Doc. 422-107 at 248.) Mr. [redacted] was assigned, without an ICB screening, to N Block, where on March 5, 2020, Mr. [redacted] was the victim of a gang-related stabbing. (Doc. 422-173.) Following the stabbing, he was brought before the ICB, where he was assigned to the SSU. (Doc. 422-107.) No gang information or the stabbing is noted on his ICB Checklist. (Id.)

**DEFENDANTS' RESPONSE:** Disputed. St. Clair staff incorporate STG information into housing decisions. (Doc. 422-76, 28 (106:3-22); Doc. 422-87, 43 (168:18-169:21)). Moreover, Named Plaintiffs' examples of how St. Clair's alleged "failure" to consider gang affiliation in housing decisions fail to establish any causation between St. Clair's classification decisions and violence.

According to a St. Clair incident report, on September 2, 2021, [redacted] affiliated with the "Gangster Disciples", was involved in a fight with another Gangster Disciple-affiliated inmate, [redacted] in N Dorm. (Doc. 422-189.) Mr. [redacted] was assigned to bed N-32 at the time. (Id.) This incident was discussed at the facility's STG meeting that month, which St. Clair's ICB Chair, Captain [redacted], attended. (Doc. 422-277.) Following the incident, Mr. [redacted] was moved to Q Block. (Doc. 422-189.) According to Mr. [redacted] ICB Continuation Checklist, on September 8, 2021, Mr. [redacted] transferred to Donaldson Correctional Facility, and on September 21, 2021, Mr. [redacted] was released back to general population to the same cell—N-32. (Doc. 422-109.) Mr. [redacted] ICB Continuation Checklist notes that [redacted] has "no documented enemy at St. Clair" and there is no mention of any gang activity on the form. (Id.) Thus, ADOC moved inmate [redacted] to another facility, eliminating any potential

future risk of violence by [redacted] on [redacted] According to the incident report, on the same day he was released back to general population, Mr. [redacted] was assaulted. (Doc. 422-187). The incident report states that "the results of an in depth ongoing investigation into Security Threat Group incident" identified eight inmates affiliated with the Gangster Disciples as participants in the assault. (Doc. 422-187; Doc. 422-393.)

According to [redacted] ICB Classification and Housing Checklist, he arrived at St. Clair from Holman on February 27, 2020. (Doc. 422-107 at 248.) According to a St. Clair incident report, on March 5, 2020, Mr. [redacted] who refused to name his assailant, was stabbed by an inmate named Larry Thompson, with no listed gang affiliation. (Doc. 422-173.) Mr. [redacted] reported that he "had a run in with the Crips a couple of years ago and they put a hit on [him]." (Id.) No gang information or the stabbing is noted on his ICB Checklist; however, the ICB Checklist indicates that [redacted] should "remain" in SSU because of "unknown enemies at St. Clair". (Doc. 422-107 at 248.) St. Clair's ICB clearly considered Inmate [redacted] recent assault when making his housing placement.

### G. Defendants Have Cell Inspection and Institutional Search Practices that Are Ineffective in Reducing the Enormous Volume of Drugs and Weapons in the Facility

#### 1. There Are High Amounts of Contraband at St. Clair

115. High volumes of contraband persist at St. Clair; for example, in the quarter ending September 30, 2023, 2,114 grams of drugs were discovered along with 65 knives, 122 other miscellaneous weapons, 152 cellphones and 127 other electronic devices. (See Doc. 422-103 tbl. 1, citing ADOC Quarterly Report Ending 09/30/2023.)

**DEFENDANTS' RESPONSE:** Argument and expert opinion.

116. There has been a recent "uptick in free-world weapons coming in". (Doc. 422-073 at 225:19-226:8.)

**DEFENDANTS' RESPONSE**: Disputed. ADOC is "doing a lot of things about contraband in the prisons…we're continuously working on contraband, whether it's weapons, cell phones, drugs. We spend an exorbitant amount of overtime on LESD and K-9 of searching these places, getting the contraband. We have K-9 that searches, you know, vehicles coming in the parking lot. They search people going in the front gate. They monitor the perimeter fence. We have our OWL cameras. I mean, we have all these host of things that we're doing." (Id. at 226:12-227:11.)

**2. Defendants' Cell Inspection and Institutional Search Practices Are Ineffective In Limiting the Possession of Contraband in the Facility**

117. Prisoners testified that searches are neither frequent nor thorough:

a. "Each time [officers] shakedown, they don't never get all the contraband". (Doc. 422-077 at 232:20-233:2.)

