FILED
2025 Sep-02 PM 11:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| | * | |
| MARK DUKE, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| vs. | * | |
| | * | Civil Action No: 4:14-cv-01952-RDP |
| | * | |
| JOHN HAMM, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

**<u>MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

PRELIMINARY STATEMENT ........ 1

FACTS ........ 3

I. St. Clair Is Among the Most Dangerous Prisons in the Nation. ........ 3

II. Defendants' Practices Facilitate St. Clair's Dangerous Conditions ........ 6

- A. Ignoring Unauthorized Movement ........ 6
- B. Ignoring Broken Security Devices ........ 7
- C. Assigning Housing Without Considering Relevant Information ........ 8
- D. Carrying Out Insufficient Inspections and Searches ........ 9
- E. Providing Inadequate Training on Use of Force ........ 10
- F. Conducting Inadequate Investigations ........ 10

III. Defendants Refuse to Take Simple and Immediate Steps to Improve St. Clair's Conditions. ........ 12

IV. Procedural History ........ 14

LEGAL STANDARD ........ 15

APPLICABLE LAW ........ 16

ARGUMENT ........ 20

I. Substantial Evidence Supports Plaintiffs' Claims Regarding Inmate-on-Inmate Violence and Sexual Assault. ........ 21

- A. Plaintiffs Are Exposed to a Substantial Risk of Serious Harm from Inmate-on-Inmate Violence and Sexual Assault. ........ 22
- B. Defendants Are Deliberately Indifferent to the Substantial Risk of Serious Harm They Cause Plaintiffs to Face. ........ 24
- C. Plaintiffs' Claims Do Not Depend on Understaffing. ........ 29

II. Substantial Evidence Supports Plaintiffs' Claim Regarding Excessive Force. ........ 32

- A. Each Plaintiff Has Standing to Assert the Claim for Risk of Excessive Force. ........ 32
- B. Plaintiffs Are Exposed to a Substantial Risk of Being Subjected to Excessive Force. ........ 34
- C. Defendants Are Deliberately Indifferent to the Substantial Risk of Serious Harm They Cause Plaintiffs to Face. ........ 36

III. Defendants' Class Certification Argument Is Both Irrelevant to Summary Judgment and Wrong on the Law. ........ 38

IV. The *Braggs* Action Does Not Preclude Any Relief in This Case, As This Court Has Already Held....41

CONCLUSION....43

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Dairy Farmers of Am., Inc.*,
No. 09-cv-230, 2012 WL 5844871 (D. Vt. Nov. 19, 2012)........................................40

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................................32

*Ball v. Brown*,
No. 2:16-CV-01425, 2019 WL 5727438, at *9 (N.D. Ala. Nov. 5, 2019) ..................42

*Bonner v. Chambers Cnty.*,
No. 04-CV-01229, 2006 WL 1731135 (M.D. Ala. June 19, 2006)............................34

*Bugge v. Roberts*,
430 F. App'x 753 (11th Cir. 2011) .....................................................18, 25

*Caldwell v. Warden, FCI Talladega*,
748 F.3d 1090 (11th Cir. 2014) ...............................................18, 25, 38

*Calloway v. Partners Nat. Health Plans*,
986 F.2d 446 (11th Cir. 1993) ..........................................................................39

*Clark v. Duke Univ.*,
No. 16-CV-1044, 2018 WL 1801946 (M.D.N.C. Apr. 13, 2018) ..............................40

*Coopers & Lybrand v. Livesay*,
437 U.S. 463 (1978)........................................................................................38

*Cox v. Adm'r U.S. Steel & Carnegie*,
17 F.3d 1386 (11th Cir. 1994) ..........................................................................38

*Edward Braggs, et al. v. Jefferson Dunn, et al.*,
No. 2:14-cv-00601 (N.D. Ala.)..........................................................................41

*Elisa W. v. City of New York*,
82 F.4th 115 (2d Cir. 2023) ....................................................................33, 39

*Farmer v. Brennan*,
511 U.S. 825 (1994).......................................................................18, 20, 31, 34

*Gates v. Cook*,
376 F.3d 323, 333 (5th Cir. 2004) ....................................................................17

*Green v. Cady*,
90 F.R.D. 622 (E.D. Wis. 1981) ....................40

*Guifu Li v. A Perfect Franchise, Inc.*,
No. 10-CV-01189, 2011 WL 4635198 (N.D. Cal. Oct. 5, 2011) ....................41

*Hale v. Tallapoosa Cnty.*,
50 F.3d 1579 (11th Cir. 1995) .................... passim

*Harris v. Georgia Dep't of Corr.*,
No. 18-cv-00365, 2021 WL 6197108 (M.D. Ga. Dec. 29, 2021)....................39

*Harrison v. Culliver*,
746 F.3d 1288 (11th Cir. 2014) ....................17, 36

*Haves v. City of Miami*,
52 F.3d 918 (11th Cir. 1995) ....................16, 28

*J W ex rel. Williams v. Birmingham Board of Education*,
904 F.3d 1248 (11th Cir. 2018) ....................32, 33

*Kennedy v. Floridian Hotel, Inc.*,
998 F.3d 1221 (11th Cir. 2021) ....................32, 33

*LaMarca v. Turner*,
995 F.2d 1526 (11th Cir. 1993) .................... passim

*Lane v. Philbin*,
835 F.3d 1302 (11th Cir. 2016) ....................16, 17, 18, 21

*Langley v. Coughlin*,
715 F. Supp. 522 (S.D.N.Y. 1989) ....................40

*Marsh v. Butler County, Alabama*,
268 F.3d 1014 (11th Cir. 2001) ....................17, 22

*McKennon v. Nashville Banner Pub. Co.*,
513 U.S. 352 (1995)....................39

*McNeil v. Guthrie*,
945 F.2d 1163 (10th Cir. 1991) ....................42

*Nelson v. Tompkins*,
89 F.4th 1289 (11th Cir. 2024) ....................18, 24

*Norris-Wilson v. Delta-T Grp.*,
270 F.R.D. 596 (S.D. Cal. 2010) ....................41

*Odom v. Se. Supply Header, LLC*,
675 F. Supp. 2d 1105 (S.D. Ala. 2009)....................39

*Ogletree v. Colbert Cnty.*,
No. 18-cv-01218, 2021 WL 4477630 (N.D. Ala. Sept. 20, 2021)....................16, 28, 32

*Oliver v. Price*,
No. 14-CV-2187, 2017 WL 1628550, at *12 (N.D. Ala. May 2, 2017) ....................17

*Rasho v. Jeffreys*,
22 F.4th 703 (7th Cir. 2022) ....................31

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)....................16

*Samples ex rel. Samples v. City of Atlanta*,
846 F.2d 1328 (11th Cir. 1988) ....................16

*Swain v. Junior*,
961 F.3d 1276 (11th Cir. 2020) ....................31

*Tafoya v. Salazar*,
516 F.3d 912 (10th Cir. 2008) .................... passim

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021)....................34

*United States v. Alabama*,
No. 2:20-CV-01971, 2021 WL 4711841 (N.D. Ala. Oct. 8, 2021)....................41, 42

*Wade v. McDade*,
106 F.4th 1251, 1255 (11th Cir. 2024) (en banc) .................... passim

*Weaver v. Pool*,
32 So. 2d 765 (Ala. 1947)....................40

**Statutes & Rules**

Fed. R. Civ. P. 23....................39

Fed. R. Civ. P. 56(a) ....................15

**Other Authorities**

U.S. Const. amend. VIII.................... passim

Mark Duke, Nathaniel Harris, Benny Jones and Johnny Young (collectively, "Plaintiffs") respectfully submit this Memorandum of Law in opposition to Defendants' motion for summary judgment.

## PRELIMINARY STATEMENT

Prisoners at the St. Clair Correctional Facility ("St. Clair") live in constant and imminent danger of getting stabbed, raped, kidnapped and beaten, while the people entrusted with their safety fail to take basic steps to prevent these things from happening. On the contrary, Alabama Department of Corrections ("ADOC") and St. Clair officials maintain numerous practices—often in contravention of written policies—that allow these risks to persist and, ultimately, to manifest in violence across the prison. It is further clear from the discovery obtained in this case that Defendants have long been aware of the conditions at St. Clair, yet continue to look the other way. Not only do Defendants choose to ignore mandatory ADOC regulations and facility policies that were adopted specifically to keep prisoners safe, but they also refuse to take known, low-cost steps to address the dangers right in front of their faces. This culture of deliberate indifference to the prisoners' safety has made St. Clair one of the most dangerous correctional facilities in the nation, with a toleration of violence quite unlike most state maximum-security prisons. Plaintiffs instituted this action to force Defendants to follow the law in service of keeping St. Clair's inmates safe—nothing more.

Defendants' motion for summary judgment attempts to blame all of the problems at St. Clair on its low staffing levels, because staffing is the one area Defendants have worked on. If that excuse is accepted, it would allow Defendants to avoid all fault for the prison's intolerable conditions by relieving them of any responsibility to improve those conditions beyond posting a "For Hire" sign. But Defendants' argument fails for at least three reasons: ***First***, as Defendants concede, maximum-security correctional facilities across the country

currently face the same or worse staffing issues as St. Clair; however, those other prisons have been able to protect their inmates much more successfully than St. Clair. ***Second***, the root cause of the unsafe conditions at St. Clair is the inadequate and dangerous practices its officials employ, not staffing shortages; therefore, increasing staffing levels without remediating those harmful practices will not sufficiently improve the inmates' safety. ***Third***, as former ADOC Deputy Commissioner of Operations Charles Daniels aptly described ADOC's obligations: "You go to war with the army you have, not the army you might want or wish to have at a later time." For years now, St. Clair has been understaffed, yet Defendants refuse to adjust to realities on the ground and adopt practices that will improve safety even at low staffing levels. Defendants may not simply wait for a solution in the form of higher staffing that has not yet—and may never—come while the people in their custody remain at serious risk of life-threatening harm.

In any event, whether ADOC's unsuccessful attempts to hire additional staff satisfy constitutional requirements is a disputed issue of fact. And because Defendants were aware of reasonable alternative measures to improve the prison's dangerous conditions but deliberately refused to implement them, those officials may be found deliberately indifferent to the serious risks to prisoner safety *despite* the staffing efforts they may have taken. At the very least, these issues should be evaluated with the benefit of a full trial, especially given the need to determine each Defendant's knowledge and state of mind under the Eighth Amendment standard.