**DEFENDANTS' RESPONSE:** Removed as outside the scope, Jones was discussing his time in N dorm in 2017.

**3. The Infrequent Institutional Searches Recover Contraband Left by Inmates in Common Areas, Which Defendants Do Not Investigate**

118. Defendants acknowledge that inmates leave contraband in common areas for staff to find during searches, which Defendants then do not investigate to determine the source of the contraband:

a. Defendant Warden Mitchell testified, "[y]ou have a whole lot of people in there, and a lot of people is throwing their stuff out, you know. It was not — not like they were finding it. They probably was throwing it out to keep you from finding something else." (Doc. 422-087 at 426:5-10.)

**4. Defendants Do Not Regularly Search Staff Entering St. Clair**

119. "[C]ontraband could come in several ways through the back gate" without being searched. (Doc. 422-088 at 69:15-22.)

**DEFENDANTS' RESPONSE**: While the ADOC Officials do not dispute the proposition that contraband can be introduced through the back gate in several ways, Plaintiffs' total proposition is disputed as misleading. Plaintiffs' use of a small portion of quoted testimony from former Warden Noe and adding "without being searched" to the end creates a misleading and unfair purported fact. The full exchange from Former Warden Noe is as follows:

> Q: Now, I've seen some indications that contraband may sometimes enter through the back gate. What -- what types of deliveries or entries generally occur through the back gate at St. Clair?
>
> A: So contraband could come in several ways through the back gate. It's not – it's not being searched. It's manned – it's manned with either an officer or a supervisor when that back gate is open. Inmates can bring it in in their body cavity. They can conceal it in their property. It comes in on vending trucks, in cans, in beans, in -- in stuff that -- that is searched, but you really have to get in and search it to find that. It comes in in cement. It comes in in stuff that -- that's hid very well.

(Doc. 422-088 at 69:15- 70:10.) The other testimony in the exchange ("[the back gate] is manned" and "you really have to get in and search it to find it") demonstrate the misleading nature of this proposition that the back gate is not being searched. Further, Warden Noe provided voluminous testimony about contraband interdiction, for example:

> We've actually reduced a lot of the contraband coming over, but we still have contraband coming into the facility. We -- we talk about means to -- to stop it, to slow it down. We prosecute. We arrest. We put in camera systems that detect. We put in procedures where we search staff. We have an outside agency, outside -- I don't want to say agency. They're with the Department of Corrections, but not -- not -- not St. Clair staff, that -- they use K-9 interdictions, that provide extra security around the perimeter during times

(Id. at 48:3-17).

> They come in at night, throw it over in different places. We've seen a lot of drone activity lately. Now we're starting to detect a little bit of drone activity lately. We – we've seen staff bring it in on occasions. We do probably a better job searching staff than -- than any facility in the state.

> We do run our lobbies. We do come in in the, you know, odd hours of the night and checking people coming in and out. We do monitor cameras.

(Id. at 49:16-50:5; see also id. at 74:12-75:4 (testimony regarding Warden Noe's directive to do a better job searching the front and back entrances); id. at 53:20-63:4 (testimony regarding staff dismissals, security checks, fence checks, and the OWL system; id. at 68:7-69:4 (testimony regarding mail interdiction efforts)).

**5. Defendants Do Not Have a Practice of Investigating Incidents to Recover Weapons Used in Assaults.**

120. There is no practice at St. Clair to recover weapons used in assaults. (See Doc. 422-103 ¶¶ 168-169.)

**DEFENDANTS' RESPONSE:** Opinion and argument.

121. The state of supervision at St. Clair frequently enables inmates to hide weapons used in assaults. (See, e.g., Doc. 422-150.)

**DEFENDANTS' RESPONSE**: Opinion and argument.

122. There is also no practice at St. Clair to search for drugs following an inmate's overdose. (See Doc. 422-103 ¶ 170.)

**DEFENDANTS' RESPONSE**: Opinion and argument.

**6. Contraband Increases the Risk of Harm Inmates Face at St. Clair**

123. Assaults at St. Clair frequently involve very serious injuries as a result of the weapons commonly used in inmate-on-inmate assaults. (See Doc. 422-103 ¶ 160.)

**DEFENDANTS' RESPONSE**: Opinion and argument.

124. Former Deputy Commissioner Daniels understood that "[w]eapons in any correctional environment increase the risk of death, which is why obviously they are prohibited" and that "of course there is a correlation between weapons and violence". (Doc. 422-057 at 29:11-17, 83:14-15.)