Defendants' remaining arguments fare no better: As an initial matter, each Named Plaintiff has standing to assert the excessive force claim because they have each suffered a concrete and particularized injury—*i.e.*, the ongoing risk of being subjected to inappropriate

force as a result of St. Clair's insufficient training, violent correctional practices and inadequate investigations. Courts across the nation, including in the Eleventh Circuit, have endorsed "risk of harm" as a basis for standing for injunctive relief in civil-rights cases.

Next, the possibility that some prisoners contribute to the violence at St. Clair does nothing to undermine Plaintiffs' claims because Defendants' harmful practices are a proximate cause of the prison's dangerous conditions. Indeed, those prisoners' ability to take advantage of St. Clair's inadequate security is a directly foreseeable consequence of Defendants' deliberate indifference. St. Clair is a maximum-security prison, and Defendants should (and do) expect some prisoners to be unable to conform their conduct. Moreover, Defendants' argument is better understood as challenging the appropriateness of class treatment in this case, which is not germane to the summary judgment inquiry.

Finally, as this Court has already held, the existence of the *Braggs* action does not preclude Plaintiffs from seeking relief related to staffing. The issue in *Braggs* is specifically limited to mental health treatment in ADOC facilities, which this lawsuit does not address. The remedies applicable to both cases can therefore exist together without conflict.

For the foregoing reasons, and as further demonstrated below, the Court should deny Defendants' motion for summary judgment.

## FACTS

### I. ST. CLAIR IS AMONG THE MOST DANGEROUS PRISONS IN THE NATION.

Prisoners at St. Clair are violently assaulted on a regular basis. The physical assault rate at St. Clair is substantially higher than the national average for state maximum-security prisons. (Pls.' SOF ¶ 28 (7.8 assaults per 100 prisoners at St. Clair in 2023 compared to 4.1 assaults per 100 prisoners across the nation).) Moreover, this only accounts for the violent incidents that the correctional staff correctly codes in incident reports as "inmate-on-inmate

assaults"; a significant number of violent incidents are either miscoded—and therefore are not captured by the statistics—or go unreported entirely. (Joint SOF ¶¶ 143, 151; Pls.' SOF ¶ 26.) Due to the pervasiveness of contraband at St. Clair, these assaults often involve weapons such as knives and ice picks, and frequently result in serious injury or death. (Pls.' SOF ¶¶ 30-33; Joint SOF ¶¶ 147, 149, 151.) In 2021, more than one-quarter of assaults at St. Clair were so severe the victim could not be treated at the infirmary and had to be transported to an outside hospital, and in 2023, the prisoner-on-prisoner homicide rate at St. Clair was over double the national average for state prisons. (Pls.' SOF ¶¶ 30, 32.)

The weapons circulating at St. Clair are both prisoner-made and "free world" (*i.e.*, smuggled in from outside the facility), and ADOC Commissioner John Hamm testified in December 2023 that there has been a recent "uptick in free-world weapons coming in" to St. Clair. (Pls.' SOF ¶ 116.) Warden III Phillip Mitchell similarly testified that finding approximately 100 weapons during an institutional search at St. Clair was "nothing" out of the ordinary (Joint SOF ¶ 239) and Warden II Darrel Fox called that "a low number" because he believes that a staggering "fifty percent" of the prisoners at St. Clair have a weapon (Joint SOF ¶ 240). During the third quarter of 2023 alone, 65 knives and 122 other weapons were confiscated. (Joint SOF ¶ 237.)

Sexual abuse is also commonplace at St. Clair. Just based on the incidents that are actually reported—Defendants' own expert testified that male prisoners "tend to cover up the fact that they were sexually assaulted" (Doc. 422-292 at 363:11-18)—the data show that sexual assaults occur in every cell block and common area across the prison. (Pls.' SOF ¶¶ 35-36, 47-48.) St. Clair's Institutional PREA Compliance Manager Kevin Gillilan testified to personally knowing about approximately 20 sexual assaults occurring at the facility in the 10 months

preceding his deposition. (Pls.' SOF ¶ 50(b).) Moreover, prisoners are routinely sexually assaulted at knifepoint (Joint SOF ¶ 163) or by multiple assailants acting in concert (Joint SOF ¶¶ 159, 161, 163, 167), and often in connection with owing the perpetrator some sort of debt (Joint SOF ¶ 165). On one occasion in 2023, a prisoner reported being tied up and raped by multiple prisoners in different cells multiple times. (Joint SOF ¶ 159(b).) On another occasion in 2023, a prisoner reported that he was held against his will and repeatedly beaten, sexually assaulted and burned with cigarettes for over two weeks. (Joint SOF ¶ 159(a).) Prisoners deposed in this case have testified to being in constant fear of sexual violence at St. Clair. (Joint SOF ¶ 170 [redacted].) And as reflected in the notes of St. Clair's PREA auditor, Darla O'Connor, one prisoner expressed that "[t]hey are not separating predators and victims", while another prisoner said he does not "feel safe here – sexually or physically". (Joint SOF ¶ 172.)

The widespread presence of illegal drugs at St. Clair further increases the risk of both physical and sexual violence, as well as the frequency of deadly overdoses. [redacted] (Joint SOF ¶ 229.) During the third quarter of 2023 alone, more than 2,100 grams of illegal drugs were discovered. (Pls.' SOF ¶ 115.) According to Lieutenant Antoine Price, drug overdoses occur daily at St. Clair (Pls.' SOF ¶ 126), [redacted] (Pls.' SOF ¶ 125). These figures represent only a small fraction of the drug activity occurring at the prison, given that Defendants have not undertaken a full

institutional sweep of St. Clair since [redacted] (Joint SOF ¶¶ 231, 235-236) and the searches that actually are conducted are neither frequent nor thorough (Joint SOF ¶¶ 242-244).

In addition to prisoner-on-prisoner violence, St. Clair officials regularly use unnecessary and/or excessive force when dealing with prisoners. Groups of officers will often team up against a single prisoner, and officers frequently attack prisoners who are already handcuffed or otherwise restrained. (Joint SOF ¶¶ 628, 633; Pls.' SOF ¶¶ 53-56.) It is also common for officers to use a burn-inducing chemical spray against prisoners who do not pose a threat of violence, sometimes deploying the chemical indiscriminately at large groups of prisoners. (Joint SOF ¶ 630; Pls.' SOF ¶ 55.) Multiple St. Clair personnel testified to using force against prisoners, for example, on an inmate who "didn't do anything to justify using the force" or when an inmate is "not follow[ing] a verbal command". (Joint SOF ¶¶ 549(a), 550(b); Pls.' SOF ¶¶ 54, 98.) Many times these incidents result in severe injuries to the prisoners, requiring treatment in the prison infirmary or even at outside hospitals. (Joint SOF ¶ 642; Pls.' SOF ¶ 98.)

## II. DEFENDANTS' PRACTICES FACILITATE ST. CLAIR'S DANGEROUS CONDITIONS.

Although St. Clair has numerous written policies to prevent and address these dangerous conditions, prison staff ignore those rules and actively engage in practices that facilitate St. Clair's violent atmosphere.

### A. Ignoring Unauthorized Movement

St. Clair Standard Operating Procedure ("SOP") 137 [redacted] (Joint SOF ¶ 377.) Nevertheless, Defendants routinely allow prisoners to move throughout the facility in an uncontrolled manner. Numerous St. Clair officers testified that prisoners roam from dormitory

to dormitory (Joint SOF ¶¶ 384-385; Pls.' SOF ¶ 60(a)-(d)) while security staff do nothing to check whether the prisoners are entering areas to which they are not assigned (Joint SOF ¶¶ 386-387; Pls.' SOF ¶¶ 61-62). Further testimony demonstrates that staff [redacted] (Joint SOF ¶¶ 386-387; Pls.' SOF ¶¶ 61-62) and do not pay attention to prisoner movement during high-activity periods such as meal times, work call, pill call and mail call even though multiple dorms are "let out" together during these times (Joint SOF ¶ 387; Pls.' SOF ¶ 62). Defendants also entirely ignore St. Clair's written policy of using colored wristbands to identify which prisoners are out of place (Joint SOF ¶¶ 392-396; Pls.' SOF ¶¶ 63-64), and largely ignore the written policies of conducting regular bed roster counts (Joint SOF ¶¶ 397-402; Pls.' SOF ¶¶ 65-68); and documenting, reporting and disciplining unauthorized movement (Joint SOF ¶ 403; Pls.' SOF ¶ 69). The failure to enforce these rules results in violent incidents between prisoners assigned to different housing units. (Joint SOF ¶ 404; Pls.' SOF ¶ 70.)

**B. Ignoring Broken Security Devices**

St. Clair SOP 182 [redacted] (Joint SOF ¶¶ 260-261.) Nevertheless, testimony from high-ranking officers at St. Clair confirms that these inspections are not conducted daily (Joint SOF ¶¶ 262, 266-267) and that inspection forms are routinely ignored or filled out improperly (Joint SOF ¶ 270; Pls.' SOF ¶¶ 75-76). St. Clair officials and Defendants' experts have also testified [redacted] (Joint SOF ¶¶ 326-328), [redacted] (Joint SOF ¶ 294) and that "half" of the call buttons "don't work" (Joint SOF ¶ 267). Yet even though Defendants are aware of the numerous broken cell door locks

throughout the facility, they have consistently delayed in getting them fixed or replaced (Joint SOF ¶¶ 330, 333, 336-337; Pls.' SOF ¶¶ 79-81) and have refused to retain a company that could provide ongoing lock maintenance (Joint SOF ¶ 337; Pls.' SOF ¶ 79). Testimony also reveals Defendants are aware that many call buttons and cameras are not operational and consistently choose not to repair them. (Joint SOF ¶¶ 294, 359; Pls.' SOF ¶ 86.)

These perennially broken security devices naturally contribute to the high levels of violence at St. Clair. Without functioning locks, staff is unable "to separate inmates when necessary and to control inmate movement when necessary". (Joint SOF ¶ 339; *see also id.* ¶¶ 340-345.) Because cell door locks "defeat[] a controlled movement plan" (Joint SOF ¶ 341), their large-scale state of disrepair at the facility creates a "serious concern for the safety and security at St. Clair" (Joint SOF ¶¶ 338-342). Without functioning cameras, correctional staff are unable to prevent assaults occurring in facility blind spots (Joint SOF ¶¶ 298-299) and are unable to properly investigate violent incidents after they have occurred (Joint SOF ¶¶ 300, 302-309). This has led to multiple, preventable inmate assaults across the prison. (Joint SOF ¶¶ 305-309.) And without functioning call buttons, a prisoner who is "in duress", "had a medical emergency" or otherwise "needs officer attention" will often be unable to get the immediate help he requires. (Joint SOF ¶¶ 361-362.)