**DEFENDANTS' RESPONSE:** Disputed as to format.

**7. Overdoses and Overdose Deaths are Common at St. Clair**

125. At least nine prisoners at St. Clair died of drug overdoses during 2022 and 2023. (See Doc. 422-103 ¶ 165 (citing hospital records).)

**DEFENDANTS' RESPONSE:** Expert opinion and argument.

126. Lt. [redacted] testified that Drug overdoses occur "[p]retty much" daily at St. Clair. (Doc. 422-090 at 135:1-17; *see also* Doc. 422-381; Doc. 422-382; Doc. 422-391; Doc. 422-392.))

**DEFENDANTS' RESPONSE**: When asked "how often" drug overdoses occur at St. Clair, Lieutenant [redacted] responded "[p]retty often." When asked, "Daily?", he responded, "Yeah. Pretty much, yeah." Lieutenant [redacted] was not asked, and did not state, what he considers an "overdose." He testified that "[s]ome" overdoses are fatal, but the testimony does not establish that overdoses requiring medical attention occur daily at St. Clair. (Id. at 135:9-10).

127. Plaintiff Mark Duke sees inmates high on drugs "[m]aybe once every three days or so". (Doc. 422-061 at 122:9-17.)

**DEFENDANTS' RESPONSE:** Disputed as not a fact as it is "maybe."

**H. Defendants Have a Practice of Conducting Severely Inadequate Investigations of Physical and Sexual Assaults**

128. Inadequate investigations at St. Clair perpetuates the risk of violence, sexual assault and excessive use of force as (i) perpetrators are not held accountable and (ii) systemic failures in the facilities, personnel issues and security procedures that contribute to the incidents are not identified and investigated. (See Doc. 422-103 §§ VI.F, XI.B; Doc. 422-102 § VII.7.)

**DEFENDANTS' RESPONSE:** Argument.

1. **Defendants Have a Practice of Encouraging Victims to Sign Prosecution Waivers in Order To Prematurely End LESD Investigations**

2. **After Victims Sign Prosecution Waivers, Defendants Have a Practice of Declining To Conduct Administrative Investigations**

129. Defendants' use prosecution waivers to resolve incidents of prisoner-on-prisoner sexual violence. (Doc. 422-102 at 73.)

**DEFENDANTS' RESPONSE:** Plaintiffs diminish the role of inmates in signing prosecution waivers.

130. A majority of LESD investigations into incidents of violence are deemed "unsubstantiated" and closed without adequate investigation. (Doc. 422-103 ¶ 95.)

**DEFENDANTS' RESPONSE**: Expert opinion.

131. Investigatory closures are typically based solely on the victim's decision not to press criminal charges—a decision that the victim often makes quickly and without sufficient information. (Id.) For example:

a. For additional examples, see Doc. 422-103 ¶ 95. (See also Doc. 422-222; Doc. 422-215; Doc. 422-143; Doc. 422-218; Doc. 422-210; Doc. 422-212.)

**DEFENDANTS' RESPONSE**: Not a factual statement.

132. Defendants conduct no further investigation of alleged violence—administrative or otherwise—once a victim declines to press criminal charges. (See Doc. 422-102 at 75-77.) On December 7, 2022, former ADOC Inspector General Mark Fassl issued guidance to conduct administrative investigations of "all PREA-type incidents" using the preponderance standard and to refer substantiated cases to

LESD for criminal investigation. (Doc. 422-250.) By mid-2023, this policy reverted to exclusive use of criminal investigations by LESD for all sexual assault allegations. (See Doc. 422-069 at 292:18-293:11.)

**DEFENDANTS' RESPONSE:** Disputed that the policy "reverted to exclusive use of criminal investigations by LESD for all sexual assault allegation." Under the "December 2022" procedure, Special Investigator IPCMs were involved in criminal investigations because they interviewed the alleged perpetrators. (Doc. 422-69, 16 (58:8-13). St. Clair IPCM [redacted] testified that ADOC instituted the "mid-2023" change "due to Miranda issues," so under the new procedure, the Special Investigator IPCM no longer interviews perpetrators; instead, LESD investigators perform that function. (Id., 74 (292:22-293:11)). However, under this policy, the Special Investigator IPCM still performs "administrative investigations." (Id.). During the course of these investigations, the Special Investigator IPCM interviews the alleged victim and any witnesses and reviews any video footage of the incident. (Id., 70-71 (274:19-278:5); 15-16 (57:22-58:7)).