### C. Assigning Housing Without Considering Relevant Information

St. Clair SOP 126 requires the Internal Classification Board ("ICB") to review all pertinent classification information prior to making either an initial housing assignment or a change in an existing assignment. (Joint SOF ¶¶ 416-419.) The purpose of this procedure is to identify the particular needs and risks associated with the individual being assigned to ensure that he is placed in an appropriate environment. (Pls.' SOF ¶¶ 105-106.) Nevertheless, in practice, Defendants permit housing assignments without consideration of pertinent classification

information. For example, prisoners are often housed in contravention of their PREA designations (Joint SOF ¶ 420; Pls.' SOF ¶¶ 109-112) and without considering relevant gang-affiliation information (Joint SOF ¶¶ 422-423; Pls.' SOF ¶¶ 113-114). And testimony from the ICB Chairman demonstrates that the ICB has regularly permitted the Inmate Control Systems ("ICS") Officer to make the housing assignments even though he is generally not privy to relevant classification information. (Joint SOF ¶¶ 421, 423; Pls.' SOF ¶¶ 107-111.) As a result of these practices, there have been numerous instances of preventable sexual assaults and gang-related violence. (Pls.' SOF ¶¶ 112, 114.)

**D. Carrying Out Insufficient Inspections and Searches**

[redacted] (Joint SOF ¶¶ 220-224.) [redacted] (Joint SOF ¶¶ 220-224, 226) [redacted] (Joint SOF ¶¶ 220-225). In practice, however, Defendants employ search protocols that are plainly ineffective in limiting the possession of contraband. Multiple St. Clair officers testified that institutional searches are conducted infrequently and in a cursory manner. (Joint SOF ¶¶ 242-244.) Defendants also commonly allow staff to enter the facility without being searched, patted or scanned. (Joint SOF ¶¶ 253-256.) And there are no procedures in place to search for and recover the weapons used in assaults or the drugs connected with overdoses. (Joint SOF ¶ 247; Pls.' SOF ¶¶ 118, 120-122.) As a result of these deficient search practices, the levels of drugs and weapons (free-world and prisoner-made) entering and circulating throughout St. Clair are extraordinarily high (Joint SOF ¶¶ 237-241, 245-246; Pls.' SOF ¶¶ 115-116), leading to

stabbings and overdoses throughout the prison (Joint SOF ¶¶ 173, 175-176, 189; Pls.' SOF ¶¶ 123-126).

### E. Providing Inadequate Training on Use of Force

ADOC Administrative Regulation ("AR") 327 and [redacted] (Joint SOF ¶¶ 635-636.) [redacted] (Joint SOF ¶ 637.) Despite these directives, Defendants fail to adequately train St. Clair personnel on when it is appropriate to use force or in how much force is permissible to use. (Joint SOF ¶ 640; Pls.' SOF ¶ 98.) On the contrary, St. Clair officers are improperly trained to "not hesitate" to use force, and that it is their "duty" to use force on the job. (Joint SOF ¶ 640.) Testimony from St. Clair's own staff indicates that this inadequate training has led officers to use excessive force when no force is justified (Joint SOF ¶¶ 549-550, 641-642; Pls.' SOF ¶ 97) and as a way to punish or retaliate against prisoners who agitate officers with their behavior, even when those prisoners pose no risk of actual harm (Pls.' SOF ¶ 99). Defendants' inadequate training sharply increases the probability that correctional staff will use unnecessary force when interacting with prisoners.

### F. Conducting Inadequate Investigations

Despite their obligations to protect the prisoners in their care, Defendants have a widespread practice of conducting severely inadequate investigations of violent incidents at St. Clair. For example, correctional staff encourage victims to sign prosecution waivers in order to

prematurely end investigations into incidents of violence and sexual assault. (Joint SOF ¶¶ 526-531, 533-534, 538.) Indeed, St. Clair's Institutional PREA Compliance Manager Kevin Gillilan testified that he "assumes" that any time a victim signs a prosecution waiver, his prison rape allegations are "deemed unfounded", and, further, that he could not recall a single instance in which his office continued looking into a prison rape where the victim had declined to prosecute. (Joint SOF ¶ 533.) This is the case even if there is strong evidence that a violent crime has been committed (Joint SOF ¶ 534) or the investigator suspects that the victim signed the prosecution waiver out of fear of retaliation from the perpetrator (Joint SOF ¶ 538). Additionally, Defendants do not require their officers to search for contraband that was involved in violent incidents or overdoses (Joint SOF ¶ 247; Pls.' SOF ¶¶ 118, 120-122) and permit investigators to close cases without testing available DNA evidence or evaluating other physical evidence left at the scene (Joint SOF ¶ 547; Pls.' SOF ¶ 134).

Regarding use-of-force incidents, correctional staff regularly do not document their own use of force against inmates, [redacted] (Joint SOF ¶ 549; Pls.' SOF ¶¶ 135-136.) Nor do prisoners generally report such incidents out of fear that they may be punished. (Joint SOF ¶ 548.) And even when excessive force incidents are reported, there is no meaningful review process to ensure that the application of force was justified under the circumstances. (Joint SOF ¶ 551; Pls.' SOF ¶ 136.)

As a result of these inadequate investigative practices, perpetrators are generally not held accountable and systemic problems with the facilities, officers and security procedures are not identified and continue to persist. (Pls.' SOF ¶ 128.) [redacted]

[redacted] (Pls.' SOF ¶ 136; Pls.' Additional Disputed Fact ¶ 2.)

## III. DEFENDANTS REFUSE TO TAKE SIMPLE AND IMMEDIATE STEPS TO IMPROVE ST. CLAIR'S CONDITIONS.

In addition to disregarding St. Clair's clear security policies, Defendants consistently refuse to take known, low-cost measures to protect the prisoners under their charge. For example, in 2019, ADOC Deputy Commissioner of Operations Charles Daniels proposed a "Short-Term/Mid-Term Plan for St. Clair Correctional Facility" to address the glaring security issues at the prison. (Joint SOF ¶¶ 231, 234, 435-440; Pls.' SOF ¶¶ 73, 94.) Among other things, Daniels sought to limit the spread of contraband, control inmate movement and efficiently utilize the limited number of correctional staff. (Joint SOF ¶¶ 231, 234, 435-440; Pls.' SOF ¶¶ 73, 94.) Some of these simple proposals included:

- Staggering out-of-cell time between inmates living in the top tier and bottom tier of cell blocks, which would "immediately increase[] the ratio of available staff to inmates who are out of their cells in these blocks" (Joint SOF ¶¶ 439-440);
- Implementing the mandatory assignment of a warden and a captain to certain cell blocks in order to "enforce an intensive and deliberate direct supervision model" in areas where data indicate the threat of violence was greatest (Joint SOF ¶ 438); and
- Executing facility-wide "institutional searches" on a quarterly basis, which would prevent the inmates' common practice of hiding contraband in areas of the prison that were not being searched (Joint SOF ¶¶ 231, 234).

But Defendants did not implement the Daniels Plan. [redacted] (Joint SOF ¶ 442.) When Daniels resigned from ADOC in December 2019 to take another job (as director of the Nevada Department of Corrections), he continued to believe that St. Clair would benefit from the plan, a sentiment he maintained at his deposition in December 2023. (Pls.' SOF ¶ 73.) [redacted]

[redacted] (Pls.' SOF ¶ 74.)

Another example of Defendants' refusal to make low-cost and simple improvements to St. Clair is their choice not to employ [redacted] (Joint SOF ¶¶ 302-304) even though it is undisputed that doing so would help prevent and deter prisoner-on-prisoner assaults (Joint SOF ¶ 300). [redacted] (Joint SOF ¶ 301.) [redacted] (Joint SOF ¶¶ 277, 293(b)-(c); Pls.' SOF ¶ 85.)

Defendants also continue to delay fixing the large number of broken and tricked cell door locks throughout the facility even though they are aware of the issue and realize the obvious risk presented by not having functioning locks at a maximum-security prison. (Joint SOF ¶¶ 330, 333, 336-337; Pls.' SOF ¶¶ 79-81.) Other appropriate options would be to retain a company to provide regular lock maintenance or hire a full-time locksmith whose role at the prison would be to ensure the continual functioning of St. Clair's cell door locks—Defendants have refused to do either. (Joint SOF ¶¶ 336-337; Pls.' SOF ¶¶ 79-81.)

Notably, in December 2022, Defendants abruptly disbanded the Quality Improvement Team ("QIT"), one of the few concrete initiatives to address the problems at St. Clair, which was implemented as part of the previous settlement of this case. (Joint SOF ¶ 145.) Defendants decided to discontinue the QIT soon after it reported that there was a "clear trend in increasing violence at St. Clair" from November 2021 to November 2022. (Joint SOF ¶ 145.)

The only area in which Defendants seriously contend they have made efforts to improve St. Clair's conditions is in statewide ADOC staffing (*i.e.*, recruitment and retention). Here, too, Defendants have failed to achieve successful results. The vacancy rate at St. Clair remains 59.8% at year-end 2023 as measured against ADOC's own staffing plan. (Joint SOF ¶ 112.) This is worse than every year for which data is available from 2014 (when this action was brought) to 2022. (*See* Pls.' Additional Disputed Fact ¶ 3.) Even worse, Defendants have made no efforts over the past decade to adapt how they operate St. Clair to account for the persistent low staffing. For example, when faced with unacceptable levels of violence in a prison, leadership could put more officers on the floor or (if the prison is understaffed, like St. Clair) could rely more on real-time camera monitoring. Yet Defendants have refused to do so. (Joint SOF ¶¶ 300-304.) Commissioner Daniels' Short-Term/Mid-Term Plan was another proposal to manage violence given conditions of understaffing, [redacted] (Joint SOF ¶¶ 436-443; Pls.' SOF ¶¶ 71-74.)