133. Because Defendants do not complete administrative investigations, there is no discipline or corrective action to track potential perpetrators of future violence and sexual abuse in the overwhelming majority of cases. (See Doc. 422-102 at 78-79.)

**DEFENDANTS' RESPONSE:** Expert opinion.

a. Perpetrators of sexual assault are moved back into general population, without discipline or reclassification, and can abuse again without consequence. (See id. at 78.)

**DEFENDANTS' RESPONSE**: Expert opinion.

**3. Defendants Have a Practice of Inadequately Responding To the Conditions that Lead To Incidents of Violence and Sexual Violence (e.g., Contraband)**

#### 4. Investigators Close Cases Without Testing Forensic Evidence or Properly Evaluating Physical Evidence

134. Although LESD collects the physical evidence, if a victim signs a prosecution waiver, LESD has a practice of not testing the rape kit to substantiate sexual assault allegations or identify the perpetrator. (See, e.g., Doc. 422-102 at 77; Doc. 422-232 (LESD notifying ADFS not to test a sexual assault kit after victim signed a prosecution waiver); Doc. 422-082 at 209:22-210:8.) For example:

a. For additional examples, see Doc. 422-102 at 77-78. (*See also* Docs. 422-131, 422-206, 422-167, 422-235, 422-270, 422-091 at 128:14-132:1.)

**DEFENDANTS' RESPONSE**: Not a factual statement.

#### 5. Defendants Have a Practice of Failing To Timely and Adequately Identify and Investigate Incidents Involving the Use of Force

135. Defendants do not adequately identify incidents involving the use of force against prisoners or appropriately investigate such incidents when brought to their attention. (See Doc. 422-103 ¶ 229.)

136. Officers regularly do not document their own use of force against inmates, even though required to do so by ADOC written policy (AR 327). (See Doc. 422-011 at 4.)

**DEFENDANTS' RESPONSE:** Argument

a. For hundreds of incidents involving officer use of force, the "Use of Force Investigative Report" is a near copy-and-paste of the incident report, followed by a copy-and-paste determination that the use of force was justified: "This use of force was justified and the appropriate level of force." (Doc. 422-103 ¶ 232; see also Docs. 422-200, 422-199.)

**DEFENDANTS' RESPONSE:** Argument and expert opinion.

## PLAINTIFFS' ADDITIONAL DISPUTED FACTS

1. Defendants have failed to improve staffing levels at St. Clair, as staffing levels have declined over the last several years. (Doc. 422-103 at 55 and fig. 9) As of September 30, 2023, St. Clair's correctional staff vacancy rate was 59.8%. (Doc. 422-042.)

**DEFENDANTS' RESPONSE:** The Quarterly Correctional Staffing Report for the quarter ending September 30, 2023 from the Braggs Action reports a vacancy rate, for the quarter, at 59.8%. (Doc. 422-42). The ADOC Officials disagree they "failed to improve staffing levels at St. Clair," and Named Plaintiffs' own evidentiary submission failed to support this contention. For example, the number of correctional staff and correctional supervisors increased from 121 for the period ending March 31, 2020 to 142.5 for the period ending September 30, 2020. (Doc. 422-358, 2; Doc. 422-359, 3). The number of correctional staff increased again from 142.5 for the period ending September 30, 2020 to 152.5 for the period ending December 31, 2020. (Doc. 422-359, 3; Doc. 422-360, 3). These numbers again increased from 2020 to 2021 from 152.5 for the period ending December 31, 2020 to 155 for the period ending March 31, 2021. (Doc. 422-360, 3; Doc. 422-361, 3).

2. From November 2020 through November 2023, only three officers at St. Clair received disciplinaries for excessive use of force. (Doc. 459-024; Doc. 459-060.)

**DEFENDANTS' RESPONSE:** The ADOC Officials deny Named Plaintiffs' contention that "only three officers at St. Clair received disciplinaries for excessive use of force." Named Plaintiffs' own evidentiary submission disproves this claim. Named Plaintiffs' exhibits 425 and 461 represent a St. Clair staff disciplinary spreadsheet. Second, Named Plaintiffs failed to demonstrate the spreadsheets represent every disciplinary provided for at St. Clair or whether the spreadsheet only shows disciplinaries for staff employed at St. Clair as of a certain date (such as the date of production). Third, Named Plaintiffs' exhibit 425

lists at least twenty (20) staff members who received an infraction of "#27" which represents an infraction for "[a]busive or excessive physical force in dealing with inmates." (Doc. 459-24). Named Plaintiffs' exhibit 461 lists at least seventeen (17) staff members who received an infraction of "#27." (Doc. 459-60; Doc. 422-4, 34).