## IV. PROCEDURAL HISTORY

Plaintiffs brought this action on October 13, 2014, by filing their Class Action Complaint to address St. Clair's "extremely high rate of prisoner-on-prisoner assaults and homicides and the dangerous conditions that facilitate the incidents and culture of violence". (Doc. 1 at 3.) On February 17, 2015, this Court denied Defendants' motion to dismiss the complaint for failure to state a claim (Doc. 20 (Hopkins, J.)) and on November 1, 2017, the parties entered into a settlement agreement pursuant to which (1) Defendants would implement reforms and remedial measures to address the unconstitutional conditions at St. Clair; (2) Plaintiffs' counsel were designated as monitors to the agreement; and (3) the Court would retain jurisdiction in the event that Plaintiffs reinstated the litigation (Docs. 180, 203 ¶¶ 5-7). Although Plaintiffs agreed on two separate occasions to extend the expiration of their settlement

agreement to give St. Clair additional time to improve its conditions (Docs. 184, 194), by January 2021, it was clear that Defendants had failed to live up to their end of the bargain and were no longer trying to comply with the settlement agreement. Indeed, not only did the same problems continue to plague the facility more than four years later, certain conditions had deteriorated further. Plaintiffs therefore reinstated this case on April 15, 2021. (Doc. 202.)

On November 8, 2021, Plaintiffs filed their Third Amended and Supplemental Complaint (Doc. 240), which Defendants moved to dismiss in part on December 8, 2023 (Doc. 248). The Court granted that motion in part as to Named Defendants whose duties and powers were not sufficiently alleged under the *Ex parte Young* doctrine, but gave Plaintiffs an opportunity to add further detail in a subsequent complaint. (Docs. 261-262.) Plaintiffs filed their Fourth Amended and Supplemental Complaint on February 7, 2022 (Doc. 267) and Defendants again moved to dismiss on the same grounds as before (Doc. 271). This time, the Court denied Defendants' motion in its entirety, holding that Plaintiffs had sufficiently alleged each Defendant's connection to the constitutional violations at issue as well as their authority to implement the relief sought. (Doc. 283, at 18.) Since then, the parties have engaged in extensive document production, fact witness depositions and expert discovery, with fact discovery concluding in January 2023 and expert discovery concluding in April 2023.

On August 19, 2025, Defendants filed their motion for summary judgment (Doc. 564). Plaintiffs submit this memorandum of law in opposition to Defendants' motion.

## <u>LEGAL STANDARD</u>

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law". "[A] non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in

its favor." *Ogletree v. Colbert Cnty.*, No. 18-cv-01218, 2021 WL 4477630, at *3 (N.D. Ala. Sept. 20, 2021).

"A court evaluating a summary judgment motion must view the evidence in the light most favorable to the non-movant. If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion." *Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

## APPLICABLE LAW

"A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment if he is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016); *see also Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc). Accordingly, to survive summary judgment on an Eighth Amendment deliberate indifference claim, a plaintiff must produce sufficient evidence that (1) he suffered a "sufficiently serious" deprivation; and (2) the defendant was "subjectively aware that his own conduct caused a substantial risk of serious harm" and did not "respond[] reasonably to the risk". *Wade*, 106 F.4th at 1262; *see also Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995).

**Objective Prong**

"The first element of an Eighth Amendment claim—a substantial risk of serious harm—is assessed under an objective standard." *Lane*, 835 F.3d at 1307. Prison conditions are sufficiently serious under this standard if they are "extreme" and pose "an unreasonable risk of serious injury to [one's] future health or safety". *Id.* For example, "an excessive risk of inmate-on-inmate violence" or "confinement in a prison where violence and terror reign" each constitute a substantial risk of serious harm. *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014).

Moreover, "[i]t is clear that prisoners can make out an Eighth Amendment confinement violation based on the totality of multiple conditions, rather than demonstrating that each objectionable condition individually is unconstitutional." *Oliver v. Price*, No. 14-CV-2187, 2017 WL 1628550, at *12 (N.D. Ala. May 2, 2017). "[S]uch claims are cognizable as long as the multiple conditions combine to deprive the prisoner of a specific human need." *Id.* (citing *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004)).

In *Marsh v. Butler County, Alabama*, 268 F.3d 1014, 1027-28 (11th Cir. 2001) (en banc), the Eleventh Circuit held that the plaintiff satisfied this element on a motion to dismiss by alleging "that inmates dismantled the jail facility to make weapons, that inmates had ready access to weapons, and that the prison provided inadequate supervision of inmates". *Lane*, 835 F.3d at 1308. And in *Hale v. Tallapoosa County*, the Eleventh Circuit held that evidence of the defendant's "failure to classify or segregate violent from non-violent inmates, assign inmates to cells or beds, adequately train the jailers, and adequately supervise and monitor the inmates" was sufficient to defeat summary judgment. 50 F.3d at 1584-85.

**Subjective Prong**

The second element of an Eighth Amendment claim—the defendants' deliberate indifference to a substantial risk of serious harm—has three components: (1) "the official was subjectively aware that the inmate was at risk of serious harm"; (2) "the official disregarded that risk"; and (3) the official "was actually aware that his own conduct caused a substantial risk of serious harm to the [inmate]". *Wade*, 106 F.4th at 1255, 1261. Under the first component, the plaintiff must adduce "evidence that the defendant officer actually (subjectively) knew of the risk to the plaintiff inmate". *Nelson v. Tompkins*, 89 F.4th 1289, 1297 (11th Cir. 2024) (internal quotations omitted). In other words, the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference". *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "[C]ircumstantial evidence . . . can be used to show that a prison official possessed the necessary knowledge", *Lane*, 835 F.3d at 1308, and whether a prison official had the requisite knowledge of a substantial risk "may be inferred based on the obviousness of the risk", *Bugge v. Roberts*, 430 F. App'x 753, 758 (11th Cir. 2011).

Under the second component,"a plaintiff must produce evidence that the defendant disregarded that known risk by failing to respond to it in an (objectively) reasonable manner." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (internal quotations and alterations omitted). Thus, even if "an official attempts to remedy a constitutionally deficient prison condition, but fails in that endeavor", he can still be found to be deliberately indifferent if "he knows of, but disregards, an appropriate and sufficient alternative". *LaMarca v. Turner*, 995 F.2d 1526, 1536 (11th Cir. 1993); *see also Tafoya v. Salazar*, 516 F.3d 912, 918 (10th Cir. 2008) ("A prison official may be liable for a substantial risk of serious harm

to inmates in spite of efforts reasonably calculated to reduce the risk, if he intentionally refuses other reasonable alternatives and the dangerous conditions persist."). Moreover, "[t]he knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference." *Tafoya*, 516 F.3d at 919.

In *LaMarca v. Turner*, the defendant prison superintendent argued that he was not deliberately indifferent because he made "affirmative efforts to improve the conditions of confinement" at the prison, such as attempting to secure additional funds, making improvements to the physical plant, expanding recruitment efforts and instituting policies to reduce risk of violence. *See* 995 F.2d at 1537. In rebuttal, the plaintiffs presented evidence "(1) that Turner failed to ensure that his direct subordinates followed the policies he established, and (2) of specific, low-cost actions that Turner could have taken and that his successors successfully undertook". *Id.* The Eleventh Circuit held that there was sufficient evidence to support liability where, "while much of the record indicates that Turner did make good faith efforts to resolve the dilemmas facing [the prison], the evidence does support the plaintiffs' position that Turner recklessly disregarded the necessary means to protect inmate safety." *Id.* at 1538.

In *Hale v. Tallapoosa County*, the defendant argued that he was not deliberately indifferent "because he worked toward construction of a new jail which, he contends, was the only way to reduce the risk of violence". 50 F.3d at 1584. However, the plaintiff offered evidence of several reasonable alternative measures that were available to the defendant but which he didn't take, such as "classifying and segregating the inmates based on their likelihood for violence; assigning inmates to cells and bunks rather than letting them choose for themselves; adequately training jailers; and adequately supervising and monitoring the inmates". *Id.* at 1584-85. The Eleventh Circuit held that "[a] jury could find that despite any efforts he made toward

construction of the new jail, Smith was deliberately indifferent by disregarding 'alternative means' or interim measures for reducing the risk of violence such as those advanced by Hale." *Id.* at 1584.

In *Tafoya v. Salazar*, a case dealing with prison conditions creating the risk of officer-on-inmate sexual assault, the defendant argued that he was not deliberately indifferent because he "established a 'no-contact' policy for male officers and female inmates, installed several new surveillance cameras, hired additional female staff, and provided for a half-day staff training by an outside agency regarding the prohibition against sexual contact between staff and inmates". 516 F.3d at 918. In response, the plaintiff offered evidence that the defendant "made no effort to alter his own managerial strategy, impose a serious threat of discipline for policy violations upon his detention staff, or establish an adequate grievance procedure by which inmates could report officer misconduct with a reasonable expectation of serious investigation". *Id.* The Tenth Circuit held that, "although Sheriff Salazar instituted some new safety measures, they were insufficient to prevent liability because there is evidence that he ignored numerous other problems of which he had knowledge and for which he was aware of remedies that he chose not to implement." *Id.* at 919.

Under the third component, "the plaintiff must demonstrate that the defendant acted with 'subjective recklessness as used in the criminal law'". *Wade*, 106 F.4th at 1262 (quoting *Farmer*, 511 at 839). This means that the defendant must have been "subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff" and the defendant did not respond reasonably to that risk. *Id.*

## ARGUMENT

Since reinstatement of this case in 2021, Plaintiffs have uncovered a large volume of evidence—including documents, data, communications, testimony and expert

analysis—demonstrating the dire conditions at St. Clair and Defendants' active unwillingness to improve them. In moving for summary judgment, Defendants ignore this evidence. At the very least, genuine disputes of material fact exist as to both (i) the existence of an excessive risk of inmate-on-inmate violence, inmate-on-inmate sexual assault and officer-on-inmate excessive force at St. Clair; and (ii) Defendants' knowledge of, and deliberate indifference to, those risks. Summary judgment is therefore improper. *See Hale*, 50 F.3d at 1584-85.

## I. SUBSTANTIAL EVIDENCE SUPPORTS PLAINTIFFS' CLAIMS REGARDING INMATE-ON-INMATE VIOLENCE AND SEXUAL ASSAULT.

Defendants' primary argument in support of summary judgment is that "Plaintiffs cannot establish a claim regarding inmate violence or inmate sexual violence" (Counts I and II) simply because Defendants have made efforts to improve staffing. (MSJ Br. at 7-31 (capitalization adjusted).) That is wrong. Not only does overwhelming evidence demonstrate that the conditions inside St. Clair pose "an unreasonable risk of serious injury" to Plaintiffs and the other prisoners at St. Clair, *see Lane*, 835 F.3d at 1307, but Defendants' own testimony proves that they were well aware of that risk and deliberately ignored it. Furthermore, Defendants' argument that understaffing is the ***only*** cause of St. Clair's problems is a straw man argument that is belied by evidence that Defendants "knowing[ly] fail[ed] to enforce policies necessary to the safety of inmates", *see Tafoya*, 516 F.3d at 919, and have continuously refused to implement reasonable, low-cost "alternative means" or "interim measures" to protect the prisoners' safety, *see Hale*, 50 F.3d at 1584.