3. St. Clair's correctional staff vacancy rate has steadily increased each year since 2014 for which data is available. (*See* Doc. 422-103 at 55 & fig.9.) (Doc. 422-042.)

**DEFENDANTS' RESPONSE:** The ADOC Officials deny paragraph 44 of Named Plaintiffs' Additional Undisputed Facts. Named Plaintiffs relied on their Advocate Martin's report to support the claim that St. Clair's "staff vacancy rate has steadily increased each year since 2014." However, Martin's data remains facially flawed. For example, Figure 9 of Martin's report contains a gap from 2018 to 2019 for which Martin failed to identify St. Clair's alleged vacancy rate. (Doc. 422-103, 58, fig. 9). The ADOC Officials agree that the vacancy rate at St. Clair fluctuates, as is normal in any job setting. (See Doc. 423-68, 51 (201:1-21)). However, St. Clair's vacancy rate experienced drops as well. For example, St. Clair's vacancy rate dropped in the third quarter of 2023. (Doc. 411-367; Doc. 422-42) (showing St. Clair's vacancy rate dropping from 61.8% to 59.8%).

4. Defendants publish monthly and quarterly statistical reports on the ADOC website that include statistics on inmate-on-inmate violence. Doc. 422-86 at 12:6-9; Doc. 422-103 at 45; *see also* Doc. 422-370 at 161:6-9, 231:7-20 (Deputy Commissioner for Special Services [redacted] testified that "[l]ooking at statistics give you numbers of increases, decreases, where you may need to focus on one place more than others based on the incidents that you've had. So those operations -- operational plans would be used to also monitor the statistics of contraband being collected, any type of violence, et cetera").)

**DEFENDANTS' RESPONSE:** The ADOC Officials agree the ADOC publishes monthly statistical reports on its website, documents which speak for

themselves. (Doc. 422-85). The ADOC Officials also agree the ADOC publishes quarterly statistical reports, documents which speak for themselves. (Doc. 459-138, Doc. 459-139). The ADOC Officials deny that Deputy Commissioner [redacted] quoted testimony related to either the ADOC's monthly or quarterly statistical reports. (Doc. 422-370, 59 (231:7-20)). Deputy Commissioner [redacted] provided the quoted testimony in response to counsel's question, "Why do you look at the statistics that are collected? Either why would you through this [forthcoming] digital system and why now do you look at the statistics?" (Id.).

5. Defendants are notified of incidents of assault and sexual assault at St. Clair soon after they occur. (Doc. 422-88 at 138:21-139:1 (former Warden Noe testifying that "[w]hen you have a Class A or B incident, you got to send out a 302C [duty officer report] within -- within four hours of that incident"); Doc. 422-96 at 75:10-22 (Dr. Williams testified that when a Class A incident occurs, she receives both the automatic Duty Officer Report and a call-out email from LESD); Doc. 422-63 at 65:11-19 (Regional Director Edward Ellington testified that he was notified of Class A and Class B incidents).)

**DEFENDANTS' RESPONSE:** The ADOC Officials deny that each named defendant in this action is "notified of incidents of assault and sexual assault at St. Clair." The ADOC Officials agree that some executive level staff and some St. Clair officials receive, via e-mail, notifications of Class A and B incidents as supported by the evidence cited by Named Plaintiffs. However, Named Plaintiffs failed to demonstrate certain named defendants, like Abbott, receive those same notifications. The ADOC Officials deny that Abbott, for example, receives notifications of Class A or B incidents.

6. Ms. O'Connor testified that she relied on incorrect representations from then-IPCM Lieutenant [redacted] in making her audit findings. (Doc. 422-356 at 95:23-94:3 ("Q. So now that we have seen three representations from Lieutenant Gordy, each of which turned out to be untrue, does that trouble you in terms of your PREA audit report? A. Yes, it does.").) Ms. O'Connor further testified that during

the 12 months before her audit in 2021, "there were gaping holes in PREA investigations, the whole PREA process. The IPCM did not do what she was supposed to do. And I was pretty stunned." (*Id*. at 50:22-51:1.) Ms. O'Connor also testified, when asked whether she had formed a view as to whether St. Clair's staffing problems affected sexual safety, that she "had the feeling that -- that in 2020 that they were a hot mess and that there were some problems, some significant." (*Id*. at 104:308.) In addition, Ms. O'Connor testified that St. Clair's records of PREA education information and reassessment was "very disturbing" and that St. Clair's PREA compliance in 2020 was "abysmal". (*Id*. at 99:15-21 and 105:5-10.) (Doc. 422-042.)