Plaintiffs' claims are about much more than staffing. Remarkably, as part of their attempt to shift the focus entirely onto staffing, Defendants characterize Plaintiffs' evidence of known, low-cost measures that would substantially reduce violence at St. Clair as "***quibbles*** with various practices of the ADOC Officials and St. Clair staff". (MSJ Br. 22 (emphasis added).) If

that is really what Defendants believe, it serves only to demonstrate their deliberate indifference, as these practices directly cause the lack of safety at St. Clair, and Defendants could take known measures to reduce the level of violence, yet choose not to do so.

### A. Plaintiffs Are Exposed to a Substantial Risk of Serious Harm from Inmate-on-Inmate Violence and Sexual Assault.

Plaintiffs are subjected to a constant and imminent risk of being violently assaulted and sexually abused by other prisoners at St. Clair. As discussed above (*supra* Facts Sections I and II), the assault rate at the prison is nearly double the national average for state maximum-security facilities (Pls.' SOF ¶ 28) while the homicide rate is *more than double* the national average (Pls.' SOF ¶ 30). And the brutality of the violence at St. Clair is compounded by the astonishingly high number of knives and other weapons in circulation (Pls.' SOF ¶¶ 30-33), with one warden estimating that at least 50% of the prisoners at the facility possess such weapons (Joint SOF ¶ 240). Moreover, the practice of prison staff to assign inmates to housing blocks without considering crucial classification information such as gang affiliation or predatory tendencies (Pls.' SOF ¶¶ 109-114; Joint SOF ¶¶ 422-423) greatly increases the probability of gang attacks and sexual assaults, while the high prevalence of unauthorized movement all but ensures that enemies will be able to find each other even if they have been assigned to appropriate housing (Joint SOF ¶¶ 384-387, 404; Pls.' SOF ¶¶ 59-63, 70). Perhaps most alarming, the high prevalence of broken cell door locks (Joint SOF ¶¶ 326-328, 339; Pls.' SOF ¶ 78) means that no prisoner is safe while he sleeps at night.

The severity of the conditions at St. Clair exceeds those in *Marsh v. Butler County*, *Hale v. Tallapoosa County* and *LaMarca v. Turner*, all of which were held to pose a substantial risk of serious harm under the "objective prong" of the deliberate indifference test. In *Marsh*, for example, the Eleventh Circuit held that "conditions in a jail facility that allow

prisoners ready access to weapons, fail to provide an ability to lock down inmates, and fail to allow for surveillance of inmates pose a substantial risk of serious harm to inmates." 268 F.3d at 1028. These conditions are all present at St. Clair. (*See* Joint SOF ¶¶ 239-240; Pls.' SOF ¶ 116 (weapons); Joint SOF ¶¶ 326-328, 338-343; Pls.' SOF ¶ 78 (malfunctioning locks); Joint SOF ¶¶ 294, 298-300, 302-309; Pls.' SOF ¶¶ 84-86 (malfunctioning surveillance cameras).)

And in *LaMarca*, the Eleventh Circuit held there was "an unconstitutional risk of violence" where there was "(1) a 'prevalence of . . . weapons' at GCI, (2) the lack of adequate patrols, (3) the lack of adequate reporting procedures for rapes and assaults, (4) the presence of 'obvious and rampant indicia of homosexual activity,' and (5) a lack of supervision of officers leading to corruption and incompetence." 995 F.2d at 1539. Plaintiffs have adduced considerable evidence demonstrating substantially the same conditions at St. Clair as well. (*See* Joint SOF ¶¶ 239-240; Pls.' SOF ¶ 116 (weapons); Joint SOF ¶ 130; Pls.' SOF ¶ 96 (lack of "rovers"); Pls.' SOF ¶ 41 (barriers to reporting sexual assaults); Joint SOF ¶¶ 159, 161, 163, 165, 167-168; Pls.' SOF ¶¶ 43-50 (prevalence of sexual violence); Joint SOF ¶¶ 249-255, 526-531, 533-534, 538; Pls.' SOF ¶¶ 129-130 (lack of supervision and corruption of staff).)

In response, Defendants suggest that the risk of sexual assault at St. Clair is low because the facility received "passing scores on its PREA audits". (MSJ Br. at 11.) This argument misses the mark because a PREA audit merely checks compliance with policies and procedures, and does not assess whether a prison is safe.[1] (Pls.' Additional Disputed Fact ¶ 8.) The argument is particularly disingenuous here in light of the PREA auditor's testimony

[1] For similar reasons, Defendants are wrong to suggest that St. Clair is sexually safe simply because "ADOC's and St. Clair's PREA policies comply with PREA standards". (MSJ Br. at 11.) Plaintiffs' primary concern is with the prison's dangerous *practices*, which are the true gauge of St. Clair's conditions.

admitting that, in hindsight, St. Clair's PREA compliance at the time of her audit was "a hot mess", "abysmal" and "very disturbing". (Pls.' Additional Disputed Fact ¶ 6.) In fact, when confronted with information that St. Clair staff hid from her in the audit, the PREA auditor testified that this concealed information would have troubled her "in terms of [her] PREA audit report". (Pls.' Additional Disputed Fact ¶ 6.) Defendants' own prison sexual safety expert, Kathlene Lane, acknowledged her awareness of the PREA audit's unreliability. (Pls.' Additional Disputed Fact ¶ 7.) Indeed, the PREA auditor's notes from her time at St. Clair show that the prisoners were in constant fear of imminent sexual violence and believed that the prison was failing to take important steps to keep the inmates safe from sexual predators. (Joint SOF ¶ 172; Pls.' SOF ¶ 52.)

**B. Defendants Are Deliberately Indifferent to the Substantial Risk of Serious Harm They Cause Plaintiffs to Face.**

Evidence uncovered in discovery over the last two years also demonstrates that Defendants are deliberately indifferent to the risk of serious harm to which Plaintiffs are subjected at St. Clair.

As an initial matter, there can be no dispute that Defendants "actually (subjectively) knew of the risk" to the Plaintiffs. *See Nelson*, 89 F.4th at 1297. Indeed, Defendants' own testimony demonstrates their detailed knowledge of the deplorable conditions at St. Clair, including the extreme physical and sexual violence (Joint SOF ¶¶145, 155; Pls.' SOF ¶ 50), abundance of drugs and weapons (Joint SOF ¶¶ 229, 239-240, 247, 249-250; Pls.' SOF ¶ 116, 118), broken locks (Joint SOF ¶¶ 267, 326-328, 342-344), broken call buttons (Joint SOF ¶ 359), non-functional cameras (SOF ¶ 294; Pls.' SOF ¶ 86), low staffing levels (Pls.' SOF ¶ 90) and unauthorized movement (Joint SOF ¶¶ 384-387, 395; Pls.' SOF ¶¶ 60-62, 64). Defendants also have a deep familiarity with St. Clair's dangerous conditions by virtue of, among other

things, the Monthly and Quarterly Statistical Reports that are published on the ADOC website (Pls.' Additional Undisputed Fact ¶ 4) and the incident reports submitted after every case of prisoner violence, which Defendants admit were always reviewed by former Defendant Warden III Guy Noe and his staff (Defs.' SOF ¶ 20). In addition, senior St. Clair and ADOC officials are automatically notified of every violent incident at the facility via "Duty Officer Reports". (Pls.' Additional Undisputed Fact ¶ 5.)

Moreover, Defendants were necessarily aware of the conditions relevant to this lawsuit at least as far back as November 2017, when the parties reached a settlement agreement and Defendants committed to implement reforms and remedial measures to address the unconstitutional conditions at St. Clair. (Docs. 180, 203 ¶¶ 5-7.) And of course Defendants' knowledge of these conditions "may be inferred based on the obviousness of the risk" they present. *See Bugge*, 430 F. App'x at 758.

It is also clear that Defendants "disregarded that known risk by failing to respond to it in an (objectively) reasonable manner." *Caldwell*, 748 F.3d at 1099. ***First***, Defendants and their subordinates continue to violate numerous ADOC regulations and prison policies that were put in place to maintain prisoner safety. Among other things, they:

- do not prevent inmates from being in "unassigned living areas, job sites, [or] program areas", in violation of SOP 137 (Joint SOF ¶¶ 377, 384-387, 392-404; Pls.' SOF ¶¶ 59-69);
- do not regularly inspect locks, cameras and call buttons or properly report when those devices are broken/malfunctioning, in violation of SOP 182 (Joint SOF ¶¶ 260-262, 266-268, 270);
- do not review all pertinent classification information prior to making housing assignments, in violation of SOP 126 (Joint SOF ¶¶ 417-422; Pls.' SOF ¶¶ 108-111); and
- do not conduct the mandatory inspections, searches and shakedowns to prevent contraband from entering the facility and to recover the contraband that does get inside, in violation of SOP 110 (Joint SOF ¶¶ 220-226, 242-244).

This "knowing failure to enforce policies necessary to the safety of inmates" demonstrates Defendants' ongoing deliberate indifference to the serious risk of harm to which Plaintiffs are subjected. *Tafoya*, 516 F.3d at 919; *see also LaMarca*, 995 F.2d at 1537 (evidence that defendant "failed to ensure that his direct subordinates followed the policies" of the prison supported finding that he disregarded "lack of reasonable protection of inmates").

***Second***, Defendants have consistently refused to implement reasonable, known, low-cost measures that would immediately reduce the risk of harm to Plaintiffs' safety. For instance, they:

- refuse to adopt any of the proposals set forth in the Daniels Plan for optimizing St. Clair's scarce human resources, limiting the spread of contraband and regaining control of the prison's most dangerous areas (Joint SOF ¶¶ 231, 234, 435-440, 442; Pls.' SOF ¶¶ 73-74, 94);
- refuse to employ [redacted] of surveillance cameras that have already been installed throughout the facility (Joint SOF ¶¶ 293(c), 277, 302-304; Pls.' SOF ¶ 85);
- refuse to allow the cubicle officers or line staff to [redacted] (Joint SOF ¶ 277; Pls.' SOF ¶ 85);
- refuse to expeditiously replace all of the broken cell door locks at St. Clair (Joint SOF ¶¶ 330, 336);
- refuse to either retain a company to provide regular lock maintenance or hire a full-time locksmith to keep the locks in working order (Joint SOF ¶¶ 316, 320, 336-337; Pls.' SOF ¶ 79); and
- refuse to reinstate the Quality Improvement Team after unceremoniously disbanding it in December 2022 (Joint SOF ¶ 145).