**DEFENDANTS' RESPONSE:** The allegations in paragraph 41 ignored contrary record evidence and, thus, lack both materiality and relevance for purposes of summary judgment. Specifically, St. Clair ultimately passed its PREA audit in 2021. (ADOC Officials' SOF, ¶ 428–29). The 2021 PREA audit initially found that St. Clair met 43 of 45 PREA standards; St. Clair successfully completed corrective action on the *two (2)* unmet standards. (Id. at ¶ 429).

7. Defendants' PREA expert testified that she knew that the PREA auditor who conducted St. Clair's PREA audit in 2021 later became aware of information about the sexual safety practices at St. Clair that would have troubled the auditor in terms of her audit report. (Doc. 422-292 at 299:8-15.)

**DEFENDANTS' RESPONSE:** The allegations in paragraph 44 lack both relevance and materiality for purposes of summary judgment. The ADOC Officials' Expert Lane ultimately concluded, despite Named Plaintiffs' gripes with the particulars of her testimony, that the ADOC Officials and St. Clair staff adequately and appropriately enforce measures to prevent sexual violence at St. Clair; that they provide a variety of methods for inmates to report allegations of sexual abuse; that they respond appropriately to allegations of sexual abuse; and that they fully investigate and provide corrective action for allegations of sexual abuse. (ADOC Officials' SOF, ¶¶ 440–444).

8. A PREA audit is a "snapshot in time, once every three years" and is not the sole measure of sexual safety at a facility because compliance can be achieved through "forwarding the paperwork". (Doc. 422-102 at 11, 14-19, 83.) Defendants' PREA expert testified that a PREA audit does not necessarily assess whether a facility is in fact sexually safe. (*See* Doc. 422-292 at 277:7-16 ("But getting ready for a PREA audit, that's a lot of work. That's a lot of documentation. That's documentation that's been over years and months. There are certain things that you just cannot make up. Are -- can I walk in and things look pretty and then fall apart the next day? Perhaps. I don't think that's anybody's intention"); 288:20-289:5 ("Q. So it's possible that through pencil-whipping, you could satisfy on a technical level a PREA standard; right? A. You can do anything, but I can tell you something. At the end of the day, it's that leadership's responsibility to make sure things are in place and that they are viable and they're working"); 320:10-21 ("Q. Well, what I mean is, isn't it true that a facility can receive a passing score in their PREA audit even when there are these problems that go on? A. That is true. However, I will say that if an allegation is not made, how are we to know? If it's not -- Q. And we talked about that before; right? A. Right. If it's not reported. If it's reported and it's ignored, shame on whoever is doing that").)

**DEFENDANTS' RESPONSE:** The allegations in paragraph 45 are not "facts" and instead consist only of argumentation by Named Plaintiffs as to the significance of PREA audits. Indeed, Named Plaintiffs cited only the report of their Advocate Bonner (Doc. 422-102) and the deposition testimony of the ADOC Officials' expert Lane (Doc. 422-292) in support of this argument. The Court should simply disregard the argument that a PREA audit "is a 'snapshot in time, once every three years' and is not the sole measure of sexual safety at a facility" because Named Plaintiffs simply seek to diminish St. Clair's passing PREA audit result in 2021. (ADOC Officials' SOF, ¶ 429).

Dated: July 22, 2025

/s/ *Charlotte Morrison*
Charlotte R. Morrison
Equal Justice Initiative
122 Commerce Street
Montgomery, Alabama 36104
Telephone: (334) 269-1803
Facsimile: (334) 269-1806
cmorrison@eji.org

/s/ *Antony Ryan*
Antony L. Ryan (*pro hac vice*)
Lauren M. Rosenberg (*pro hac vice*)
Helam Gebremariam (*pro hac vice*)
Cravath, Swaine & Moore LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
aryan@cravath.com
lrosenberg@cravath.com
hgebremariam@cravath.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document is being served by electronic mail to the designated counsel of record in the above-captioned action on this 22nd day of July, 2025.

By: /s/ Lauren M. Rosenberg

Lauren M. Rosenberg
Cravath, Swaine & Moore LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700