Defendants and other high-ranking St. Clair officials also admit to doing nothing to improve safety and security at St. Clair or to ensuring that violent incidents are not repeated:

- Defendant Warden II Darrel Fox testified that he takes no steps to improve safety and security at St. Clair beyond "reviewing [incident reports] to make sure they have everything that's pertinent to that particular incident" and "pass[ing] that information along". (Doc. 422-066 at 141:16-142:2.)

- Warden Fox also testified that he does not ensure cameras in the Restrictive Housing Unit ("RHU") are monitored in real time despite two incidents in which prisoners died by suicide in the RHU after correctional staff falsified records of mandatory security checks. (Doc. 422-066 at 86:20-91:9.)

- IPCM Kevin Gillilan and PREA Director Christy Vincent both testified that they took no concrete steps regarding the role of contraband in sexual assaults at St. Clair. (Pls.' SOF ¶ 104.)

This pattern of consciously disregarding "appropriate and sufficient" measures to improve St. Clair's dangerous conditions is strongly indicative of Defendants' deliberate indifference. *See LaMarca*, 995 F.2d at 1536; *see also Hale*, 50 F.3d at 1584 ("A jury could find that . . . Smith was deliberately indifferent by disregarding 'alternative means' or interim measures for reducing the risk of violence[.]"); *Tafoya*, 516 F.3d at 918 ("A prison official may be liable for a substantial risk of serious harm to inmates . . . if he intentionally refuses other reasonable alternatives and the dangerous conditions persist.").

Finally, there can be no doubt that Defendants are actually aware that their own practices cause the ongoing substantial risk of serious harm to the prisoners at St. Clair. *See Wade*, 106 F.4th at 1261. To begin with, Defendants have known since at least 2017, when they entered into a settlement agreement with Plaintiffs to resolve this very Eighth Amendment case, that their correctional practices "put the plaintiff[s] at a substantial risk of serious harm". *Id.* at 1258. Indeed, Defendants agreed to implement targeted reforms specifically to rectify their harmful practices. (*See, e.g.*, Joint SOF ¶ 145 (establishing Quality Improvement Team, which has now been discontinued), *id.* ¶¶ 416, 419, 421-422 (establishing Internal Classification Board, which now fails to operate as required).) Defendants also know that it is their own deliberate indifference that creates the dangers at issue here by virtue of the reinitiation of this lawsuit in April 2021 (Doc. 202) and the ongoing litigation against them over the last four years. And the extensive deposition testimony from this case proves that Defendants are well aware that their

actions underlie the dangerous conditions at St. Clair. (*See, e.g.*, Joint SOF ¶ 247(a) (Former Defendant Graham knows that there are no investigations to determine who puts contraband in common areas); *id.* ¶ 249 (Defendants Fox and Howard know that St. Clair staff bring contraband into the facility); *id.* ¶ 262 (Defendant Parker knows that "inspections of cell locks is not conducted daily"), *id.* ¶ 266 (Defendant Parker knows that call buttons are not inspected), ¶ 302 (Former Defendant Mitchell knows that [redacted]), *id.* ¶ 443 (the Alabama Inspector General recommended that Defendant Ellington receive corrective action for his failure to carry out the Daniels Plan); Pls.' SOF ¶ 64(a)-(b) (Defendant Parker and former Defendant Noe know that the wristband policy is not enforced).)

Defendants attempt to neutralize this undisputed evidence by suggesting that, even if they have failed to comply with "basic correctional practices", their attitude does not constitute "total unconcern" for Plaintiffs' safety. (MSJ Br. at 23.) But that, of course, is an issue ripe for the fact-finder to evaluate with the benefit of a trial, particularly because it will require credibility determinations with respect to Defendants' knowledge and intentions. *See Ogletree*, 2021 WL 4477630, at *3 (courts "may not make credibility determinations" on summary judgment). Moreover, the evidence Plaintiffs have already proffered to show Defendants' unconcern for Plaintiffs' well-being is more than sufficient to raise the reasonable inference that Defendants are deliberately indifferent. *See Haves*, 52 F.3d at 921 (courts must "make all reasonable inferences in favor of the party opposing summary judgment").

Defendants also suggest that Plaintiffs expect the prison to "eliminate acts of violence" completely (MSJ Br. at 2), "reduce the number of sexual assaults to zero" (MSJ Br. at 11) and "eliminate the introduction of drugs, weapons and other contraband" (MSJ Br. at 41). That is false. Plaintiffs simply expect Defendants to abide by their constitutional obligations in

operating St. Clair, including their duty not to deliberately ignore conditions that pose a substantial risk of serious harm to the prisoners incarcerated there and their duty to take reasonable action in response.

**C. Plaintiffs' Claims Do Not Depend on Understaffing.**

In an effort to avoid responsibility for the intolerable conditions at St. Clair, Defendants contend that all of the problems Plaintiffs raise exist "solely because of challenges the ADOC Officials face as to correctional staffing". (MSJ Br. at 12.) Because correctional staffing is the one area that ADOC has arguably made an effort to improve, albeit unsuccessfully, Defendants believe they can defeat a claim of deliberate indifference by recharacterizing this lawsuit around that issue. (MSJ Br. at 12-22.) But Plaintiffs' claims are ***not*** all about staffing—far from it. Defendants' straw man argument fails for several reasons.

***First***, as Defendants themselves point out, "staffing represents a significant challenge for correctional agencies across the United States". (MSJ Br. at 14.) Yet the fact that St. Clair registers dramatically above average among maximum-security prisons for metrics like assault per capita (Pls.' SOF ¶ 28) and homicide per capita (Pls.' SOF ¶ 30) shows that staffing is *not* the primary cause of the prison's unsafe conditions.

***Second***, as demonstrated at length above (*supra* Facts Sections II and III; Argument Section I.A and I.B), Defendants engage in numerous harmful practices that are directly responsible for the dangerous conditions at St. Clair and which have nothing to do with staffing shortages (*e.g.*, submitting improperly completed inspection forms; leaving common area gates ajar; permitting staff to enter the facility without going through a body scanner; not retaining an outside company to replace cell doors or fix cell door locks; encouraging victims to sign prosecution waivers). Therefore, increasing staffing levels without remediating those harmful practices will not sufficiently improve inmates' safety. And while staffing levels remain

low (as they have for years), Defendants continue to refuse to take these other obvious, low-cost measures. *See LaMarca*, 995 F.2d at 1538; *Hale*, 50 F.3d at 1584-85.

***<u>Third</u>***, even if staffing issues *were* the primary cause of St. Clair's dangerous conditions, Defendants mistakenly believe that the Eighth Amendment affords prisons unlimited time for their remedial efforts to begin yielding results. That is wrong. "A prison official may be liable for a substantial risk of serious harm to inmates *in spite of efforts reasonably calculated to reduce the risk*, if he intentionally refuses other reasonable alternatives and the dangerous conditions persist." *Tafoya*, 516 F.3d at 918 (emphasis added) (discussing Eleventh Circuit's reasoning in *LaMarca v. Turner*). Here, Defendants proudly state that "ADOC's efforts to address correctional staffing challenges began as early as 2006" (MSJ Br. at 15), apparently presuming that this gives them cover. But this is tantamount to an admission that they have failed to implement available "alternative" or "interim" measures after it was clear that their efforts to increase staffing were not effectively reducing the risk of violence and sexual assault. *See Hale*, 50 F.3d at 1584. Defendants simply are not permitted to wait for a solution that has not yet—and might never—come while the people in their custody remain at serious risk of life-threatening harm. Former Deputy Commissioner Daniels understood this concept perfectly when he advised St. Clair's leadership: "You go to war with the army you have, not the army you might want or wish to have at a later time." (Joint SOF ¶ 440.)

* * *

Even if, for the sake of argument, all of the problems at St. Clair did exist "solely because of challenges the ADOC Officials face as to correctional staffing" (MSJ Br. at 12)—which Plaintiffs deny, and which Plaintiffs have amassed substantial evidence showing is not the case—the adequacy of Defendants' efforts would still be in genuine dispute between the parties. St. Clair continues to have a 59.8% vacancy rate in 2023 as measured by ADOC's own staffing

plan. (Pls.' Additional Disputed Fact ¶ 1.) Yet Defendants have made no attempt to use the limited staff at St. Clair effectively. Testimony from St. Clair witnesses shows that even the mandatory "critical posts" regularly go unfilled (Pls.' SOF ¶ 90), and further discovery reveals that many violent incidents occur in areas of the prison where no officers are positioned (Joint SOF ¶ 130; Pls.' SOF ¶ 96). In light of the dangers St. Clair's low staffing numbers create, Defendants should revise the prison's staffing plan to use available personnel in a way that will better address the facility's security needs. There is no excuse for inaction, after a decade of understaffing. However, Defendants have refused to revise St. Clair's staffing plan to tackle these issues (Pls.' SOF ¶¶ 91-93) [redacted] (Pls.' SOF ¶¶ 94-95). And as discussed above, Defendants refuse to implement measures that would require no additional correctional staffing, such as hiring a locksmith or activating live camera feeds. This inaction is powerful evidence of deliberate indifference to the problems of prison violence.

To be clear, Plaintiffs are not advocating an "outcome"-based approach, as Defendants insinuate. (MSJ Br. at 17.) The facts of this case are materially different from those in *Swain v. Junior*, 961 F.3d 1276 (11th Cir. 2020), and *Rasho v. Jeffreys*, 22 F.4th 703 (7th Cir. 2022), two decisions Defendants cite for the unremarkable proposition that "prison officials cannot be liable for deliberate indifference 'if they responded reasonably to the risk, even if the harm ultimately was not averted'". (MSJ Br. at 18-19 (quoting *Farmer*, 511 U.S. at 837).) Far from "respond[ing] reasonably", Defendants deliberately ignore and facilitate the deplorable conditions that continue to threaten Plaintiffs' lives. As shown above, they do so by violating policies meant to promote prisoner safety and wellbeing, maintaining practices that allow

violence to thrive and refusing to adopt numerous available and low-cost measures that would reduce the risk of serious harm to which the prisoners at St. Clair are subjected.

Because material factual disputes exist regarding, at least, (i) Defendants' reasons for disregarding alternative staffing proposals and (ii) Defendants' knowledge of the risk created by failing to staff critical posts, Defendants are not entitled to judgment as a matter of law, even considering staffing alone (which, again, is just one piece of Plaintiffs' claims). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are inappropriate on summary judgment). Plaintiffs have presented more than sufficient evidence on these questions for a reasonable jury to conclude that Defendants are deliberately indifferent with respect to facility staffing. *See Ogletree*, 2021 WL 447630, at *44 ("Thus, at best, Defendants' efforts, if timely implemented, did not prove adequate to prevent excessive inmate-on-inmate violence, and Defendants still could display deliberate indifference if they knew about, but declined to implement, reasonable alternative measures.").

## II. SUBSTANTIAL EVIDENCE SUPPORTS PLAINTIFFS' CLAIM REGARDING EXCESSIVE FORCE.

Defendants also argue that "Plaintiffs cannot establish a claim regarding excessive force" (Count III). (MSJ Br. at 31-41.) Again, Defendants are wrong. The evidence shows that Plaintiffs face a substantial risk of being subjected to excessive force from St. Clair staff, and that Defendants are deliberately indifferent to that risk.

### A. Each Plaintiff Has Standing to Assert the Claim for Risk of Excessive Force.

As a threshold matter, Plaintiffs have Article III standing to assert this claim. Relying on *J W ex rel. Williams v. Birmingham Board of Education*, 904 F.3d 1248 (11th Cir. 2018), and *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221 (11th Cir. 2021), Defendants argue

that Plaintiffs have not shown "an immediate threat of future injury" sufficient to invoke standing for an injunctive relief claim. (MSJ Br. at 32-33.) Defendants fundamentally misapprehend the legal standard set out in those cases—*J W* and *Kennedy* both involved plaintiffs who had control over their own circumstances, whereas Plaintiffs in this case are in the State's custody involuntarily and can "expect to be future victims of more of the same harms they had alleged because they faced those harms due to circumstances they could not change". *J W*, 904 F.3d at 1269. The court in *J W* explains this distinction at length:

> The plaintiffs in *31 Foster Children* and *Church* could not avoid exposure to the conduct they challenged because their own behavior or situation, which drove the challenged conduct, was involuntary. "[F]or reasons beyond [their] control" they were "unable to avoid repeating the conduct that led" to their injuries. *See Church [v. City of Huntsville]*, 30 F.3d [1332,] 1338 [(11th Cir. 1994)]. In *31 Foster Children [v. Bush]*, [329 F.3d 1255 (11th Cir. 2003),] the plaintiffs were foster care children who were in the state's custody involuntarily and would be until they were adopted or reached the age of majority. *See* 329 F.3d at 1266. ***Because they were legally required to be in the state foster care system***, the children could not "avoid exposure to the . . . challenged conduct," which consisted of "alleged systematic deficiencies" and the resulting harms. *See id.* The same type of involuntariness was present in *Church*, where we recognized that the plaintiffs' homelessness was an involuntary status and the City of Huntsville's alleged policy of harassment and arrest was incited by that homelessness. *See* 30 F.3d at 1338-39. ***The plaintiffs in those two cases could expect to be future victims of more of the same harms they had alleged because they faced those harms due to circumstances they could not change.***

*Id.* (emphases added).

This case is a textbook example of a claim for injunctive relief based on a systemic risk of harm to persons in government custody. At the outset of the litigation, Plaintiffs, who are inmates in a maximum-security prison, identified the existence of practices employed at St. Clair that subject prisoners to an unreasonable risk of excessive force. (Fourth Amended and Supplemental Complaint, Doc. 267, ¶¶ 116-125.) Courts across the nation recognize the ability to bring these and similar types of actions. *See, e.g.*, *Elisa W. v. City of New York*, 82 F.4th 115, 128 n.7 (2d Cir. 2023) ("Defendants first maintain that plaintiffs have failed

to satisfy the injury-in-fact requirement because their theory of liability depends on a future risk of harm. However, the Supreme Court has made clear that individuals 'exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial.'" (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021)); *Bonner v. Chambers Cnty.*, No. 04-CV-01229, 2006 WL 1731135, at *4 (M.D. Ala. June 19, 2006) ("[T]he Supreme Court has implicitly recognized that prisoners have standing for injunctive relief where they allege a contemporary violation that is likely to continue. *Farmer,* 511 U.S. at 845-46. In connection with an alleged failure of prison officials to prevent harm from being inflicted upon prisoners, prisoner plaintiffs may bring an action seeking injunctive relief based on a claim that officials are knowingly and unreasonably disregarding an objectively intolerable risk of harm and will continue to do so.").

### B. Plaintiffs Are Exposed to a Substantial Risk of Being Subjected to Excessive Force.

Turning to the merits of this claim, Defendants argue that the "evidence fails to establish that officer use of force at St. Clair amounts to "an 'objectively serious' deprivation". (MSJ Br. at 35.) Not so. As discussed above (*supra* Facts Sections I and II), St. Clair personnel regularly use unnecessary force in dealing with prisoners, including by assaulting prisoners who are already handcuffed or otherwise restrained (Joint SOF ¶¶ 628, 633; Pls.' SOF ¶¶ 53-56) and by deploying a burn-inducing chemical spray indiscriminately at large groups of prisoners (Joint SOF ¶ 630; Pls.' SOF ¶ 55). Former Named Plaintiff Robert Carlile (deceased) testified that he had seen correctional officers use chemical spray *in the infirmary* on multiple occasions, covering everyone in the room, including prisoners who are "real bad sick [and] on breathing machines". (Pls.' SOF ¶ 55.) And St. Clair inmate [redacted] testified that correctional officers "assault [prisoners] every day". (Pls.' SOF ¶ 56.) These incidents often result in severe

injuries requiring medical treatment at the prison infirmary or outside hospitals. (Joint SOF ¶ 642; Pls.' SOF ¶ 98.) [redacted] and another officer once beat a prisoner so severely that he had to go to a free-world hospital. (Pls.' SOF ¶ 98.) Sergeant Dent and another officer once assaulted a prisoner with a baton, causing severe injuries to the man's face, chest and back and requiring six staples to his forehead. (Joint SOF ¶ 642.) Numerous other examples can be found in the Joint Statement of Facts and Plaintiffs' Statement of Facts (*e.g.*, Joint SOF ¶¶ 641-642; Pls.' SOF ¶¶ 97-99.)

Moreover, Defendants do not properly train St. Clair officers on *when* it is appropriate to use force or in *how much* force is permissible to use. (Joint SOF ¶ 640; Pls.' SOF ¶ 98.) After training, officers are left with the impression that they should "not hesitate" to use force against prisoners (Joint SOF ¶ 640), and believe they can use force as a way to punish or retaliate against prisoners who pose no objective risk of harming themselves or others (Joint SOF ¶¶ 549-550, 641-642; Pls.' SOF ¶¶ 97-99). [redacted] (Joint SOF ¶ 636.)

Finally, use-of-force incidents are not adequately investigated, essentially guaranteeing that officers will continue their violent ways with impunity. This is because correctional staff regularly do not document their own use of force against inmates (Joint SOF ¶ 549; Pls.' SOF ¶ 100) and prisoners are afraid to report uses of force out of fear of retaliation (Joint SOF ¶ 548). And in the rare instances when the use of force is reported, Defendants fail to prioritize the required investigations and generally just rubber-stamp their finding that the force was justified. (Pls.' SOF ¶¶ 135-136.) To that end, between November 2020 and November 2023, there were only three instances in which a correctional officer received discipline for

inappropriate use of force despite there being hundreds of reported incidents, and many more unreported incidents, involving officer use of force. (Pls.' SOF ¶ 136; Pls.' Additional Disputed Fact ¶ 2.)

As a result of St. Clair's violent correctional practices, insufficient training and inadequate investigations with respect to officer use of force, every prisoner at the facility is subject to an intolerable risk serious harm from inappropriate officer force. The combination of these harmful practices has truly created an environment "where violence and terror reign". *Harrison*, 746 F.3d at 1299.

### C. Defendants Are Deliberately Indifferent to the Substantial Risk of Serious Harm They Cause Plaintiffs to Face.

Substantial evidence demonstrates that Defendants are aware of the excessive-force culture described above and yet continue to let it thrive at the prison:

- Defendant Captain Omar Parker testified that "incidents where officers use force against prisoners take place in the dorms" over which he is the population captain. (Joint SOF ¶ 632.)
- Former Defendant Captain Carla Graham testified "I'm sure it does" when asked if unnecessary force is used at St. Clair. (Doc. 422-070 at 238:2-5.)
- Captain Graham testified that she recalled an incident where then-Sergeant (now Lieutenant) Santa-Maria used force, including deploying chemical spray as well as physical force, on a prisoner who "really didn't do anything to justify the using of force". (Joint SOF ¶ 549.)
- [redacted] (Pls.' SOF ¶ 100.)
- [redacted] (Joint SOF ¶ 641(a).)
- Lieutenant Roderick Gadson testified that officers "can go and be malicious and use force every day" and "probably get justified for it". (Doc. 422-068 at 154:7-13.)

- And Defendants acknowledge in their summary judgment brief that they are aware of "occasions where officers use excessive force" and then list several such incidents. (MSJ Br. at 40-41.)

Regarding training, the St. Clair "Lesson Guide" for use of force clearly instructs officers to "not hesitate" to use force, and that it is their "duty" to use force on the job. (Joint SOF ¶ 640.) Again, this is contrary to State law (Joint SOF ¶¶ 634-639), so the fact that such training materials continue to get used is *ipso facto* evidence of Defendants' deliberate indifference to Plaintiffs' safety. *See Tafoya*, 516 F.3d at 919 ("The knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference."). And it is further clear that the prison's officers apply this improper training in dealing with prisoners:

- [redacted] (Joint SOF ¶ 550(b).)

- Lieutenant Roderick Gadson testified that it is his belief that "whatever the level of force the inmate is using on you, you use it back on him". (Pls.' SOF ¶ 97.)

- A correctional officer stated that that she used chemical spray against a prisoner because he "failed to obey a direct order to leave M2 dorm and was insubordinate". (Joint SOF ¶ 642(a).)

- A correctional officer stated that "if [a prisoner] spit in your face that's a total different ball game. I think you should least be able to get a punch in if he just spit in your face." (Joint SOF ¶ 642(d).)

St. Clair officials are likewise aware of the systemic failure to investigate inappropriate uses of force:

- Lieutenant Roderick Gadson testified that officers "can go and be malicious and use force every day" and "probably get justified for it". (Doc. 422-068 at 154:7-13.)

- Lieutenant Gadson testified that he is "sure" that officers sometimes do not report when they use force. (Pls.' SOF ¶ 100.)

- Defendant Captain Omar Parker admitted that he and Defendant Captain Howard did not receive the required use-of-force investigations training until approximately nine

months after they were promoted to their current positions, leaving only one captain (Carla Graham) available to conduct all use-of-force investigations for the entire prison. (Joint SOF ¶ 551(b).)

- Former Defendant Captain Carla Graham testified that Sergeant Santa-Maria "didn't write an incident report" after he used unjustified force against a prisoner. (Joint SOF ¶ 549(a).)

Taken together, the foregoing is more than sufficient for a reasonable fact-finder to conclude that Defendants are aware that their own conduct causes a substantial risk of serious harm to the prisoners under their watch (indeed, the harm is at their and their subordinates' own hands), and that they consciously disregard the risk of excessive force being used against the prisoners at St. Clair. *See Wade*, 106 F.4th at 1261; *Caldwell*, 748 F.3d at 1099.

## III. DEFENDANTS' CLASS CERTIFICATION ARGUMENT IS BOTH IRRELEVANT TO SUMMARY JUDGMENT AND WRONG ON THE LAW.

Defendants next contend that class treatment is inappropriate in this case because some "class members perpetrate violence and sexual violence on other inmates" and other class members may "disagree with the relief Plaintiffs seek". (MSJ Br. at 41-44.) Defendants' arguments are more properly directed to Plaintiffs' class certification motion and have no bearing on the summary judgment analysis. Indeed, "[t]he decision of a district court denying class certification 'does not of its own force terminate the entire litigation because the plaintiff is free to proceed on his individual claim.'" *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1423 (11th Cir. 1994) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978)). For this reason, and because the parties are separately briefing class certification (*see* Docs. 565-566), Plaintiffs respectfully submit that the Court should disregard this section of Defendants' brief.

In any event, Defendants' arguments fail on the merits. The fact that some class members (who are not named Plaintiffs) may take part in the violence at St. Clair does not defeat

Rule 23's commonality requirement because Defendants' harmful practices remain a proximate cause of the dangerous conditions to which ***all*** prisoners at St. Clair are subjected. *See Elisa W.*, 82 F.4th at 126 (holding, in vacating the district court's denial of class certification in a risk-of-harm case, that "plaintiffs need not prove that [the defendant's] policies are the sole cause" of the harm "but only that its policies are a proximate cause" of the harm); *Harris v. Georgia Dep't of Corr.*, No. 18-cv-00365, 2021 WL 6197108, at *12 (M.D. Ga. Dec. 29, 2021) (holding that "as long as the members of the class have allegedly been affected by a general policy of the defendant, and the general policy is the focus of the litigation", class treatment remains appropriate).

Defendants' related suggestion that intra-class violence gives rise to an "unclean hands" defense is also unsupportable. (MSJ Br. at 43.) The one case Defendants cite in support of that argument neither deals with a class-action lawsuit nor gives any guidance as to how the unclean hands doctrine should be applied in the civil-rights context. *See Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 450-51 (11th Cir. 1993) (rejecting unclean hands defense in wage discrimination case). Indeed, Plaintiffs can locate no decision in which the unclean hands defense was applied to bar the enforcement of constitutional rights. To that end, the Supreme Court has indicated that the unclean hands doctrine is inapplicable where "Congress authorizes broad equitable relief to serve important national policies" or where "a private suit serves important public purposes", *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360-61 (1995), both of which are true in this case.

Moreover, Defendants' argument would essentially preclude ***all*** prisoner class-action lawsuits seeking to improve violent prison conditions, an absurd result for a doctrine of "narrow application". *See Odom v. Se. Supply Header, LLC*, 675 F. Supp. 2d 1105, 1120 (S.D.

Ala. 2009). Such an outcome would also run counter to the long-recognized principle that the unclean hands doctrine should "not be allowed to work injustice and wrong, nor be applied contrary to the rules of equity jurisprudence". *Weaver v. Pool*, 32 So. 2d 765, 768 (Ala. 1947). Prisoners at St. Clair are in State custody, and an essential component of Defendants' legal obligations is to protect them form foreseeable risks in a maximum-security prison. Accordingly, when confronted with cases similar to this one, courts have rejected the precise argument Defendants make here, that certain class members' allegedly harmful conduct defeats the appropriateness of class treatment. *See Langley v. Coughlin*, 715 F. Supp. 522, 561-62 (S.D.N.Y. 1989) ("The fact that several of the assertedly deranged inmates may have been presumably unwitting agents for creating some of the conditions in question does not demonstrate a legally cognizable conflict between them and the remaining class members."); *Green v. Cady*, 90 F.R.D. 622, 623-24 (E.D. Wis. 1981) ("The case is not rendered inappropriate for resolution through class action merely because the plaintiff inmates challenge the failure of the defendants to protect them from other inmates.").

Nor should class certification "be denied merely because every member of the class might not be enthusiastic about enforcing his rights". *Allen v. Dairy Farmers of Am., Inc.*, No. 09-cv-230, 2012 WL 5844871, at *7 (D. Vt. Nov. 19, 2012). This is especially true when the remedy sought is the cessation of illegal activity, as is the case here. *See id.* ("[P]utative class members should not be heard to complain that the court has ordered the discontinuation of illegal conduct even if they find such conduct beneficial and would like to preserve the status quo."). Courts around the nation have uniformly held the same. *See, e.g.*, *Clark v. Duke Univ.*, No. 16-CV-1044, 2018 WL 1801946, at *8 (M.D.N.C. Apr. 13, 2018) ("The fact that a few class members might be 'unhappy' if they are no longer able to participate in a plan that is run in a

way that breaches the fiduciary duties owed to participants does not create a legal conflict between those class members and the named plaintiffs."); *Guifu Li v. A Perfect Franchise, Inc.*, No. 10-CV-01189, 2011 WL 4635198, at *9 (N.D. Cal. Oct. 5, 2011) ("The fact that all proposed class members may not like each other, or even that some potential class members may prefer their current employment situation, is not sufficient to defeat adequacy."); *Norris-Wilson v. Delta-T Grp.*, 270 F.R.D. 596, 606 (S.D. Cal. 2010) ("Just because potential class members disagree with the spirit of an action doesn't mean it shouldn't be certified. . . . It will almost always be the case that some putative class members are happy with things as they are." (citation omitted)).

## IV. THE *BRAGGS* ACTION DOES NOT PRECLUDE ANY RELIEF IN THIS CASE, AS THIS COURT HAS ALREADY HELD.

Finally, Defendants argue that the ongoing litigation in *Edward Braggs, et al. v. Jefferson Dunn, et al.*, No. 2:14-cv-00601 (N.D. Ala.), *on appeal*, No. 22-10292 (11th Cir.), "precludes Plaintiffs from seeking relief regarding correctional staffing in this matter" because the similarities between the two actions could lead to conflicting remedies. (MSJ Br. at 44.) This Court rejected the same argument in ruling on Defendants' motion to dismiss, holding that this case "is being litigated outside the boundaries of the *Braggs* class action" and so there is no basis to conclude that there would be conflicting remedies. (Doc. 261 at 3 (citation omitted).) The Court also rejected this argument in *United States v. Alabama*, No. 2:20-CV-01971, 2021 WL 4711841, at *3 (N.D. Ala. Oct. 8, 2021), where it observed that "the *Braggs* class action is specific to the effects of understaffing on mental-health care" whereas the United States' case "concerns the effects of purported understaffing on prisoner-on-prisoner violence and sexual abuse as well as prison conditions". Nothing has changed since then.

Defendants now ask the Court to reconsider those rulings because they believe that the "*Braggs* Remedial Order failed to tie its relief regarding correctional staffing to mental-health care". (MSJ Br. at 45 n.23.) The Court should deny Defendants' request for the following reasons: ***First***, the parties already extensively briefed this issue regarding the exact same provision of the *Braggs* Remedial Order (*see* Docs. 248 at 7-10; 255 at 12-16; 258 at 5-6; 259 at 1-2) and Defendants raise no new circumstances, facts or binding legal precedents for the Court to consider here. *See Ball v. Brown*, No. 2:16-CV-01425, 2019 WL 5727438, at *9 (N.D. Ala. Nov. 5, 2019) (Proctor, J.) ("Plaintiff's third bite at the apple does not raise any new issues or present any new evidence."). Thus, Defendants fail to present the type of "extraordinary" circumstance that can overcome "the interests of finality and conservation of scarce judicial resources". *Id.* at *8. ***Second***, Defendants still fail to acknowledge that Plaintiffs are seeking injunctive relief consisting predominately of reformed and improved policies and practices to protect the prisoners at St. Clair, not additional staffing. (Doc. 267, Prayer for Relief, at 124-25.) ***Third***, as the Court observed in *United States v. Alabama*, the out-of-circuit holding Defendants rely upon for this argument "does not apply" when (as here) the second case is also a class-action lawsuit. 2021 WL 4711841, at *3 (discussing *McNeil v. Guthrie*, 945 F.2d 1163 (10th Cir. 1991)). Rather, the *McNeil* court was specifically concerned about individual class members filing redundant *pro se* lawsuits to litigate matters that were already being addressed in the class action. *See McNeil*, 945 F.2d at 1165-66 & n.4. That is why that court made a point of emphasizing that "[c]laims for equitable relief *must be made through the class representative* until the class action is over or the consent decree is modified." *Id.* at 1166 (emphasis added). That admonition is simply inapplicable here.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion for summary judgment.

Dated: September 2, 2025

/s/ *Charlotte Morrison*
Charlotte R. Morrison
Equal Justice Initiative
122 Commerce Street
Montgomery, Alabama 36104
Telephone: (334) 269-1803
Facsimile: (334) 269-1806
cmorrison@eji.org

/s/ *Antony Ryan*
Antony L. Ryan (*pro hac vice*)
Lauren M. Rosenberg (*pro hac vice*)
Helam Gebremariam (*pro hac vice*)
Cravath, Swaine & Moore LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
aryan@cravath.com
lrosenberg@cravath.com
hgebremariam@cravath.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document is being served by electronic mail to the designated counsel of record in the above-captioned action on this 2nd day of September, 2025.

By: /s/ *Antony Ryan*

Antony L. Ryan
Cravath, Swaine & Moore LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 474-1000
Facsimile: (212) 474-3700